## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Jenna Gayler, individually and on behalf of all others similarly situated, known and unknown, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. : 23-3197 |
| Atlas MedStaff, LLC, FocusOne Solutions, LLC, and Nomad Health Inc., | ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Jenna Gayler ("Gayler" or "Plaintiff") individually, and on behalf of all others similarly situated, known and unknown, complains against Defendants Atlas MedStaff, LLC ("Atlas") and FocusOne Solutions, LLC, ("FocusOne") for failure to pay all wages in violation of the Nurse Transparency Licensing Act, 225 ILCS 510/1, *et seq.* (hereafter "NALA"), against Atlas MedStaff for violation of Section 14.3 of NALA, and against FocusOne Solutions, LLC  and Nomad Health, Inc. ("Nomad") for common law retaliatory discharge:

### INTRODUCTION

1.      Atlas is a nurse staffing agency that staffs registered nurses and medical technicians at hospitals across Illinois.

2.      Atlas sources vacancies at hospitals through FocusOne, an intermediary between Atlas and the hospitals.

3.      On May 27, 2022, the Illinois Legislature passed P.A. 102-946 which amended NALA, specifically Section 14.1, to add subsection (d) which states as follows:

> Any nurse staffing agency that has been found not to have paid an employee 100% of the hourly wage rate identified in the contract between such nurse staffing agency and health care facility shall be liable to the employee for the actual amount of the underpayment, plus damages of 5% of the amount of the underpayment.

See 225 ILCS 510/14.1(d).

4.      This amendment went into effect on July 1, 2022.

5.      Nurse staffing agencies, like Atlas, employed nurses like Plaintiff in contracts wherein they charged the hospital one rate for the nurse's services, but paid the nurse a rate less than that charged to the hospital.

6.      With the above amendment to NALA, these existing contracts violated the law, and should have been amended prior to July 1, 2022.

7.      Atlas and FocusOne failed to amend existing contracts prior to July 1, 2022, resulting in months of violations of NALA when they failed to pay Plaintiff and others one hundred percent of the rate charged to the hospital for the nurses' service.

8.      Atlas also failed to bring its contracts into compliance with Section 14.3 of NALA before that section came into effect on July 1, 2022.

9.      When Plaintiff questioned whether she was being paid the full contract hourly rate as required by NALA, FocusOne and Nomad did not renew, as previously planned, Plaintiff's contract to work at OSF Sacred Heart, in retaliation for her inquiry as to whether Nomad and FocusOne were complying with NALA.

## PARTIES

10.     Plaintiff Jenna Gayler is an Indiana resident, employed by Defendant to work as a travel nurse at OSF Sacred Heart Hospital in Danville, Illinois.

11.     Defendant Atlas MedStaff, LLC is a Nebraska LLC with its principal place of business in Nebraska.

12.     Defendant FocusOne Solutions, LLC is a Nebraska LLC with its principal place of business in Nebraska.

13.     Defendant Nomad Health, Inc. is a Delaware corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to 28 U.S. Code § 1332 (diversity of citizenship) in that there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that the acts or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

16.    Plaintiff brings this suit individually and as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of all similarly situated individuals. The classes that Plaintiff seeks to represent are composed of:

   a.    All employees, as that term is defined in 225 ILCS 510/3, of Atlas MedStaff and FocusOne who entered or renewed contracts with them to work in Illinois and who were not paid 100% of the hourly wage rate identified in the contract between Atlas and/or FocusOne and any health care facility from July 1, 2022 to present.

   b.    All employees, as that term is defined in 225 ILCS 510/3, of Atlas MedStaff, who entered or renewed contracts with them to work in Illinois and whose contracts did not contain provisions in compliance with Section 14.3 of the Nurse Agency Licensing Act, 225 ILCS 510/14.3.

17.    The classes are so numerous that joinder of all members is impracticable and the disposition of their claims in a class action is a benefit to the parties and the Court.

18.    FocusOne is a subsidiary of Aureus Medical Group, one of the largest staffing agencies in the country and staffs nurses and other medical professionals covered by NALA at both hospitals and managed care facilities.

19.    Atlas and FocusOne staff hundreds of nurses throughout Illinois at any one time, and did so at all times relevant meaning the class likely exceeds one hundred individuals.

20.    The proposed class members share a well-defined common interest with respect to both questions of law and fact involved because they were or are all being denied payment of one

hundred percent of the rate Defendants charged to the hospital for their services, in violation of NALA.

21.    A key common question of law and fact involves Atlas and FocusOne's failure to compensate its employees, as required by Section 14.1 of NALA.

22.    A second key common question of law and fact involves Atlas's failure to add provisions to its contracts entered into after July 1, 2022 to bring them in compliance with Section 14.3 of NALA.

23.    The proposed class members have been denied payment of their promised wages. Plaintiff therefore satisfy the commonality requirement for a class action.

24.    The proposed class members' contracts, like that of Plaintiff, did not contain certain disclosure provisions as required by Section 14.3 of NALA.

25.    Plaintiff is an adequate class representative because she worked for Atlas and FocusOne as a travel nurse and was not paid the full contract rate charged to the hospital. Her renewal contracts entered into after July 1, 2022 did not contain the language required by Section 14.3 of NALA. Her interests are not antagonistic or in conflict with the interests of the class as a whole.

26.    The attorneys seeking to represent the class are qualified and experienced in representing plaintiffs in wage and employment-related class actions in state and federal court.

27.    Plaintiff seeks monetary damages for all class members. Compensation is set by Defendants' contracts meaning the participation of individual class members is unnecessary. Damages for violation of Section 14.3 of NALA are set by statute meaning the participation of individual class members is unnecessary.

28.    Plaintiff also seek injunctive and declaratory relief to remedy any ongoing violation of NALA by Defendants.

**FACTS**

29.     OSF Sacred Heart ("OSF"), in Danville, Illinois, contracted with FocusOne for FocusOne to provide it with travel nurses to fill vacancies at all times relevant.

30.     FocusOne, in turn, fulfilled the OSF contract by subcontracting with Atlas.

31.     Atlas in turn contracted with travel nurses, like Plaintiff, to work as travel nurses at OSF.

32.     Plaintiff entered into a contract with Atlas on approximately October 4, 2021 to work as a nurse at OSF.

33.     The initial contract was for a term of thirteen weeks (ending on or about January 1, 2022).

34.     The contract was subsequently renewed for an additional thirteen weeks (ending on or about April 3, 2022).

35.     Plaintiff's contract was then renewed for a six-week extension (ending on or about May 16, 2022), another six-week extension (ending on or about June 26, 2022), an eight-week extension (ending on or about August 20, 2022) and lastly a six week extension (ending on or about October 1, 2022).

36.     Plaintiff was initially paid $95 per hour in the first thirteen-week contract, then $96 per hour in the next thirteen-week renewal, then $66 per hour starting on or about April 3, 2022, then $61 per hour starting on or about May 15, 2022, and remained at $61 per hour for all subsequent renewals of her contract.

37.     Plaintiff learned that pursuant to the contracts starting in or about May 15, 2022 when Plaintiff's pay was set at $61 per hour, OSF paid Atlas and/or FocusOne $114 per hour as the contract hourly rate for Plaintiff's services.

38.     This difference between the rate Atlas charged OSF and the rate it paid Plaintiff was legal until July 1, 2022, when NALA was amended to require that 100% of the hourly rate a nurse staffing agency charges the hospital be paid to the nurse/employee.  See 225 ILCS 510/14.1(d).

39.     Upon information and belief, this difference between the rate of pay OSF paid to FocusOne and/or Atlas and the rate paid to Plaintiff existed for all contracts Plaintiff entered into starting with the May 15, 2022 extension and ending with her last extension on August 20, 2022.

40.     The amendments to NALA were signed into law in May 2022 and scheduled to become effective on July 1, 2022. Thus, Defendants had over one month from the passage of this amendment to its effective date to ensure their contracts complied with NALA's new requirements, but failed to do so.

41.     Atlas also failed to ensure that subsequent renewals of existing contracts were modified to comply with NALA.

42.     Plaintiff signed the August 20, 2022 – October 1, 2022 extension on or about August 9, 2022.  The contract consisted of two pages and failed to contain the following provisions as required by Section 14.3 of NALA:

> (2) A commitment that nurses or certified nurse aides employed, assigned, or referred to a health care facility by the nurse agency perform any and all duties called for within the full scope of practice for which the nurse or certified nurse aide is licensed or certified.
>
> (3) No less than 100% of the nurse or certified nurse aide hourly rate shall be paid to the nurse or certified nurse aide employee.

See Exhibit A, August 20, 2022 contract renewal.

43.     From July 1, 2022 to the date of the expiration of Plaintiff's contract, Atlas and FocusOne continued to pay Plaintiff only $61 per hour, despite charging OSF $114 per hour for Plaintiff's services.

44.    Plaintiff worked approximately 36 hours per week, plus sporadic overtime, from July 1, 2022 to September 30, 2022 at OSF being paid $61 per hour when she should have been paid $114 per hour, the rate OSF was paying Atlas.

45.    On or about August 22, 2022, Plaintiff and a different staffing agency, Nomad, began to discuss a renewal of Plaintiff's contract to work at OSF for the period after October 1, 2022 when her current contract was set to expire.

46.    Nomad, like Atlas, was staffing nurses at OSF through Defendant FocusOne.

47.    Plaintiff, in an effort to verify the rate promised by Nomad was the same as that being paid by OSF to Nomad, contacted FocusOne to inquire about the rates OSF was paying compared to the rates FocusOne and Atlas/Nomad were paying nurses.

48.    Up until Plaintiff contacted FocusOne, her contract was on track to be renewed as it had previously been renewed through Atlas as evidenced by Nomad tendering her a draft contract. See Exhibit B, Nomad Draft Contract.

49.    Gayler and Nomad had even both signed the contract.  See Ex. B.

50.    Concomitantly, Plaintiff questioned Atlas as to why she was not being paid a $1000 per month travel stipend, when other Atlas travel nurses working at OSF were being paid such a stipend.

51.    Shortly after Plaintiff contacted FocusOne to investigate the hourly rate issue and Atlas regarding the travel stipend issue, she was informed that her contract was not being renewed.

52.    The firing and/or the non-renewal of Plaintiff's contract by FocusOne and Nomad was in retaliation for Plaintiff having engaged in protected activity, to wit, complaining about and/or otherwise reporting her reasonable belief that Defendants' actions violated NALA.

53.    As a direct result of Plaintiff's firing and/or the non-renewal of her contract by FocusOne and Nomad, Plaintiff was unable to find work and experienced monetary damages, loss of employment opportunities, and emotional distress.

## CLASS ACTION COUNT I
## NALA – UNPAID COMPENSATION
### Atlas and FocusOne

54.     Plaintiff incorporates Paragraphs 1 - 53 by reference as though fully set forth herein.

55.     As of July 1, 2022, NALA requires staffing agencies to pay travel nurses the full hourly rate paid by the hospital to the staffing agency.   See 225 ILCS 510/14.1(d).

56.     Plaintiff was an employee of Atlas and FocusOne, and Atlas and FocusOne were Plaintiff's employer and/or nurse agency, as defined under NALA.  225 ILCS 510/3.

57.     Atlas and FocusOne knowingly violated NALA from July 1, 2022 to September 30, 2022 by failing to pay Plaintiff and the putative class members the full hourly rate paid by the hospital to the staffing agency.

58.     As a direct result of Atlas's and FocusOne's violation of NALA, Plaintiff and the putative class members were damaged in the form of being denied earned compensation.

Wherefore, Plaintiff, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in her favor against Atlas MedStaff and FocusOne Solutions and award:

A.   Payment to Plaintiff of all unpaid back wages for hours where she should have been paid the full hourly rate paid by OSF to Defendants;

B.   Statutory damages equal to 5% interest;

C.   Reasonable attorneys' fees and costs; and

D.   Such other and further relief as this Court deems appropriate and just.

## CLASS ACTION COUNT II
## NALA – FAILURE TO INCLUDE STATUTORY PROVISIONS
### Atlas MedStaff

59.     Plaintiff incorporates Paragraphs 1 - 53 by reference as though fully set forth herein.

60.    Section 14.3(a) of NALA requires that all contracts entered into on or after July 1, 2022, contain the following provisions:

> (1) A full disclosure of charges and compensation. The disclosure shall include a schedule of all hourly bill rates per category of employee, a full description of administrative charges, and a schedule of rates of all compensation per category of employee, including, but not limited to, hourly regular pay rate, shift differential, weekend differential, hazard pay, charge nurse add-on, overtime, holiday pay, and travel or mileage pay.
>
> (2) A commitment that nurses or certified nurse aides employed, assigned, or referred to a health care facility by the nurse agency perform any and all duties called for within the full scope of practice for which the nurse or certified nurse aide is licensed or certified.
>
> (3) No less than 100% of the nurse or certified nurse aide hourly rate shall be paid to the nurse or certified nurse aide employee.

225 ILCS 510/14.3.

61.    Section 14.3 provides that a party's failure to comply with subsection (a) shall have a right of action in a State Court against the offending party and may recover for each violation: "(1) liquidated damages of $1,500 or actual damages, whichever is greater; (2) reasonable attorney's fees and costs . . . and (3) other relief, including an injunction."  225 ILCS 510/14.3(b).

62.    Plaintiff was an employee of Atlas, and Atlas were Plaintiff's employer and/or nurse agency, as defined under NALA.  225 ILCS 510/3.

63.    Atlas knowingly violated NALA from July 1, 2022 to September 30, 2022 by failing to add terms compliant with Section 14.3(a) of NALA to the contracts with Plaintiff and the putative class members.

64.    As a direct result of Atlas's violation of NALA, Plaintiff and the putative class members were and are aggrieved by the violation of Subsection (a) and seek the greater of their actual damages or $1,500 in liquidated damages for each violation by Atlas.

Wherefore, Plaintiff, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in her favor against Atlas and award:

9

    A.  The greater of Plaintiff's and the putative class members' actual damages or $1,500 in liquidated damages, per violation by Atlas;

    B.  Reasonable attorneys' fees and costs;

    C.  Injunctive relief barring Atlas from further violations of NALA; and

    D.  Such other and further relief as this Court deems appropriate and just.

## COUNT III
## COMMON LAW RETALITORY DISCHARGE
### FocusOne and Nomad Staffing

65.    Plaintiff incorporates Paragraphs 1 - 53 by reference as though fully set forth herein.

66.    Plaintiff was an employee of FocusOne and FocusOne were Plaintiff's employer.

67.    Plaintiff engaged in protected activity when she questioned FocusOne as to whether she was being paid the full contract rate as required by NALA.

68.    Plaintiff's investigation as to whether she was being paid the full hourly rate as required by NALA constituted protected activity.

69.    In response, FocusOne declined to renew Plaintiff's contract.

70.    The decision to decline to renew Plaintiff's contract constituted a discharge of Plaintiff's employment.

71.    Plaintiff's discharge violated a clearly mandated public policy, to wit, reporting or refusing to engage in activities Plaintiff believed to violate a law of the State of Illinois.

72.    As a result of FocusOne declining to renew Plaintiff's contract, Plaintiff sustained monetary damages and emotional distress.

Wherefore, Plaintiff requests this Court enter judgment in her favor against Defendant and award:

    A.  Back pay;

    B.  Front pay;

C. Reasonable attorneys' fees and costs; and

D. Such other and further relief as this Court deems appropriate and just.

## COUNT IV
## IWPCA RETALIATION
### All Defendants

73. Plaintiff incorporates Paragraphs 1 - 53 by reference as though fully set forth herein.

74. Plaintiff was an employee of Defendants and Defendants were Plaintiff's employers.

75. The IWPCA prohibits and employer from retaliating against an employee who engages in protected activity of complaining to his employer because he has not been paid consistent with the IWPCA. See 820 ILCS 115/14.

76. Plaintiff engaged in protected activity when she questioned FocusOne as to whether she was being paid the full contract rate as required by NALA.

77. Plaintiff engaged in protected activity when she complained to Altas that she was not being paid a travel stipend like other travel nurses at OSF.

78. In response to these protected activities, FocusOne and Nomad terminated Plaintiff's contract.

79. The decision to terminate Plaintiff's contract constituted a discharge of Plaintiff's employment.

80. Plaintiff's discharge violated the IWPCA.

81. As a result of FocusOne and Nomad terminating Plaintiff's contract, Plaintiff sustained monetary damages and emotional distress.

Wherefore, Plaintiff requests this Court enter judgment in her favor against Defendant and award:

E. Back pay;

F. Front pay;

G. Reasonable attorneys' fees and costs; and

H. Such other and further relief as this Court deems appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues triable herein.

The Garfinkel Group, LLC                          Respectfully submitted,
The Civitas
701 N. Milwaukee Avenue
Chicago, IL 60642                                 */s/ Matthew Fletcher*
Matthew Fletcher (IARDC No. 6305931)              One of the Plaintiffs' Attorneys
matthew@garfinkelgroup.com
Haskell Garfinkel (IARDC No. 6274971)
haskell@garfinkelgroup.com
(312) 736-7991

**EXHIBIT A**

DocuSign Envelope ID: EB48C5A3-24D5-43AA-93B1-763C0ED7FBB4



Order Reason: Extension

## Assignment Work Order

This Work Order serves as the first step in the process of Jenna Gayler _____ ("Traveler") becoming an employee of Atlas MedStaff, LLC ("Atlas") and securing this Assignment; however, no employment relationship is formed simply by executing this Work Order. Instead, this Assignment and Traveler's employment is conditioned upon: (a) execution of this Work Order; (b) execution of the Traveler Employment Agreement; (c) receipt and consent to Atlas' employment policies; (d) approval by the Client Facility of Traveler's background check report; (e) Traveler's successful completion of a drug screening; (f) proof of authorization to work in the United States; (g) satisfaction of all other requirements of the Traveler Employment Agreement and this Work Order. Where such conditions are met, Traveler will become or remain an at-will employee of Atlas and Traveler shall be committed to complete this Assignment as outlined in this Work Order.

While performing this Assignment, the terms and conditions of Traveler's employment will be governed by the Traveler Employment Agreement, this Work Order, and Atlas's employment policies. Should the length of this Assignment be extended beyond the "End Date" provided below, the terms and conditions set forth herein shall apply to the extended period, unless otherwise agreed to in writing by Traveler and Atlas. Traveler acknowledges and agrees that the cancellation and termination provisions set forth in the Traveler Employment Agreement are applicable to this Assignment, as well as all other provisions.

| | | | |
|---|---|---|---|
| **Traveler Name:** | Jenna Gayler | Unit: | Med Surg |
| Recruiter: | Reinie Benoit | Position: | RN |
| | | Shift: | day |
| Facility Name: | OSF Sacred Heart Medical Center | | |
| Facility Address: | 812 North Logan Avenue | Start Date: | 8/21/22 | Scheduled Hrs/wk: | 36 |
| City/State/Zip | Danville, IL  61832 | End Date: | 10/1/22 | Guaranteed Hrs/wk: | 36 |

**IMPORTANT**: BLS Required for ALL Positions  &  BLS/ACLS/PALS must be American Heart Association

Additional Required Certs: BLS, NIHSS

Call Off Policy/Procedure: all hours guaranteed

Other Important Notes:

### Wage Information:

**Rates of Pay ($/hour)**

| | | | | | | |
|---|---|---|---|---|---|---|
| Regular: | $ 61 | Holiday: | $ 92 | On Call: | $ 3.50 |
| Overtime: | $ 92 | Call Back: | $ 92 | Charge: | $ n/a |

**Important Wage Related Notes:**

- If any of the pay rates are left blank, they are not expected to be applicable to this assignment.
- For any partial week of an assignment, including an initial or ending week that does not run the entire workweek, pay, per diems and allowances will be pro-rated for that week. Additionally, pay, per diems, and allowances are also subject to pro-ration for any non-full scheduled week, holiday, orientation, and time off.
- Overtime, Holiday, and Call Back hours are paid for actual hours worked, and not for on-call hours (which are not hours worked) or other hours required by law to be paid for reporting to work and being sent home.
- Except where otherwise required by applicable state or local law, overtime will be paid on hours worked in excess of 40 hours in a workweek, not counting hours that were already paid a daily overtime rate.
- Time Tracking and Confirmation. Traveler is responsible for accurately recording his/her stop and start times in Atlas's time tracking system and notifying Atlas of any missed meal periods or breaks (absent a waiver). Traveler's hours must also be approved by the Client Facility, which confirms that the hours were worked and allows Atlas to bill for Traveler's time. Atlas then pays Traveler's wages for the confirmed hours. When these steps are not adhered to, it may affect when the traveler receives payment for hours worked. Accordingly, the traveler agrees to accurately record his/her hours worked daily and obtain Client Facility approval of hours worked in a timely manner, on a weekly basis, in accordance with Atlas's payroll rules. Traveler shall also complete forms required by the Client Facility to confirm hours worked, including meal periods worked.
- Guaranteed hours do not apply to orientation weeks, weeks including a holiday, weeks where Traveler takes time off (approved or unapproved), or any partial weeks of an assignment. Additionally, guaranteed hours are subject to the terms set by the master contract with the facility or vendor manager.
- Traveler must review his/her weekly schedule with the Client Facility as soon as posted and immediately contact Atlas if the hours scheduled are less than the guaranteed hours/week in this Work Order, if any.
- Traveler's hours and shift are subject to change and may be modified to meet the needs of the Client Facility; however, guaranteed hours will not be reduced, except as outlined above.

*As of 1/27/20*
*Page 1 of 2*

DocuSign Envelope ID: EB48C5A3-24D5-43AA-93B1-763C0ED7FBB4

## Per Diem & Housing Allowance Information:

| | | |
|---|---|---|
| **Per Diem Allowance:** | $ n/a | Per Week |
| **Housing Allowance:** | $ n/a | Per Week |

**Important Per Diem & Housing Allowance Related Notes:**

* The payment of per-diems and housing allowance is contingent upon Travelers' completion and submission of the Permanent Tax Home Notification Form. Where eligible, per diem and housing allowances may be paid on a tax-free basis.
* Per-diem and housing allowances are subject to proration for full shifts missed from an assignment, whether voluntary or involuntary.
* Call backs and on-call hours are not counted as scheduled shifts in determining the per diem and housing deduction, except in the event Traveler is called off his/her regularly scheduled shift (i.e. informed that he/she will not be needed for a regularly scheduled shift) and then is called back to work any part of such shift. Traveler will be deemed to have worked such shift for purposes of per diem and housing allowances, and such amounts will not be reduced. If this occurs, Traveler will be paid his/her regular rate for all time worked on such a call back, and the call back rate shall not apply to any such hours. Please see Section 7 of the Traveler Employment Agreement.
* If Traveler is terminated from or voluntarily leaves an assignment early for any reason, Traveler will not be paid any housing or per diem allowances that remain unpaid as of the date of departure/termination or that would have been earned after the date of departure/termination. Final amounts will be determined on Traveler's last check.
* Per Diem Allowances and Housing Allowances are subject to the terms set forth in Sections 5-7 of the Traveler Employment Agreement

## Travel Stipend:

N/a

## Approved Time Off:

N/A

## Benefit Information:

* Separate benefit election forms will be provided to Traveler. Where benefits are elected, Traveler authorizes Atlas to deduct from his/her pay Traveler's share of the premium associated with each elected benefit for all coverage selected and any missed premiums from other week(s).
* When you elect Medical, Dental or Vision coverage, the premiums are automatically deducted from your wages on a pre-tax basis. If you do not want your wages reduced on a pre-tax basis, contact Human Resources in writing on or before your initial eligibility date or before the start of the plan year to request to pay the premiums on an after-tax basis. Plan elections and pre-tax premium deductions (including any increases in premium) will automatically carry over for subsequent years unless changed. Atlas will provide you with information on the current premium amounts for each plan. If you need to know your current plan elections, contact Human Resources.
* If Traveler does not extend the Assignment or confirm his/her next assignment prior to this current Assignment ending, coverage will expire at the end of the month in which last worked. Traveler will be responsible for any premiums for coverage to the end of the month. The amount, if any, will be deducted on Traveler's last paycheck of the Assignment.
* If Traveler extends the Assignment or confirms his/her next assignment prior to the current Assignment ending, and such extension or new assignment commences within 4 weeks of the end date of this Assignment, Traveler can remain an Atlas employee and continue insurance coverage during this time period. Please note that the full amount will be deducted on Traveler's last check(s) of the current assignment for any premiums due for any time off.

Traveler further acknowledges and agrees that:

* Traveler acknowledges and agrees that Traveler's employment with Atlas and all assignments are on an at-will basis. This means the Traveler or Atlas may end the employment relationship at any time with or without cause and with or without notice. Likewise, a Client Healthcare Facility has the right to terminate Traveler's services. Employee further acknowledges and agrees that neither this Agreement nor any other Atlas document, statement or policy should be interpreted as creating any contractual rights to continuing employment, pay or benefits or employment for a fixed term.
* All Worker's Compensation claims will be filed in the state of this Assignment.
* The Assignment cannot be started unless all required documentation is received by Atlas and is fully compliant. This includes a copy of any applicable professional license or certification(s). Assignments may also be ended early if any Traveler professional licenses or certifications expire during the Assignment.

Traveler has read and understands the foregoing terms and conditions of this Work Order, which Traveler accepts and agrees to perform.

**Traveler Signature:** _DocuSigned by:_ _jenna gayler_ _BBEC50D27B834BE..._      **Date:** 8/9/2022

*As of 1/27/20*
*Page 2 of 2*

 **EXHIBIT 5B**

# Nomad

## Local Placement Agreement

### Employee and Facility Information

| | |
|---|---|
| Employee Name: **Jenna Gayler** | Permanent Address: **1763 West Dixie Bee Road** **Covington, IN 47932** |
| Facility Name: **OSF Sacred Heart Medical Center** | Facility Address: **812 N. Logan Avenue** **Danville, IL 61832** |
| Miles From Facility: **18.0** | Position: Registered Nurse |
| Employee Phone Number: **(765) 299-6768** | Unit: **Med/Surg** |

### Hours and Placement Information

Guaranteed hours do not apply to orientation weeks, weeks including a holiday, weeks where Employee takes approved or unapproved time off, calls out sick, or any partial weeks of a placement.

| | |
|---|---|
| Start Date: **10/03/22** | End Date: **12/31/22** |
| Duration in Weeks: **13** | Shift: **3x12 Nights** |
| Scheduled Hrs/Wk: **36** | Guaranteed Hrs/Wk: **36** |
| Approved Time Off: **10/16 - 10/22** | |

### Pay Rates

Per diem and housing allowances are subject to change and may impact your pay rates over the length of the assignment. These rates are established by the U.S. General Services Administration (GSA). Therefore, we've provided you with a set of rates that you will be paid over the course of your placement. To learn more, please visit https://www.gsa.gov/travel/plan-book/per-diem-rates.

| | | |
|---|---|---|
| Regular Rate | $ 59.48 | / hour |
| Per Diem and Housing | $ 1,099.00 | / week |
| Standard OT | $ 135.00 | / hour |
| Holiday | $ 86.13 | / hour |
| On-Call | $ 3.00 | / hour |
| Call-Back | $ 86.13 | / hour |
| Charge | $ 62.48 | / hour |
| Training/Modules | $ 15.00 | / hour |

**Additional Notes:**

N/A

### Additional Terms

- **Given that this is a local placement, relative to Employee's permanent address, the per diem and housing allowances will be paid as taxable wages.**
- Per diem and housing allowances will be pro-rated during partial weeks (an initial or ending week of a placement that does not run the entire workweek) and for any weeks where Employee misses a full scheduled shift, regardless of reason. These allowances will be pro-rated based on full scheduled shifts that are not worked. (i.e., If scheduled for 3 shifts per week and Employee does not work one of those shifts, the weekly allowances shall be reduced by one-third).
- Employee shall be paid in accordance with Nomad's standard payroll practices included in the Employee Handbook.
- Employee must review his/her weekly schedule with the Client Facility as soon as posted and immediately contact Nomad if the hours scheduled are less than the guaranteed hours/week in this Placement Agreement.
- Employee will be paid overtime in accordance with applicable federal, state, and local law. For the purposes of pay and overtime, Employee's workweek will be based on the workweek of the Client Facility. If the Client Facility has adopted and implemented an alternative workweek schedule, any overtime paid will be consistent with the alternative workweek of the Client Facility, as allowed by applicable law.
- Unless otherwise required by applicable law, should employee work overtime during an orientation week, the applicable overtime rate paid for such work will be one and a half times the regular rate and not the overtime rate listed above, even if the overtime rate listed above is higher

# Nomad

than one and a half times the regular rate.

- In the event overtime hours are worked on a day recognized as a holiday by Nomad or the Client Facility, Employee shall be paid at the higher of the holiday or overtime rates for such hours, so long as such rates meet or exceed the rate required to be paid by applicable law.
- If any of the pay rates are left blank, then no special rate applies and the regular hourly rate will govern.
- Employee shall be expected to work all hours and shifts specified in this Placement Agreement and any additional hours and shifts requested by Nomad and/or the Client Facility.
- Employee may be required to float to similar units based on facility needs. See policy in Employee Handbook.
- Employee's hours, shift and rates are subject to change and may be modified to meet the needs of the Client Facility; however, guaranteed hours will not be reduced.
- This placement is subject to all of the terms of the Nurse Employment Agreement, to which this Placement Agreement serves as an addendum. Employee shall also be required to comply with all of Nomad's employment policies.

**Placement Agreement**

This Placement Agreement serves as an addendum to the Nurse Employment Agreement executed by <u>Jenna Gayler</u> ("Employee") and Nomad Nurses, Inc. ("Nomad"), which remains in full force and effect. While performing this Placement, the terms and conditions of Employee's employment will be governed by the Nurse Employment Agreement, this Placement Agreement, and Nomad's employment policies. The terms of the Nurse Employment Agreement and this Placement Agreement shall be read in conjunction with the other, and they shall be applied so as to give full effect to each.

Employee understands that this placement is conditioned upon the approval by the Client Facility of Employee's background check report, the successful completion of a drug screening, and all other conditions set forth in the Nurse Employment Agreement.

Upon acceptance of this placement, Employee agrees to complete the full term of the placement and work the hours requested by Nomad and/or the Client Facility. Should the length of this placement be extended beyond the "End Date" provided below, the terms and conditions set forth herein shall apply to the extended period, unless otherwise agreed to in writing by Employee and Nomad. Employee acknowledges and agrees that the cancellation and termination provisions set forth in the Nurse Employment Agreement are applicable to this placement

I have read and understand the foregoing terms and conditions of this Placement Agreement, which I accept and agree to perform. I understand that my employment and this placement is governed by the Nurse Employment Agreement, this Placement Agreement, and all Nomad policies, with which I will fully comply.

NOMAD NURSES, INC.

*Benjamin Denson*
_____
Signature

Manager
_____
Title

09 / 19 / 2022
_____
Date

EMPLOYEE

*Jenna Gayler*
_____
Signature

09 / 16 / 2022
_____
Date

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652



### Nurse Employment Agreement

This Employment Agreement ("Agreement"), dated this 16___ day of September___, 20 22 is agreed to be effective as of and after ___October___, 20 22 ("**Effective Date**"), and is made and entered into by and between Nomad Nurses, Inc., a Delaware corporation ("**Company**" or "**Nomad**") and ___Jenna Gayler___ ("**Employee**"). Nomad and Employee each may be referred to herein individually as a "**Party**," or collectively as the "**Parties**".

      **WHEREAS**, Nomad desires to employ Employee as an at-will employee on the terms and conditions set forth herein to provide healthcare professional services at hospitals, clinics, and/or other health care facilities with medical staffing needs, who are clients of Nomad; and

      **WHEREAS**, Employee desires to be employed by Nomad on such terms and conditions.

      **NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, the Parties agree as follows:

**I.**     **Eligibility of Employee.**   Employee's employment is contingent on meeting the following eligibility requirements:

      A.     Verification of Employee's right to work in the United States, as demonstrated by Employee's completion of the I-9 form upon hire and submission of acceptable documentation (as noted on the I-9 form) verifying Employee's identity and work authorization within three days of starting employment.

      B.     Satisfactory completion of a background investigation, in compliance with applicable law, for which Employee will be provided with the required notice and consent forms.

      C.     Successful completion of a post-offer, pre-employment drug screening at a location and within a time frame specified by Nomad, and at the expense of Nomad.

      D.     Receipt by Nomad of verification that Employee has all current licenses, permits, registrations, credentials, or other certifications as required by applicable Laws to provide the Employee Services (as defined below) in all of the states in which Employee will provide Employee Services.

      E.     Receipt by Nomad of all required medical records, competency tests, and other documents as required by either Nomad and/or Client within a time frame specified by Nomad, and at the expense of Nomad. All documents will be reviewed by Nomad and Client and require approval before Employee may commence placement.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

F.    Receipt by Nomad of verification that Employee has and shall maintain an unrestricted federal Drug Enforcement Administration registration, to the extent applicable based on the types of Placements (as defined below) that Employee intends to seek and Employee Services that Employee will provide.

G.    Register for and maintain an account with the www.nomadhealth.com site (the "**Site**"), and comply with all policies governing such accounts and Site, including Nomad's Nurse Terms of Service.

Employee's employment with Nomad shall not commence until the above conditions are satisfied. Employee acknowledges that Nomad may, in its sole discretion, use a third party or parties (generally referred to herein as "**Administrative Services Manager(s)**" or "**ASM(s)**") to assist with administration of payroll, benefits, and other employment obligations or functions including assisting with determining eligibility. Employee authorizes Nomad to share and transfer all employment and personnel related information of Employee to the ASM in order to allow the ASM to perform these functions.

II.    **Duties and Responsibilities.**

A.    Placements.  Nomad, at its discretion, may enter into contracts with hospitals, clinics or other health care facilities seeking to engage healthcare professionals for terms of various durations to provide professional services ("**Employee Services**") at their facilities ("**Clients**"). Pursuant to its contract with Nomad, a Client will issue orders requesting placement at its facilities of healthcare professionals with certain qualifications and skill sets under certain terms ("**Work Orders")**.  During the Employment relationship, Nomad or Employee may determine that Employee's qualifications and skill set may match those requested by a Client's Work Order, and Nomad may offer Employee temporary placement with that Client (each separate placement, a "**Placement**").

B.    Acceptance of Placements.  Employee may accept Placements presented to Employee through the Site, acceptance of which shall be effective upon execution by Employee of a Placement-specific document to be signed by Employee (a "**Placement Agreement**"). Employee may search and find a Placement for which he or she wishes to be considered through review of opportunities on Nomad's Site, or a Client may find Employee's profile on the Site and initiate contact, or Nomad may direct a particular Placement to Employee for consideration. Employee agrees that Nomad may: (i) direct Employee to Clients that have requested that have regularly introduced to employees with qualifications like Employee's and (ii) promote Employee to Clients, even if such Clients have not posted job listings for applicants similar to Employee.

C.    Placement Agreements Provide Placement Details.  After Nomad's assignment of Employee to a Placement and Employee's acceptance of the terms of the Placement, which shall be memorialized in the execution of a Placement Agreement, Employee will perform duties and responsibilities that are reasonable and consistent both with the position and with Employee's credentials.  Employee's day-to-day duties and responsibilities therefore may vary depending on the particular Placement.  The Placement Agreement shall provide the details of the Placement, which may include the name and location of the Client, required certifications and licensures, start and end dates, shift, scheduled hours, guaranteed hours, approved time off, rates of pay, and per diem allowance, among other things.  Accordingly, the Placement shall be governed by this

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Agreement any Placement Agreement.  Although Placement Agreements generally set forth the expected hours of work and commensurate pay, Employee's hours and shift during a Placement are subject to change and may be modified to meet the needs of the Client.  Employee shall be expected to work all hours and shifts specified in any Placement Agreement and any additional hours and shifts requested by Nomad and/or a Client.  Should the length of a Placement as defined in a Placement Agreement be extended beyond the term cited, Employee understands that all of the terms and conditions set forth in the initial Placement Agreement remain in full force and effect.  If there is a conflict between any Placement Agreement and this Agreement, the terms of the Placement Agreement shall govern.

D.      <u>Employee's Responsibilities</u>.    In providing Employee Services for any Placement, Employee shall:

1.      Exercise the degree of skill, diligence and knowledge normally possessed by members of the same profession in the state(s) in which Employee provides the Employee Services and shall conform to the standards of care of such states;

2.      Comply with standards of the applicable licensing boards, certifying authorities or professional specialty boards having jurisdiction from time to time over the Employee (collectively, the "**Boards**");

3.      Comply with all terms of this Agreement and any Placement Agreement;

4.      Comply with all applicable Nomad employment policies, procedures and guidelines (the "**Nomad Policies**"), each as may be adopted or amended by Nomad from time to time, to include any employee handbook and its policies regarding the absolute prohibition of any form of discriminatory behavior or sexual harassment in any Placement relationship;

5.      Comply with all federal, state and local laws, regulations and orders (collectively, the "**Laws**") applicable to performance of the Employee Services;

6.      Comply with all lawful policies, procedures, and guidelines of the Client (the "**Client Policies**"), each as may be adopted or amended by the Client from time to time;

7.      Comply with Nomad's Nurse Terms of Service, which are incorporated into this Agreement by reference as they may be updated or amended by Nomad from time to time;

8.      <u>Not</u> use illegal drugs or perform Employee Services while impaired by alcohol or any chemical substance;

9.      Have and maintain any and all licenses, permits, registrations, credential, or other certifications as required by applicable Laws to provide the Employee Services in the State of the Placement, including an unrestricted federal Drug Enforcement Administration registration, as applicable depending on Employee's licenses, permits, registrations, or other certifications;

3

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

10. Immediately notify Nomad in the event any license, permit, registration, credential, or certification required for the Placement is cancelled, terminated, or no longer held by Employee; and

11. Immediately report all instances of discrimination, harassment, offensive conduct, and/or workplace violence or threats in accordance with Nomad's policies and procedures.

E.    <u>Reporting</u>.   Unless otherwise set forth in writing, on a day-to-day basis during a Placement Employee shall report to and be supervised by a supervisor designated by the Client. Employee's contact point at Nomad shall be Nomad's Director of Human Resources.

F.    <u>No Fee to Employee</u>.  Employee acknowledges that Nomad is not collecting, charging or receiving a fee, in cash or in kind, from Employee for procuring, or attempting to procure, or assisting to procure employment, work or a situation of any kind for Employee.

G.    <u>No Employment by Clients</u>.  Employee agrees and acknowledges that Employee is an employee of Nomad and not of any Client.   Any and all compensation due Employee for Employee Services rendered under any Placement are owed to Employee by Nomad and not any Client.

H.    <u>Place of Performance</u>.  Employee's place of performance shall vary depending on each Placement Agreement associated with a particular Placement.

## III.    <u>At-Will Employment; No Specified Employment Term; Termination of Employment and Placements.</u>

A.    Employee's employment with Nomad and any placement with any Client shall be temporary and at-will, meaning that either Employee or Nomad may terminate the employment relationship or Placement for any reason and at any time, with or without cause or prior notice. However, when Employee accepts a Placement, Nomad and Client are relying on Employee to appear for and complete the Placement as specified in the Placement Agreement. If Employee cancels Placement contract within 14 days prior to agreed start date in the Placement Agreement, Nomad reserves the right to invoice Employee for expenses including, but not limited to, credentialing expenses and cancellation fees declared by the Client. If Employee is terminated or unilaterally decides to end work on a Placement before the end date set forth in the Placement Agreement, (i) Employee shall be responsible for all travel, housing, and other expenses from the date of termination or resignation forward, (ii) any per diems, allowances, and/or reimbursements shall end as of the date of termination or resignation, and (iii) Employee will not be paid any per diems, allowances, and/or reimbursements that remain unpaid as of the date of termination or resignation. Additionally, where Employee voluntarily terminates a Placement without good reason, Nomad may, in its discretion, terminate Employee's employment and identify Employee as ineligible for rehire or for future placements through Nomad. For the purposes of this Agreement, Employee shall have "good reason" to terminate the Placement when: (i) it is necessitated by the need for medical leave available under the Family and Medical Leave Act (FMLA), Americans with Disabilities Act (ADA), and/or similar state or local medical leave or disability law; (ii) it is necessitated by a family emergency, such as a death in the family or related

4

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

medical issue; or (iii) such termination or leave is protected by applicable federal, state, or local law.

B.        Employee acknowledges that a Placement may end earlier than stated in the Placement Agreement, including due to cancellation by the Client or Nomad for any reason, in which case Employee's only relief is to seek other Placements through Nomad.

C.        In addition to the above termination provisions, Employee acknowledges that Employee will have voluntarily and immediately resigned Employee's employment with Nomad, therefore terminating this Agreement, in the event of any of the following:  (1) Employee accepts employment or engagement with or through any other entity such that Employee cannot devote Employee's full time and attention to the Employee Services during working hours, including any placement with any other travel health care agency; or (2) Employee accepts an engagement which would present a conflict of interest as to Employee's relationship with Nomad or any Client at which Employee is placed.

D.        Upon completion of a Placement, Employee's employment with Nomad shall be terminated unless Employee has accepted and signed a subsequent Placement with Nomad prior to the end date declared in the Placement Agreement. Such subsequent Placement must commence within fourteen (14) calendar days of the end date of the previous Placement. If the subsequent Placement does not begin within fourteen (14) calendar days of the previous Placement, Employee's employment and benefits shall be terminated effective the end date of the previous Placement and shall recommence at the start date of the subsequent Placement. Nomad shall comply with all applicable laws relating to breaks in employment and re-hiring, if any.

E.        Upon any termination of this Agreement, all rights and obligations of the Parties shall cease except: (a) those rights and obligations that have accrued and remain unsatisfied prior to the termination of these Agreement, including that Employee shall be entitled to any accrued but unpaid compensation and benefits; and (b) those rights and obligations that expressly survive termination of these Agreement.  Employee shall have no further rights to any compensation, per diems, or any other benefits from Nomad after the termination date.

IV.    **Temporary Nature of Placements.**

A.        The duration of each Placement is governed by the Placement Agreement.    Each Placement constitutes a new placement of temporary employment.    Absent prior written authorization by Client and Nomad, Employee must start each Placement on the start date set forth in the Placement Agreement.

B.        Employee understands that Nomad will attempt to provide but cannot guarantee continuous Placements to Employee.  **Any refusal by Employee to accept a particular Placement offered by Nomad may be considered a voluntary quit which may disqualify Employee's eligibility for unemployment benefits.**

V.    **Compensation**.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

A.    Employee will be considered non-exempt and paid by Nomad for all time worked, on an hourly basis, in accordance with Nomad's customary payroll practices and applicable payroll laws, plus all applicable overtime as required by law, in accordance with the terms of the Placement Agreement.  Employee's hourly rates of pay will be set by, and may vary depending on the Placement Agreement associated with each Placement.  Placements *may* also provide other compensation such as housing allowances, per diems and shift differentials.  Nomad shall withhold from any amount payable hereunder any federal, state, and local taxes required to satisfy withholding tax obligations under applicable laws.

B.    Employee is required to comply with any Alternative Workweek Schedule adopted and in practice by any Client at which Employee accepts a Placement. Any and all overtime will be paid in accordance with federal, state, and/or local laws applicable to the Client, in accordance with the Client's workweek (whether standard or alternative), which workweek is expressly consented to by Employee.

**VI.    Employee Benefits**.  While employed by Nomad, Employee shall be entitled to participate in all employee benefit plans and programs that are maintained by Nomad (including by and through its third-party ASM) and made available to Nomad temporary employees, as in effect from time to time (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans.  These *may* include group medical, dental and vision insurance, and other fringe benefits.  Nomad reserves the right to amend or cancel any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan, including eligibility, employee premium contributions, and other provisions of such plans and programs, and applicable law. Information regarding Nomad's Employee Benefit Plans will be provided to Employee separately. Employee's eligibility for some or all Employee Benefit Plans may be contingent on whether Employee is currently working on a Placement and/or whether Employee is working full-time versus part-time.

**VII.    Employee Professional Standards and Qualifications.**  To be eligible for any Placement and avoid the suspension by Nomad of Employee's Site account and/or termination of employment, in addition to the Responsibilities listed above in Section II(C), Employee shall:

A.    Participate in continuing education and training programs as required to maintain skills compatible with prevailing standards of medicine or other applicable health care professional care in the state of practice as required by the Medical Board or required to maintain licensure for Employee's position.

B.    Remain eligible for professional errors or omissions coverage for the Employee Services.

C.    Promptly and fully cooperate and participate in any peer reviews that are required by applicable laws in connection with any Placement.

**VIII.    Change in Employee's Tax Home**.  If at any point during the employment relationship or during any Placement, Employee's tax home, as defined by applicable law and IRS regulations and interpretations, changes or Employee no longer maintains a tax home separate from his/her current residence, Employee must immediately notify Nomad of the change.  To the extent the change in tax

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

home or the loss of a tax home prevents Employee from being paid per diems on a tax-free basis, future payments of per diems shall not be paid on a tax-free basis.

**IX.    Excluded Provider**.  Employee represents and warrants that Employee is not now and at no time has been excluded from participation in any state or federally funded health care program, including Medicare and Medicaid (collectively referred to as "governmental health care program").  Employee further warrants that he/she will not engage in behavior that leads to his/her exclusion from any governmental health care program.  Employee agrees to immediately notify Nomad of any threatened, proposed, or actual exclusion from participation in any governmental health care program. Notwithstanding anything to the contrary contained herein, in the event Employee is excluded from participating in any governmental health care program or, if at any time after the Effective Date of the Agreement, it is determined that Employee is not in compliance with this Section, the Agreement and any Placement shall automatically terminate.  Employee agrees to indemnify and hold Nomad harmless against all actions, claims, demands, and liabilities, and against all loss, damage, penalties, costs, and expenses, including reasonable attorneys' fees, arising directly or indirectly out of any violation of this Section by Employee or due to his/her exclusion from a governmental health care program.

**X.    Confidential Information**. Employee understands and acknowledges that during the Employment Term, Employee will have access to and learn about Confidential Information, as defined below.

A.    Confidential Information Defined.  For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, research, operations, services, strategies, techniques, contracts, terms of agreements, transactions, potential transactions, know-how, trade secrets, computer programs, computer software, applications, software design, web design, work-in-process, databases, manuals, supplier or vendor information, financial information, results, accounting information or records, legal information, marketing information, pricing information, staffing information, employee lists, security procedures, market studies, sales information, revenue, costs, product plans, inventions, unpublished patent applications, experimental processes, specifications, client information, and client lists, of Nomad or of any other person or entity, including Clients, that have entrusted information to Nomad or its employees in confidence.  Employee understands this list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used, as well as any trade secret of Nomad, as that term is defined by applicable law.

B.    Disclosure and Use Restrictions.  Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever except as required in the performance of Employee's authorized employment duties to Nomad or a Client with the prior consent of Nomad's Director of Human Resources in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such

7

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

documents, records, files, media, or other resources from the premises or control of Nomad or the Client as applicable, except as required in the performance of Employee's authorized employment duties to Nomad or to the Client or with the prior consent of Nomad's Director of Human Resources in each instance (and then, only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required or permitted by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Employee shall promptly provide written notice of any such order to Nomad.

C.     <u>Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA").</u>     Notwithstanding any other provision of this Agreement, any written agreement, or any policy or handbook, the following actions shall not be a violation of this Agreement, any Nomad Policy, or constitute criminal or civil violations of any federal or state trade secret law:: (1) the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; (2) the disclosure of a trade secret that is made in a complaint or other document filed under seal in a lawsuit or other proceeding; or (3) if Employee files a lawsuit for retaliation by Nomad for reporting a suspected violation of law, the disclosure of a trade secret by Employee to Employee's attorney and use the trade secret information in the court proceeding if Employee files any document containing trade secrets under seal and does not disclose trade secrets, except pursuant to court order.

D.     <u>Duration</u>.     Employee understands and acknowledges that Employee's obligations with regard any Confidential Information shall commence immediately upon Employee first having access to such Confidential Information and shall continue during and after the Employment Term, until such time as the Confidential Information has become public knowledge other than as a result of Employee's breach of this Agreement or breach by those acting in concert with Employee or on Employee's behalf.

**XI.     Indemnification**. Employee shall indemnify and hold Company harmless against any and all liabilities, damages, lawsuits, claims, causes of action, penalties, governmental fines, and defense costs related thereto, hereinafter brought against Company or a Client by a third party or governmental entity arising, in whole or in part, out of Employee's (1) failure to comply with any obligations imposed under this Agreement or any Placement Agreement, (2) negligence, (3) intentional wrongdoing, or (4) Employees' receipt of per diems on a tax-free basis without maintaining a tax home in accordance with applicable law.

**XII.     No Waiver.**  Nomad's failure to require performance of any provision shall not affect its right to require performance at any time thereafter, nor shall Nomad's waiver of any breach or default of this Agreement constitute a waiver of any subsequent breach or default.

**XIII.     Governing Law.**  This Agreement is enforceable pursuant to and in accordance with the Laws of the State of New York without regard to conflicts of law principles.  To the extent not covered by Section XVII (Arbitration) below, any dispute arising out of this Agreement shall be decided by a court of competent jurisdiction in New York, New York. The Parties hereby irrevocably submit to the exclusive

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

**XIV.    Successors and Assigns; No Assignment.**    This Agreement shall be binding upon, and shall inure to the benefit of, Nomad and Employee and their respective heirs, legal representatives, successors and assigns.  Employee shall not assign or subcontract any of its rights, interests, duties, or obligations under this Agreement without the prior written consent of Nomad, which consent may be given or withheld in Nomad's sole discretion, and any attempted or purported assignment in violation of this Section shall be void.

**XV.    Headings.**    The subject headings of the sections of this Agreement are for convenience only and shall not affect the construction of interpretation of any of its provisions.

**XVI.    Arbitration.**    Except as prohibited by Law, any and all disputes between Nomad and Employee shall be resolved through binding arbitration in New York, New York under the Federal Arbitration Act. Nothing in this arbitration provision is intended to prevent Nomad or Employee from filing charges with state or federal agencies.  Employee agrees that such arbitration shall be conducted on an individual basis only, not a class, collective or representative basis, and Employee waives any right to bring class-wide, collective or representative claims before any arbitrator or in any forum except as required by governing law.    **EMPLOYEE UNDERSTANDS THAT BY AGREEING TO ARBITRATE DISPUTES EMPLOYEE IS WAIVING ANY RIGHT THAT HE OR SHE MIGHT OTHERWISE HAVE TO A JURY TRIAL.**    This arbitration provision is not intended to modify or limit the right of Nomad or Employee's right to seek equitable relief, such as an injunction or attachment, through judicial process, which will not be deemed a waiver of the right to demand and obtain arbitration.

**XVII.    Notices.**    All notices or communications required or permitted under this Agreement may be made either via (a) e-mail (in which cases such notice shall be deemed given on the date of delivery), (b) by next business day courier service (e.g., Federal Express, UPS or other similar service) (in which case such notice shall be deemed given on the business day following date of deposit with the courier service), or (c) by United States mail, first class, postage prepaid, registered or certified, return receipt requested (in which case such notice shall be deemed given on the third (3rd) day following the date of deposit with the United States Postal Service).  Contact information for Nomad may be found by clicking the "Contact Us" link in the footer of the home page.  Notice to Employee shall be delivered to the e-mail address or physical address provided by Employee in writing to Nomad from time to time.

**XVIII. Modifications.**    No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Employee and Nomad's Director of Human Resources.

**XIX.    No Conflict.**    By accepting employment with Nomad, Employee confirms that Employee is able to accept this job and carry out the Employee Services without breaching any legal restrictions on Employee's activities, such as restrictions imposed by a current or former employer.  Employee will inform and provide Nomad with as much information about such restrictions as possible, including any agreements between Employee and Employee's current or former employer describing such restrictions. Employee confirms that he/she will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with Employee from Employee's current or former employer to Nomad, nor will Employee use or disclose any such confidential information during the course and scope of Employee's employment with Nomad.  Employee will discuss any questions about the ownership of

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

particular documents or other information with Employee's former employer before removing or copying the documents or information.

**XX.    Exit Obligations.** Upon (a) voluntary or involuntary termination of the Employment Term or (b) Nomad's request at any time during the Employment Term, Employee shall provide or return to Nomad (or to the relevant Client as further explained below) any and all Company or Client property, including but not limited to keys, access or identification cards, computers, phones, pagers, manuals, reports, files, work product, e-mail messages, recordings, disks, thumb drives or other removable information storage devices, hard drives, and all Company or Client data, documents and materials belonging to the Company or Clients and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information, that are in the possession or control of Employee, whether they were provided to Employee by Nomad or any of its Clients or created by Employee in connection with Employee's employment by Nomad.  For the avoidance of doubt, any protected health information, as defined in 45 C.F.R. § 160.103 , which may have been provided directly or indirectly to Employee by any Client in relation to a Placement, and which remains in Employee's possession, custody or control at the time of termination, shall be returned by Employee to the relevant Client, not to Nomad, and Employee agrees to work with such Client to facilitate timely return of such PHI.  To the extent that certain data cannot be physically returned to Nomad (or the relevant Client), Employee also shall delete or destroy all copies of any such unreturned documents and materials that remain in Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in Employee's possession or control.

**XXI.    Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties agree that, to the maximum extent permitted by law, any such court is authorized to modify any such unenforceable provision in lieu of severing it from this Agreement in its entirety, and that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

**XXII.    Counterparts.** This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute the same instrument.

**XXIII.    Survival.**   Upon the expiration or other termination of this Agreement, Sections VIII, XI, XII, XIV, XV, XVII, XVIII, XXI, and XXII shall survive.

**XXIV.    Entire Agreement.**   This Agreement, any Placement Agreement, Nomad's Nurse Terms of Service, and the Nomad's Site Use Terms constitute the entire agreement between Employee and Nomad relating to and governing Employee's use of the Site and Nomad's relationship with Employee, superseding any prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, between Employee and Nomad.

**EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS FULLY READ, HAS HAD AN OPPORTUNITY TO ASK QUESTIONS, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT.**

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**EMPLOYEE**                                    **NOMAD NURSES, INC.,**

Signature: _Jenna Gayler_____              Signature: _Benjamin Denson_____

Print Name: _Jenna Gayler_____              Title: _Manager_____

4843-2913-4435, v. 1

11

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

# Nomad Nurses, Inc.

## Nurse Employee Handbook
## &
## State-Specific Supplements

**Effective Date: June 19th, 2021**

## <u>TABLE OF CONTENTS</u>

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**I.      INTRODUCTION; PURPOSE OF HANDBOOK**                                      **9**

**II.     EMPLOYMENT POLICIES**                                                    **11**

**1.     Nurse Employment Agreement and Placements**                              **11**

**2.     At-Will Employment; Termination or Cancellation of Placements**          **11**

**3.     Equal Employment Opportunity Policy**                                     **12**

**4.     Anti-Discrimination and Anti-Harassment Policy**                          **13**

**5.     Reporting Harassment, Discrimination, or Offensive Conduct**             **14**

**6.     Cultural Diversity, Competency, and Sensitivity**                         **15**

**7.     Workplace Violence Prevention Policy**                                    **15**

**8.     Compliance with Policies and Procedures of Client Facility**             **16**

**9.     Floating Policy**                                                         **16**

**10.    Required Nurse Reports/Complaints**                                       **17**

**11.    Drug & Alcohol Free Workplace; Drug & Alcohol Testing**                  **17**

**12.    Employment Applications**                                                 **19**

**13.    Immigration Law Compliance**                                             **19**

**14.    Confidentiality & HIPAA**                                                 **19**

**15.    Code of Business Ethics**                                                 **21**
    15.1    Scope & Purpose                                               21
    15.2    Loyalty & Integrity                                           22
    15.3    Ethical Standards                                             22
    15.4    Waivers                                                       25
    15.5    Violations of Ethical Standards                               25
    15.6    Compliance Procedures                                         26

**16.    Updating Nurse Information**                                              **27**

**17.    Workers' Compensation; Reporting Accidents and Workplace Injuries**      **27**

**18.    Job Safety Practices & Procedures**                                       **28**

**19.    Payroll Practices**                                                       **28**

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

| 19.1 | Tracking Time Worked | 28 |
| 19.2 | Paydays | 29 |
| 19.3 | Overtime Pay | 29 |
| 19.4 | Holiday Pay | 30 |
| 19.5 | Attendance; No Paid Leave; Absences | 30 |
| 19.6 | Payroll Deductions | 30 |
| 19.7 | Reporting Pay Errors or Improper Deductions | 31 |

**20. Benefit Programs** — **31**

**21. Continuing Education** — **31**

**22. FMLA Leave** — **31**

**23. Military Leave** — **34**

**24. Property Searches; No Expectation of Privacy** — **34**

**25. Safe Vehicle Operation Policy; Automobile Insurance** — **35**

**26. Nurse Conduct and Work Rules** — **35**

**27. Progressive Discipline** — **36**

**III. STATE-SPECIFIC SUPPLEMENTS** — **37**

**1. Effect of State-Specific Supplements to Nurse Employee Handbook** — **37**

**2. Alabama** — **38**
| 2.1 | Jury Duty Leave | 38 |
| 2.2 | Voting Leave | 38 |
| 2.3 | Crime Victim Leave | 38 |
| 2.4 | Military Leave | 38 |

**3. Alaska** — **39**
| 3.1 | Overtime Pay | 39 |
| 3.2 | Jury Duty Leave | 39 |
| 3.3 | Voting Leave | 39 |
| 3.4 | Military Leave | 39 |
| 3.5 | Drug Testing | 39 |

**4. Arizona** — **40**
| 4.1 | Paid Sick Leave | 40 |
| 4.2 | Jury Duty Leave | 40 |
| 4.3 | Voting Leave | 40 |
| 4.4 | Crime Victim Leave | 40 |

**5. Arkansas** — **41**
| 5.1 | Jury Duty Leave | 41 |

| | | |
|---|---|---|
| 5.2 | Voting Leave | 41 |
| 5.3 | Drug Testing | 41 |
| **6.** | **California** | **42** |
| 6.1 | Meal and Rest Breaks | 42 |
| 6.2 | Overtime Pay | 42 |
| 6.3 | Jury Duty Leave | 42 |
| 6.4 | Witness Duty Leave | 42 |
| 6.5 | Domestic Violence Leave | 42 |
| 6.6 | Military Spouse Leave | 42 |
| 6.7 | Voting Leave | 43 |
| 6.8 | Alcohol and Drug Rehabilitation Leave | 43 |
| 6.9 | Paid Kin Care Leave | 43 |
| 6.10 | Paid Sick Leave | 43 |
| 6.11 | Pregnancy Disability Leave | 44 |
| 6.12 | California Paid Family Leave | 44 |
| 6.13 | San Francisco Paid Parental Leave | 45 |
| **7.** | **Colorado** | **46** |
| 7.1 | Meal and Rest Breaks | 46 |
| 7.2 | Overtime Pay | 46 |
| 7.3 | Jury Duty Leave | 46 |
| 7.4 | Voting Leave | 46 |
| 7.5 | Domestic Violence Leave | 46 |
| 7.6 | Colorado's Family Care Act (relating to use of FMLA leave rights) | 46 |
| **8.** | **Connecticut** | **48** |
| 8.1 | Meal Breaks | 48 |
| 8.2 | Jury Duty Leave | 48 |
| 8.3 | Victims of Family Violence Leave | 48 |
| 8.4 | Paid Sick Leave | 48 |
| **9.** | **Delaware** | **49** |
| 9.1 | Meal and Rest Breaks | 49 |
| 9.2 | Jury Duty Leave | 49 |
| 9.3 | Crime Victims Leave | 49 |
| 9.4 | Volunteer Emergency Responders Leave | 49 |
| 9.5 | Pregnancy Accommodation | 50 |
| **10.** | **Florida** | **51** |
| 10.1 | Jury Duty Leave | 51 |
| 10.2 | Leave for Victims of Domestic or Sexual Violence | 51 |
| **11.** | **Georgia** | **52** |
| 11.1 | Jury Duty Leave | 52 |
| 11.2 | Voting Leave | 52 |
| **12.** | **Hawaii** | **53** |
| 12.1 | Jury Duty Leave | 53 |

| 12.2 | Voting Leave | 53 |
| 12.3 | Hawaii Victims Leave Act | 53 |
| 12.4 | Reasonable Accommodations for Nurses Who Are Victims of Domestic or Sexual Abuse | 53 |
| 12.5 | Pregnancy Disability Leave | 54 |
| 12.6 | Hawaii's Family Leave Law | 54 |
| 12.7 | Temporary Disability Insurance | 54 |
| 12.8 | Drug Testing | 54 |

**13.   Idaho** ..... **57**
| 13.1 | Jury Duty Leave | 57 |

**14.   Illinois** ..... **58**
| 14.1 | Meal Breaks | 58 |
| 14.2 | Jury Duty Leave | 58 |
| 14.3 | Voting Leave | 58 |
| 14.4 | Child Bereavement Leave Act | 58 |
| 14.5 | Leave under the Illinois Victims and Economic Security and Safety Act | 58 |
| 14.6 | School Activities Leave | 59 |
| 14.7 | Illinois Family Military Leave | 59 |
| 14.8 | Paid Sick Leave for Nurses on Assignments in Chicago City Limits or in Certain Municipalities in Cook County, Illinois | 59 |

**15.   Indiana** ..... **61**
| 15.1 | Jury Duty Leave | 61 |
| 15.2 | Witness Duty Leave | 61 |
| 15.3 | Indiana Military Family Leave Act | 61 |
| 15.4 | Leave of Absence for Military Training | 61 |

**16.   Iowa** ..... **62**
| 16.1 | Jury Duty Leave | 62 |
| 16.2 | Witness Leave | 62 |
| 16.3 | Voting Leave | 62 |
| 16.4 | Drug and Alcohol Screening Policy | 62 |

**17.   Kansas** ..... **65**
| 17.1 | Jury Duty Leave | 65 |
| 17.2 | Voting Leave | 65 |
| 17.3 | Domestic Violence Leave | 65 |

**18.   Kentucky** ..... **66**
| 18.1 | Meal and Rest Breaks | 66 |
| 18.2 | Overtime Pay | 66 |
| 18.3 | Jury Duty Leave | 66 |
| 18.4 | Voting Leave | 66 |
| 18.5 | Adoption Leave | 66 |
| 18.6 | Witness Leave | 66 |
| 18.7 | Emergency Responder Leave | 66 |

**19.   Louisiana** ..... **68**

| | | |
|---|---|---|
| 19.1 | Jury Duty Leave | 68 |
| 19.2 | Volunteer Firefighter Leave | 68 |
| 19.3 | Veterans' Medical Appointments Leave | 68 |
| 19.4 | Bone Marrow Donation Leave | 68 |
| 19.5 | Pregnancy Leave | 68 |
| 19.6 | Drug Testing | 69 |
| **20.** | **Maine** | **70** |
| 20.1 | Meal and Rest Breaks | 70 |
| 20.2 | Jury Duty Leave | 70 |
| 20.3 | Military Family Leave | 70 |
| 20.4 | Maine Family and Medical Leave | 70 |
| 20.5 | Drug Testing | 71 |
| **21.** | **Maryland** | **76** |
| 21.1 | Drug Testing | 76 |
| 21.2 | Jury Duty Leave | 76 |
| 21.3 | Voting Leave | 76 |
| 21.4 | Crime Victim Leave | 76 |
| 21.5 | Deployment Leave | 76 |
| 21.6 | Parental Leave | 77 |
| 21.7 | Filing a complaint with the Office of Health Care Quality (OHCQ) | 77 |
| **22.** | **Massachusetts** | **78** |
| 22.1 | Meal Breaks | 78 |
| 22.2 | Paid Sick Leave | 78 |
| 22.3 | Jury Duty Leave | 78 |
| 22.4 | Voting Leave | 78 |
| 22.5 | The Massachusetts Domestic Violence Leave Act | 78 |
| 22.6 | Small Necessities Leave | 79 |
| **23.** | **Michigan** | **80** |
| 23.1 | Jury Duty Leave | 80 |
| 23.2 | Crime Victim Leave | 80 |
| 23.3 | Paid Medical Leave | 80 |
| **24.** | **Minnesota** | **81** |
| 24.1 | Meal and Rest Breaks | 81 |
| 24.2 | Drug Testing | 81 |
| 24.3 | Jury Duty Leave | 81 |
| 24.4 | Voting Leave | 81 |
| 24.5 | School Conference and Activities Leave | 81 |
| 24.6 | Pregnancy and Parental Leave | 82 |
| 24.7 | Subpoena and Crime Victim Leave | 82 |
| 24.8 | Leave for Military Family Members | 82 |
| 24.9 | Bone Marrow Donation Leave of Absence | 83 |
| 24.10 | Organ Donation Leave of Absence | 83 |
| 24.11 | Minneapolis Paid Sick Leave Ordinance | 83 |

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

24.12    St. Paul Paid Sick Leave Ordinance                          84

**25.    Mississippi**                                               **85**
25.1     Jury Duty Leave                                             85
25.2     Voting Leave                                                85
25.3     Victim Leave                                                85
25.4     Drug Testing                                                85

**26.    Missouri**                                                  **86**
26.1     Jury Duty Leave                                             86
26.2     Voting Leave                                                86
26.3     Crime Victim Leave                                          86

**27.    Montana**                                                   **87**
27.1     At-Will Employment                                          87
27.2     Jury Duty Leave                                             87
27.3     Pregnancy and Maternity Leave                               87

**28.    Nebraska**                                                  **88**
28.1     Voting Leave                                                88
28.2     Jury Duty Leave                                             88
28.3     Nebraska Military Family Leave                              88
28.4     Pregnancy Accommodation                                     88

**29.    Nevada**                                                    **90**
29.1     Meal and Rest Breaks                                        90
29.2     Overtime Pay                                                90
29.3     Jury Duty Leave                                             90
29.4     Voting Leave                                                90
29.5     Domestic Violence Leave                                     90
29.6     Pregnancy Accommodation                                     91

**30.    New Hampshire**                                             **92**
30.1     Meal Break                                                  92
30.2     Minimum Pay for Reporting to Work                           92
30.3     Jury Duty Leave                                             92
30.4     Crime Victim Employment Leave Act                           92
30.5     Payment of Wages at Termination                             92

**31.    New Jersey**                                                **93**
31.1     Jury Duty Leave                                             93
31.2     Emergency Responders Leave                                  93
31.3     Military Leave                                              93
31.4     Paid Sick Leave                                             93

**32.    New Mexico**                                                **95**
32.1     Jury Duty Leave                                             95
32.2     Voting Leave                                                95
32.3     Domestic Abuse Leave                                        95

| | | |
|---|---|---|
| 32.4 | Emergency Responders Leave | 95 |
| **33.** | **New York** | **96** |
| 33.1 | Supplement to Anti-Harassment and Anti-Discrimination Policy | 96 |
| 33.2 | Meal Breaks | 100 |
| 33.3 | Jury Duty Leave | 100 |
| 33.4 | Voting Leave | 100 |
| 33.5 | Lactation & Breastfeeding Break Time | 100 |
| 33.6 | Crime Victims Leave | 100 |
| 33.7 | Paid Family Leave | 100 |
| 33.8 | New York City Earned Sick Time Act | 101 |
| **34.** | **North Carolina** | **103** |
| 34.1 | Jury Duty Leave | 103 |
| 34.2 | Parent Involvement in School Leave | 103 |
| 34.3 | Leave to Seek Order for Domestic Violence | 103 |
| 34.4 | Drug Testing | 103 |
| **35.** | **North Dakota** | **104** |
| 35.1 | Meal Breaks | 104 |
| 35.2 | Jury Duty Leave | 104 |
| 35.3 | Pregnancy Accommodation | 104 |
| **36.** | **Ohio** | **105** |
| 36.1 | Jury Duty Leave | 105 |
| 36.2 | Military Family Leave | 105 |
| 36.3 | Crime Victim Leave | 105 |
| 36.4 | Witness Duty Leave | 105 |
| 36.5 | Voting Leave | 105 |
| **37.** | **Oklahoma** | **106** |
| 37.1 | Jury Duty Leave | 106 |
| 37.2 | Voting Leave | 106 |
| 37.3 | Additional Drug and Alcohol Testing Provisions | 106 |
| **38.** | **Oregon** | **107** |
| 38.1 | Meal and Rest Periods | 107 |
| 38.2 | Paid Sick Leave | 107 |
| 38.3 | Jury Duty Leave | 107 |
| 38.4 | Oregon Family Leave Act | 107 |
| 38.5 | Crime Victim Leave | 108 |
| **39.** | **Pennsylvania** | **109** |
| 39.1 | Jury Duty Leave | 109 |
| 39.2 | Crime Victim Leave | 109 |
| 39.3 | Philadelphia's Paid Sick Leave Ordinance | 109 |
| 39.4 | Philadelphia Entitlement to Leave Due to Domestic Violence, Sexual Assault, or Stalking Ordinance | 109 |
| **40.** | **Rhode Island** | **111** |

40.1    Drug Testing                                          111
40.2    Jury Duty Leave                                       111
40.3    School Involvement Leave                              111
40.4    Parental and Family Medical Leave Act                 111
40.5    Temporary Caregiver Insurance Program                 112
40.6    Paid Sick Leave                                       112

**41.    South Carolina**                                     **114**
41.1    Jury Duty or Court Proceeding Leave                   114
41.2    Pregnancy Accommodation                               114

**42.    South Dakota**                                       **115**
42.1    Jury Duty Leave                                       115
42.2    Voting Leave                                          115

**43.    Tennessee**                                          **116**
43.1    Meal Break                                            116
43.2    Jury Duty Leave                                       116
43.3    Voting Leave                                          116
43.4    Lactation and Breastfeeding Break Time                116

**44.    Texas**                                              **117**
44.1    Jury Duty Leave                                       117
44.2    Voting Leave                                          117
44.3    Witness Leave                                         117

**45.    Utah**                                               **118**
45.1    Jury Duty Leave                                       118
45.2    Voting Leave                                          118
45.3    Witness Leave                                         118
45.4    Pregnancy Accommodation                               118
45.5    Drug Testing                                          118

**46.    Vermont**                                            **120**
46.1    Jury Duty Leave                                       120
46.2    Witness Leave                                         120
46.3    Paid Sick Leave                                       120
46.4    Drug Testing                                          120

**47.    Virginia**                                           **122**
47.1    Jury Duty or Court Appearance Leave                   122
47.2    Crime Victim Leave                                    122
47.3    Election Officer Leave                                122

**48.    Washington**                                         **123**
48.1    Meal and Rest Breaks                                  123
48.2    Paid Sick Leave                                       123
48.3    Jury Duty Leave                                       123
48.4    Domestic Violence Leave                               123

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

48.5    Military Family Leave Act                                    124
48.6    Family Leave                                                 124
48.7    Washington Family Care Act                                   124
48.8    Seattle Paid Sick and Safe Leave                             125

**49.    Washington, D.C.**                                          **126**
49.1    District of Columbia Family and Medical Leave Act            126
49.2    District of Columbia Accrued Safe and Sick Leave Act         126
49.3    Parental Leave Act                                           127
49.4    Jury Duty Leave                                              127
49.5    District of Columbia Emancipation Day Leave                  127

**50.    West Virginia**                                             **128**
50.1    Meal Break                                                   128
50.2    Jury Duty Leave                                              128
50.3    Voting Leave                                                 128

**51.    Wisconsin**                                                 **129**
51.1    Wisconsin Family and Medical Leave                           129
51.2    Jury Duty Leave                                              129
51.3    Witness Leave                                                129
51.4    Voting Leave                                                 129
51.5    Emergency Response Leave                                     129

**52.    Wyoming**                                                   **130**
52.1    Jury Duty Leave                                              130
52.2    Voting Leave                                                 130
52.3    Victim and Witness Leave                                     130

**II.    RECEIPT, ACKNOWLEDGEMENT, AND CONSENT                       131**

# I.    INTRODUCTION; PURPOSE OF HANDBOOK

This Nurse Employee Handbook ("Handbook") is for your information and guidance and to acquaint you with Nomad Nurses, Inc. ("Nomad" or the "Company") and its employment policies and procedures. It is intended to provide general information on key policies, but it is not an exhaustive list of Nomad's policies or expectations of nurses. Additional information may be provided by management by various notices. We expect you to familiarize yourself with the policies contained herein, and any policies in the State-Specific Supplements found in Section III

(where applicable), and comply with them during your employment. Failure to do so may result in disciplinary action, up to and including termination of employment. Where there is a conflict between the policies in this Handbook and any State-Specific Supplement attached hereto, the State-Specific Supplement controls.

The Company reserves the right to revise, supplement, modify, or rescind any or all of these policies, plans, procedures, or benefits. Although we will attempt to give adequate notice of any such changes, the Company reserves the right to revise, supplement, modify, interpret, or rescind any or all of these policies, plans, or procedures as it deems appropriate, in its sole and absolute discretion, with or without prior notice.

While this Handbook sets forth some of the policies, procedures, work rules, and benefits, it should not be construed as a guarantee that your employment or any specific placement will continue for any specified period of time or end under certain conditions. **THIS HANDBOOK IS NOT A CONTRACT OF EMPLOYMENT, EITHER EXPRESS OR IMPLIED. UNLESS ALTERED BY A WRITTEN AGREEMENT SIGNED BY THE NURSE AND NOMAD'S CEO, YOUR EMPLOYMENT AND ALL PLACEMENTS ARE "AT-WILL." AS SUCH, EITHER THE NURSE OR NOMAD MAY END THE EMPLOYMENT RELATIONSHIP AND/OR ANY PLACEMENT AT ANY TIME AND FOR ANY LAWFUL REASON, OR NO REASON AT ALL. NOTHING IN THIS HANDBOOK ALTERS THE EMPLOYMENT-AT-WILL RELATIONSHIP BETWEEN YOU AND NOMAD.** Notwithstanding, the Nurse Employment Agreement and applicable Placement Agreement may set conditions regarding payments of expenses, allowances, per diems, and reimbursements upon cancellation and/or termination.

**ADDITIONALLY, NO MANAGER, SUPERVISOR, OR REPRESENTATIVE OF NOMAD HAS THE AUTHORITY TO ENTER INTO ANY AGREEMENT CONTRARY TO THIS HANDBOOK OR FOR EMPLOYMENT FOR ANY SPECIFIED TIME, AND ANY SUCH AGREEMENT OR TERMS WILL BE UNENFORCEABLE, UNLESS THEY ARE IN A WRITING SIGNED BY THE EMPLOYEE AND NOMAD'S CEO.**

If you have any questions or comments regarding the contents of this Handbook, please contact Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623. In addition, Nomad's business hours are 9:30 a.m .to 6:00 p.m., Monday through Friday. This Handbook is Nomad's property, and all hardcopies shall be returned to Nomad and digital copies deleted upon termination of your employment.

This Handbook becomes effective June 19th, 2021 and supersedes any and all prior handbooks and prior oral and written policies where there is a conflict. This Handbook applies to existing employees and employees hired after the effective date.

## II.  EMPLOYMENT POLICIES

### 1.  Nurse Employment Agreement and Placements

In addition to the policies and procedures set forth in this Handbook and State-Specific Supplements, the terms and conditions of your employment with Nomad will be governed by the Nurse Employment Agreement between you and Nomad and any applicable Placement Agreements, which are placement specific. Where there is any conflict between the Handbook and the terms of the Nurse Employment Agreement and/or applicable Placement Agreement, the Nurse Employment Agreement and/or Placement Agreement shall control, with the Placement Agreement taking ultimate precedence on the terms of a particular placement.

Although Placement Agreements generally set forth the expected hours of work and commensurate pay, your hours and shifts at a Client Facility are subject to change and may be modified to meet the needs of the Client Facility and/or Nomad. You will be expected to work all hours and shifts specified in any Placement Agreement and any additional hours and shifts requested by Nomad and/or a Client Facility, assuming such additional hours are safe and reasonable per the nurse, Nomad, and/or Client Facility.

### 2.  At-Will Employment; Termination or Cancellation of Placements

As stated in the Section I of this Handbook, unless otherwise altered by a written agreement signed by the nurse and Nomad's CEO, all employees are at-will employees. This means that either Nomad or the employee may end the employment relationship at any time and for any lawful reason, or no reason at all, with or without prior notice. Nomad may also cancel any agreement with the nurse and/or terminate any placement for any lawful reason, or no reason at all. Likewise, a Client Facility may terminate a nurse's services in accordance with any agreement between Nomad and the Client Facility.

Employee's employment with Nomad and any placement with any Client shall be temporary and at-will, meaning that either Employee or Nomad may terminate the employment relationship or placement for any reason and at any time, with or without cause or prior notice. However, when an Employee accepts a Placement, Nomad and Client are relying on the Employee to appear for and complete the Placement as specified in the Placement Agreement. If Employee is terminated or unilaterally decides to end work on a Placement before the end date set forth in the Placement Agreement, Employee shall be (i) responsible for all travel, housing, and other expenses from the date of termination or resignation forward, (ii) any per diems, allowances, and/or reimbursements shall end as of the date of termination or resignation, and (iii) Employee will not be paid any per diems, allowances, and/or reimbursements that remain unpaid as of the date of termination or resignation. Additionally, where Employee voluntarily terminates a Placement without good reason, Nomad may, in its discretion, terminate Employee's employment and identify Employee as ineligible for rehire or for future placements through Nomad.

For the purposes of this Agreement, Employee shall have "good reason" to terminate the Placement when: (i) it is necessitated by the need for medical leave available under the Family

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

and Medical Leave Act (FMLA), Americans with Disabilities Act (ADA), and/or similar state or local medical leave or disability law; (ii) it is necessitated by a family emergency, such as a death in the family or related medical issue; or (iii) such termination or leave is protected by applicable federal, state, or local law.

Disciplinary action noted throughout this Handbook is not all inclusive and does not restrict Nomad's right to terminate employment "at-will."

**3.      Equal Employment Opportunity Policy**

Nomad is an equal opportunity employer. It is our policy to select the most qualified person for each position in the Company, whether that is a new hire, a transfer to another position, or a promotion. Neither Nomad nor any Nomad employee will discriminate against any applicant for employment or a fellow employee because of race, color, religion, creed, sex, national origin, ancestry, disability, genetic testing information, age, military or veteran status, pregnancy, marital status, sexual orientation, gender identity, or any other basis prohibited under applicable local, state, or federal law. Likewise, Nomad will not tolerate discrimination or harassment of its nurses by employees, vendors, or patients of Client Facilities.

This EEO policy applies to all employment practices and actions, including hiring, job assignment, promotion, compensation, access to benefits and training, discipline, termination, and all other terms and privileges of employment.

Nomad will make reasonable accommodations for qualified individuals with known disabilities unless doing so would result in an undue hardship to Nomad or result in a direct threat of substantial harm to the health or safety of the nurse or others. Any applicant or nurse who requires an accommodation should make a request for an accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623. Upon receipt of a request for accommodation, a manager or human resources representative will confer with the requesting individual to discuss and identify the limitations resulting from the disability and the potential accommodations that Nomad might make to help overcome those limitations. Nomad will determine the feasibility of the requested accommodation or other reasonable accommodation as required by law. If a reasonable accommodation is provided, it may or may not be the accommodation requested by the nurse.

Any nurses with questions or concerns about any type of discrimination or harassment in the workplace and/or at any Client Facility are encouraged to bring these issues to Nomad's attention *immediately* by reporting them in the manner outlined in the Reporting Harassment, Discrimination, or Offensive Conduct Policy, set forth below (Policy No. 5). Particularly because your work is performed at Client Facilities located throughout the country, we ask your help in reporting any conduct that is in violation of our policies against harassment and discrimination. In order to correct and eliminate such activity, we must know about it, and we will not know about it unless you report it.

Nurses can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of discrimination or harassment will be subject to disciplinary action, up to and including termination of employment.

**4.    Anti-Discrimination and Anti-Harassment Policy**

Neither harassment nor discrimination will be tolerated, whether by Nomad's own employees or the employees, vendors, and/or patients of Client Facilities. All employees are prohibited from engaging in the harassment of any employee or other person in the course of or in connection with their employment at Nomad. Statements or actions that you make with regard to fellow employees or nurses, whether done jokingly or otherwise, may create feelings of discomfort, fear, embarrassment, or ill will and may interfere with productivity. The desired standard of employee behavior is one of cooperation and respect for each other, despite any differences. We expect all employees and nurses to abide by this standard.

In general, statements, slurs, jokes, and other verbal or physical conduct relating to any of the following characteristics are not permitted: race, color, religion, creed, sex, national origin, ancestry, disability, genetic testing information, age, military or veteran status, pregnancy, marital status, sexual orientation, gender identity or any other prohibited basis under applicable local, state, or federal law. Prohibited conduct includes sexual harassment, but extends far beyond that. Prohibited conduct may include, but is not limited to the following:

- Epithets, racial "jokes", slurs or negative stereotypes, intimidating or hostile acts based upon protective classification, and/or written or graphic material that denigrates or shows hostility or aversion to persons of a protected class that is posted or circulated on Company property or the property of a Client Facility.

- Verbal harassment and unwelcome discussions relating to or motivated by a person's protected characteristic or class.

- Making threats of reprisal a term or condition of employment (explicitly or implicitly).

- Unwelcome requests or demands for sexual favors. This includes subtle or blatant expectations to engage in sexual relations and pressures for dates, especially when submission to such conduct is a condition of employment, or when submission or rejection of such conduct is used as a basis for employment decisions affecting the individual.

- Using coercive sexual behavior to control or affect the career, salary, or performance review of another employee.

- Verbal harassment or unwelcome kidding of a sexual nature, such as telling "dirty" jokes and comments about body parts, appearance, or clothing, where such comments go beyond mere courtesy or are unwelcome.

- Unwelcome or unwanted sexual advances, such as patting, pinching, brushing up against, hugging, cornering, kissing, fondling, sexual flirtations, or any other similar contact.

Impermissible harassment may exist when co-workers, nurses, or even non-employees, such as vendors, customers, and/or patients engage in such conduct.

Sexual harassment does not have to involve conduct of a sexual nature in order to constitute improper behavior. For example, abusive, offensive, or demeaning behavior that is directed to members of one gender only (whether male or female) may be deemed a form of sexual harassment, even though the conduct was not motivated by sexual desire or gratification. In addition, harassment of a male by another male, or a female by another female is not permitted. Likewise, disparate treatment motivated by any other protected characteristic is also prohibited discrimination, and will not be tolerated.

If there are questions about whether conduct is permissible under this policy, nurses should refrain from the conduct.

Any nurses with questions or concerns about *any type* of discrimination or harassment in the workplace are encouraged to bring these issues to Nomad's attention by immediately reporting the conduct in the manner set forth in the Reporting Harassment, Discrimination, or Offensive Conduct Policy, set forth below (Policy No. 5). Nurses can raise concerns and make reports without fear of reprisal.

Harassment is contrary to Nomad's culture and values, and we desire to provide a workplace that is free of harassment and filled with respect. We need every employee's and nurse's commitment to help make this a reality. Therefore, do not allow issues to fester or persist. Instead, if you believe you have been the victim of prohibited harassment, or if you have witnessed any such harassment, immediately report it.

Anyone found to be engaging in any type of discrimination or harassment will be subject to disciplinary action, up to and including termination of employment.

5.    **Reporting Harassment, Discrimination, or Offensive Conduct**

We all have a responsibility to promote equal employment opportunities, and we expect everyone to share this commitment. If you believe you have been subjected to any form of discrimination, harassment, or offensive conduct, or if you have witnessed any such discrimination, harassment, or offensive conduct, please take the following action immediately:

- STEP 1: Ask the offending party to stop, unless confronting the offending party would be uncomfortable or place you in danger.

  -AND-

- STEP 2: Report complaint to their Nomad Navigator or Nomad Support Team who may be reached at support@nomadhealth.com and 866-656-6623. Nurses must also report the complaint to the immediate supervisor at the Client Facility. If the nurse's immediate supervisor at the Client Facility is unavailable or if such person is the individual they believe is responsible for the harassment, discrimination, or offensive conduct, or they

believe it would be otherwise inappropriate to contact them, they should report the complaint to another member of management at the Client Facility.

Please note that the complaint must be reported in accordance with Step 2, even if the offending party is asked to stop. Nomad will not know of the discrimination, harassment, or offensive conduct unless you report it, and we cannot correct if we do not know about it. Please help us eliminate all such conduct by reporting it.

Nomad will not retaliate against you for filing a complaint in good faith and does not permit retaliation by supervisors, management, employees, co-workers, or Client Facilities. In addition, individuals who participate in this complaint process as potential witnesses (other than the alleged harasser) are assured of non-retaliation. You must report acts of retaliation just as you must report acts of discrimination or harassment.

Your complaint will be investigated in a confidential and professional manner, consistent with resolution of the complaint, by a member of management and/or human resources.

## 6.    Cultural Diversity, Competency, and Sensitivity

A key component of providing safe, competent, and quality patient care is showing respect for patients' cultural, spiritual, and social values. Where our nurses demonstrate this cultural competency, they will better understand their patients' expectations and deliver better care.

Culture represents the traditions, customs, values, and beliefs of a person, which are passed down from generation to generation and affect how that person views the world. A person's culture, which may vary among racial and ethnic groups, informs that person's beliefs, how they interact with others, and their healthcare decisions. Optimal patient care requires that the plan of care take cultural issues into account.

As you deliver care to patients and culturally diverse populations, learn about their individual cultural beliefs and practices and how that impacts their interactions and healthcare decisions. It is vital that we treat patients as individuals and that we do not make unnecessary or inaccurate assumptions regarding culture. Ultimately, show respect to patients by interacting with them as they desire to be interacted with (i.e. eye contact, personal space, etc.), and where you have questions about unfamiliar cultural practices, politely ask them so you can learn and adapt.

Be aware of your own cultural beliefs and actions and how they may impact your decisions and interactions with others. Do not assume that your cultural viewpoints are shared by your patients.

Of course, communication is the key to optimal patient care, and patients are entitled to receive information in their preferred language, wherever possible. Therefore, quickly assess language barriers and the patient's preferred language, and act to provide information in a manner that meets the patient's needs. Use an interpreter or translator as appropriate.

## 7.    Workplace Violence Prevention Policy

Employee safety and security is of the utmost importance to Nomad. Threats, threatening behavior, or acts of violence against employees, nurses, or other individuals by anyone on Nomad premises or at Client Facilities (or off work premises if it involves employees or nurses) will not be tolerated.

If you believe your safety and/or security is in danger, or if you have been threatened, assaulted, or been the victim of violence in any manner, please take immediate steps to get yourself into a safe location and then report the matter to an appropriate contact at the Client Facility **AND** to your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

Likewise, if you have witnessed any such activity directed at another employee or nurse, please immediately report it as well. You are responsible for making this report, regardless of the relationship between the individual who initiated the threat or threatening behavior and the person or persons who were threatened or were the focus of the threatening behavior.

Violations of this policy will lead to disciplinary action up to and including termination of employment. Violations may also be subject to criminal and civil action.

## 8.    Compliance with Policies and Procedures of Client Facility

Client Facilities may from time to time establish certain policies and procedures governing the performance of duties by nurses during a placement. Nurses agree and understand that they must comply with all such lawful policies and procedures. The failure or refusal to do so may result in disciplinary action, up to and including termination of employment and/or a placement.

However, where directives, procedures, or policies of Client Facilities involve any of the issues or circumstances set forth in the Required Nurse Reports Policy (Policy No. 10), report it to Nomad immediately.

## 9.    Floating Policy

In the event a Client Facility requires you to float to a different department or unit, you will comply with the float request if: (1) the request is within your clinical experience, skills, and competency, and you have the necessary crede; and (2) the Client Facility provides an appropriate orientation to the department/unit. If an appropriate orientation is not provided, immediately contact your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

If a float assignment is beyond your clinical experience, skills, or competency, or you do not have the necessary credentials, such that you will be unable to provide a competent level of care, you must:

   a)   Immediately advise Nomad of the floating assignment by contacting your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623;

b) Immediately inform the Client Facility that the float assignment is beyond your clinical experience, skills, or competency, and/or you lack the necessary credentials; and

c) Not provide any patient care beyond your clinical experience, skills, or competency.

Within the bounds of the applicable Nurse Practice Act and the contract between the Client Facility and Nomad, Nomad will work with the Client Facility to resolve the issue. Nurses will be paid for all hours worked.

## 10.    Required Nurse Reports/Complaints

In addition to instances of discrimination, harassment, and/or workplace violence and threats, you must also immediately notify your immediate supervisor at the Client Facility **AND** your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, of any of the following:

d) A work environment that poses a safety risk to you, patients, or others;

e) Any injury that you suffer in the workplace and/or in the performance of your job duties, regardless of the severity of the injury;

f) Any request to perform tasks and responsibilities beyond the scope of what you have been trained for or where required resources are not available, including float assignments outside of your competency;

g) Any activities that compromise the quality of patient care and/or patient rights;

h) Any incident that resulted in a risk of patient safety and/or a compromised quality of care to the patient, including errors, injuries, and safety hazards;

i) Any situation arises that prevents you from performing your assigned duties with integrity and/or honesty; or

j) Any occurrence of unlawful or aberrant activities or behavior and/or any request to participate in any activity which you believe to be unlawful.

Nomad desires to create an ethical, safe, and lawful workplace. In order to do so, we need every employee's assistance and commitment to report any activity outlined above. Where any of the foregoing requires additional reports be made to government agencies, professional boards, and/or law enforcement agencies, Nomad will work with nurses to gather the required information and complete any required reports.

Where a nurse reports any of the above-stated circumstances, the initial report to Nomad must _not_ include patient protected health information. _See_ Nomad's Confidentiality & HIPAA Policy, set forth below (Policy No. 14). If additional information is needed, Nomad will request such details in a written statement.

In the event that any party is dissatisfied with the level of service or quality of care, they may contact their dedicated Nomad Health representative at any time to resolve the issue. Nomad Health is committed to resolving all reported issues in a timely manner. At any point, issues may

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

be escalated to the appropriate management representative by contacting support@nomadhealth.com or 866-656-6623. Nomad Health will make all reasonable efforts to resolve issues or complaints with all parties in a timely manner.

If any party is concerned about the quality, service, and patient safety standards delivered by Nomad Health or its employees that is not addressed or resolved by Nomad Health, they may contact the Joint Commission via their website (www.jointcommission.org) or calling 630-792-5636. Nomad Health will not retaliate nor take any action against parties that report concerns to the Joint Commission.

## 11.    Drug & Alcohol Free Workplace; Drug & Alcohol Testing

Nomad is committed to protecting the safety, health, and well-being of its employees, nurses, and all people who come into contact with them. We recognize that drug and alcohol abuse pose a direct and significant threat to these goals, and to the goal of a productive and efficient working environment in which all employees have an opportunity to reach their full potential. We therefore are committed to ensuring a drug and alcohol-free working environment for all of our employees, and underscore that commitment through implementation and enforcement of this policy.

### Drug and Alcohol Prohibitions
Being under the influence of, as well as the use, sale, manufacturer, purchase, transfer, dispensation, distribution or possession of an illegal drug or alcohol by any employee or nurse at or about Nomad's premises or a Client Facility, or while operating a vehicle rented, leased to, or owned by Nomad, or while performing any work for Nomad or a Client Facility is expressly prohibited. The presence of alcohol or an illegal drug in any amount in a nurse's body while performing work for Nomad or while on Nomad's premises or at a Client Facility also violates this Policy and is prohibited. Moreover, the use or abuse of illegal drugs or alcohol off the job that impairs, to any extent, performance on the job, is prohibited.

### Use of Medications
If a nurse uses prescription and/or over-the-counter medications that may impair his/her ability to perform his/her job safely, the nurse must inform his/her immediate supervisor at the Client Facility and Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, so that steps may be taken to minimize the safety risks posed by such use. In such circumstances, nurses may be asked to obtain a doctor's certification that they are able to safely perform the responsibilities of their position. Any information that Nomad may learn about a nurse's health or medications will be treated confidentially and shared with personnel only on a need-to-know basis.

### Drug & Alcohol Testing
Unless otherwise required or prohibited by applicable law, Nomad may require applicants and nurses to submit to a drug and alcohol test under the following circumstances, and applicants and nurses hereby consent to such testing:

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

a) **Post-Employment Offer Testing**: After a contingent offer of employment has been extended, the applicant may be required to submit to a drug and alcohol test as a qualification to assume the position. The offer of employment shall be contingent upon the applicant passing the drug and alcohol test. Failure to do so will result in withdrawal of the job offer.

b) **Post-Employment, Pre-Placement Testing**: As a condition of continued employment with Nomad and prior to commencing a placement at a Client Facility, nurses may be required to submit to a drug and alcohol test. Failure to do so will result in withdrawal of the potential placement and potential termination of employment.

c) **Post-Accident Testing**: Where a nurse is involved in an incident or accident that causes personal injury to the nurse or another person or property damage while on duty, under circumstances where drug and/or alcohol use may have contributed to the incident and for which testing can identify impairment caused by drug or alcohol use, the nurse may be asked to submit to a drug and alcohol test.

d) **Reasonable Suspicion Testing**: A drug and alcohol test may be required if there is direct observation of drug or alcohol use, or if significant and observable changes in the nurse's performance, appearance, behavior, speech, etc. provide reasonable suspicion of being under the influence of alcohol and/or drugs. Reasonable suspicion also includes reason to believe a violation of this policy has occurred. As a healthcare professional, you are in a safety-sensitive position. A Nurse will follow applicable Client Facility and State policies and procedures for suspicious drug testing.

Please refer to applicable State-Specific Supplements for any variations to this policy required by applicable law.

All information acquired in the drug and alcohol testing process constitutes private and confidential information that will not be disclosed to any third party individual, other employer, government agency, or private organization without the expressed written consent of the nurse or applicant tested; however, test results may be provided to supervisors and other persons at Client Facilities with a need to know, as permitted by applicable law. Nurses expressly consent to Nomad sharing test results with Client Facilities.

Any nurse who refuses to submit to the testing will be subject to disciplinary action, up to and including the termination of employment. Additionally, nurses in violation of this policy will be subject to disciplinary action, up to and including termination of employment and any applicable placement. In appropriate circumstances, Nomad will notify law enforcement and/or licensing authorities, and cooperate with any resulting investigation and prosecution.

## 12.    Employment Applications

Nomad relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data presented during the hiring, employment, and placement process.

Any misrepresentations, falsifications, or omissions in any of this information may result in the exclusion of the nurse from consideration for employment and/or placements, or, if the person has been hired, termination of employment and cancellation of any placement.

**13.    Immigration Law Compliance**

In compliance with the Immigration Reform and Control Act of 1986, each new employee, as a condition of employment, must complete the Employment Eligibility Verification Form I-9 and present original documentation establishing identity and employment eligibility.

**14.    Confidentiality & HIPAA**

All patient records and information relating to the provision of services by any nurse at any Client Facility are confidential and must, therefore, be treated with the utmost confidence and in compliance with all applicable health information privacy laws, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

As stated more specifically below, nurses must not disclose any confidential information or protected health information, purposefully or inadvertently through casual conversation, to any unauthorized person. Additionally, because nurses perform their services at Client Facilities, there should be no reason why any patient records or protected health information should be transmitted to Nomad.

If any required report by a nurse, as prescribed by Policy No. 10, should require additional details, Nomad will specifically request such details. Initial reports under Policy No. 10, "Required Nurse Reports," must not include protected health information.

***Confidentiality of Patient Information***
All information regarding patients is legally and ethically considered confidential information. This information is not to be disclosed or used in any way other than as needed for treatment of the patient (or as otherwise may be permissible under HIPAA). Accidental or intentional disclosure, modification or destruction of patient information is strictly prohibited.

***Protected Health Information (PHI)***
"Individually identifiable health information" is defined as information that relates to:
- the individual's past, present or future physical or mental health or condition,
- the provision of health care to the individual, or
- the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.

Identifiable information includes, but is not limited to, the following types of information:
- Name
- Any address specification, such as street, city, county, precinct, and zip code
- Dates, such as date of birth, admission date, discharge date, date of death
- Telephone number

- Fax number
- Electronic mail address
- Social Security Number
- Medical record number
- Health plan beneficiary number
- Account number maintained by the healthcare provider
- Certificate or license number, such as driver's license number
- Vehicle identifier and serial number, including license plate number
- Medical device identifier and serial number, such as pacemaker serial number
- Web site address
- Internet protocol (IP) address number
- Biometric identifier, including finger and voice prints
- Full face photographic images or any comparable image
- Any other unique identifying number, characteristic or code

Patients have the right to privacy of their health information, and as such, can dictate with whom they do/do not want their PHI shared. You may, however, use and disclose PHI about a patient in order to carry out treatment. Treatment is defined as the provision, coordination, or management of healthcare and related services by one or more healthcare providers or the referral of a patient for healthcare from one provider to another.

*Minimum Necessary*
In following the rules and regulations under HIPAA, nurses shall abide by the "minimum necessary" rule. Under the HIPAA Privacy Rule, any use and disclosure of a patient's PHI is limited to the minimum necessary to accomplish the intended purposes of the use, disclosure or request. The minimum necessary means that the fewest number of people have access to the minimum amount of information needed to do their jobs. Portions of the patient's PHI must be withheld from those individuals who do not need it to do their jobs.

As stated above, PHI should not be shared with Nomad, unless in furtherance of an investigation by Nomad of a Required Nurse Report (Policy No. 10). However, Nomad will specifically request such details if additional details are needed.

The minimum necessary rule generally does not apply in any of the following circumstances: (a) disclosure to or request by a health care provider for treatment; (b) disclosure to an individual who is the subject of the information or to the individual's personal representative; (c) use or disclosure made pursuant to an individual's authorization; (d) disclosure to the United States Department of Health and Human Services for complaint investigation, compliance, review or enforcement; (e) use or disclosure that is required by other law; or (f) use or disclosure required for compliance with the HIPAA Administrative Simplification Rules.

*Compliance with Client Facilities' Rules & Procedures*
Client Facilities will have patient confidentiality and HIPAA compliance rules in place in their facilities. Nurses are responsible for complying with all such lawful policies and procedures.

*Violations of this Policy*

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Nurses will be subject to appropriate disciplinary action, up to and including termination, for knowingly or unknowingly revealing information of a confidential nature or protected health information.

## 15.    Code of Business Ethics

### 15.1    Scope & Purpose

Nomad is committed to integrity as the fundamental guiding principle for all of the actions taken by our employees and any others who act on our behalf. Nomad's commitment to integrity is a vital component of its mission to deliver exceptional healthcare staffing services. This Code of Business Ethics (the "Code") is a symbol and recognition of that commitment and defines the ethical and legal standards that Nomad expects every employee and others acting on its behalf to follow.

Compliance with the Code is required for all of Nomad's directors, officers and employees (including its nurses) (collectively referred to as "Associates"), as well as other individuals acting on Nomad's behalf.

This Code is designed to help you respond to situations that you may face in performing your everyday duties. Because it is a general resource, it cannot address every situation that you may encounter. In many instances, you may need to refer to one or more of Nomad's policies or procedures. Nomad encourages you to seek additional guidance from your manager or supervisor, another member of management, or, depending on the nature of the issue, Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623

If you encounter situations about which you are unsure, you should not hesitate to utilize any of the resources that are available to you. If you are unsure, ask before you act.

### 15.2    Loyalty & Integrity

As part of Nomad's culture of integrity, Nomad expects its Associates to serve patients and clients with undivided loyalty. This means that the needs and interests of patients, clients, and Nomad take priority over personal interests. You should always:

1.   Put the interests of patients, clients, and Nomad ahead of any other individual business or commercial interest you may have;
2.   Avoid situations in which a conflict of interest could arise; and
3.   Disclose any potential conflict of interest you may have regarding your responsibilities to Nomad and remove the conflict.

Nomad expects each Associate to recognize and avoid activities and relationships that involve or might appear to involve conflicts of interest, and to avoid behavior that may compromise

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Nomad's or the Associate's integrity. If you are unsure whether a situation involves a conflict of interest, ask your manager or supervisor or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

Consistent with the requirement to avoid conflicts of interest, Nomad Associates, who are in a position to select business partners or vendors, must choose based on the merits of the potential partner or vendor, in the best interest of Nomad, and without regard to non-business considerations.

### 15.3    Ethical Standards

**Conflicts of Interest**

A conflict of interest exists when a person's private interest interferes in any way with the interests of Nomad. A conflict can arise when a Nomad Associate takes actions or has interests that may make it difficult to perform his/her work for Nomad objectively and effectively. Conflicts of interest may also arise when a Nomad Associate, or members of his/her family, receive improper personal benefits as a result of his/her position at Nomad.

Loans to, or guarantees of obligations of, Nomad Associates and their family members may create conflicts of interest. It is almost always a conflict of interest for a Nomad Associate to work simultaneously for a competitor of Nomad, a client that Nomad conducts business with, or a supplier of Nomad.

Conflicts of interest may not always be obvious or clear-cut, so if you have a question, you should consult with Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, and if circumstances warrant, the CEO of Nomad. Any Nomad Associate who becomes aware of a conflict or potential conflict should immediately bring it to the attention of Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

All officers and directors of Nomad shall disclose to the CEO of Nomad any material transaction or relationship that could reasonably be expected to give rise to such a conflict. No action may be taken with respect to such transaction or party unless and until the CEO of Nomad has approved such action.

**Corporate Opportunities**

Nomad Associates are prohibited from taking for themselves opportunities that are discovered through the use of corporate information, position or property, without the consent of the Nomad Board of Directors. No Nomad Associate may use corporate information, position or property for improper personal gain, and no employee may compete with Nomad directly or indirectly. Nomad Associates owe a duty to Nomad to advance its legitimate business interests whenever possible.

**Fair Dealing**

Nomad Associates shall behave honestly and ethically at all times and with all people. They shall act in good faith and with due care, and shall engage only in fair and open competition, by treating all competitors, clients, colleagues, etc. in an ethical and fair manner. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. No Nomad Associate should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair practice.

The purpose of business entertainment and gifts in a commercial setting is to create goodwill and sound working relationships, not to gain unfair advantage with clients. No gift or entertainment should ever be offered or accepted by a Nomad Associate or any family member of a Nomad Associate unless it is consistent with customary business practices, is not excessive in value, cannot be construed as a bribe or payoff, and does not violate any local, state or federal law or regulation. The offer or acceptance of cash gifts by any Nomad Associate is prohibited. Nomad Associates should discuss with the Human Resource Department any gifts or proposed gifts, which they think may be inappropriate.

### Insider Trading

Nomad Associates who have access to confidential information are not permitted to use or share that information for any other purpose, except to conduct the business of Nomad. All non-public information about Nomad should be considered confidential information.

### Confidentiality

Nomad Associates must maintain the confidentiality of confidential information entrusted to them, except when the CEO of Nomad authorizes the disclosure or local, state or federal law requires it. Confidential information includes all non-public information that might be of use to competitors or harmful to Nomad or its clients if disclosed. It also includes information that clients or suppliers have entrusted to Nomad. The obligation to preserve confidential information continues even after employment ends.

### Protection and Proper Use of Company Assets

Nomad Associates should always endeavor to protect Nomad's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on Nomad's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation. Nomad's equipment should not be used for non-company business, though incidental personal use is permitted.

The obligation of Nomad Associates to protect Nomad's assets includes its proprietary information. Proprietary information includes intellectual property, such as trade secrets, patents, trademarks, and copyrights, as well as business, marketing and service plans, designs, databases, records, salary information and any unpublished financial data and reports. Unauthorized use or distribution of this information would violate Nomad policy. It could also be illegal and may

result in civil or criminal penalties.

### Compliance with Laws, Rules and Regulations

Obeying the law, both in letter and in spirit, is the foundation on which Nomad's ethical standards are built. In conducting the business of Nomad, Associates shall comply with applicable local, state and federal laws or regulations.

Although not all Nomad Associates are expected to know the details of these laws, it is important to know enough about the applicable local, state and federal laws to determine when to seek advice from managers or supervisors, or other appropriate personnel.

Nomad will comply with all laws that are applicable to Nomad's business activities, and expects that all officers, directors and employees acting on behalf of Nomad will obey the law. Specifically, Nomad is committed to:

1. Maintaining a safe and healthy work environment;
2. Promoting a workplace that is free from discrimination or harassment based on race, color, religion, sex or other factors that are unrelated to Nomad's business interests;
3. Supporting fair competition and laws prohibiting restraints of trade and other unfair trade practices;
4. Keeping the political activities of Nomad's officer, directors, and employees separate from Nomad's business; and
5. Complying with all applicable local, state and federal laws and regulations.

### Timely and Truthful Public Disclosure

In reports and documents submitted to employees, clients, suppliers, Nomad executives, and in other public communications made by Nomad, the Nomad Associates who are involved in the preparation of such reports and documents (including those who are involved in the preparation of financial or other reports and the information included in such reports and documents) shall make disclosures that are full, fair, accurate, timely and understandable. Where applicable, these Nomad Associates shall provide thorough and accurate financial and accounting data for inclusion in such disclosures. They shall not knowingly conceal or falsify information, misrepresent material facts or omit material facts necessary to avoid misleading Nomad's CEO, employees, clients, or suppliers.

### Significant Accounting Deficiencies

The CEO of Nomad shall promptly be notified of any information concerning significant deficiencies in the design or operation of internal control over financial reporting, which could adversely affect Nomad's ability to record, process, summarize and report financial data, any fraud, whether or not material, that involves management or other employees who have a significant role in Nomad's financial reporting, disclosures or internal control over financial reporting.

**Marketing Materials**

All marketing materials shall fully, fairly and accurately represent Nomad and the services it provides. Any Nomad Associates who are involved with preparing such marketing materials shall adhere to this commitment. To this end, officers, directors, and employees shall not make false or misleading statements or representations in its marketing materials.

**15.4    Waivers**

The provisions of this Code may be waived for officers or directors only by a resolution of Nomad's Board of Directors. The provisions of this Code may be waived for employees who are not directors or officers by Nomad's CEO. Any waiver of this Code granted to an officer or director must be promptly disclosed as may be required by local, state and federal law or regulation.

**15.5    Violations of Ethical Standards**

**Reporting Known or Suspected Violations**

Nomad's officers, directors, and employees shall promptly report any known or suspected violations of this Code to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623. Nomad Associates may also report questionable behavior in the same manner as they may report complaints regarding patient care to a third party organization called the Joint Commission.

**No Retaliation**

No retaliatory action of any kind will be permitted against anyone making a report in good faith of a violation of this Code, and Nomad will strictly enforce this prohibition against retaliation.

**Accountability for Violations**

If Nomad determines that this Code has been violated, either directly, by failure to report a violation, or by withholding information related to a violation, the offending Nomad Associate may be disciplined, up to and including termination. Other penalties may include written notices to the individual involved that a violation has been determined, demotion, or re-assignment of the individual involved and suspension with or without pay or benefits. Violations of this Code may also constitute violations of law and may result in criminal penalties and civil liabilities for the offending Nomad Associate and Nomad. All Nomad Associates are expected to cooperate in internal investigations of misconduct.

**15.6    Compliance Procedures**

Everyone at Nomad must work together to ensure consistent and prompt action is taken against violations of this Code. However, in some situations it may be difficult to know if a violation has occurred. Because Nomad cannot anticipate every situation that may arise, it is important that we

have a way to approach a new question or problem. Below are the steps that everyone at Nomad should keep in mind:

1. **Do you have all the facts?** In order to reach the right solution, we must be as informed as possible.

2. **Ask yourself: What specifically am I being asked to do? Does it seem unethical or improper?** This will enable you to focus on the specific question you are faced with, and the alternatives you have. Use your judgment and common sense. If something seems unethical or improper, it probably is.

3. **Clarify your responsibility and role.** Are your colleagues informed? It may help to get others involved and discuss the problem.

4. **Discuss the problem with Human Resources.** This is the basic guidance for all situations.

5. **You may report ethical violations in confidence without fear of retaliation or reprisal.** If your situation requires that your identity be kept secret, your anonymity will be protected to the maximum extent possible consistent with local, state and federal law and regulation. In all circumstances Nomad prohibits retaliation of any kind against those who report ethical violations in good faith.

6. **Ask first, act later.** If you are unsure of what to do in any situation, seek guidance before you act.

## 16.   Updating Nurse Information

Where any of the following nurse information changes, nurses email communicate the changes to their Nomad Navigator or support@nomadhealth.com and (866) 656-6623:

- Legal Name;
- Permanent address;
- Telephone number;
- Changes in marital status and/or number of dependents;
- Emergency contact information; and
- U.S. employment eligibility or authorization.

Keeping this information current and updated is vital for emergencies, payroll, tax withholding, and benefit enrollment purposes.

## 17.   Workers' Compensation; Reporting Accidents and Workplace Injuries

Nurses are covered by Nomad's workers' compensation insurance, which exists to compensate nurses for lost time and medical expenses from covered workplace injuries and illnesses.

If you are injured at work, regardless of the severity of the injury, you must:

   a) Report the injury to your immediate supervisor at the Client Facility **AND** notify Nomad by contacting your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623;

   b) Complete an incident report within 48 hours and submit it to Nomad's Support Team; and

   c) Complete any reports and forms required by the Client Facility, which shall also be provided to Nomad.

Your cooperation in completing the necessary medical forms and reports is essential because Nomad may be required to submit documentation about an injury or illness to appropriate government agencies.

Nomad Nurses are covered by Praetorian Insurance Company located at 1 General Drive, Sun Prairie, WI, 53596. The phone number is (608) 837-4440.

A neglected injury can become a serious problem if not treated promptly. If the injury is of a serious nature, arrangements will be made to provide you medical treatment. You must obtain treatment for work related injuries from our designated providers.

Failure to report an injury or illness at the time of the incident may result in disciplinary action up to and including termination of employment and/or cancellation of a placement. Employees who file exaggerated or fraudulent claims for workers compensation will be subject to immediate termination and will be prosecuted to the fullest extent allowed by law. Employees who falsify information during the course of an accident investigation may be subject to disciplinary action up to and including termination.

## 18.    Job Safety Practices & Procedures

Nomad is committed to providing its nurses with a safe working environment. We want to prevent workplace injuries, and where injuries occur, we want the nurse to receive proper care and treatment. To accomplish these goals, Nomad needs everyone's commitment to safety.

Nurses should practice common sense and must:

   1. Read, understand, and obey all safety regulations, policies, and warnings;

   2. Not attempt to lift or move anything beyond their strength and utilize safe lifting techniques;

   3. Correct safety hazards in their area of responsibility and keep their work area clean and clear;

   4. Immediately report all injuries, regardless of severity, in accordance with Policy No. 17;

   5. Cooperate fully with all investigations; and

6. Immediately report all unsafe working conditions to their immediate supervisor at the Client Facility and to Nomad.

## 19. Payroll Practices

### 19.1 Tracking Time Worked

Nomad is required by law to track and pay nurses for all hours worked. In order to do this, you must accurately track and record worked time—which will be accomplished by (1) completing and submitting your worked hours to Nomad on a weekly basis and (2) utilizing the timekeeping systems and procedures of the Client Facility, if any. It is your responsibility to accurately record all of your time worked. **Do not perform work off the clock**. You are to record and be compensated for all time worked.

To ensure that you are compensated for all work time, in recording your time worked, you must follow these guidelines:

- **Accuracy**: Accurately record your start time and end time, which should coincide with your scheduled shift, unless otherwise directed by your supervisor or your shift is modified. You may not record time for another employee, and you may not have another employee record your time worked. Falsification of any time record is strictly prohibited.
- **No Off the Clock Work**: Do not work off the clock. This means that you must not begin working before your scheduled start time and you must cease working at your scheduled end time, unless you are otherwise directed to continue working and you record the additional time as time worked.
- **Rest Breaks**: Depending upon the Client Facility and applicable law, you may be provided rest breaks. Regular rest breaks of up to 20 minutes or less are compensable time, and you should not clock in or out for rest breaks. Please refer to the State-Specific Supplements for information on required rest breaks, if any. Unless required by applicable law, rest breaks are not guaranteed and will be controlled by the policies and practices of the Client Facility.
- **Lactation & Breastfeeding**: For up to one year after a child's birth, any nurse who is breastfeeding her child will be provided reasonable break times as needed to express breast milk for her baby. Nomad will work with the Client Facility to designate a room for this purpose and provide appropriate refrigeration facilities. Breaks of more than 20 minutes in length taken by nurses for such purposes will be unpaid, and the nurse should indicate this unpaid period on her time record.
- **Meal Breaks**: Meal breaks, wherein you are completely relieved of all work duties and extend for at least 30 minutes, are not compensable time. You should record the start and end time for your meal break on your time record. Some states require that meal breaks be provided, and where they are required, please help Nomad ensure that they are provided. Please refer to the State-Specific Supplements for information on required meal breaks, if any.

Violations of this policy may result in disciplinary action, up to and including termination of employment.

### 19.2    Paydays

Nurses are paid every Friday. Where a regular payday falls on a holiday, payment of wages will be made on the next succeeding business day.

### 19.3    Overtime Pay

Nomad pays its nurses overtime in accordance with all applicable laws. The federal Fair Labor Standards Act ("FLSA") requires that non-exempt nurses be paid at least time and one half their regular rate of pay for all hours worked in excess of 40 hours per week. State law may impose additional overtime obligations, such as overtime pay for more than 12 hours worked in a single day or consecutively or double pay for certain hours. Please refer to the State-Specific Supplements for information on state overtime protections, if any. If there are no state-specific overtime requirements, nurses will be paid overtime for all hours worked in excess of 40 hours in a week.

Although payment for overtime hours will be at least 1 ½ times your regular rate, your Placement Agreement for a particular placement will designate the applicable overtime rate, which may be greater than 1 ½ times the regular rate. The rates provided by the Placement Agreement will control, so long as they are equal to or greater than the rate required by applicable law.

Although your contemplated schedule will be stated in your Placement Agreement, your actual shift and hours at a Client Facility are subject to change and you may be required to work additional hours, including overtime. However, unless your regular schedule contemplates the working of overtime, you should not work overtime or hours in excess of your scheduled work time without approval from your supervisor at the Client Facility.

### 19.4    Holiday Pay

Given the nature of your work, nurses are not paid Holiday-pay where no work is performed. However, we value your work on holidays and want to compensate you fairly for such work. Therefore, when you work on New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, or Christmas Day, you will be paid at least 1 ½ times your regular hourly rate for the hours worked. Your Placement Agreement for a particular placement may also designate an applicable holiday pay rate, which may be greater than 1 ½ times the regular hourly rate. The rates provided by the Placement Agreement will control.

### 19.5    Attendance; No Paid Leave; Absences

Given the nature of travel placements and the needs of patients and Client Facilities, unless otherwise required by applicable law, nurses are not provided paid leave, and attendance at work placements, as stated on the Placement Agreement or otherwise modified by the Client Facility, is mandatory (unless otherwise excused by applicable law, such as the FMLA). If you are unable to work one or part of your scheduled shifts, you must notify your immediate supervisor at the

Client Facility **AND** your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, at least 3 hours before the scheduled start time. If an emergency prevents you from doing so, you must do so as soon as practicable.

When you accept a travel placement, you agree to work the shifts and hours designated on the Placement Agreement and as modified by the Client Facility, for the length of the placement. All requests for approved time off (which is unpaid) must be (1) approved by Nomad and the Client Facility when the placement is accepted, with the time off identified on the Placement Agreement; or (2) approved at least 7 days in advance of the requested leave.

Nomad will comply with state-specific laws related to required leave. Please refer to applicable State-Specific Supplements for additional information.

### 19.6    Payroll Deductions

Nomad will deduct and withhold all applicable and required taxes and deductions for federal and state employment taxes, Social Security, and Medicare Programs, as required by applicable law. You may also arrange for certain voluntary deductions such as those for insurance and other employee benefits, where eligible, which must be done by written agreement. No other deductions will be made absent a written agreement between you and Nomad, or as otherwise required by law (such as wage garnishments served by creditors of employees).

### 19.7    Reporting Pay Errors or Improper Deductions

Nomad makes every effort to ensure employees are paid correctly and for all hours worked. You can assist us in this matter by closely reviewing each pay stub to ensure that your pay was proper. If mistakes are made, either because of improper deductions, hours recorded, or the applicable pay rate, please report the mistakes to your Nomad Navigator or Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623. Upon notification by you, Nomad will conduct a prompt and thorough investigation into the complaint, and will make every effort to conclude that investigation in a reasonable amount of time. If Nomad determines that an error has been made or improper deduction taken, Nomad will fully compensate and/or reimburse you and make a good faith commitment to avoid the error in the future.

### 20.    Benefit Programs

Nomad presently offers various benefit programs to nurses, including medical, dental, and vision insurance, and malpractice insurance coverage, among others, which are discussed in greater detail in applicable Placement Agreements, Summary Plan Description booklets, and Nomad's Benefit Guide. Please see those documents for additional information. As with any benefit program, Nomad reserves the right to amend or terminate any of these programs or to require increases in nurse premium contributions toward any benefits, at any time and for any reason, at Nomad's discretion.

### 21.    Continuing Education

Nomad believes in the importance of its nurses continuing to develop the knowledge and skills necessary to succeed in their jobs and to provide optimum services to patients at Client Facilities. Therefore, all nurses are encouraged to participate in education and training programs that will enhance their knowledge and skills.

Accordingly, Nomad will reimburse nurses for approved continuing education classes, work related in-services, training, and other educational activities, to support the continued development of skills and knowledge in the nursing field. All requests for reimbursement should be submitted allowing for sufficient advance notice. All requests and attendance for continuing education, work related in-services, training, and other educational activities, will be considered subject to the approval of Nomad by emailing navigators@nomadhealth.com. Nomad reserves the right to determine and require nurses to participate in continuing education programs as deemed necessary to enhance the performance of their job.

## 22.    FMLA Leave

### *Basic Leave Entitlement*

Under the Family and Medical Leave Act of 1993 ("FMLA"), nurses may be eligible for up to 12 weeks of unpaid leave in a 12-month period. To be eligible for this leave, a nurse must: (1) have been employed by the Company for at least 12 months; (2) have worked at least 1,250 hours during the 12 months immediately preceding commencement of the leave; and (3) be employed at a location where 50 or more employees are employed or a location where there are 50 or more employees within 75 miles of your location. This leave consists of up to 12 weeks of unpaid leave during a 12-month period for any of the following reasons:

1.    The birth of a son or daughter and in order to care for such son or daughter.
2.    The placement of a son or daughter with you for adoption or foster care.
3.    To care for a spouse, son, daughter or parent with a serious health condition.
4.    Your own serious health condition which makes you unable to perform your job.
5.    To handle various non-medical "qualifying exigencies" arising out of the fact that your spouse, son, daughter or parent is a "military member" on "covered active duty" or on call to "covered active duty status."

Examples of "qualifying exigencies" arising out of the covered active duty, which may qualify for this type of FMLA leave include, but are not necessarily limited to: (a) short-notice deployment (seven calendar days or less); (b) military events and related activities; (c) childcare and school activities; (d) making financial and legal arrangements; (e) counseling sessions for you, the covered military member or for a child or dependent; (f) up to fifteen days of leave to spend time with the covered military member who is on short-term, temporary rest and relaxation leave during the period of deployment; (g) post-deployment activities; (h) parental care leave to care for a military member's parent who is incapable of self-care when the care is necessitated by the member's covered active duty (including arranging for alternative care, providing care on an immediate need basis, admitting or transferring the parent to a care facility, or attending meetings with

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

staff at a care facility); and (i) other events and additional activities that arise out of the military duty if we agree these qualify.

### *Servicemember Family Leave*

Additional leave time may be provided for the spouse, son, daughter, parent, or next of kin of an injured or ill "covered servicemember" or "covered veteran" who is undergoing medical treatment, recuperation, or therapy, is otherwise on outpatient status, or is otherwise on the temporary disability retired list, for a "serious injury or illness."

An eligible nurse who is the spouse, son, daughter, parent, or next of kin of a covered servicemember or covered veteran may be entitled to a total of 26 workweeks of unpaid leave during a single 12-month period to care for the injured or ill servicemember or veteran. Leave to care for an injured or ill covered servicemember, when combined with other FMLA–qualifying leave, may not exceed 26 weeks in a single 12-month period.

For Servicemember Family Leave, the 12-month period begins on the first day of the leave.

### *The 12-Month Period*

In calculating entitlement to FMLA leave, the 12-month period is determined on a "rolling" basis, measured backward from the date a nurse uses any FMLA leave. Under this method, each time a nurse takes FMLA leave, the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months.

By way of example only, if you use four weeks beginning February 1, 2017, four weeks beginning June 1, 2017, and four weeks beginning December 1, 2017, you would not be entitled to any additional FMLA leave until February 1, 2018. However, on February 1, 2018, you would be entitled to four weeks of leave; on June 1, 2018 you would be entitled to an additional four weeks, etc.

### *Using Available Paid Leave*

Unless otherwise required by applicable law, nurses do not accrue paid leave. Notwithstanding, available paid leave (if any) must be used as part of your FMLA leave that would otherwise be unpaid. Nurses on leave for a condition or injury covered by Worker's Compensation will be required to take FMLA leave concurrently with that Worker's Compensation leave.

### *Notice and Certification*

In the case of foreseeable leave, you must provide 30 days advance notice, if possible. If 30 days notice is not possible, notice must be provided as soon as possible. If it is necessary for you to take leave to obtain planned medical treatment, you must make a reasonable effort to schedule the treatment so it does not disrupt our operations. In some cases, you may need leave on only an intermittent basis. In those cases, you may be assigned to an alternative position which better accommodates your intermittent absences.

In the case of leave due to the serious health condition of you or your spouse, child or parent, you will be required to provide appropriate medical certification. This certification must include information such as the date the serious health condition commenced; the probable duration of

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

the condition; the appropriate medical facts within the knowledge of the health care provider regarding the condition; and, in the case of your own serious health condition, a statement from a health care provider that you are unable to perform your job duties. In addition, if your leave is to care for a family member, the health care provider must indicate that you are needed to care for the family member and provide an estimate of the time you will be needed.

In the case of servicemember family leave, you must provide appropriate certification to confirm the family member is a "covered servicemember" or "covered veteran." This certification must include information such as the date the serious injury or illness commenced, the probable duration of the serious injury or illness, and the appropriate medical facts within the knowledge of the health care provider regarding the condition. In addition, the health care provider must indicate that you are needed to care for the covered servicemember and provide an estimate of the time you will be needed, and if the individual is a covered veteran, confirmation that the military member is a veteran, the date of separation, and whether the separation was other than dishonorable.

In the case of military "qualifying exigency" leave, you will be required to provide appropriate documentation and certification of the need for leave and certain details related to the leave, including but not limited to, where applicable, a copy of the military member's Rest and Recuperation leave orders, or other documentation issued by the military setting forth the dates of the military member's leave.

### *Return to Work and Benefits*
Upon return from your leave, we will make a reasonable effort to reinstate you to your former position or to an equivalent position. Your seniority and benefits will not continue accruing during any unpaid period of your leave. If you are returning from a leave due to your own serious health condition, you must provide a note from your healthcare provider releasing you to work.

Any group insurance you had prior to leave, if any, will continue during the term of your leave on the same basis as if you were not absent from work, including your obligation to pay your normal portion of the premium. Please note that if you fail to return from your leave, we may recover from you the cost of any premiums paid on your behalf to continue insurance coverage, as allowed by law.

It is impossible to cover all aspects of family and medical leave in this policy. Therefore, when you determine that you will need to take leave under this policy, please contact Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, for additional details. For further information, you may also refer to the Federal Department of Labor's "Employee Rights and Responsibilities" notice.

## 23.    Military Leave

Employees required to be absent from employment for the purposes of military service, training, and/or examination in the Uniformed Services, as defined by law, will be granted a military leave of absence in accordance with the law, including the Uniformed Services Employment and

Reemployment Rights Act (USERRA) and any applicable state law. If you have questions about military leave or may need military leave, please contact Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

## 24.    Property Searches; No Expectation of Privacy

Nomad and Client Facilities retain the right to access, inspect, monitor, and search their respective Company property, including computers, desks, file cabinets, storage facilities, lockers, and files and folders, electronic or otherwise, at any time, as well as all items brought onto the premises by nurses, whether locked or secured by the nurse or not. During these inspections, Nomad or the Client Facility may, without the permission of the nurse, remove Company property or any other items in violation of Company policy. Generally, at least two persons will conduct the inspection, and inspections may or may not be made in the presence of the employee.

Thus, do not bring any personal items, property, or materials to work if you do not wish for the information to be made known. As a result, you should not have any expectation of privacy for information, items, or materials stored or kept at work.

Refusal to cooperate with or permit such searches will be grounds for disciplinary action up to and including termination of employment and/or cancellation of a travel placement.

## 25.    Safe Vehicle Operation Policy; Automobile Insurance

Cell phones may never be utilized, nor may a nurse text or call, while operating any vehicle owned, operated, or rented by Nomad, or while driving a personal vehicle (whether owned or rented) on Nomad business or connection with any placement. Nurses shall (a) comply with all rules of the road, (b) obey all traffic laws, (c) avoid any and all activities which may distract him/her from safely operating the vehicle, (d) not operate a vehicle under the influence of drugs or alcohol, (e) exercise due care for all other drivers, and (f) maintain a valid driver's license. Failure to do so may result in disciplinary action, up to and including termination of employment.

Where a nurse utilizes his/her own vehicle while on a placement, whether for personal or Nomad purposes, the nurse shall be required to maintain personal automobile insurance coverage with limits of at least $100,000/$300,000 during the entirety of the placement and shall furnish proof of insurance and a valid driver's license to Nomad.

Where a nurse obtains a rental vehicle during a Placement, whether for personal or Nomad purposes, he/she shall be required to accept the automobile insurance coverage offered by the rental company, and shall provide proof of such acceptance to Nomad, along with a copy of his/her valid driver's license.

Nothing in this policy requires that any nurse utilize his/her personal vehicle or a rental vehicle while on a placement. You are free to elect to use public transportation or other means of transport, so long as you are punctual and work your required shifts.

## 26.    Nurse Conduct and Work Rules

We expect nurses to conduct themselves in a manner that reflects positively of themselves and Nomad, and that provides the highest quality of care to patients and service to Client Facilities. While it is impossible to list every action that is unacceptable conduct, the following lists some examples. Nurses who break work rules such as these may be subject to disciplinary action, up to and including termination of employment and/or cancellation of a placement:

- Violations of Company policy, including but not limited to policies prohibiting discrimination, harassment, and/or retaliation;
- Theft or inappropriate removal or possession of property;
- Falsification of timekeeping records;
- Falsification of employment information;
- Working under the influence of alcohol or illegal drugs;
- Possession, distribution, sale, transfer, or use of alcohol or illegal drugs in the workplace or while on duty;
- Fighting or threatening violence in the workplace;
- Boisterous or disruptive activity in the workplace;
- Insubordination or other disrespectful conduct;
- Violation of safety or health rules;
- Failure to provide medical care and treatment in accordance with best practices and the required standard of care;
- Abuse, neglect, or mistreatment of a patient;
- Failure to adhere to compliance guidelines;
- Smoking in prohibited areas;
- Excessive tardiness and/or absenteeism or any absence without notice;
- Use of personal electronic devices while working;
- Sleeping on duty;
- Breach of patient, colleague, business confidentiality;
- Unsatisfactory performance;
- Failure to provide Nomad with updated requirements upon request prior to expiration
- Other misconduct as determined at the Company's discretion.

Nothing herein shall be construed to alter the at-will employment relationship between Nomad and its nurses.

Nurses should bring government issued photo identification with them on their first day of their employment and present it to the appropriate party for verification.

## 27.    Progressive Discipline

We believe it is important that disciplinary actions are prompt, consistent, and impartial. The major purpose of a disciplinary action is to correct the problem, prevent it from happening again, and prepare the nurse for satisfactory performance in the future.

Although employment is based on mutual consent and both Nomad and nurses have the right to terminate employment at will, with or without cause or advance notice, Nomad may use progressive discipline at its discretion. Nomad, however, reserves the right to determine the appropriate discipline under the circumstances, including immediate termination and/or cancellation of a placement. Thus, any of the following steps may be bypassed as deemed appropriate by Nomad. Please note that the same workplace violation or performance issue need not occur in order to progress through the disciplinary steps.

Appropriate disciplinary action may include, but is not limited, to any of the following progressive disciplinary steps: 1) verbal warning, 2) written warning 3) cancellation of a placement, or 4) termination of employment. While many disciplinary issues may start at a verbal warning, Nomad will evaluate how severe the problem is and how often it has happened when deciding which step to take. The progressive discipline policy contains guidelines only and should not be considered contractual in nature. Nomad reserves the right to discipline in the manner it determines is in the best interest of the organization and patients it serves.

By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both the employee and the Company. Progressive discipline and evaluation of issues will be discussed with the Nurse and documented internally. However, nothing herein alters the at-will employment relationship between Nomad and its nurses.

# III.  STATE-SPECIFIC SUPPLEMENTS

**1.**     **Effect of State-Specific Supplements to Nurse Employee Handbook**

Nurses are expected to comply with all policies in this Nurse Employee Handbook and all policies found in this State-Specific Supplement. Where the Handbook and the State-Specific Supplement conflict, the policy set forth in the State-Specific Supplement controls. Where the State-Specific Supplement is silent on an issue, the Handbook policy continues to govern.

**[State-Specific Supplements are Set Forth on the Following Pages]**

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

## 2.      Alabama

The following policies shall apply to nurses on assignment in Alabama:

### 2.1      Jury Duty Leave

Upon receipt of a jury summons, a nurse must notify Nomad and the Client Facility of the date such service is anticipated to begin. Nurses who have been summoned for jury duty will be provided paid leave to complete such jury service. The leave time will be determined by the length of the jury service.

### 2.2      Voting Leave

On Election Day, if the voting polls open less than 2 hours before the end of a nurse's shift and do not remain open for at least 1 hour after the end of the shift, a nurse entitled to vote in Alabama will be provided up to 1 hour of unpaid leave from work to vote, upon a reasonable request for such leave. Generally, the request need be made prior to Election Day, and Nomad may dictate when such leave is taken.

### 2.3      Crime Victim Leave

Nurses who have been a victim of a crime may seek unpaid leave to attend a proceeding in court and/or participate in the reasonable preparation of criminal proceedings.

### 2.4      Military Leave

Nurses who are active members of the Alabama National Guard, Naval Militia, the Alabama State Guard organized in lieu of the National Guard, or of any other reserve component of the armed forces of the United States will be provided leave as required by Alabama Code § 31-2-13, as interpreted, in addition to any rights to military leave under applicable federal law. If you learn that such leave may be needed, please contact Nomad as soon as possible.

3:23-cv-03197-CRL-EIL     # 1     Filed: 06/06/23     Page 68 of 225

### 3.     Alaska

The following policies shall apply to nurses on assignment in Alaska:

#### 3.1     Overtime Pay

Nurses are entitled to overtime at a rate of at least 1 ½ times the regular rate of all hours worked in excess of 40 per workweek or 8 hours per workday.

#### 3.2     Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service.

#### 3.3     Voting Leave

If there are less than 2 hours between the opening and closing of the polls during which a nurse is not required to be on the job on Election Day, and the nurse is eligible to vote in Alaska, the nurse will be provided up to 2 hours of paid leave in which to vote. Nomad will specify the hours of leave.

#### 3.4     Military Leave

Nurses who are members of the state militia, including the Alaska National Guard, the Alaska Naval Militia, and the Alaska State Defense Force, will be provided unpaid leave and reinstatement as required by Ala. Code 26.05.075, in addition to any rights to military leave under applicable federal law. If you learn that such leave may be needed, please contact Nomad as soon as possible.

#### 3.5     Drug Testing

In Alaska, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy also includes the following provisions:

1. All testing and sample collection shall be in compliance with Ala. Code § 23.10.640.
2. Nurses have a right to a confirmatory drug test to be reviewed by a licensed physician or doctor of osteopathy after an initial positive drug test result, in accordance with Ala. Code § 23.10.640(d). The physician or osteopath will (1) contact the nurse within 48 hours and offer an opportunity to discuss the confirming test result; (2) interpret and evaluate the positive drug test results for legal use; and (3) report test results that have been caused by prescription medication as negative.
3. Nurses have the right, at their request, to obtain the written test results within five working days after a written request is made, so long as the written request is made within six months after the date of the test.
4. Nurses have the right, at the nurses' request, to explain in a confidential setting, a positive test result. To exercise that right, the request must be made within 10 working days after notification of the positive test result. Where such opportunity is requested, it will occur

within 72 hours after receiving the request or before taking adverse employment action.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

4.    **Arizona**

The following policies shall apply to nurses on assignment in Arizona:

4.1    **Paid Sick Leave**

Nurses on assignment at Client Facilities in Arizona will accrue 1 hour of Paid Sick Leave for every 30 hours worked. Paid Sick Leave begins to accrue at the commencement of employment at a Client Facility in Arizona. Nurses may not accrue or use more than 40 hours of earned paid sick time per calendar year.

Paid Sick Leave can be used to care for oneself, or the care of a family member with a mental or physical illness, injury, or health condition. Nurses must generally comply with Nomad's regular call-in procedures.

Nurses may retain and use accrued and unused Paid Sick Leave after leaving the Arizona Client Facility, even at assignments with Client Facilities outside of Arizona. However, only time worked at an Arizona Client Facility will accrue Paid Sick Leave under this policy.

Accrued Paid Sick Leave will <u>not</u> be paid at termination of employment, but will instead be lost, except where the employee is rehired within 9 months.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued paid sick leave.

4.2    **Jury Duty Leave**

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service.

4.3    **Voting Leave**

If there are less than 3 consecutive hours between the opening of the polls and the beginning of the regular work shift or between the end of the regular work shift and the closing of the polls, a nurse entitled to vote in Arizona, may seek leave from work to vote. Approved voting leave will be paid. Any nurses wishing to take time from work to vote must apply for such leave prior to the day of election.

4.4    **Crime Victim Leave**

Nurses who have been a victim of a crime may seek unpaid leave to attend a proceeding in court and/or to obtain or attempt to obtain an order for protection or a form of injunction to ensure the health, safety, or welfare of the victim or the victim's child. Nurses may elect to use Paid Sick Leave in this situation.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

5.      **Arkansas**

The following policies shall apply to nurses on assignment in Arkansas:

    5.1      **Jury Duty Leave**

Nurses summoned for jury duty are entitled to unpaid leave to serve on a jury. The amount of leave granted will be based on the duration of the jury service.

    5.2      **Voting Leave**

Nurses who are registered to vote in Arkansas, will be scheduled on Election Day in a manner that provides the nurse sufficient time to vote.

    5.3      **Drug Testing**

In Arkansas, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy also includes the following provisions:

1.  All testing shall be in compliance with Ark. Code Ann. § 11-14-101 et seq.
2.  Pursuant to Ark. Code Ann. § 11-14-101(b), a nurse who fails a drug or alcohol test or who refuses to submit to a drug or alcohol test may be precluded from receiving applicable workers' compensation and indemnity benefits.
3.  Nomad may also conduct routine fitness-for-duty drug testing consistent with Ark. Code Ann. § 11-14-106(3) and follow-up drug testing consistent with Ark. Code Ann. § 11-14-106(4).
4.  Employee Assistance Programs may be available to assist nurses with drug or alcohol problems. For additional information regarding potential resources or programs in your area, please contact Nomad.
5.  Nomad will test nurses for all illegal drugs, including but not limited to: Amphetamines, Cannabinoids, Cocaine, Phencyclidine (PCP), Hallucinogens, Methaqualone, Opiates, Barbiturates, Benzodiazepines, Synthetic narcotics, Designer drugs, and a metabolite of any of these substances.
6.  An applicant or nurse who tests positive for alcohol or drugs may contest or explain the result to the medical review officer within five (5) working days after receiving written notification of the test result. If the explanation or challenge is unsatisfactory to the medical review officer, the medical review officer shall report a positive test result to Nomad and the nurse may contest the result pursuant to the rules adopted by the Workers' Health and Safety Division of the Workers' Compensation Commission. Where such action is brought, the applicant or nurse must notify the laboratory of such action.

6.      **California**

The following policies shall apply to nurses on assignment in California:

### 6.1     Meal and Rest Breaks

Nurses who work for a period of more than 5 hours per day are entitled to a meal period of not less than 30 minutes, except if the total work period per pay is no more than 6 hours. Nurses who work more than 10 hours per day are entitled to a second meal period of not less than 30 minutes, except if the total hours worked is no more than 12 hours. Meal periods may be waived by mutual consent of the nurse and Nomad.

Nurses are permitted to take rest periods, which insofar as practicable must be in the middle of each work period. The authorized rest period time must be based on the total hours worked daily at the rate of 10 minutes net rest time per 4 hours. Please work with the Client Facility in scheduling such rest breaks.

### 6.2     Overtime Pay

Nurses are entitled to overtime at the rate of at least 1 ½ times the regular rate of pay for all hours worked in excess of 8 hours and up to and including 12 hours in any workday, and for the first 8 hours worked on the 7th consecutive day of work in a week. Nomad will pay overtime pay at the rate of 2 times the regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of 8 on the 7th consecutive day of work in a week.

### 6.3     Jury Duty Leave

Nurses summoned for jury duty are entitled to unpaid leave to serve on a jury. The amount of leave granted will be based on the duration of the jury service.

### 6.4     Witness Duty Leave

Nurses summoned to be a witness in a court proceeding, as a crime victim or otherwise, are entitled to unpaid leave to serve as a witness. The amount of leave granted will be based on the amount of time need to appear in court.

### 6.5     Domestic Violence Leave

Nurses who are victims of domestic violence, sexual assault, or stalking are entitled to unpaid leave to seek a restraining order, seek medical attention, obtain services from a domestic violence shelter or rape crisis center, obtain counseling, or participate in safety planning.

### 6.6     Military Spouse Leave

Nurses whose spouse is a member of the Armed Forces of the United States, National Guard, or the reserves, and the spouse is on leave from deployment during a period of military conflict, are

entitled to take up to 10 days of unpaid leave.

### 6.7    Voting Leave

Nurses who are registered to vote in California, and do not have sufficient time outside of working hours to vote, the nurse may take leave to vote. No more than 2 hours of leave can be taken without loss of pay. Nurses shall provide notice of taking voting leave 3 days prior to Election Day.

### 6.8    Alcohol and Drug Rehabilitation Leave

Nurses may take unpaid leave to enter and participate in a drug or alcohol rehabilitation program, as long as the leave does not impose an undue hardship on Nomad or a Client Facility. Nurses may also use accrued Paid Sick leave to attend a drug or alcohol rehabilitation program.

### 6.9    Paid Kin Care Leave

Nurses may use up to one-half of their accrued and available Paid Sick Leave to attend to an illness or the preventative care of a family member. Nurses do not receive additional sick leave under California's Kin Care Leave.

### 6.10    Paid Sick Leave

Nurses who work at Client Facilities in California for 30 or more days within a year are entitled to Paid Sick Leave. Nurses are entitled to use up to 3 days or 24 hours of accrued Paid Sick Leave per year.

Nurses accrue Paid Sick Leave at the rate of one hour per every 30 hours worked on assignment in California, beginning at the commencement of employment. Nurses are entitled to use accrued paid sick days beginning on the 90th day of employment.

Paid Sick Leave may be used for the diagnosis, care, or treatment of an existing health condition, or preventive care, for oneself or a family member. Such Paid Sick Leave may only be used on assignments at Client Facilities within the State of California. Nurses must generally comply with Nomad's regular call-in procedures.

Accrued Paid Sick Leave will not be paid at termination of employment, but will instead be lost.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued Paid Sick Leave.

In addition to the state Paid Sick Leave law, the following municipalities in California have enacted paid sick leave laws which may provide lesser, greater, or equivalent sick leave benefits:
- Berkeley
- Emeryville
- Los Angeles

- Oakland
- San Diego
- San Francisco
- Santa Monica

Nurses working in one of the above-mentioned municipalities are covered under both California's Paid Sick Leave law and the municipality's law. Nomad will follow the law most beneficial to the nurse where the two laws conflict.

### 6.11    Pregnancy Disability Leave

Nurses disabled by pregnancy, childbirth, or a related medical condition may take up to 4 months of unpaid pregnancy disability leave. A pregnancy disability is a physical or mental condition related to pregnancy or childbirth that prevents you from performing essential duties of your job, or if your job would cause undue risk to you or your pregnancy's successful completion.

A nurse should inform Nomad as soon as possible if the nurse believes she will need to take time off from work due to a pregnancy-related disability. If possible, 30 days' notice is preferred.

Nomad may require you to provide a written medical certification from your health care provider substantiating your need for leave. Pregnancy disability leave does not provide for time off for bonding time after the birth or placement of a child in foster care or adoption.

Leave under this policy may also qualify as FMLA leave. If so, this leave and FMLA leave will run concurrently.

### 6.12    California Paid Family Leave

The California Paid Family Leave Act provides temporary disability insurance benefits to workers to care for their family members. Family temporary disability insurance provides up to 6 weeks of wage replacement benefits to nurses who take time off to care for a seriously ill child, spouse, parent, grandparent, grandchild, sibling, domestic partner, or to bond with a minor child within one year of birth or placement in foster care or adoption.

In order to be eligible for Paid Family Leave, a nurse must:
1. Be unable to do your regular or customary work due to the need to provide care for a seriously ill family member or to bond with a new child.
2. Be employed or actively looking for work at the time your family leave begins.
3. Have lost wages because you were caring for a seriously ill family member or bonding with a new child.
4. Have earned at least $300 from which State Disability Insurance (SDI) deductions were withheld during your base period.
5. Complete and submit your claim form no earlier than the first day your family leave begins, but no later than 41 days after your family leave begins or you may lose benefits.
6. Provide a medical certificate on your care claim for the seriously ill family member. The certificate must be completed by the care recipient's physician/practitioner.

Nurses are eligible to receive family temporary disability insurance benefits equal to $1/7^{th}$ of his or her weekly benefit amount for each full day during which he or she is unable to work. The maximum amount payable during any disability period is 6 times his or her weekly benefit amount. No more than 6 weeks of family temporary disability insurance benefits shall be paid within any 12 month period.

### 6.13    San Francisco Paid Parental Leave

Nurses who are working in a Client Facility in San Francisco, and are receiving California Paid Family Leave benefits may be eligible for San Francisco Paid Parental Leave. The San Francisco Paid Parental Leave provides supplemental compensation for San Francisco workers.

To be eligible, the nurse must do the following:
- The nurse commenced work for Client Facility located in San Francisco at least 180 days before the start of the nurse's Paid Family Leave payment period;
- The nurse works at least 8 hours per week in San Francisco for a covered employer;
- The nurse works in San Francisco for at least 40% of his or her weekly hours for a covered employer; and
- The nurse is receiving California Paid Family Leave benefits.

Nurses eligible for San Francisco's Paid Parental Leave will receive supplemental compensation in the amount of the difference between the nurse's normal weekly wage and the California Paid Family Leave benefit amount.

7.       **Colorado**

The following policies shall apply to nurses on assignment in Colorado:

### 7.1       Meal and Rest Breaks

Nurses are entitled to an uninterrupted and "duty free" meal period of at least 30 minutes when the scheduled work shift exceeds 5 consecutive hours.

Nurses are permitted to take rest periods, which, insofar as practicable, in the middle of each 4 hour work period. A compensated 10 minute rest period for each 4 hours or major fractions thereof is permitted.

### 7.2       Overtime Pay

Nurses are entitled to overtime at a rate of at least 1 ½ times the regular rate for all hours worked in excess of 40 per workweek, 12 hours per workday, or 12 consecutive hours—whichever calculation results in the highest pay.

### 7.3       Jury Duty Leave

Nurses who have been summoned for jury duty may take leave to serve on a jury. The leave time will be determined by the length of the jury service. For the first 3 days of any jury leave, the nurse will be paid a daily wage of $50 by Nomad. Jury leave beyond 3 days will be unpaid.

### 7.4       Voting Leave

If there are less than 3 hours between the opening and closing of the polls during which a nurse is not required to be on the job on Election Day, and the nurse is eligible to vote in Colorado, the nurse will be provided up to 2 hours of paid leave in which to vote. Nomad will specify the hours of leave, but the leave will be at the beginning or ending of the shift, if so requested by the nurse. Any nurses wishing to take this voting leave must apply for such leave prior to Election Day.

### 7.5       Domestic Violence Leave

Nurses in Colorado who are victims of domestic abuse, stalking, sexual assault, or any other crime, are entitled to up to 3 days of unpaid leave per 12 month period for various activities related to the same, including but not limited to seeking a protective order, seeking medical care and mental health care, securing the home, and seeking legal advice. Any use of such leave will be strictly confidential. For additional information, please contact Nomad or refer to Colo. Rev. Stat. § 24-34-402.7.

### 7.6       Colorado's Family Care Act (relating to use of FMLA leave rights)

Colorado's Family Care Act ("FCA") expands the family relationships for which FMLA leave can be taken, but in doing so creates a state-provided leave program. In addition to the familial

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

relationships listed in the FMLA, nurses in Colorado, if they meet all eligibility requirements for leave under the FMLA, may also take FCA leave for to care for the serious medical condition of a "person to whom the employee is related by blood, adoption, legal custody, marriage, or civil union or with whom the employee resides and is in a committed relationship with." If the leave is covered by both the FCA and the FMLA, the leave will run concurrently under both laws. The certification, documentation, and notification rules of Nomad's FMLA policy shall apply to FCA leave requests.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

8.      **Connecticut**

The following policies shall apply to nurses on assignment in Connecticut:

8.1      **Meal Breaks**

Nurses who work 7 ½ or more consecutive hours are permitted an unpaid meal break of at least 30 consecutive minutes. Meal breaks must occur after the first 2 hours of work and before the last 2 hours of work. Some exceptions may apply.

8.2      **Jury Duty Leave**

Nurses who serve on a jury will be paid regular wages for the first 5 days of jury service. A juror who serves more than 5 days will be paid by the state at a rate of $50 per day of service.

8.3      **Victims of Family Violence Leave**

Any nurse that is a victim of family violence is permitted to take unpaid leave to seek medical or psychological care, to obtain services from a victim services organization, to relocate due to the family violence, or to participate in any civil or criminal proceeding related to or resulting from the family violence. It is required to provide advance notice of taking leave if such leave is foreseeable.

8.4      **Paid Sick Leave**

Nurses will accrue 1 hour of Paid Sick Leave for every 40 hours worked. Nurses will be entitled to use accrued Paid Sick Leave upon the completion of 618 hours of work at a Connecticut Client Facility. Nurses may carry over unused hours of Paid Sick Leave from the current year to the following year, but may not use more than 40 hours of Paid Sick Leave per year.

Paid Sick Leave may be used to care for oneself, or to care for the nurse's child's or spouse's illness, injury, or health condition. Such Paid Sick Leave may only be used on assignments at Client Facilities within the State of Connecticut. Nurses must generally comply with Nomad's regular call-in procedures.

Accrued Paid Sick Leave will <u>not</u> be paid at termination of employment, but will instead be lost.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued paid sick leave.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

9.      **Delaware**

The following policies shall apply to nurses on assignment in Delaware:

### 9.1      Meal and Rest Breaks

Except where a specific exemption applies, nurses will receive a meal break of at least 30 minutes if the nurse is scheduled to work 7.5 or more hours per day. Such meal break will be given sometime after the first 2 hours of work and before the last 2 hours of work.

### 9.2      Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 9.3      Crime Victims Leave

To the extent required by law, the following nurses may take leave to attend judicial proceedings related to a crime or to prepare for a criminal judicial proceeding related to a crime:
- Nurses who are victims of certain, specified crimes.
- Nurses who attend a criminal proceeding in response to a subpoena.
- Spouses, domestic partners, adult children, step-children, parents, or siblings of a deceased victim.
- Parents, guardians, or custodians of victims who cannot understand or participate in the legal process because of a physical, psychological, or mental impairment.

Please notify Nomad and the Client Facility if you require such leave. Retaliation against nurses requesting leave under this policy is strictly prohibited.

### 9.4      Volunteer Emergency Responders Leave

Nurses who are volunteer firefighters, members of a ladies auxiliary of a volunteer fire company, volunteer emergency medical technicians, or volunteer fire police officers are permitted to take unpaid leave:
- For up to seven consecutive days of work to respond to a Governor-declared state of emergency.
- For up to 14 consecutive days of work to respond to a President-declared state of emergency.
- For injuries sustained while acting as a volunteer emergency responder.

Nurses must notify Nomad and the Client Facility as soon as they are aware of the dates they will be taking leave. Nurses must also provide certification from the person in charge of the volunteer emergency service or the responsible medical professional. The certification must specify the date and time of the emergency and the date and time the volunteer activities were completed.

### 9.5    Pregnancy Accommodation

Nomad will provide reasonable accommodations to nurses for the known limitations of a nurse relating to pregnancy, childbirth, or a related condition, unless doing so would result in an undue hardship to Nomad. Reasonable accommodation with respect to pregnancy, childbirth, or related medical conditions, may include, but is not limited to: acquisition of equipment for sitting, more frequent or longer breaks, periodic rest, assistance with manual labor, job restructuring, light duty assignments, modified work schedules, temporary transfers to less strenuous or hazardous work, time off to recover from childbirth, or break time and appropriate facilities for expressing breast milk.

Any nurse who requires such accommodation should make a request for accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

10.    **Florida**

The following policies shall apply to nurses on assignment in Florida:

### 10.1    Jury Duty Leave

Nurses who have been called for jury duty may take unpaid leave to serve as a juror. The leave time is determined by the length of the jury service.

### 10.2    Leave for Victims of Domestic or Sexual Violence

Eligible nurses who have been the victims of domestic or sexual violence, or whose family members have been so victimized, may take up to 3 working days of unpaid leave in a 12 month period to seek judicial protection from domestic violence, obtain medical care or counseling, seek legal assistance, obtain other services from a victim services organization, or to make needed housing arrangements. Unless leave is taken for an emergency, the nurse seeking leave should comply with Nomad's time-off notice requirements. For additional information, please refer to Fla. Stat. § 741.313.

## 11.    Georgia

The following policies shall apply to nurses on assignment in Georgia:

### 11.1    Jury Duty Leave

Nurses who have been summoned to serve on a jury will be entitled to their regular wages during jury service. If the court provides compensation for jury service, Nomad will offset any amounts received by the nurse for the time of jury service against the wages due. The amount of leave is determined by the length of the jury service.

### 11.2    Voting Leave

Nurses who are registered to vote in a particular election may take unpaid leave to vote, unless their shift begins at least 2 hours after the opening of the polls or ends at least 2 hours prior to the closing of the polls. Nurses will be given up to 2 hours of unpaid leave to vote.

## 12.    Hawaii

The following policies shall apply to nurses on assignment in Hawaii:

### 12.1    Jury Duty Leave

Nurses summoned for jury duty are entitled to unpaid leave to serve on a jury. The amount of leave granted will be based on the duration of the jury service.

### 12.2    Voting Leave

Nurses who are registered to vote in Hawaii, may take up to 2 hours of paid leave from work to vote (not counting a meal period or break). Nurses are only eligible for leave if they do not have 2 consecutive hours outside of their work shift to vote. Nurses will continue to be paid during voting leave, so long as the nurse actually votes.

### 12.3    Hawaii Victims Leave Act

Nurses who have worked for Nomad for at least 6 consecutive months and are victims of domestic or sexual violence, or whose minor child has been so victimized, may take up to 30 working days of unpaid leave in a calendar year to a) seek medical attention for the nurse or nurse's minor child to recover from physical or psychological injury or disability caused by domestic or sexual violence; (b) obtain services from a victim services organization; (c) obtain psychological or other counseling; (d) temporarily or permanently relocate; or (e) take legal action, including preparing for or participating in any civil or criminal legal proceeding related to or resulting from the domestic or sexual violence, or other actions to enhance the physical, psychological, or economic health or safety of the nurse or the nurse's minor child or to enhance the safety of those who associate with or work with the nurse.

Unless leave is taken for an emergency, a nurse seeking leave should inform Nomad and the Client Facility of need for such leave. The nurse should report status regarding timing of intended return once per week.

Certification of the need for leave may be required in accordance with Haw. Rev. Stat. § 378-72. Information shared by a nurse utilizing this leave shall be kept in the strictest confidence.

Leave under this policy will be unpaid.

### 12.4    Reasonable Accommodations for Nurses Who Are Victims of Domestic or Sexual Abuse

Unless it would cause and undue hardship on Nomad's business operations or the business operations of the Client Facility, Nomad shall make reasonable accommodations in the workplace for a nurse who is a victim of domestic or sexual violence, consistent with Haw. Rev. Stat. § 378-81. If you are in need of such accommodation, please contact Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

### 12.5    Pregnancy Disability Leave

Consistent with Haw. Admin. Rules § 12-46-107, Nomad shall make every reasonable accommodation to the needs of nurses affected by disability due to and resulting from pregnancy, childbirth, or related medical conditions. Female nurses with a disability due to and resulting from pregnancy, childbirth, or related medical conditions, will be granted an unpaid leave of absence for a reasonable period of time as determined by their physician.

Before the unpaid leave begins, a nurse must submit a physician's certificate estimating the length of the leave and the estimated commencement and termination dates of the leave. On timely returning to work, the nurse will be reinstated to her original job or to a position of comparable status and pay without the loss of seniority and privileges. During leave, a nurse may qualify for temporary disability benefits or paid time off benefits to the same extent as any other employee.

### 12.6    Hawaii's Family Leave Law

Nurses who have worked for Nomad for at least 6 consecutive months are eligible for 4 weeks of unpaid leave per year for family leave purposes authorized by Hawaii's Family Leave Law, including leave for the birth or adoption of a child or to care for the nurse's child, spouse, reciprocal beneficiary, sibling or parent with a serious health condition. Where such leave qualifies as FMLA leave, such leaves will run concurrently.

Where the need for such leave is foreseeable, the nurse must provide Nomad and the Client Facility with prior notice in a manner that is reasonable and practicable. Nomad may require certification of the need for such leave in accordance with Haw. Rev. Stat. § 398-6.

Upon return from family leave, the nurse shall be entitled to be restored to the position of employment held by the nurse when the leave commenced, or restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. If, however, during a leave, Nomad or a Client Facility experiences a layoff or workforce reduction and the nurse would have lost a position had the nurse not been on family leave, the nurse is not entitled to reinstatement in the former or equivalent position. In such circumstances, the nurse retains all rights, including seniority rights, pursuant to the good faith operation of a bona fide layoff and recall system.

### 12.7    Temporary Disability Insurance

In compliance with state law, Nomad provides Temporary Disability Insurance to eligible nurses. Disability claims must be filed within 90 days from the date of disability. To file a claim, please contact Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, who will provide the requisite forms.

### 12.8    Drug Testing

In Hawaii, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy, also includes the following provisions:

1. All drug testing shall be in compliance with Haw. Rev. Stat. § 329B-1 *et seq.*
2. Nomad will test nurses for all illegal drugs, including but not limited to: Amphetamines, Cannabinoids, Cocaine, Phencyclidine (PCP), Hallucinogens, Methaqualone, Opiates, Barbiturates, Benzodiazepines, Synthetic narcotics, Designer drugs, and a metabolite of any of these substances.
3. Please be advised that the following over-the-counter and prescription drugs could alter or affect drug test results:

| Category | Examples |
|---|---|
| Alcohol | All liquid medications containing ethyl alcohol (ethanol). Please read the label for alcohol content. As an example, Vick's Nyquil is 25% (50 proof) ethyl alcohol, Comtrex is 20% (40 proof), Contact Severe Cold Formula Night Strength is 25% (50 proof) and Listerine is 26.9% (54 proof) |
| Amphetamines | Obetrol, Biphetamine, Desoxyn, Dexedrine, Didrex, Ionamine, Fastine |
| Cannabinoids | Marinol (Dronabinol, THC) |
| Cocaine | Cocaine HCI topical solution (Roxanne) |
| Phencyclidine | Not legal by prescription |
| Methaqualone | Not legal by prescription |
| Opiates | Paregoric, Parepectolin, Donnagel PG, Morphine, Tylenol with Codeine, Emprin with Codeine, APAP with Codeine, Aspirin with Codeine, Robitussin AC, Guiatuss AC, Novahistine DH, Novahistine Expectorant, dilaudid (Hydromorphine), M-S Contin and Roxanol (morphine sulfate), Percodan, Vicodin, Tussi-organidin, etc. |
| Barbituates | Phenobarbitol, Tuinal, Amytal, Nembutal, Seconal, Lotusate, Fiorinal, Fioricet, Esgic, Butisol, Mebral, Butabarbital, Butalbital, Phenrinin, Triad, etc. |
| Benzodiazepines | Ativan, Azene, Clonopin, dalmine, Diazepam, Librium, Xanax, Serax, Tranxene, Valium, Verstran, Halcion, Paxipam, Restoril, Centrax |
| Methadone | Dolphine, Metadose |
| Propoxyphene | Darvocet, Darvon N, Dolene, etc. |

*Due to the large number of obscure brand names and constant marketing of new products, this list cannot and is not intended to be all-inclusive.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

4. A substance abuse on-site screening test may be administered in accordance with Haw. Rev. Stat. § 329B-5.5.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**13.    Idaho**

The following policies shall apply to nurses on assignment in Idaho:

### 13.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

## 14.    Illinois

The following policies shall apply to nurses on assignment in Illinois:

### 14.1    Meal Breaks

Nurses who work for 7 ½ continuous hours or longer are entitled to at least 20 minutes for a meal period beginning no later than 5 hours after the start of the work period.

### 14.2    Jury Duty Leave

Upon receipt of a jury summons, a nurse must notify Nomad and the Client Facility of the date such service is anticipated to begin. In no event, will such notice to Nomad or the Client Facility be more than 10 days after the date the summons was issued.

Nurses will be provided unpaid leave to complete jury service. The leave time will be determined by the length of the jury service. Additionally, nurses working night shifts will not be required to work on days where jury service is rendered.

### 14.3    Voting Leave

Nurses who are eligible to vote in Illinois elections, and request voting leave from Nomad prior to election day, may take up to 2 hours of paid leave to vote, unless their shift begins at least 2 hours after the opening of the polls or ends at least 2 hours prior to the closing of the polls. Nomad will specify the hours of leave.

### 14.4    Child Bereavement Leave Act

Under the Illinois Child Bereavement Leave Act, eligible employees who work for an employer that is covered by the FMLA are entitled to up to 10 days of unpaid leave following the death of a child. For additional information regarding eligibility and the use of this leave, please contact Nomad or refer to the Illinois statutes describing such leave (820 ILCS 154).

### 14.5    Leave under the Illinois Victims and Economic Security and Safety Act

In accordance with the Illinois Victims Economic Security and Safety Act ("VESSA"), up to 12 weeks of unpaid leave will be granted to a nurse who is a victim of domestic or sexual violence or who has a family or household member who is a victim in order to seek medical attention or for recovery purposes, obtain services from a victim services organization, seek counseling or treatment, complete safety preparations and relocations, and seek legal assistance.

For employees on VESSA leave who are also eligible for FMLA leave, VESSA leave time is not in addition to the 12-week FMLA entitlement when the reason for VESSA leave also qualifies under FMLA, An employee who may have exhausted all available leave under FMLA, for a purpose other than that which is available under VESSA, remains eligible for leave under VESSA.

During VESSA leave, employee benefits will continue upon the same terms as existed prior to leave, including employee contributions. An employee shall be entitled, on return from leave, to be restored to the position held by the employee when the leave commenced, or to an equivalent position with equivalent benefits, pay, and other conditions of employment.

Employees seeking VESSA leave must provide Nomad and the Client Facility at least 48 hours advance notice, unless doing so is not practicable. Nomad may require that nurses seeking VESSA leave provide certification for the need for the leave. Any use of VESSA leave will be strictly confidential.

For additional information regarding eligibility and the use of this leave, please contact Nomad or refer to the Illinois statutes describing such leave (820 ILCS 180).

### 14.6    School Activities Leave

Nurses who have been employed with Nomad for at least 6 months are entitled to take up to 8 hours of unpaid leave during a school year to attend school conferences or classroom activities related to the nurse's child, if the activity cannot be scheduled during non-work hours and no other paid leave is available (820 ILCS 147/1).

### 14.7    Illinois Family Military Leave

Nurses who have been employed by Nomad for at least one year and have worked at least 1,250 hours during the preceding 12 months, may take up to 30 days of unpaid leave when his/her spouse, parent, child, or grandparent is called to military service lasting longer than 30 days. Employee benefits, if any, will continue during this period of leave.

### 14.8    Paid Sick Leave for Nurses on Assignments in Chicago City Limits or in Certain Municipalities in Cook County, Illinois

By ordinance, the City of Chicago has required that employers provide covered employees with certain paid sick leave benefits. Cook County, Illinois has also passed an ordinance requiring that employers provide covered employees working in a municipality in Cook County that has not opted out of the sick leave ordinance with certain paid sick leave benefits. In addition to the City of Chicago, presently, the only municipalities in Cook County that have not opted out of the sick leave ordinance include: Barrington Hills, Bensenville, Berwyn, Cicero, Countryside, Deerfield, Dixmoor, Dolton, Elmhurst, Evanston, Ford Heights, Franklin Park, Frankfort, Glencoe, Indian Head Park, Kenilworth, McCook, Northfield, Oak Brook, Oak Park, Palos Hills, Phoenix, Robbins, Skokie, University Park, and Winnetka (individually a "Covered Municipality"). Where additional municipalities opt into the program, they too will be deemed a Covered Municipality.

In accordance with the Chicago and Cook County ordinances, Nomad will provide Nurses working at Client Facilities within Chicago city limits or a Covered Municipality with Paid Sick Leave as outlined below:

- This policy is drafted to comply with both the City of Chicago ordinance and the Cook County ordinance.
- Nurses will begin accruing Paid Sick Leave on their first date of employment at a Client Facility within Chicago city limits or a Covered Municipality, at a rate of 1 hour for every 40 hours worked
- The benefit year for measuring Paid Sick Leave accrual begins on the date a nurse begins working at a Client Facility within Chicago city limits or within a Covered Municipality.
- Only hours worked at a Client Facility within Chicago city limits or a Covered Municipality will count toward accrual of Paid Sick Leave.
- Paid Sick Leave can be used after 120 days of employment.
- This Paid Sick Leave benefit may only be used for absences at Client Facilities within Chicago city limits or a Covered Municipality.
- A nurse may use up to a total of 60 hours of accrued Paid Sick Leave in a 12-month period.
- Paid Sick Leave may be used by nurses to care for themselves or their families when they are sick, to receive medical care, where they or a family member is the victim of domestic violence or sexual abuse, or where there is a public health emergency closing a child's school or the place of work.
- Paid Sick Leave may be used in 4-hour increments.
- For absences of more than 3 consecutive workdays, Nomad may require that the nurse certify and document the need for the leave.
- If the need for the leave is foreseeable, reasonable notice must be provided to Nomad and the Client Facility. Nurses also must comply with Nomad's other call-in procedures.
- Up to 60 hours of Paid Sick Leave may be carried over to the next benefit year, and may be used for leave consistent with this policy and FMLA leave, where applicable.
- Paid Sick Leave is <u>not</u> paid out at termination of employment or upon the end of an assignment. However, unless there is a break in employment, this accrued leave will be available for use at future assignments at Client Facilities within Chicago city limits or a Covered Municipality. Upon break in employment, any accrued Paid Sick Leave will be lost.

15.

## 15.     Indiana

The following policies shall apply to nurses on assignment in Indiana:

### 15.1          Jury Duty Leave

Upon receipt of a jury summons, a nurse must notify Nomad and the Client Facility of the date such service is anticipated to begin. Nurses will be provided unpaid leave to complete jury service. The leave time will be determined by the length of the jury service.

### 15.2          Witness Duty Leave

A nurse subpoenaed in a criminal proceeding will be provided unpaid leave to complete witness service. Upon receipt of the subpoena, the nurse must notify Nomad and the Client Facility of the date of such witness service is anticipated to begin.

### 15.3          Indiana Military Family Leave Act

Eligible nurses may take unpaid leave of up to a total of ten (10) workdays per year if a spouse, parent, grandparent, or sibling is ordered to active duty.

Under the Indiana Military Family Leave Act, an eligible nurse may take an unpaid leave of absence during one or more of the following periods:
1. during the thirty (30) days before active duty orders are in effect;
2. during a period in which the person ordered to active duty is one leave while active duty orders are in effect; or
3. during the thirty (30) days after the active duty order are terminated.

Eligible nurses wishing to take leave must provide written notice, including a copy of the active duty orders if available, to Nomad and the Client Facility. Notice should be given thirty (30) days in advance of the requested leave date, unless the active duty orders are issued less than thirty (30) days before the requested leave date.

### 15.4          Leave of Absence for Military Training

In addition to any leave required by applicable federal law, a nurse who is a member of the United States armed forces and is called upon to receive temporary military training will be granted an unpaid leave of absence not to exceed fifteen (15) days per calendar year.

The nurse seeking a leave of absence for military training must provide Nomad and the Client Facility with evidence of the dates of the nurse's departure and return as soon as practicable before departure and furnish evidence of the nurse's satisfactory completion of training upon return.

## 16.    Iowa

The following policies shall apply to nurses on assignment in Iowa:

### 16.1    Jury Duty Leave

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury. Nurses must notify Nomad and the Client Facility of the date such service is anticipated to begin. The leave time will be determined by the length of the jury service.

### 16.2    Witness Leave

Nurses may take unpaid leave to serve as a witness in a criminal proceeding or a civil proceeding concerning domestic abuse if the nurse is the plaintiff, defendant, or a witness in such proceeding. Nurses must inform Nomad and the Client Facility of the anticipated dates for witness leave.

### 16.3    Voting Leave

Nurses who are registered to vote and do not have sufficient time outside of their working hours to vote may be granted up to two paid hours off to vote. Nurses must request time off to vote from Nomad and the Client Facility before the Election Day. Nomad reserves the right to designate the particular hours allowed to go vote. This leave does not apply to participation in the Iowa caucuses.

### 16.4    Drug and Alcohol Screening Policy

In Iowa, Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy includes the following additional provisions:

**Transport, Consent & Refusal to Consent:** Applicants and nurses who are requested to undergo a test for alcohol or drugs will be transported to a local hospital or clinic by a Nomad or Client Facility representative. The applicant or nurse will be required to sign a consent form authorizing the testing. Refusal to sign the form or submit to the drug or alcohol test, as well as any attempt to invalidate or tamper with the test, will disqualify an applicant from further hiring consideration and shall subject the nurse to disciplinary action up to and including termination of the nurse, even for a first offense.

**Technical Requirements and Qualifications:** Nomad has, by reference, adopted as part of this Policy the requirements governing evidential breath testing devices, alcohol screening devices, and the qualifications of personnel administering initial and confirmatory testing, consistent with the requirements for laboratories certified by the United States Department of Health and Human Services and/or the Iowa Department of Public Health.

**Medical Review Officer:** A Medical Review Officer (MRO) will, prior to the results being reported to Nomad, review and interpret confirmed test results to ensure that the chain of custody is complete and to consider any information provided by a nurse which might have affected the test results.

**Tampering:** Alteration, substitution for, tampering with, misidentification, or otherwise acting to deceive the lab or Nomad regarding test samples any result in disciplinary action, up to and including termination, even for a first offense. Applicants who tamper with results will not be given further hiring consideration.

**Positive Test Results:** Nurses and applicants who submit to drug and alcohol testing under the circumstances described above and who are found by initial and confirmatory testing to have unacceptable levels of drugs and/or alcohol in their bodies, will be notified of the results in writing. Nurses will have seven days after Nomad mails this notification to request and pay for a second confirmatory test. If the results of the second test do not confirm the results of the initial test, Nomad will reimburse the nurse for the cost of the second test, and the results of the first test will not be considered a "confirmed, positive test" for purposes of this policy.

Applicants whose submission to testing results in a confirmed, positive test for drugs and/or alcohol will be withdrawn from consideration for employment.

Except as provided in the rehabilitation section below, nurses whose submission to testing results in a confirmed, positive test for drugs and/or alcohol will be disciplined, up to and including termination of employment.

Following a drug or alcohol test, but prior to receipt of the final results of the drug or alcohol test, Nomad may suspend a current nurse, with or without pay, pending the outcome of the test.

For the purposes of this section, all action taken against a nurse or applicant will be based only on the confirmed results of the drug and/or alcohol test.

**Rehabilitation:** An individual who have been employed by Nomad for twelve of the eighteen months preceding a first confirmed positive alcohol test may be eligible for rehabilitation, in lieu of termination, under the following circumstances:
1. The test result must be less than the alcohol concentration specified by criminal laws relating to operating under the influence.
2. The nurse must agree to and successfully complete rehabilitation; and
3. The nurse must not have previously violated Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy.

The costs of rehabilitation will be apportioned as provided under the nurse benefit plan, if applicable.

If no nurse benefit plan exists and the nurse has coverage for any portion of the costs of rehabilitation under any health care plan, the costs of rehabilitation shall be apportioned as provided by the health care plan with any costs not covered by the plan apportioned equally

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

between the nurse and Nomad. However, Nomad will not pay more than two thousand dollars ($2,000) toward the costs not covered by the nurse's health care plan.

If no nurse benefit plan exists and the nurse does not have coverage for any portion of the costs of rehabilitation under any health care plan of the nurse, the costs of the rehabilitation shall be apportioned equally between the nurse and Nomad. Again, Nomad will not pay more than two thousand dollars ($2,000) towards the cost of rehabilitation.

Rehabilitation will not preclude Nomad from taking an adverse employment action against the nurse during the rehabilitation based on the nurse's failure to comply with any requirement of the rehabilitation, including any action by the nurse to invalidate a test sample provided by the nurse pursuant to rehabilitation. If the nurse successfully complies with the requirements of rehabilitation, and completes the rehabilitation program, Nomad will take no adverse employment action related to the first confirmed positive alcohol test.

**Confidentiality:** Because of the sensitive nature of the substance abuse testing program and the protection of nurses' rights, all information shall be classified as "Confidential," with no public disclosure of results, unless otherwise allowed by law.

In all cases where a nurse is taken to a medical facility for evaluation, the nurse will be asked to sign a consent form. This authorization releases the results of the general medical evaluation, including all diagnosis and findings, to appropriate management personnel. These results will be maintained in the nurse's personal health file which is accessible only by top level management in compliance with ADA and HIPAA requirements.

17.    **Kansas**

The following policies shall apply to nurses on assignment in Kansas:

### 17.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 17.2    Voting Leave

If there are less than 2 consecutive hours between the opening of the polls and the beginning of the regular work shift or between the end of the regular work shift and the closing of the polls, a nurse entitled to vote in Kanas may seek unpaid leave that when added to the time available before or after the shift, total at least 2 hours. Nomad and the Client Facility will decide when such leave is taken.

### 17.3    Domestic Violence Leave

Nomad provides up to 8 days over a 12-month period of unpaid leave to eligible nurses who are victims of a domestic violence or sexual assault, or any other crime that includes an act of domestic violence. Such leave may be taken for any of the following purposes: (a) seek protection orders; (b) seek medical attention for injuries caused by domestic violence or sexual assault; (c) obtain assistance from a domestic violence shelter, a domestic violence program, or a rape crisis center; or (d) make court appearances in the aftermath of domestic violence or sexual assault.  If possible, a nurse using this leave must inform Nomad and the Client Facility in advance, so arrangements can be made to accommodate the nurse's absence.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

## 18.    Kentucky

The following policies shall apply to nurses on assignment in Kentucky:

### 18.1    Meal and Rest Breaks

Nurses will be afforded a reasonable period for an unpaid meal break, which will be as close to the middle of the scheduled work shift as possible.  In no case shall a nurse be required to take a lunch period sooner than 3 hours after his/her work shift commences, nor more than 5 hours from the time his/her work shift commences.

Nurses will be provided a paid 10-minute rest break for each 4-hour period worked.

### 18.2    Overtime Pay

Nurses are entitled to overtime at a rate of at least 1 ½ times the regular rate for all hours worked in excess of 40 per workweek. Additionally, in the event a Nurse is required to work 7 days in one workweek, all hours worked on the 7th day will be paid at 1 ½ times the regular rate.

### 18.3    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 18.4    Voting Leave

Nurses who are registered to vote in Kentucky may take up to 4 hours of paid leave on Election Day in order to vote. Such leave must be coordinated with Nomad and the Client Facility, and Nomad and/or the Client Facility may specify the hours of leave.

### 18.5    Adoption Leave

On written notice of the need for such leave, Nomad will provide nurses up to 6 weeks of unpaid personal leave in order for the nurse to receive an adoptive child under the age of seven.

### 18.6    Witness Leave

Nurses who are subpoenaed or compelled to appear and testify in a civil or criminal court proceeding or administrative tribunal will be granted unpaid leave to do so. Nurses must notify Nomad and the Client Facility of their need for such leave as soon as possible.

### 18.7    Emergency Responder Leave

If a nurse is a volunteer firefighter, rescue squad member, emergency medical technician, peace officer, or member of an emergency management agency (Emergency Responder), he/she may be

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

excused from work if he/she is absent or tardy if the absence or tardiness was caused by responding to an emergency. Proof of such response may be required.

If a nurse is injured in the line of duty, he/she will be provided up to 12 months of unpaid leave from work, upon satisfaction of the conditions listed in KRS § 337.100.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

### 19.    Louisiana

The following policies shall apply to nurses on assignment in Louisiana:

### 19.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take leave to serve on a jury. The leave time will be determined by the length of the jury service. Consistent with applicable law, the first day of leave for jury service will be paid, but all other days of jury service will be unpaid by Nomad. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 19.2    Volunteer Firefighter Leave

In accordance with La. Rev. Stat. § 23:893, a nurse who is a volunteer firefighter employed by the State of Louisiana shall not be denied leave, work-related benefits, or employment for absenting himself from said employment for the purpose of emergency response pursuant to such certification. Leave time provided under this policy will be unpaid.

### 19.3    Veterans' Medical Appointments Leave

Nurses who are honorably discharged from the US armed forces (including reserves), the Army National Guard, the Air National Guard, the commissioned corps of the Public Health Service, or any category of persons designated by the president during a time of war or emergency will not be discharged or otherwise penalized for attending medical appointments necessary to obtain veterans' benefits. Nurses must provide Nomad and the Client Facility with notice of attendance at the medical appointment by presenting a bill, receipt or excuse from the medical provider.

### 19.4    Bone Marrow Donation Leave

Eligible nurses (working over 20 hours per week) may take a total of 40 hours of paid leave to undergo a medical procedure to donate bone marrow. Nomad may request the nurse submit written verification from a physician of the purpose and length of each leave. The nurse is expected to provide as much reasonable advanced notice as possible.

### 19.5    Pregnancy Leave

Nomad provides female nurses with a total of 6 weeks of unpaid leave in conjunction with the birth of a child in normal circumstances.

Nomad provides female nurses disabled by pregnancy, childbirth, or related medical conditions with the same benefits and privileges enjoyed by other temporarily disabled workers. Nomad allows these nurses to take a total of four months' unpaid leave for any disability caused by pregnancy, childbirth, or related medical conditions.

Nurses using such leave must provide written notice of a pregnancy or related disability, including a doctor's certificate, that explains the expected date the leave begins and date of return

to work. Nurses returning from maternity leave will be placed in the same or a comparable position, consistent with staffing and business requirements. Where eligible, this leave will run concurrently with any available FMLA leave and any other leave where permitted by state and federal law.

### 19.6    Drug Testing

In Louisiana, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy also includes the following provisions:

1. All drug testing shall be completed in accordance with La. Rev. Stat. 49:1001 *et seq*.
2. Drug testing shall be completed by facilities that are SAMHSA-certified, CAP-FUDT-certified, or CAP-FDT-certified.
3. Any nurse or applicant with a confirmed positive drug test, upon his/her written request, shall have the right of access within seven working days to records relating to his/her drug tests and any records relating to the results of any relevant certification, review, or suspension/revocation-of-certification proceedings.

20.    **Maine**

The following policies shall apply to nurses on assignment in Maine:

### 20.1    Meal and Rest Breaks

In Maine, a nurse may be permitted to work for no more than six consecutive hours at one time unless the nurse is given the opportunity to take at least thirty consecutive minutes of rest time. Rest time may be used by the nurse as a mealtime.

### 20.2    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service.

### 20.3    Military Family Leave

Nomad provides up to 15 days of unpaid leave per deployment to eligible nurses with a spouse, domestic partner, or parent who is a Maine resident who has been deployed for military service lasting longer than 180 days, in accordance with the terms of 27 M.R.S. § 814. The leave may be taken immediately prior to deployment, during deployment, or the 15 days immediately after the period of deployment.

To be eligible, nurses must have: (a) been employed by Nomad for at least 12 months; (b) worked at least 1,250 hours during the 12 months before the leave begins; and (c) provided notice to Nomad at least 14 days before the leave begins (if a leave of five or more consecutive days), or give as much advance notice as possible if less than five consecutive days.

Nomad reserves the right to ask for documents supporting any leave requested under this policy, including certification from the proper military authority to verify your eligibility for the family military leave requested.

Retaliation against nurses who request or take leave under this policy is prohibited.

Employees taking leave under this policy shall be responsible to pay their share of employment benefits, if any.

### 20.4    Maine Family and Medical Leave

Eligible nurses on assignment in Maine, and who have been employed by Nomad for 12 consecutive months, are entitled to up to 10-weeks of unpaid leave in a 2-year period for (1) the birth or adoption of a child, (2) the nurse's own serious health condition, (2) an organ donation by the nurse,  and/or (3) the serious health condition of the nurse's spouse, domestic partner, parent, sibling, or child, and/or (4) the serious health condition or death of the nurse's spouse, domestic partner, parent, sibling, or child, if such person is a member of the state military forces

or the United States Armed Forces and dies or is injured while on activity duty. *See* 26 M.R.S. § 843 et seq.

The nurse must give at least 30 days' notice of the intended date upon which family medical leave will commence and terminate, unless prevented by medical emergency from giving that notice. Nomad may also require certification of such leave as allowed by applicable law.

To the extent such leave also qualifies for FMLA leave (and the employee is likewise eligible for FMLA leave), leave under this policy and FMLA leave will run concurrently.

If you are in need of such leave, please contact Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

### 20.5    Drug Testing

In Maine, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy shall be:

Nomad is committed to protecting the safety, health, and well-being of its employees, nurses, and all people who come into contact with them. We recognize that drug and alcohol abuse pose a direct and significant threat to these goals, and to the goal of a productive and efficient working environment in which all employees have an opportunity to reach their full potential. We therefore are committed to ensuring a drug and alcohol-free working environment for all of our employees, and underscore that commitment through implementation and enforcement of this policy.

***Drug and Alcohol Prohibitions***
Being under the influence of, as well as the use, sale, manufacturer, purchase, transfer, dispensation, distribution or possession of a Substance of Abuse, as defined in 26 M.R.S. § 682(8) by any employee or nurse at or about Nomad's premises or a Client Facility, or while operating a vehicle rented, leased to, or owned by Nomad, or while performing any work for Nomad or a Client Facility is expressly prohibited. Moreover, the use or abuse of a Substance of Abuse off the job that impairs, to any extent, performance on the job, is prohibited.

26 M.R.S. § 682(8) defines a Substance of Abuse as: "any scheduled drug, alcohol or other drug, or any of their metabolites." Additionally, "Alcohol" has the same meaning as found in Title 28-A, section 2, subsection 2, "Drug" has the same meaning as found in Title 32, section 13702-A, subsection 11, and a "Scheduled drug" has the same meaning as found in Title 17-A, section 1101, subsection 11.

***Use of Medications***
If a nurse uses prescription and/or over-the-counter medications that may impair his/her ability to perform his/her job safely, the nurse must inform his/her immediate supervisor at the Client Facility and Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623, so that steps may be taken to minimize the safety risks posed by such use. In such circumstances, nurses may be asked to obtain a doctor's certification that they are able to safely perform the responsibilities of their position. Any information that Nomad may learn

about a nurse's health or medications will be treated confidentially and shared with personnel only on a need-to-know basis.

### *Substance Abuse Testing*

Unless otherwise required or prohibited by applicable law, Nomad may require applicants and nurses to submit to a Substance Abuse Test under the following circumstances, and applicants and nurses hereby consent to such testing:

1. **Post-Employment Offer Testing**: After a contingent offer of employment has been extended, the applicant may be required to submit to a Substance Abuse Test as a qualification to assume the position. The offer of employment shall be contingent upon the applicant passing the Substance Abuse Test. Failure to do so will result in withdrawal of the job offer.

2. **Post-Employment, Pre-Placement Testing**: As a condition of continued employment with Nomad and prior to commencing a placement at a Client Facility, nurses may be required to submit to a Substance Abuse Test. Failure to do so will result in withdrawal of the potential placement and potential termination of employment.

3. **Probable Cause Testing**: A Substance Abuse Test may be required where there is probable cause to believe the nurse is under the influence of a Substance of Abuse. Probable cause means a reasonable ground for belief in the existence of facts that induce a person to believe that a nurse may be under the influence of a Substance of Abuse, provided that the existence of probable cause may not be based exclusively on any of the following: (i) information received from an anonymous informant; (ii) any information tending to indicate that a nurse may have possessed or used a substance of abuse off duty, except when the nurse is observed possessing or ingesting any substance of abuse either while on site at a Client Facility or in the proximity of the Client Facility's premises during or immediately before the nurse's working hours; or (iii) a single work-related accident. Nurses will follow Client Facility and State policies for probable cause testing.

All Substance Abuse Tests shall be conducted in accordance with 26 M.R.S. § 681 *et seq.*, including but not limited to:

1. **Collection of Samples.** The collection of any sample will be conducted in a medical facility and supervised by a licensed physician or nurse.
2. **Urine Samples/Removal of Clothing.** No nurse or applicant will be required to remove any clothing for the purpose of collecting a urine sample, except that: (a) Nomad may require that a nurse or applicant leave any personal belongings other than clothing and any unnecessary coat, jacket or similar outer garments outside the collection area; or (b) if it is the standard practice of an off-site medical facility to require the removal of clothing when collecting a urine sample for any purpose, the physician or nurse supervising the collection of the sample in that facility may require the nurse or applicant to remove their clothing.
3. **No Observation of Urine Sample.** No nurse or applicant may be required to provide a urine sample while being observed, directly or indirectly, by another individual.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

4. **Storage of Samples.** Collected samples shall be stored by the testing facility in a manner sufficient to inhibit deterioration of the sample.

5. **Chain of Custody.** The testing facility shall adopt a chain of custody of sample procedures sufficient to protect the sample from tampering and to verify the identity of each sample and test result.

6. **Suspension during Testing.** Where testing is performed on a nurse, the nurse will be suspended with full pay and benefits pending receipt of the test results.

7. **Testing Methods.** Screening tests will generally be conducted using the Enzyme Multiplied Immunoassay Test. Confirmation tests will generally be conducted using the Gas Chromatography/Mass Spectrometry methodology. Alternative testing methods, approved by the Maine Department of Health and Human Services may also be utilized.

8. **Substances Tested.** Nomad will test applicants and current nurses for the following:

| Substances | Concentration in Urine (ng/ml, except alcohol) | |
| --- | --- | --- |
| | SCREENING | CONFIRMATION |
| 6-Acetylmorphine | Special[1] | 10 ng/ml |
| Alcohol[2] | 0.02g/100ml | 0.02 g/100ml |
| Amphetamine/Methamphetamine MDMA | 500 ng/ml | 250 ng/ml |
| Barbiturates | 300 ng/ml | 300 ng/ml |
| Benzodiazepines | 300 ng/ml | 200 ng/ml |
| Cocaine and/or metabolites | 150 ng/ml | 100 ng/ml |
| Marijuana and/or metabolites[3] | 50 ng/ml | 15 ng/ml |
| Methadone | 300 ng/ml | 300 ng/ml |
| Methaqualone | 300 ng/ml | 300 ng/ml |
| Opiates and/or metabolites | 2000 ng/ml | 2000 ng/ml |
| Phencyclicine | 25 ng/ml | 25 ng/ml |
| MDA | - | 250 ng/ml |
| MDEA | - | 250 ng/ml |

9. **Blood Test Levels.** Alcohol blood test confirmation level will be .002 g/100ml. Marijuana and/or metabolites blood test confirmation level will be 10 ng/ml.

10. **Sample Segregation.** At the request of the nurse or applicant, at the time of testing, Nomad will segregate a portion of the sample for the nurse's or applicant's own testing. Within 5 days after notice of the test result is given to the nurse or applicant, the nurse or applicant may request that the segregated portion of his/her sample be retested at a qualified laboratory of his/her choosing—designating the laboratory in the notice. This laboratory must comply with the requirements of this section related to testing laboratories. When Nomad receives notice of the nurse's or applicant's selection, Nomad shall promptly send the segregated portion of the sample to the named testing laboratory, subject to the same chain of custody requirements applicable to testing of Nomad's portion of the sample. The nurse or applicant given to Nomad.

11. **Blood Sample Election.** Additionally, a nurse may request that a blood sample be taken from the nurse by a licensed physician, registered physician's assistant, registered nurse or a person certified by the Department of Health and Human Services to draw blood samples. If such request is made, Nomad shall have this sample tested for the presence of

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

alcohol or marijuana metabolites. If the nurse requests that a blood sample be taken as provided in this paragraph, Nomad will not test any other sample from the nurse for the presence of these substances.

12. **Appeal Rights.** To appeal the results of a confirmed positive result in lieu of testing the segregated sample, the applicant or nurse must fill out and sign a Drug and Alcohol Test Appeal, which may be obtained from Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623 (an example is also included below). Within 14 days of the submission of the form, the nurse or applicant will be scheduled to meet via telephone with Nomad's Support Team. The nurse or applicant will explain the basis for the appeal and may be asked questions. After the meeting concludes, a written report of findings and conclusions will be prepared and a copy sent to the nurse or applicant, as the case may be.

### Drug and Alcohol Test Appeal Form

If you have reason to question the accuracy of a substance abuse test to which you have submitted, you male file an appeal by filling out this form.

Name of person appealing: _____

Date sample provided: _____

Where was the sample provided?: _____

What are the reasons for your appeal of the test's accuracy? (please be specific): _____

_____

_____

_____

_____

Date: _____          _____
                                Signature of Person Appealing

13. **Rehabilitation.** Where a nurse receives an initial confirmed positive result, before taking any other disciplinary action against the nurse, Nomad will provide the nurse with an opportunity to participate for up to 6 months in a rehabilitation program designed to enable the nurse to avoid future use of a substance of abuse and to participate in an employee assistance program. If the nurse refuses to participate in such program or receives a subsequent confirmed positive result under this policy, Nomad will take appropriate disciplinary action, which may include termination of employment.

14. **Confidentiality.** All information acquired in the Substance Abuse Test process constitutes private and confidential information that will not be disclosed to any third party individual, other employer, government agency, or private organization without the expressed written consent of the nurse or applicant tested; however, test results may be provided to supervisors and other persons at Client Facilities with a need to know, as permitted by applicable law. Nurses expressly consent to Nomad sharing test results with Client Facilities.

15. **Employee Assistance Program.** Nomad will provide an employee assistance program to nurses, which meets the requirements of the Maine Department of Health and Human Services.

***Consequences for Positive Test Result or Refusal to Submit to Testing***

Any applicant who refuses to submit to testing under this policy will not be hired. No applicant will be hired without passing testing under this policy. Where there is a confirmed positive test result, the applicant will not be hired.

Any nurse who refuses to submit to testing under this policy will be subject to disciplinary action, up to and including the termination of employment. Upon the first confirmed positive result, a nurse will be offered the opportunity for up to 6 months of rehabilitation services. If such services are refused, the nurse's employment may be terminated. Upon a second confirmed positive result, a nurse's employment may be terminated.

***Questions or Additional Information***

If you have any questions regarding this policy, please contact Nomad's Support Team, who may be reached at [support@nomadhealth.com](mailto:support@nomadhealth.com) and (866) 656-6623.

## 21.    Maryland

The following policies shall apply to nurses on assignment in Maryland:

### 21.1    Drug Testing

All provisions of Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy in the Handbook apply, except the following changes:

1. All drug or alcohol testing shall be done in accordance with Md. Code, Health – General, § 17-214.
2. Specimen testing shall be completed by a laboratory that holds a permit under Md. Code, Health – General, § 17-214, or if the laboratory is located outside of the State of Maryland, one that is certified otherwise approved by Md. Code, Health – General, § 17-214(f).
3. At the time of testing, nurses may request the name and address of the laboratory that will test the specimen, and Nomad will provide it.
4. If a screening test produces a positive result, after confirmation of the test results, Nomad will provide the nurse with (a) a copy of the laboratory test indicating the test results; (b) a copy of Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy and this Section 9.1; (c) if applicable, written notice of Nomad's intent to take disciplinary action, terminate employment, or change the conditions of employment, if any; and (d) notice that the nurse may request independent testing of the same sample for verification of the test result, at the nurse's expense. Any such request should be made in writing to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

### 21.2    Jury Duty Leave

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

### 21.3    Voting Leave

Nurses who are registered to vote, may take up to 2 hours of paid leave from work to vote. Nurses are only eligible for leave if they do not have 2 hours outside of their work shift to vote. Nurses must seek leave in advance of Election Day. Nurses will continue to be paid during voting leave. Nomad may require proof from the Nurse that he/she voted.

### 21.4    Crime Victim Leave

Nurses who are victims of crime may seek unpaid leave from work to respond to a subpoena to testify in a criminal proceeding, attend a criminal proceeding, or to participate in the preparation of a criminal proceeding.

### 21.5    Deployment Leave

Where a Nurse's immediate family member is leaving for or returning from active duty outside the United States as a member of the armed forces of the United States, eligible nurses will be provided unpaid leave on the date of departure and return, in accordance with applicable Maryland law.

### 21.6    Parental Leave

To the extent the Family and Medical Leave Act ("FMLA") does not apply, eligible nurses may be entitled under Maryland law to up to 6 weeks of unpaid leave in a 12 month period upon the birth or placement of a child. Nomad will comply with all applicable leave requirements.

### 21.7    Filing a complaint with the Office of Health Care Quality (OHCQ)

If you have concerns about your health care or treatment, you have the right to make a formal complaint with the Office of Health Care Quality. If this is a true emergency dial 911. The Office of Health Care Quality offers three options to file a complaint. Please follow the guidelines found here: https://health.maryland.gov/ohcq/Pages/Complaints.aspx. Some of these guidelines are outlined below.

Your complaint will be investigated in accordance with Maryland statute regulations. You may make an anonymous complaint; but the OHCQ won't be able to send you a written report of the investigation.

The three options to file a complaint are below:
- File a complaint on the OHCQ website through the Online Complaint Report Form, found here: https://fs30.formsite.com/OHCQ/OnlineComplaintForm/index.html. The online complaint form will allow you to upload any supporting documentation
- Complete and mail in a Paper Complaint Report Form, found here: https://health.maryland.gov/ohcq/docs/complaint_form.pdf. Please submit documentation supporting your complaint with the complaint form when you return it to the Office of Health Care Quality either by mail or fax.
- Complaints over the telephone can be made by calling the appropriate Unit:

| OHCQ Program | Telephone Number | Toll-free Number |
|---|---|---|
| Adult Medical Day Care | (410) 402-8125 | 877-402-8221 |
| Ambulatory Care | (410) 402-8040 | 800-492-6005 |
| Assisted Living Homes | (410) 402-8217 | 877-402-8221 |
| Developmental Disabilities Programs | (410) 402-8094 | 877-402-8220 |
| Health Maintenance Organizations | (410) 402-8002 | 877-402-8218 |
| Hospitals | (410) 402-8002 | 877-402-8218 |

| Nursing Homes | (410) 402-8108 | 877-402-8219 |
|---|---|---|

## 22.    Massachusetts

The following policies shall apply to nurses on assignments in Massachusetts:

### 22.1    Meal Breaks

In Massachusetts, nurses who work for more than 6 hours during a calendar day are entitled to an interval of at least 30 minutes for a meal.

### 22.2    Paid Sick Leave

Nurses may use Paid Sick Leave if they or their child, spouse, parent, or spouse's parent are sick or injured or have a routine medical appointment.

Nurses on assignments at Client Facilities in Massachusetts are entitled to earn up to 40 hours per year of Paid Sick Leave to address certain personal and family needs, and they will accrue Paid Sick Leave at a rate of 1 hour for every 30 hours worked on assignments in Massachusetts. Nurses may carryover 40 hours of such sick leave to the next calendar year. Nurses may begin using earned sick time on the 90th calendar day after they start working in Massachusetts.

Nurses must make a good faith effort to provide notice of the need in advance for the use of Paid Sick Leave, and must otherwise comply with Nomad call-in procedures.

Nomad prohibits any unlawful discrimination or retaliation against a nurse for using or requesting to use accrued sick leave.

### 22.3    Jury Duty Leave

Nurses summoned for jury duty will be paid regular wages for the first 3 days of jury service. If your service exceeds 3 days, the state will compensate jurors at a rate of $50 per day.

### 22.4    Voting Leave

Nurses who are registered to vote in an election may take unpaid leave to vote if the nurse does not have sufficient time to vote outside of the workday. Nurses should request leave in advance of Election Day.

### 22.5    The Massachusetts Domestic Violence Leave Act

The Massachusetts Domestic Violence Leave Act provides that employees who are, or whose family members are victims of domestic violence may take unpaid leave as a result of domestic violence, sexual assault, stalking, or kidnapping.

Nurses who are victims, or whose family members are victims of domestic violence may take up

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

to 15 days of unpaid leave in a 12 month period. Except in cases of imminent danger to the health or safety of a Nurse, a nurse seeking leave shall provide advance notice of such leave.

### 22.6    Small Necessities Leave

Under this policy, nurses are eligible for a total of 24 hours of unpaid leave during a 12 month period for certain family obligations, including:

- To participate in school activities directly related to the educational advancement of a child of a Nurse, such as a parent-teacher conference.
- To accompany a child to routine medical and dental appointments.
- To accompany a relative of the Nurse to routine medical or dental appointment. In the case of elderly relatives, to interview or visit a nursing or group home.

The nurse must request leave 7 days in advance where the leave is foreseeable.

23. **Michigan**

The following policies shall apply to nurses on assignments in Michigan:

### 23.1 Jury Duty Leave

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury.

### 23.2 Crime Victim Leave

Nurses may take unpaid leave from work to respond to a subpoena, serve as a witness, or attend court during the Nurse's or another victim's testimony.

### 23.3 Paid Medical Leave

Nurses on assignment at Client Facility in Michigan accrue paid medical leave at a rate of 1 hour for every 35 hours worked. Paid Medical Leave beings to accrue at the commencement of employment at Client Facility in Michigan.

Nurses are entitled to use accrued paid medical leave beginning on the 90th day of employment. Nurses may not accrue more than 40 hours of earned paid medical time per calendar year. Eligible employees may not use more that 40 hours paid medical leave in a single benefit year. Nurses may retain and use accrued and unused paid medical leave from one benefit year to another benefit year not exceeding 40 hours.

Paid Medical Leave can be used for personal or family health needs, and for purposed related to domestic violence and sexual assault. Nurses must generally comply with Nomad's regular call-in procedures.

Eligible employee using paid medical leave will be paid at normal hourly wage. Overtime pay, holiday pay, bonuses, commissions, or supplemental pay are not included in normal hourly wage.

*Effective April 1, 2019.*

## 24.    Minnesota

The following policies shall apply to nurses on assignments in Minnesota:

### 24.1    Meal and Rest Breaks

In Minnesota, nurses who work for 8 or more consecutive hours are entitled to a sufficient time to eat a meal. Nurses are also entitled to adequate time from work within each 4 consecutive hours to utilize the restroom.

### 24.2    Drug Testing

The provisions of Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy in the Handbook apply, except with the following changes:
1. Drug tests for nurses on assignment in Minnesota will be conducted in accordance with Minn. Stat. § 181.951-.953.
2. In accordance with Minnesota law, "Post-Employment, Pre-Placement Testing" will be limited to once per year and the nurse will be given at least two weeks' written notice of the required test.
3. All testing will be performed by a laboratory that meets the requirements set forth in Minn. Stat. § 181.953

### 24.3    Jury Duty Leave

Upon receipt of a jury summons, a nurse must notify Nomad and the Client Facility of the date such service is anticipated to begin. In no event, will such notice to Nomad or the Client Facility be more than 10 days after the date the summons was issued.

Nurses will be provided unpaid leave to complete this jury service. The leave time will be determined by the length of the jury service.

### 24.4    Voting Leave

Nurses who are eligible to vote in Minnesota elections may take paid leave sufficient to allow the nurse to travel to his/her polling place, vote, and return to work. Nomad will specify the hours of leave.

### 24.5    School Conference and Activities Leave

Nurses will be granted up to a total of 16 hours of unpaid leave in a 12-month period to attend school conferences or school-related activities for their child. This leave is to be used for conferences or activities that cannot be scheduled during non-work hours, or to attend conferences or activities, or to observe child care services of the employee's child, or an employee's child's pre-kindergarten or special education program, where these matters cannot be scheduled during non-work hours.

Nurses are required to provide reasonable notice prior to the leave, when it is foreseeable, and must make a reasonable effort to schedule the leave so as not to disrupt the operations of the Client Facility.

### 24.6    Pregnancy and Parental Leave

Nurses on assignment at a Client Facility in Minnesota and who have worked for Nomad for at least 12 months immediately preceding their request for leave, and whose average number of hours during that time equals at least 1/2 of a full-time position, are eligible to take up to 12 weeks of unpaid leave after the birth or adoption of a child and/or for prenatal care, incapacity due to pregnancy, childbirth, or related health conditions.

The employee can designate the start date of this leave, but parental leave must be taken within 12 months of the birth or adoption or the date the child was released from the hospital. In most circumstances, where the beginning date of the leave is foreseeable, 30 days' notice should be provided to Nomad and the Client Facility. Where the employee also qualifies for FMLA leave and the leave is covered by the FMLA, leave under this policy and FMLA leave will run concurrently.

While the nurse is on leave, employee benefits will remain available, but all costs associated with the benefits will be paid by the nurse.

Nurses who make use of parental leave will normally be reinstated to their former position, or another comparable position, upon their return. A nurse intending to return from a leave longer than one month must notify Nomad of his/her expected return date at least two weeks in advance.

### 24.7    Subpoena and Crime Victim Leave

If an employee is served with a subpoena to appear in court, unpaid leave will be provided for the nurse to appear in court, as required by the subpoena.

If a nurse or his/her immediate family members are the victim of a violent crime, unpaid leave will be provided for the nurse to attend criminal proceedings related to the victim's case.

Generally, unless otherwise impracticable, 48 hours' advance notice should be provided to Nomad and the Client Facility. Nomad may seek verification from the nurse of the need for the above leaves, and all information gathered in response will be held in strict confidence.

### 24.8    Leave for Military Family Members

Nurses whose immediate family member is killed or injured while on active military duty will be provided up to 10 days of unpaid leave. The nurse must give as much advance notice as possible to Nomad and the Client Facility before taking such leave.

Nurses whose immediate family member, as a member of the United States armed forces, has been ordered into active service in support of a war or other national emergency, may be entitled to up to 1 day of unpaid leave per calendar year to attend a send-off or homecoming ceremony for the mobilized service member. This leave may not be granted in cases where it would unduly disrupt a Client Facility's operations.

### 24.9    Bone Marrow Donation Leave of Absence

Nurses who work for Nomad for an average of 20 or more hours per work are entitled to up to 40 work hours of paid leave of absence for the purpose of undergoing a medical procedure to donate bone marrow. Nomad will require such employees to provide verification from a physician of the purpose and length of each leave requested by employees to donate bone marrow.

### 24.10    Organ Donation Leave of Absence

Nurses who work for Nomad for an average of 20 or more hours per week are entitled to up to 40 work hours of paid leave of absence for the purpose of undergoing a medical procedure to donate an organ or partial organ to another person. Nomad will require such employees to provide verification from a physician of the purpose and length of each leave requested by employees for organ donation.

### 24.11    Minneapolis Paid Sick Leave Ordinance

By ordinance, the City of Minneapolis has required that employers provide covered employees with certain paid sick leave benefits. In accordance with the Minneapolis ordinance, Nomad will provide Nurses working at Client Facilities within Minneapolis city limits with Paid Sick Leave as outlined below:
- Nurses will begin accruing Paid Sick Leave on their first date of employment at a Client Facility within Minneapolis city limits at a rate of 1 hour for every 30 hours worked, up to a maximum of 48 hours accrued per year.
- The maximum Paid Sick Leave that may be accrued is 80 hours. Once the cap is hit, whether by annual accrual or carryover, no additional Paid Sick Leave is accrued until some paid sick leave is used and the nurse falls below the cap.
- The benefit year for measuring Paid Sick Leave accrual begins on the date a nurse begins working at a Client Facility within Minneapolis city limits.
- Only hours worked at a Client Facility within Minneapolis city limits will count toward accrual of Paid Sick Leave.
- Paid Sick Leave can be used after 90 days of employment.
- This Paid Sick Leave benefit may only be used for absences at Client Facilities within Minneapolis city limits.
- Paid Sick Leave may be used by nurses for medical appointments, the employee's own illness or injury; to care for sick or injured family members, absences due to domestic abuse, sexual assault, or stalking of the employee or family member, or to care for children whose schools or child care centers are closed because of weather, power outages, or other unexpected reasons.
- Paid Sick Leave may be used in 4-hour increments.

- For absences of more than 3 consecutive workdays or where there is clear evidence of misuse, Nomad may require that the nurse certify and document the need for the leave.
- If the need for the leave is foreseeable, reasonable notice (generally 1 week) must be provided to Nomad and the Client Facility. Otherwise, Nomad's regular call-in procedures apply.
- Paid Sick Leave may be carried over to the next benefit year, up to the 80 hour accrual cap.
- Paid Sick Leave is <u>not</u> paid out at termination of employment or upon the end of an assignment. However, unless there is a break in employment, this accrued leave will be available for use at future assignments at Client Facilities within Minneapolis city limits. Upon a break in employment, any accrued Paid Sick Leave will be lost.

**24.12  St. Paul Paid Sick Leave Ordinance**

By ordinance, the City of St. Paul has required that employers provide covered employees with certain paid sick leave benefits. In accordance with the St. Paul ordinance, Nomad will provide Nurses working at Client Facilities within St. Paul city limits with Paid Sick Leave outlined below:

- Nurses will begin accruing Paid Sick Leave on their first date of employment at a Client Facility within St. Paul city limits at a rate of 1 hour for every 30 hours worked, up to a maximum of 48 hours accrued per year.
- The maximum paid sick leave that may be accrued is 80 hours. Once the cap is hit, whether by annual accrual or carryover, no additional Paid Sick Leave is accrued until some paid sick leave is used and the nurse falls below the cap.
- The benefit year for measuring Paid Sick Leave accrual begins on the date a nurse begins working at a Client Facility within St. Paul city limits.
- Only hours worked at a Client Facility within St. Paul city limits will count toward accrual of Paid Sick Leave.
- Paid Sick Leave can be used after 90 days of employment.
- This Paid Sick Leave benefit may only be used for absences at Client Facilities within St. Paul city limits.
- Paid Sick Leave may be used by nurses for medical appointments, the employee's own illness or injury; to care for sick or injured family members, absences due to domestic abuse, sexual assault, or stalking of the employee or family member, to care for children whose schools or child care centers are closed because of weather, power outages, or other unexpected reasons, and any other reason listed in § 233.04 of the ordinance.
- Paid Sick Leave may be used in 4-hour increments.
- For absences of more than 3 consecutive workdays or where there is a pattern of abuse of the leave, Nomad may require that the nurse certify and document the need for the leave.
- If the need for the leave is foreseeable, reasonable notice (generally 1 week) must be provided to Nomad and the Client Facility. Otherwise, Nomad's regular call-in procedures apply.
- Paid Sick Leave may be carried over to the next benefit year, up to the 80 hour accrual cap.
- Paid Sick Leave is <u>not</u> paid out at termination of employment or upon the end of an assignment. However, unless there is a break in employment, this accrued leave will be

available for use at future assignments at Client Facilities within St. Paul city limits. Upon a break in employment, any accrued Paid Sick Leave will be lost, unless the nurse is rehired within 90 days.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

25.    **Mississippi**

The following policies shall apply to nurses on assignment in Mississippi:

25.1    **Jury Duty Leave**

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

25.2    **Voting Leave**

Nurses who are registered to vote in Mississippi, may take a reasonable amount of unpaid leave from work to vote. Such leave must be coordinated with Nomad and the Client Facility.

25.3    **Victim Leave**

Nurses who are victims of a criminal offense and are subpoenaed to testify in a criminal proceeding related to such offense or participate in the reasonable preparation of such criminal proceeding, will be granted unpaid leave to do so. Nurses must notify Nomad and the Client Facility of their need for such leave as soon as possible.

25.4    **Drug Testing**

In Mississippi, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy also includes the following provisions:

1. All drug and alcohol testing shall be completed in accordance with Miss. Code Ann. § 71-7-1 *et seq.*
2. All collection and confirmation testing shall be conducted in accordance with Miss. Code Ann. §§ 71-7-9 and 71-7-11.
3. Any drug and alcohol testing conducted or requested by Nomad shall occur during or immediately after the nurse's regular shift, and shall be deemed to be performed during work time for purposes of determining compensation and benefits.
4. Within five (5) working days after receipt of a positive confirmed test result report from the laboratory that conducted the test, Nomad shall, in writing, inform the nurse of such positive test result and inform the nurse in writing of the consequences of such a report and the options available to him/her.
5. A nurse may request and receive from Nomad a copy of the test result report.
6. Within ten (10) working days after receiving notice of a positive confirmed test result, the nurse may submit information to Nomad explaining the test results, and why the results do not constitute a violation of Nomad's policy. If the nurse's explanation of the positive test results is not satisfactory to Nomad, a written explanation submitted by Nomad as to why the nurse's explanation is unsatisfactory, along with the report of positive results, shall be made a part of the nurse's medical and personnel records.

26.    **Missouri**

The following policies shall apply to nurses on assignment in Missouri:

26.1    **Jury Duty Leave**

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

26.2    **Voting Leave**

Nurses who are registered to vote, may take leave from work to vote. Nurses are only eligible for leave if they do not have 3 hours outside of their work shift to vote. Nurses must seek leave in advance of Election Day. Nurses will continue to be paid during voting leave.

26.3    **Crime Victim Leave**

Nurses who are victims of crime may seek unpaid leave from work to respond to a subpoena to testify in a criminal proceeding, attend a criminal proceeding, or to participate in the preparation of a criminal proceeding.

27.    **Montana**

The following policies shall apply to nurses on assignment in Montana:

### 27.1    At-Will Employment

During the first six months of an assignment in Montana (the probationary period), a nurse working in Montana may be terminated at-will. After the probationary period has ended, a nurse on assignment in Montana may only be terminated for "good cause." Good cause means reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operations, or other legitimate business reasons. Nothing herein, however, shall restrict a Client Facility from terminating an assignment in accordance with the terms of its agreement with Nomad.

### 27.2    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Upon receipt of a jury summons, a nurse must notify Nomad and the Client Facility of the date such service is anticipated to begin.

### 27.3    Pregnancy and Maternity Leave

Nomad will provide Nurses on assignment in Montana reasonable unpaid leaves of absence for pregnancy-related disabilities and maternity leave. "Maternity leave" means "any leave of absence granted to or required of an employee because of such employee's disability due to pregnancy." A.R.M. 24.9.1201.

The amount of leave provided will depend upon the circumstances, including the recommendations of the nurse's physician. To the extent the nurse is also eligible for leave under the FMLA, and the leave is for an FMLA-qualifying reason, the FMLA leave and leave provided under this policy will run concurrently.

28.    **Nebraska**

The following policies shall apply to nurses on assignment in Nebraska:

28.1    **Voting Leave**

If there are less than 2 consecutive hours between the opening of the polls and the beginning of the regular work shift or between the end of the regular work shift and the closing of the polls, a nurse entitled to vote in Nebraska, may seek leave from work to vote so that 2 consecutive hours to vote are provided (when added to non-working time when the polls are open). Approved voting leave will be paid.

Nomad reserves the right to set the hours during which you may be absent. Retaliation against employees who request leave under this policy is prohibited.

28.2    **Jury Duty Leave**

Nurses who have been summoned for jury duty may take paid leave to serve on a jury. The leave time will be determined by the length of the jury service. If a nurse is excused from jury service during regularly scheduled working hours, the nurse should contact his/her supervisor immediately and be prepared to report to work.

28.3    **Nebraska Military Family Leave**

Nomad provides up to 30 days of unpaid leave to nurses in Nebraska with a spouse or parent in the U.S. Armed Forces, National Guard, or Reserves who has been deployed during a period of military conflict to a combat theater or combat zone operation, if the service lasts 179 days or longer.

To be eligible, the nurse must have: (a) been employed by Nomad for at least 12 months; (b) worked at least 1,250 hours during the 12 months before the leave begins; and (c) contacted his/her supervisor at least 14 days before the leave begins (if a leave of five or more consecutive days), or give as much advance notice as possible if less than five consecutive days.

Nomad reserves the right to ask for documents supporting any leave requested under this policy, including certification from the proper military authority to verify eligibility for the family military leave requested.

Nurses taking leave under this policy shall be responsible to pay their share of employment benefits, if any.

28.4    **Pregnancy Accommodation**

Nomad will also provide reasonable accommodations to qualified nurses for the known physical limitations of a nurse who is pregnant, has given birth, or has related medical conditions, unless doing so would result in an undue hardship to Nomad or result in a direct threat of substantial

harm to the health or safety of the individual or others. Reasonable accommodation with respect to pregnancy, childbirth, or related medical conditions, may include, but is not limited to: acquisition of equipment for sitting, more frequent or longer breaks, periodic rest, assistance with manual labor, job restructuring, light-duty assignments, modified work schedules, temporary transfers to less strenuous or hazardous work (if available), time off to recover from childbirth, or break time and appropriate facilities and break time for breast-feeding or expressing breast milk.

Any nurse who requires such accommodation should make a request for accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

## 29.    Nevada

The following policies shall apply to nurses on assignment in Nevada:

### 29.1    Meal and Rest Breaks

In Nevada, Nurses are entitled to a meal period of at least thirty minutes for a continuous work period of eight hours. Nurses will also be provided a 10-minute rest period for each four hours worked. No rest period is required if daily work time is less than three and one-half hours.

### 29.2    Overtime Pay

Nurses are entitled to overtime at a rate of at least 1 ½ times the regular rate for all hours worked in excess of 40 per workweek. In the event a nurse makes equal to or less than 1 ½ times the applicable Nevada minimum wage (which is unlikely), overtime of 1 ½ times the regular rate will be paid for hours worked in excess of 8 hours per workday.

### 29.3    Jury Duty Leave

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

Additionally, nurses will not be required to work within 8 hours before the time at which he/she is to appear for jury duty, and will not be required to work an evening or overnight shift on the day of jury service.

### 29.4    Voting Leave

Nurses who are registered to vote in Nevada, may take paid leave from work to vote as follows:

1. 1 hour of leave will be provided if the voting place is less than 2 miles from the Client Facility.
2. 2 hours of leave will be provided if the voting place is more than 2 miles but less than 10 miles from the Client Facility.
3. 3 hours of leave will be provided if the voting place is more than 10 miles from the Client Facility.

Nurses must seek leave in advance of Election Day. Nomad reserves the right to set the period of leave to ensure minimum disruption to the Client Facility.

### 29.5    Domestic Violence Leave

Nurses who have been employed by Nomad for at least 90 days and who is the victim of domestic violence, or whose family or household member is a victim of domestic violence (and the nurse is not the perpetrator), is entitled to up to 160 hours of unpaid leave in a 12-month period following the act of violence, which may be used consecutively or intermittently.  Such

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

leave may be used: (1) for the diagnosis, care or treatment of a health condition related the act of violence, (2) to obtain counseling or assistance related to the act of violence, (3) to participate in court proceedings related to the act of violence, (4) to establish a safety plan to increase the safety of the nurse or his/her family or household member.

Nomad may require that a nurse taking leave under this policy provide documentation that confirms or supports the reason for the leave, which documentation shall be kept confidential. Nomad shall maintain a record of the hours of leave taken pursuant to this policy for each employee.

If this leave is used for any reason that would also qualify as an FMLA-qualifying reason and the nurse is eligible for FMLA, such leaves will run concurrently.

As used in this policy, "Domestic violence" has the meaning ascribed to it in Nev. Rev. Stat. 33.018. Additionally, "family or household member" means a spouse, domestic partner, minor child, parent or other adult person who is related within the first degree of consanguinity or affinity to the nurse, or other adult person who is or was actually residing with the nurse at the time of the act which constitutes domestic violence.

### 29.6    Pregnancy Accommodation

Nomad will also provide reasonable accommodations for the known physical limitations of a qualified nurse who is pregnant, has given birth, or has related medical conditions, unless doing so would result in an undue hardship to Nomad or result in a direct threat of substantial harm to the health or safety of the individual or others.

Reasonable accommodation with respect to pregnancy, childbirth, or related medical conditions, may include, but is not limited to: (a) modifying equipment or providing different seating; (b) revising break schedules, which may include revising the frequency or duration of breaks; (c) providing space in an area other than a bathroom that may be used for expressing breast milk; (d) providing assistance with manual labor if the manual labor is incidental to the primary work duties of the nurse; (e) authorizing light duty; (f) temporarily transferring the employee to a less strenuous or hazardous position; or (g) restructuring a position or providing a modified work schedule.

Nomad is not required to: (a) create a new position that Nomad or the Client Facility would not have otherwise created, unless Nomad or the Client Facility has created or would create such a position to accommodate other classes of employees; or (b) discharge any employee, transfer any employee with more seniority or promote any employee who is not qualified to perform the job, unless Nomad or the Client Facility has taken or would take such an action to accommodate other classes of employees.

Any nurse who requires such accommodation should make a request for accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

30.    **New Hampshire**

The following policies shall apply to nurses on assignment in New Hampshire:

### 30.1    Meal Break

In New Hampshire, nurses who have worked 5 consecutive hours are entitled to a 30 minute unpaid meal break.

### 30.2    Minimum Pay for Reporting to Work

On any day when a nurse reports to work at Nomad's or a Client Facility's request, the nurse shall be paid for all hours worked, but shall not be paid less than 2 hours' pay (even if the nurse performs less than 2 hours of work), except where the limited working time is caused by the illness or personal request of the nurse or where the nurse is notified in writing prior to reporting of the limited nature of the work. Nothing herein alters or reduces guaranteed hours, if any, which shall be controlled by the Nurse Employment Agreement and/or Placement Agreement.

### 30.3    Jury Duty Leave

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

### 30.4    Crime Victim Employment Leave Act

A nurse who is the victim of a crime, or who has a family member who is a victim of a crime, may seek unpaid leave from work to attend court or other legal or investigative proceedings associated with the prosecution of the crime. Such unpaid leave will be provided unless the leave would cause an undue hardship to Nomad or the Client Facility.

### 30.5    Payment of Wages at Termination

Where a nurse's employment is involuntarily terminated by Nomad or a Client Facility, unpaid wages will be paid within 72 hours of the termination. In all other instances, wages will be paid on the next regular payday.

31.    **New Jersey**

The following policies shall apply to nurses on assignment in New Jersey:

31.1    **Jury Duty Leave**

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

31.2    **Emergency Responders Leave**

Nurses who are members of a volunteer fire company, volunteer member of a first aid rescue or ambulance squad, or a member of any county or municipal volunteer Office of Emergency, may take unpaid leave during a state of emergency declared by the President of the United States or the State of New Jersey. Nurses must provide notice to Nomad and the Client Facility that leave will be taken to provide emergency services.

31.3    **Military Leave**

Nomad will provide the necessary time off to Nurses who must fulfil military obligations in any Armed Forces, National Guard, other uniformed services, or state military, as required by state and federal law. Military leave will be unpaid. Nurses may notify Nomad and the Client Facility of service obligations unless advance notice is impossible.

31.4    **Paid Sick Leave**

In New Jersey, Nurses will accrue one hour of paid sick leave for every 30 hours worked at Client Facilities in New Jersey. Nurses working in New Jersey Client Facilities will begin to accrue paid sick live on commencement of employment. Nurses are eligible to use paid sick leave beginning on the 120th calendar day after the commencement of employment. Nurses may not accrue, use, or carry over more than 40 hours of paid sick leave.

Nurses may use accrued paid sick leave for any of the following:

1. Time needed for diagnosis, care, or treatment of, or recovery from, an employee's mental or physical illness, injury or other adverse health condition, or for preventative medical care for the employee;

2. Time needed for the employee to aid or care for a family member of the employee during diagnosis, care, or treatment of, or recovery from, the family member's mental or physical illness, injury or other adverse health condition, or during preventative medical care for the family member;

3. Absence necessary due to circumstances resulting from the employee, or a family member of the employee, being a victim of domestic or sexual violence, if the leave is to

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

allow the employee to obtain for the employee or the family member: medical attention needed to recover from physical or psychological injury or disability caused by domestic or sexual violence; services from a designated domestic violence agency or other victim services organization; psychological or other counseling; relocation; or legal services, including obtaining a restraining order or preparing for, or participating in, any civil or criminal legal proceeding related to the domestic or sexual violence;

4. Time during which the employee is not able to work because of a closure of the employee's workplace, or the school or place of care of a child of the employee, by order of a public official due to an epidemic or other public health emergency, or because of the issuance by a public health authority of a determination that the presence in the community of the employee, or a member of the employee's family in need of care by the employee, would jeopardize the health of others; or

5. Time needed by the employee in connection with a child of the employee to attend a school-related conference, meeting, function, or other event requested or required by a school administrator, teacher, or other professional staff member responsible for the child's education, or to attend a meeting regarding care provided to the child in connection with the child's health conditions or disability.

Paid Sick Leave accrued under this policy may be used at any Client Facility, even on assignments outside of New Jersey. Accrued Paid Sick Leave will not be paid at termination of employment, but will instead be lost.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued paid sick leave.

**32.    New Mexico**

The following policies shall apply to nurses on assignment in New Mexico:

### 32.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 32.2    Voting Leave

If there are 2 hours or less from the opening of the polls until a nurse' shift starts, and the nurse's shift ends with less than 3 hours prior to the closing of the polls, a nurse entitled to vote in New Mexico may seek up to 2 hours of paid leave from work to vote. Nomad and the Client Facility will decide when such leave is taken.

### 32.3    Domestic Abuse Leave

Nomad will provide nurses with 14 days of unpaid domestic abuse leave per calendar year in accordance with the Promoting Financial Independence for Victims of Domestic Abuse Act (N.M.S.A. §50-4A-1), which leave may be used to obtain or attempt to obtain an order of protection or other judicial relief from domestic abuse or to meet with law enforcement officials, to consult with attorneys or district attorneys' victim advocates or to attend court proceedings related to the domestic abuse of the nurse or the nurse's family member. Nurses must comply with the notice and certification requirements of the act.

### 32.4    Emergency Responders Leave

In accordance with N.M.S.A. § 12-10C-3, a nurse who is a voluntary emergency responder will not be terminated, demoted, or discriminated against for any absence where the nurse is responding to an emergency or disaster, up to 10 such absences in a calendar year. Such leave time will be unpaid.

A nurse who will be absent under this provision shall make reasonable efforts to notify Nomad and the Client Facility and shall continue to make those reasonable notification efforts over the course of the absence. Nomad may request the nurse provide a written verification from the office of emergency management or a state or local official managing an emergency or disaster of the dates and time that the nurse served as a volunteer emergency responder to an emergency or disaster.

33.    **New York**

The following policies shall apply to nurses on assignment in New York:

### 33.1    Supplement to Anti-Harassment and Anti-Discrimination Policy

The Anti-Harassment and Anti-Discrimination Policy set forth above, applies to all Nurses on assignment in New York. In compliance with New York law, the following additional information is provided to nurses:

- Sexual harassment, as described in Nomad's Anti-Harassment and Anti-Discrimination policy not only violates Nomad's policies, but is a form of sex discrimination and is unlawful under federal, state, and local law. Nomad's intention is to eliminate all such unwelcome behavior in the workplace, and to do so before it even rises to the level of unlawful conduct.

- The following laws provide nurses protection against harassment:

  o  The **Human Rights Law (HRL)**, codified as N.Y. Executive Law, art. 15, § 290 et seq., applies to all employers in New York State with regard to sexual harassment, and protects employees, paid or unpaid interns and non-employees, regardless of immigration status. A complaint alleging violation of the Human Rights Law may be filed either with the Division of Human Rights (DHR) or in New York State Supreme Court. Complaints with DHR may be filed any time within one year of the harassment. If an individual did not file at DHR, they can sue directly in state court under the HRL, within three years of the alleged sexual harassment. An individual may not file with DHR if they have already filed a HRL complaint in state court. Complaining internally to Nomad does not extend your time to file with DHR or in court. The one year or three years is counted from date of the most recent incident of harassment. You do not need an attorney to file a complaint with DHR, and there is no cost to file with DHR. DHR will investigate your complaint and determine whether there is probable cause to believe that sexual harassment has occurred. Probable cause cases are forwarded to a public hearing before an administrative law judge. If sexual harassment is found after a hearing, DHR has the power to award relief, which varies but may include requiring your employer to take action to stop the harassment, or redress the damage caused, including paying of monetary damages, attorney's fees and civil fines. DHR's main office contact information is: NYS Division of Human Rights, One Fordham Plaza, Fourth Floor, Bronx, New York 10458. You may call (718) 741-8400 or visit: www.dhr.ny.gov. Contact DHR at (888) 392-3644 or visit dhr.ny.gov/complaint for more information about filing a complaint. The website has a complaint form that can be downloaded, filled out, notarized and mailed to DHR. The website also contains contact information for DHR's regional offices across New York State.

o   The United States Equal Employment Opportunity Commission (EEOC) enforces federal anti-discrimination laws, including **Title VII of the 1964 federal Civil Rights Act** (codified as 42 U.S.C. § 2000e et seq.). An individual can file a complaint with the EEOC anytime within 300 days from the harassment. There is no cost to file a complaint with the EEOC. The EEOC will investigate the complaint, and determine whether there is reasonable cause to believe that discrimination has occurred, at which point the EEOC will issue a Right to Sue letter permitting the individual to file a complaint in federal court. The EEOC does not hold hearings or award relief, but may take other action including pursuing cases in federal court on behalf of complaining parties. Federal courts may award remedies if discrimination is found to have occurred. In general, private employers must have at least 15 employees to come within the jurisdiction of the EEOC. An employee alleging discrimination at work can file a "Charge of Discrimination." The EEOC has district, area, and field offices where complaints can be filed. Contact the EEOC by calling 1-800-669-4000 (TTY: 1-800-669-6820), visiting their website at www.eeoc.gov or via email at info@eeoc.gov. If an individual filed an administrative complaint with DHR, DHR will file the complaint with the EEOC to preserve the right to proceed in federal court.

o   Many **localities** enforce laws protecting individuals from sexual harassment and discrimination. An individual should contact the county, city or town in which they live to find out if such a law exists. For example, employees who work in New York City may file complaints of sexual harassment with the New York City Commission on Human Rights. Contact their main office at Law Enforcement Bureau of the NYC Commission on Human Rights, 40 Rector Street, 10th Floor, New York, New York; call 311 or (212) 306-7450; or visit www.nyc.gov/html/cchr/html/home/home.shtml.

o   If the harassment involves unwanted physical touching, coerced physical confinement or coerced sex acts, the conduct may constitute a crime. Contact the **local police department**.

●   All complaints or information about sexual harassment will be investigated, whether that information was reported in verbal or written form. Investigations will be conducted in a timely manner, and will be confidential to the extent possible. An investigation of any complaint, information or knowledge of suspected sexual harassment will be prompt and thorough, commenced immediately and completed as soon as possible. The investigation will be kept confidential to the extent possible. All persons involved, including complainants, witnesses and alleged harassers will be accorded due process, as outlined below, to protect their rights to a fair and impartial investigation.

●   Although nurses may report discrimination, harassment, and offensive conduct pursuant to Nomad's Reporting Harassment, Discrimination, or Offensive Conduct Policy, set forth above, without utilizing any particular form, New York law requires that a

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

complaint form be provided to each employee. Accordingly, nurses may use the form set forth on the following pages to make any such report:

## COMPLAINT FORM FOR REPORTING SEXUAL HARASSMENT

**COMPLAINANT INFORMATION**

Name:

Work Address:                                    Work Phone:

Job Title:                                        Email:

Select Preferred Communication Method:     ☐Email  ☐Phone  ☐In person

**SUPERVISORY INFORMATION**

Immediate Supervisor's Name:

Title:

Work Phone:                                      Work Address:

**COMPLAINT INFORMATION**

1.  Your complaint of Sexual Harassment is made about:

    Name:                                        Title:

    Work Address:                                Work Phone:

    Relationship to you: ☐Supervisor  ☐Subordinate  ☐Co-Worker  ☐Other

2.  Please describe what happened and how it is affecting you and your work. Please use additional sheets of paper if necessary and attach any relevant documents or evidence.

3.  Date(s) sexual harassment occurred:

Is the sexual harassment continuing? ☐Yes ☐No

4.  Please list the name and contact information of any witnesses or individuals who may have information related to your complaint:

*The last question is optional, but may help the investigation.*

5.  Have you previously complained or provided information (verbal or written) about related incidents? If yes, when and to whom did you complain or provide information?

If you have retained legal counsel and would like us to work with them, please provide their contact information.

*Signature:* _____      *Date:* _____

**Please email the completed form to Nomad's Support Team, whose email address is:**
**_support@nomadhealth.com_**

**33.2    Meal Breaks**

Nurses are entitled to a 30 minute meal break between 11 a.m. and 2 p.m. In addition, if a nurses' work shift begins before 11 a.m. and continues after 7 p.m., the nurse is entitled to a 20 minute meal break between 5 p.m. and 7 p.m. If a nurse works a shift lasting more than 6 hours that begins between 1 a.m. and 6 a.m., the nurse is entitled to a meal period at the time mid-way between the beginning and end of the nurses' shift.

**33.3    Jury Duty Leave**

Nurses who have been summoned to serve as a juror may take unpaid leave to serve as a juror. The leave time is determined by the length of the jury service.

**33.4    Voting Leave**

Nurses who have 4 consecutive hours either between the opening of the polls and the beginning of the Nurse's shift, or between the end of the Nurse's shift and the closing of the polls, is deemed to have sufficient time outside of working hours to vote.

Nurses who are registered voters and do not have sufficient time outside of working hours to vote, may without loss of pay for up to 2 hours, may take time off of work to go vote.

Nurses who require working time off to vote shall provide notice not more than 10 days or less than 2 working days before the day of the election.

**33.5    Lactation & Breastfeeding Break Time**

Nurses, who are nursing mothers, will be provided reasonable unpaid break time to express breast milk for her nursing child for up to 3 years following childbirth. Nomad will work with the Client Facility to designate a room for this purpose and provide appropriate refrigeration facilities. Breaks of more than 20 minutes in length taken by nurses for such purposes will be unpaid, and the nurse should indicate this unpaid period on her time record. Nurses may also elect to use meal time to express breast milk.

**33.6    Crime Victims Leave**

Nurses may take unpaid leave to appear as a witness at a criminal proceeding, to consult with the district attorney, or to exercise rights provided by New York criminal procedure law or the family court act.

**33.7    Paid Family Leave**

Eligible nurses can receive job-protected, paid family leave to bond with a child during the first 12 months after the child's birth, to care for a family member with a serious health condition, or

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

to address obligations arising out of a spouse, child, domestic partner, or parent who is on active military duty. The right to such leave and the basis for such leave shall be controlled by the New York Paid Family Leave Benefits Law.

To be eligible for Paid Family Leave, nurses must either (1) have been employed by Nomad for 26 weeks and have a regular work schedule of 20 or more hours per week or (2) have been employed by Nomad for 175 days.

In 2018, eligible nurses are eligible to receive 50% of their average weekly wage for up to 8 weeks, capped at 50% the New York State Average Weekly Wage. New York's Paid Family Leave will be fully phased in 2021 and maximum benefits will be established. The following is a benefit schedule for New York's Paid Family Leave:

| Year | Weeks Available | Max % of Employee Average Weekly Wage | Capped at % of New York State Average Weekly Wage |
|------|-----------------|---------------------------------------|---------------------------------------------------|
| 2018 | 8 | 50% | 50% |
| 2019 | 10 | 55% | 55% |
| 2020 | 10 | 60% | 60% |
| 2021 | 12 | 67% | 67% |

Where the need for leave is foreseeable, the nurse should provide Nomad 30 days advance notice of his or her intention to use Paid Family Leave. If the event or need for leave was not foreseeable, the nurse must notify Nomad as soon as practical.

A nurse seeking Paid Family Leave must submit a completed claim package to Nomad's Paid Family Leave insurance carrier within 30 days of the first day of paid leave. Nomad's insurance carrier will process the claim and issue a determination (either paying or denying the claim) within 18 days. Where a claim is approved, an eligible nurse will be paid directly by Nomad's Paid Family Leave insurance carrier.

A claim form can be obtained by contacting Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623. The completed claim form must be accompanied by supporting documentation, the form of which shall depend upon the reason for the leave.

Employee benefits shall continue during leave periods taken under this policy, subject to the same employee contributions in effect prior to leave.

For additional information related to Paid Family Leave, including definitions and additional examples, please refer to the following resource prepared by the State of New York: https://www.ny.gov/new-york-state-paid-family-leave/paid-family-leave-information-employees

### 33.8   New York City Earned Sick Time Act

New York City has required that employers provide covered employees with certain paid sick leave benefits. In accordance with the New York City Earned Sick Time Act, Nomad will provide Nurses working at Client Facilities within New York City with paid sick leave outlined below:

- Nurses will begin to accrue sick leave on the first day of employment with a Client Facility located in New York City.

- Sick leave is earned at a rate of one (1) hour for every thirty (30) hours worked.

- Nurses may use accrued sick leave 120 days after commencement of employment at a Client Facility in New York City.

- Sick leave may be used for the nurse's mental or physical illness, injury or health condition or need for medical diagnosis, care or treatment of a mental or physical illness, injury or health condition or need for preventative medical care. In addition, a nurse may use sick leave to care for a family member who needs medical diagnosis, care or treatment of a mental or physical illness, injury or health condition or who needs preventative medical care.

- Where foreseeable, Nomad requests that nurses provide reasonable notice of using sick leave.

- If an absence is more than three consecutive work days, Nomad may require reasonable documentation by a licensed healthcare provider.

- Nurses may earn up to **a maximum of** forty (40) hours of earned sick leave in a twelve (12) month period. However, Nurses shall only use forty (40) hours of sick leave per **calendar** year.

- Nurses may carry over up **to forty (40)** hours of unused sick leave to the following year.

- Sick leave is <u>not</u> paid out at termination of employment or upon the end of assignment. However, unless there is a break in employment, this accrued leave will be available for use at future assignments at Client Facilities within New York City limits. Upon a break in employment, any accrued paid sick leave will be lost, unless the nurse is rehired within six months of separation.

34.    **North Carolina**

The following policies shall apply to nurses on assignment in North Carolina:

### 34.1    Jury Duty Leave

Nurses who have been called for jury duty, or serve as a grand juror or pretit juror, may take unpaid leave to serve as a juror. The leave time is determined by the length of the jury service.

### 34.2    Parent Involvement in School Leave

Nurses who are parents, guardians, or persons standing in loco parentis may take unpaid leave to attend or otherwise be involved at the child's school. Nurses may take up to 4 hours of leave each year. Leave shall be at a mutually agreed upon time between Nomad and the nurse seeking leave. Nurses may be required to provide at least 48 hours advance written notice before taking leave.

### 34.3    Leave to Seek Order for Domestic Violence

Nurses may take reasonable unpaid time off from work to obtain or attempt to obtain judicial protection from domestic violence. Unless leave is taken for an emergency, the nurse seeking leave should comply with Nomad's time-off notice requirements.

### 34.4    Drug Testing

All provisions of Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy in the Handbook apply, except the following changes:

- Collection of samples from prospective or current nurses may be collected on-site or at an approved laboratory. The screening of samples for prospective nurses may utilize a single-use test device. However, for currently employed nurses, screening tests of samples will be performed by an approved laboratory.

- If a screening test produces a positive result, an approved laboratory will confirm the positive result by a second examination of the sample utilizing gas chromatography with mass spectrometry or an equivalent scientifically accepted method. A prospective nurse may sign a waiver of a second examination at the time or after the prospective nurse receives the preliminary positive test result.

- A portion of every sample that produced a positive examination result will be preserved by the laboratory for at least 90 days from the date of confirmation.

- The prospective or current nurse has a right to retest a confirmed positive sample at the same or another approved laboratory. The nurse must request release of the sample in writing specifying to which approved laboratory the sample is to be sent. Such request

should be made to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

**35.    North Dakota**

The following policies shall apply to nurses on assignment in North Dakota:

### 35.1    Meal Breaks

In North Dakota, nurses who work a shift exceeding five hours are entitled to an unpaid 30 minute uninterrupted break when there are two or more employees on duty.

### 35.2    Jury Duty Leave

Nurses summoned for jury duty are entitled to unpaid leave to serve on a jury. The amount of leave granted will be based on the duration of the jury service.

### 35.3    Pregnancy Accommodation

Nomad will also provide reasonable accommodations to qualified nurses for the known disabilities of a nurse who is pregnant, unless doing so would disrupt or interfere with Nomad's or the Client Facility's normal business operations, threaten an individual's health or safety, contradict a business necessity of Nomad or the Client Facility, or impose an undue hardship on Nomad or the Client Facility.

Any nurse who requires such accommodation should make a request for accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

**36.    Ohio**

The following policies shall apply to nurses on assignment in Ohio:

**36.1    Jury Duty Leave**

Nurses who have been summoned to serve on a jury may take unpaid leave to serve as a juror. The leave time is determined by the length of the jury service.

**36.2    Military Family Leave**

Nurses may be eligible for Military Family Leave under Ohio law. A nurse may have been employed for 12 consecutive months and must have worked 1,250 hours or more in the 12 months before leave. To be eligible, the Nurse must be a parent, spouse, or legal guardian of the person in uniformed services who has been called to active duty for than 30 days or has been injured, wounded, or hospitalized while serving on active duty.

Nurses may take up to 10 days or 80 hours of unpaid leave in a calendar year. Nurse will continue to maintain benefits while on leave.

**36.3    Crime Victim Leave**

Nurses who have been a victim of a crime, or is a victim's family member or representative, may take unpaid leave to prepare for a criminal or delinquency proceeding or for attendance, pursuant to a subpoena, at a criminal or delinquency proceeding.

**36.4    Witness Duty Leave**

Nurses who have been subpoenaed to testify in a civil or criminal proceeding may take unpaid leave to serve as a witness. Nurses must notify Nomad and the Client Facility by providing a copy of the subpoena. Nurses are expected to return to work when the court schedule permits.

**36.5    Voting Leave**

Nurses who are registered to vote and are unable to vote in an election during non-working hours may be granted a reasonable time off from work to vote. Nurses must request voting leave from Nomad and the Client Facility at least two working days before Election Day.

## 37.     Oklahoma

The following policies shall apply to nurses on assignment in Oklahoma:

### 37.1     Jury Duty Leave

Nurses who are summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

### 37.2     Voting Leave

Nurses who are registered to vote and do not have 3 hours before their shift or 3 hours after their shift in which to vote, may take up to 2 hours of paid leave from work to vote, at a time set by Nomad or the Client Facility. Notice of intention of taking such leave must be provided prior to Election Day and Nomad may require proof of voting. Nomad may also adjust the nurse's schedule so that the nurse does have either 3 hours before or after the shift to vote.

### 37.3     Additional Drug and Alcohol Testing Provisions

In Oklahoma, Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy includes the following additional provisions:

1. All drug testing shall be in compliance with 40 Okla. Stat. § 551 *et seq.*
2. Nomad may require that nurses who transfer to a different position or job, or who are reassigned to a different position or job, to undergo drug or alcohol testing.
3. Nomad may also conduct routine fitness-for-duty drug testing consistent with 40 Okla. Stat. § 554(5).
4. Applicants and nurses will be provided a copy of the test results, and they may request all information and records related to their testing.
5. Applicants and nurses will be afforded an opportunity to explain, in confidence, the test results.
6. If an applicant or nurse requests a confirmatory test of a positive test result, it will be at the applicant's or nurse's expense, unless the confirmation test reverses the findings of the challenged positive test. In such case, Nomad will reimburse the individual for the costs of the confirmation test. There are no other appeal procedures.
7. Disclosures of drug and alcohol tests shall be made only as authorized in 40 Okla. Stat. § 560.

38.    **Oregon**

The following policies shall apply to nurses on assignment in Oregon:

### 38.1    Meal and Rest Periods

In Oregon, nurses who work for more than 6 hours during a calendar day are entitled to an unpaid meal break of at least 30 minutes. If the work period is at least 6 hours but less than 7 hours, the meal period is to be taken after the second hour worked and prior to the commencement of the fifth hour worked. If the work period is more than 7 hours, the meal period is to be taken after the third hour worked and prior to the commencement of the sixth hour worked. If the work period is 14 hours, nurses are entitled to 2 meal periods of 30 minutes each.

Nurses will be entitled to a paid rest period of not less than 10 minutes for every 4 hours of work.

### 38.2    Paid Sick Leave

In Oregon, nurses are entitled to accrue 1 hour of Paid Sick Leave for every 30 hours worked, up to a maximum of 40 hours accrued per year. Nurses shall begin to accrue Paid Sick Leave at the commencement of employment at a Client Facility in Oregon.

Paid Sick Leave may be used for oneself or for the care of a family member's mental or physical illness, injury or health condition, need for medical diagnosis, care or treatment of a mental or physical illness, injury or health condition or need for preventive medical care. Nurses must generally comply with Nomad's regular call-in procedures.

Nurses may retain and use accrued and unused Paid Sick Leave after leaving the Oregon Client Facility, even at assignments with Client Facilities outside of Oregon. However, only time worked at an Oregon Client Facility will accrue Paid Sick Leave under this policy.

Accrued Paid Sick Leave will <u>not</u> be paid at termination of employment, but will instead be lost.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued sick leave.

### 38.3    Jury Duty Leave

Nurses summoned for jury duty are entitled to unpaid leave to serve on a jury. The length of such leave will be determined by the duration of the jury service.

### 38.4    Oregon Family Leave Act

Nurses who have been employed in Oregon for 180 days and have worked 25 or more hours/week are eligible for 12 weeks of unpaid leave in a 1-year period under the Oregon Family Leave Act.

The type of leave includes the following:

- Family leave to care for an infant or newly adopted child under 18 years of age, or for an adopted or foster child older than 18 years of age if the child is incapable of self-care, a family member with a serious health condition because of a mental or physical disability, to recover from the nurses' own serious health condition, to care for the nurse' child who is suffering from an illness, injury, or condition that is not a serious health condition, but requires home care;
- A female nurse may take a total of 12 weeks of additional leave within a one-year period for an illness, injury, or condition related to pregnancy or childbirth that disables the nurse from performing her job duties; or
- Parental leave to care for a child who is suffering from an illness, injury, or condition that is not a serious health condition but requires home care.

Under the Oregon Family Leave Act, eligible nurses may take 2 weeks of unpaid bereavement leave to make funeral arrangements, attend a funeral, or grieve the loss of a family member.

Nurses shall provide notice of taking such leave, if foreseeable.

### 38.5   Crime Victim Leave

Nurses who have worked more than 25 hours per week for at least 180 days are eligible for crime victim leave. Nurses who are victims of a crime are entitled to take unpaid leave to attend a criminal proceeding.

### 39.    Pennsylvania

The following policies shall apply to nurses on assignment in Pennsylvania:

### 39.1    Jury Duty Leave

Nurses who have been called for jury duty may take unpaid leave to serve as a juror. The leave time is determined by the length of the jury service.

### 39.2    Crime Victim Leave

Nurses may take unpaid leave to attend court by reason of being a victim of, or a witness to, a crime or being a member of the victim's family.

### 39.3    Philadelphia's Paid Sick Leave Ordinance

Nurses employed at Client Facilities in Philadelphia will accrue 1 hour of Paid Sick Leave for every 40 hours worked. Paid Sick Leave shall accrue on the commencement of employment at a Client Facility in Philadelphia. After the 90th calendar day of employment, Nurses may use accrued Paid Sick Leave, but only 40 hours of Paid Sick Leave may be used each calendar year. All accrued Paid Sick Leave will carryover to the next calendar year.

A nurse can use Paid Sick Leave to care for herself/himself, or to care for a family member with a mental or physical illness, injury, or health condition. Nurses must generally comply with Nomad's call-in procedures in using Paid Sick Leave.

Paid Sick Leave accrued under this policy may only be used on assignments at Client Facilities within Philadelphia, Pennsylvania.

Accrued Paid Sick Leave will not be paid at termination of employment, but will instead be lost.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued paid sick leave.

### 39.4    Philadelphia Entitlement to Leave Due to Domestic Violence, Sexual Assault, or Stalking Ordinance

Nurses employed at Client Facilities in Philadelphia are entitled to unpaid leave under this Ordinance. Nurses who are victims, or have family or household members who are victims of domestic violence, sexual assault, or stalking will be entitled to 8 workweeks of unpaid leave during a 12 month period.

Nurse may take unpaid leave for the following:
- To seek medical attention for physical or psychological injuries;
- To obtain services from a victim services organization;
- To obtain psychological or other counseling;

- To participate in safety planning, relocation, or other actions to increase safety; or
- To seek legal assistance or remedies, including preparing or participating in civil or criminal proceedings related to domestic violence, sexual assault, or stalking.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

## 40.    Rhode Island

The following policies shall apply to nurses on assignments in Rhode Island:

### 40.1    Drug Testing

All provisions of Nomad's "Drug & Alcohol Free Workplace; Drug & Alcohol Testing" Policy in the Handbook apply, except with the following changes:

1. Drug tests for nurses on assignment in Rhode Island will be conducted in accordance with R.I. Gen. Laws §§ 28-6.5-1 and 28-6.5-2.
2. "Post-Employment, Pre-Placement Testing" for drugs will only occur where there are reasonable grounds to believe that the nurse may be under the influence of a controlled substance, which may be impairing his/her ability to perform his/her job. This reasonable belief must be based on specific aspects of the nurse's job performance and contemporaneous, documented observations relating to the nurses' appearance, behavior, or speech.
3. All samples will be provided in private.
4. Positive tests of urine, blood or any other bodily fluid or tissue will be confirmed by a federally certified laboratory by means of gas chromatography/mass spectrometry or technology recognized as being at least as scientifically accurate.
5. The nurse will be afforded a reasonable opportunity to rebut or explain the results.
6. Nurses already employed by Nomad (not applicants with a conditional offer of employment) who test positive for drugs will not be immediately terminated, although their placements may be delayed or cancelled, but will instead be referred to a substance abuse professional for assistance. Nurses referred to a substance abuse professional will be subject to additional testing and a nurse whose testing indicates any continued use of controlled substances despite treatment will be terminated.

### 40.2    Jury Duty Leave

Upon receipt of a jury summons, a nurse must notify Nomad and the Client Facility of the date such service is anticipated to begin. Nurses will be provided unpaid leave to complete this jury service. The leave time will be determined by the length of the jury service.

### 40.3    School Involvement Leave

As required by Rhode Island law, nurses who have been employed with Nomad for at least 12 consecutive months will be granted up to a total of 10 hours of unpaid leave in a 12-month period to attend school conferences or school-related activities for their child. Nurses using this leave must provide 24 hours' advance notice to Nomad and the Client Facility and must make a reasonable effort to schedule the leave so as not to unduly disrupt the operations of the Client Facility.

### 40.4    Parental and Family Medical Leave Act

Nurses who work at least 30 hours per week and have been employed by Nomad for at least 12

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

consecutive months will be provided up to 13 consecutive work weeks of unpaid parental leave (leave for the birth or adoption of a child) or family leave (leave occasioned by a serious illness of a family member) in any 2 calendar years. Nurses seeking to utilize this leave must provide Nomad and the Client Facility at least 30 days advance notice, unless prevented by a medical emergency.

Nomad may request the nurse provide written certification from a physician, specifying the need for the leave and probable duration.

Employee benefits, if any, shall continue during this period of leave. Upon returning from such leave, the nurse will be restored to the same or equivalent position.

For additional information, please contact Nomad or refer to R.I. Gen. Laws § 28-48-1 et seq.

### 40.5    Temporary Caregiver Insurance Program

In Rhode Island, nurses are entitled to receive up to 4 weeks of wage replacement benefits when nurses take leave to care for specified family members. Nurses are eligible to collect temporary disability insurance benefits in any week in which he or she is unable to perform his or her regular and customary work due to:
- Bonding with a newborn child or a child newly placed for adoption or foster care (bonding claims must be requested during the first 12 months of birth or placement in adoption or foster care); and
- Caring for a child, parent, parent-in-law, grandparent, spouse, or domestic partner with a serious health condition.

To receive temporary caregiver insurance benefits, nurses must file an application with the Department of Labor and Training and provide Nomad with written notice of intent to take a leave of absence. The written notice must be at least 30 days in advance before leave begins, unless unforeseeable.

### 40.6    Paid Sick Leave

In accordance with the Rhode Island Healthy and Safe Families and Workplaces Act, Nomad will provide Nurses working at Client Facilities in Rhode Island with Paid Sick Leave as outlined below:
- Nurses will begin accruing Paid Sick Leave on their first date of employment at a Client Facility within Rhode Island at a rate of 1 hour for every 35 hours worked, up to a maximum of 40 hours accrued per year.
- All accrued Paid Sick Leave will carryover from year to year, but the maximum number of Paid Sick Leave hours that can be used in a benefit year is 40 hours.
- Accruals will be measured on a calendar year basis.
- Only hours worked at a Client Facility within Rhode Island will count toward accrual of Paid Sick Leave.
- Paid Sick Leave can be used after 90 days of employment.

- This Paid Sick Leave benefit may only be used for absences at Client Facilities within Rhode Island.
- Paid Sick Leave may be used by nurses for:
  - A nurse's mental or physical illness, injury, or health condition; a nurse's need for medical diagnosis, care, or treatment of a mental or physical illness, injury, or health condition; a nurse's need for preventive medical care;
  - Care of a family member with a mental or physical illness, injury, or health condition; care of a family member who needs medical diagnosis, care, or treatment of a mental or physical illness, injury, or health condition; care of a family member who needs preventive medical care;
  - Closure of a Client Facility by order of a public official due to a public health emergency or a nurse's need to care for a child whose school or place of care has been closed by order of a public official due to a public health emergency, or care for oneself or a family member when it has been determined by the health authorities having jurisdiction or by a health care provider that the nurse's or family member's presence in the community may jeopardize the health of others because of their exposure to a communicable disease, whether or not the nurse or family member has actually contracted the communicable disease; or
  - Time off needed when the nurse or a member of the nurse's family is a victim of domestic violence, sexual assault, or stalking.
- Paid Sick Leave may be used in 4-hour increments.
- For absences of more than 3 consecutive workdays, Nomad may require that the nurse certify and document the need for the leave.
- If the need for the leave is foreseeable, reasonable notice (generally 1 week) must be provided to Nomad and the Client Facility. Otherwise, Nomad's regular call-in procedures apply.
- Paid Sick Leave is <u>not</u> paid out at termination of employment or upon the end of an assignment. However, unless there is a break in employment, this accrued leave will be available for use at future assignments at Client Facilities within Rhode Island. Upon a break in employment, any accrued Paid Sick Leave will be lost.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

41.    **South Carolina**

The following policies shall apply to nurses on assignments in South Carolina:

### 41.1    Jury Duty or Court Proceeding Leave

Nurses will be granted unpaid leave to serve on a jury, or to testify at a court proceeding or administrative proceeding. The amount of leave granted will be based upon the duration of the jury service or the time to provide testimony.

### 41.2    Pregnancy Accommodation

Nomad will also provide reasonable accommodations to qualified nurses for the known limitations arising from pregnancy, childbirth, breastfeeding, and related medical conditions, unless doing so would result in an undue hardship to Nomad. Such reasonable accommodations may include: providing more frequent or longer break periods; providing more frequent bathroom breaks; providing a private place, other than a bathroom stall for the purpose of expressing milk; modifying food or drink policy; providing seating or allowing the nurse to sit more frequently if the job requires the nurse to stand; providing assistance with manual labor and limits on lifting; temporarily transferring the nurse to a less strenuous or hazardous vacant position, if qualified; providing job restructuring or light duty, if available; acquiring or modifying equipment or devices necessary for performing essential job functions; and modifying work schedules.

Any nurse who requires such accommodation should make a request for accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

42.    **South Dakota**

The following policies shall apply to nurses on assignments in South Dakota:

42.1    **Jury Duty Leave**

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service.

42.2    **Voting Leave**

If there are less than 2 hours between the opening and closing of the polls during which a nurse is not required to be on the job on Election Day, and the nurse is eligible to vote in South Dakota, the nurse will be provided up to 2 hours of paid leave in which to vote. Nomad will specify the hours of leave.

43.    **Tennessee**

The following policies shall apply to nurses on assignments in Tennessee:

43.1    **Meal Break**

In Tennessee, nurses who work for more than 6 hours during a calendar day are entitled to an unpaid meal break of at least 30 minutes.

43.2    **Jury Duty Leave**

Nurses summoned for jury duty may take leave to serve on a jury. Nurses will be entitled to their usual compensation while on jury duty leave, however, Nomad has the discretion to deduct the amount of the fee or compensation the nurse receives from serving on a jury. The length of the leave will be determined by the length of the jury service.

43.3    **Voting Leave**

Nurses who are registered to vote, may take a reasonable period of time, not to exceed three hours, to vote. However, if the nurse's shift begins three hours after the opening of the polls or ends three hours before the closing of the polls, the nurse will not be eligible for voting leave. Nomad and the Client Facility reserves the right to determine the specific hours the Nurse may be absent from work to vote. Nurses must inform Nomad and the Client Facility of the need to take voting leave before twelve o'clock noon the day before the election.

43.4    **Lactation and Breastfeeding Break Time**

Nurses, who are nursing mothers, will be provided reasonable unpaid break time to express breast milk for her nursing child. Nomad will work with the Client Facility to designate a room for this purpose and provide appropriate refrigeration facilities. Breaks of more than 20 minutes in length taken by nurses for such purposes will be unpaid, and the nurse should indicate this unpaid period on her time record. Nurses may also elect to use meal time to express breast milk.

## 44.    Texas

The following policies shall apply to nurses on assignments in Texas:

### 44.1    Jury Duty Leave

Nurses summoned for jury duty may take unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

### 44.2    Voting Leave

Nurses who are registered to vote, may take leave from work to vote. Nurses are only eligible for leave if they do not have 2 hours of their work shift to vote. Nurses will continue to be paid during voting leave.

### 44.3    Witness Leave

Occasionally, nurses may be subpoenaed to attend civil, criminal, legislative, or administrative proceedings as a witness. In these circumstances, you will be excused from work if you are legally compelled to attend a proceeding as a witness. Nurses must notify Nomad and the Client Facility immediately of their need for leave under this policy.

45.    **Utah**

The following policies shall apply to nurses on assignment in Utah:

### 45.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 45.2    Voting Leave

If there are less than 3 consecutive hours between the opening of the polls and the beginning of the regular work shift or between the end of the regular work shift and the closing of the polls, a nurse entitled to vote in Utah may seek up to 2 hours of paid leave from work to vote. The nurse must apply for such leave before Election Day.

Nomad and the Client Facility will decide when such leave is taken; however, if the nurse requests the leave at the beginning or the end of the shift, such request will be granted.

### 45.3    Witness Leave

Nurses who are subpoenaed to attend a judicial hearing or deposition will be granted unpaid leave to attend such proceeding or deposition, in accordance with the subpoena. Nurses must notify Nomad and the Client Facility of their need for such leave as soon as possible.

### 45.4    Pregnancy Accommodation

Nomad will also provide reasonable accommodations to qualified nurses for conditions or limitations related to pregnancy, childbirth, breastfeeding and related conditions, unless doing so would result in an undue hardship to Nomad. Nomad may require certification from the nurse's health care provider concerning the advisability of a reasonable accommodation, which must include the date the reasonable accommodation becomes medically advisable, the probable duration, and an explanatory statement as to the medical advisability of the reasonable accommodation. No medical certification will be required where the accommodation is more frequent restroom, food, or water breaks.

Any nurse who requires such accommodation should make a request for accommodation to Nomad's Support Team, who may be reached at support@nomadhealth.com and (866) 656-6623.

### 45.5    Drug Testing

In Utah, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy also includes the following provisions:
7.  All drug and alcohol testing shall be completed in accordance with Utah Code § 34-38-1 *et seq.*

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

8. Any drug or alcohol testing on nurses shall occur during or immediately after the regular shift and shall be deemed work time for purposes of compensation and benefits. Nomad will pay for all costs of testing, including transportation.

9. Samples shall be collected and tested with due regard to the privacy of the individual being tested and in a manner reasonably calculated to prevent substitutions or interference with the collection or testing of a reliable sample.

10. Positive results must be confirmed in accordance with Utah Code § 34-38-6(6)(b).

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

## 46.    Vermont

The following policies shall apply to nurses on assignments in Vermont:

### 46.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service.

### 46.2    Witness Leave

Nurses who have been summoned to appear as a witness in a civil or criminal case may take unpaid leave to attend such proceedings. The leave time will be determined by the length of the witness service.

### 46.3    Paid Sick Leave

Nurses working at Client Facilities in Vermont are entitled to accrue paid sick leave. One hour of sick time is accrued for every 52 hours of actual work, including overtime, on assignment in Vermont, and nurses may use up to 40 hours per year (once accrued). Up to 40 hours of paid sick leave may be carried over from one calendar year to the next.

Nurses may use paid sick time when a nurse or a nurse's child, parent, grandparent, spouse, or parent-in-law is sick or injured. This includes helping a family member obtain health care or travel to an appointment related to his or her long-term care, or to address the effects of domestic violence, sexual assault, or stalking. Nurses may also use paid sick time to care for a family member because a school or business where the family member is located is closed for public health or safety reasons.

Nomad prohibits any unlawful discrimination or retaliation against a nurse for using or requesting to use accrued paid sick leave. Unused paid sick leave shall not be paid upon termination of employment.

### 46.4    Drug Testing

In Vermont, Nomad's Drug & Alcohol Free Workplace; Drug & Alcohol Testing Policy, also includes the following provisions:
1. All drug testing shall be in compliance with 21 V.S.A. § 511 *et seq.*, including the procedures set forth in 21 V.S.A. § 514.
2. In no event will random drug testing occur.
3. Post-Accident Testing and Reasonable Suspicion Testing will be replaced with Probable Cause Testing, and such test will only be performed when Nomad has probable cause to believe the nurse is using or is under the influence of a drug or alcohol on the job.
4. Nomad will provide existing nurses with an initial confirmed positive test result and the opportunity to participate in an alcohol or drug rehabilitation program. Where an existing nurse has an initial confirmed positive test result and the nurse elects to participate in the rehabilitation program, the nurse will be suspended while participating in such program

(up to 3 months), but will not be terminated. Refusal to participate in such a program or a second confirmed positive test result will result in termination of employment.

5. For the purposes of this policy, the term "drug" shall mean: "a drug listed or classified by the U.S. Drug Enforcement Administration as a Schedule I drug, or its metabolites, and alcohol. It shall also mean other drugs or their metabolites which are likely to cause impairment of the individual on the job, which are: amitriptyline, amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, doxepin, glutethimide, hydromorphone, imipramine, meperidine, methadone, methaqualone, opiates, oxycodone, pentazocine, phenytoin, phencyclidine, phenothiazines, and propoxyphene." 21 V.S.A. § 511.

6. Nomad will not request or require that a blood sample be drawn for the purposes of administering a drug test.

7. Testing shall be performed by a laboratory qualified by the Vermont Department of Health.

8. The collector of the sample shall establish a chain of custody procedure for both sample collection and testing that will assure the anonymity of the individual being tested and verify the identity of each sample and test result.

9. If a urinalysis procedure is used to screen for drugs, Nomad shall:
   - require the laboratory performing the test to confirm any sample that tests positive by testing the sample by gas chromatography with mass spectrometry or an equivalent scientifically accepted method that provides quantitative data about the detected drug or drug metabolites; and
   - provide the nurse tested with an opportunity, at his or her request and expense, to have a blood sample drawn at the time the urine sample is provided, and preserved in such a way that it can be tested later for the presence of drugs.

10. A laboratory may report that a urine sample is positive only if both the initial test and confirmation test are positive for the particular drug.

11. The laboratory report must contain the following information: (A) the unique identifier code of the nurse tested; (B) the type of test conducted for both initial screening and confirmation; (C) the results of each test; (D) the detection level, meaning the cut-off or measure used to distinguish positive and negative samples, on both the initial screening and confirmation procedures; (E) the name and address of the laboratory; and (F) any other information provided by the laboratory concerning that person's test.

12. Nomad shall contract with or employ a certified medical review officer who shall be a licensed physician with knowledge of the medical use of prescription drugs and the pharmacology and toxicology of illicit drugs. The medical review officer shall review and evaluate all drug test results, assure compliance with this section and sections 515 and 516 of this title, report the results of all tests to the individual tested, and report only confirmed drug test results to Nomad.

13. A medical review officer shall personally contact the nurse or applicant who has a positive test result and explain the results and why the results may not be accurate.

14. An opportunity to retest a portion of the sample at an independent laboratory at the expense of the person tested and shall consider the results of the retest.

**47.     Virginia**

The following policies shall apply to nurses on assignments in Virginia:

### 47.1     Jury Duty or Court Appearance Leave

Nurses summoned for jury duty or a court appearance will be granted unpaid leave to serve on a jury or appear in court.

### 47.2     Crime Victim Leave

Nurses who are victims of a crime will be granted unpaid leave from work to attend criminal proceedings involving the crime against the victim.

### 47.3     Election Officer Leave

Nurses who are officers of election in Virginia, a person appointed to serve at a polling place, will be granted unpaid leave on Election Day.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

48.    **Washington**

The following policies shall apply to nurses on assignment in Washington:

### 48.1    Meal and Rest Breaks

Nurses are entitled to a meal period of at least 30 minutes when commences no less than 2 hours or more than 5 hours from the beginning of the shift. No nurse must be required to work more than 5 consecutive hours without a meal period.

Nurses are entitled to a rest period of not less than 10 minutes for each 4 hours of working time. No nurse must be required to work more than 3 hours without a rest period. Where the nature of the work allows nurses to take intermittent rest periods equivalent to 10 minutes for each 4 hours worked, scheduled rest periods are not required.

### 48.2    Paid Sick Leave

Nurses will accrue 1 hour of Paid Sick leave for every 40 hours worked. Nurses are entitled to use accrued paid sick leave beginning on the 19th calendar day after the commencement of his or her employment at a Client Facility in Washington. Unused Paid Sick Leave carries over to the following year, except nurses may not carry over paid sick leave in excess of 40 hours.

A nurse can use Paid Sick Leave to care for herself/himself, or to care for a family member with a mental or physical illness, injury, or health condition. In addition, Paid Sick Leave may be used when a nurse's child's school or place of care has been closed by order of a public official for any health related reason. Nurses must generally comply with Nomad's call-in procedures in using Paid Sick Leave.

Paid Sick Leave accrued under this policy may only be used on assignments at Client Facilities within the State of Washington.

Accrued Paid Sick Leave will <u>not</u> be paid at termination of employment, but will instead be lost.

Nomad prohibits any unlawful discrimination or retaliation against nurses for using or requesting to use accrued paid sick leave.

### 48.3    Jury Duty Leave

Nurses who are summoned to serve on a jury will be entitled to take unpaid leave to serve on a jury. The amount of leave will be determined by the duration of service.

### 48.4    Domestic Violence Leave

Nurses are entitled to take unpaid leave for the following:

- To seek legal or law enforcement assistance or remedies to ensure the health and safety of oneself or the Nurse's family members, preparing for, or participating in legal proceedings related to domestic violence, sexual assault, or stalking;
- To seek treatment or assistant a family member seeking treatment by a health care provider for physical or mental injuries caused by domestic violence, sexual assault, or stalking;
- To obtain or assist a family member is obtaining services from a domestic violence shelter, rape crisis center, or other social services;
- To obtain or assist a family member is obtaining mental health counseling related to an incident of domestic violence, sexual assault, or stalking; or
- To participate in safety planning, relocation, or other actions to increase the safety of oneself or family members.

Nurses shall provide advance notice of taking such leave, if foreseeable.

### 48.5    Military Family Leave Act

During a period of military conflict, a nurse who is the spouse of a member of the armed forces of the United States, national guard, or reserves who has been notified of an impending call or order to active duty or has been deployed, is entitled to a total of 15 days of unpaid leave per deployment.

Nurses shall provide notice to Nomad and the Client Facility, within 5 business days, of receiving official notice, of the nurse's intention of taking such leave.

### 48.6    Family Leave

Nurses are entitled to a total of 12 workweeks of unpaid leave during any 12-month period for one or more of the following:
- The birth of a child of the nurse and in order to care for the child;
- The placement of a child with the nurse for adoption or foster care;
- To care of a family member with a serious health condition; or
- To care for oneself with a serious health condition that makes the nurse unable to perform the functions of the position.

Family leave for the birth or placement of a child expires at the end of the 12-months period beginning on the date of birth or placement.

Nurses shall provide notice to Nomad and the Client Facility, if foreseeable.

### 48.7    Washington Family Care Act

Nurses with accrued Paid Sick Leave may use such paid leave to care for a sick minor child with a routine illness, or a spouse, parent, parent-in-law, or grandparent with a serious or emergency health condition.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Nurses wishing to take leave under the Family Care Act must comply with the terms of the Paid Sick Leave described above and Nomad's normal call-in procedures.

### 48.8    Seattle Paid Sick and Safe Leave

Nurses who work at least 240 hours within a calendar year in a Client Facility located within Seattle, Washington are entitled to accrue Paid Sick and Safe Leave Time.

Nurses will accrue 1 hour of Paid Sick and Safe Leave Time for every 30 hours worked. Paid Sick and Safe Leave Time will begin to accrue at the commencement of employment at a Seattle Client Facility. Nurses may carry over up to 72 hours of unused Paid Sick and Safe Leave Time.

Nurses can use Paid Sick and Safe Leave Time for the following reasons:
- A nurse's mental or physical illness, injury, health condition, need for medical diagnosis care or treatment of a mental or physical illness, injury or health condition, or a nurse' need for preventive medical care;
- A nurse's need to provide care for a family member with an illness, injury or medical appointment, etc.;
- A nurse's place of business has been closed by order of a public official to limit exposure to an infectious agent, biological toxin or hazardous material;
- A nurse's need to care for a child whose school or place of care has been closed by order of a public health official to limit exposure to an infectious agent, biological toxin or hazardous material; or
- For reasons related to domestic violence, sexual assault or stalking that affect the nurse, the nurse' family member or housemate.

Because the Seattle Ordinance is more generous than the state paid leave law, nurses who accrue Paid Sick and Safe Leave Time under this policy, will not accrue additional Paid Sick Leave under the state law. Instead, compliance with this policy and ordinance shall satisfy the state law. However, because compliance with this ordinance will be used to comply with state law, Paid Sick and Safe Leave Time accrued under this policy may be used on assignments at all Client Facilities located in Washington, not just in Seattle.

Accrued sick and safe leave will <u>not</u> be paid at termination of employment, but will instead be lost.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**49.     Washington, D.C.**

The following policies shall apply to nurses on assignment in Washington, D.C.:

### 49.1    District of Columbia Family and Medical Leave Act

A nurse is eligible for leave under the District of Columbia Family and Medical Leave Act if he or she has been employed by Nomad for at least 1 year without a break in service and worked at least 1000 hours during the 12-month period immediately preceding the request for family and medical leave.

An eligible nurse is entitled to 16 workweeks of unpaid family leave during a 24 month period for:
- The birth of a child (The entitlement of leave related to the birth or placement of a child expires 12 months after the birth of the child or the placement of the child with the Nurse);
- The placement of a child with the Nurse for adoption or foster care;
- The placement of a child with the Nurse for whom the Nurse permanently assumes and discharges parental responsibility; or
- The care of a family member with a serious health condition.

An eligible nurse is also entitled to 16 workweeks of unpaid medical leave during a 24 month period when the Nurse becomes unable to perform the functions of the position because of a serious health condition.

A nurse seeking either family or medical leave shall provide reasonable prior notice of such leave if foreseeable.

Where the FMLA also applies, leave under this policy will run concurrent with FMLA leave.

### 49.2    District of Columbia Accrued Safe and Sick Leave Act

In the District of Columbia, nurses will accrue 1 hour of Paid Safe and Sick Leave Time for every 37 hours worked, not to exceed 7 days of paid leave per calendar year. Accrued Paid Safe and Sick Leave Time may be carried over annually, however, no more than 7 days of Paid Safe and Sick Leave Time may be used per calendar year.

Nurses may use Paid Safe and Sick Leave Time for the following reasons:
- Absence due to physical or mental illness, injury, or medical condition of the nurse;
- Obtaining professional medical diagnosis or care or preventative medical care for the nurse;
- To care for a family member who has physical or mental illness, injury, or medical condition, or to obtain professional medical diagnosis or care or preventative medical care for the family member; or
- To seek medical attention, to obtain counseling, or to take legal action related to the stalking, domestic violence, or sexual abuse of the nurse or a family member.

A nurse seeking to use accrued Paid Safe and Sick Leave Time shall provide reasonable prior notice of such leave if foreseeable, and must generally comply with Nomad's call-in procedures.

Paid Safe and Sick Leave Time accrued under this policy may only be used on assignments at Client Facilities within the District of Columbia.

Accrued Paid Safe and Sick Leave Time will <u>not</u> be paid at termination of employment, but will instead be lost.

### 49.3    Parental Leave Act

In the District of Columbia, a nurse who is a parent is entitled to a total of 24 hours of unpaid leave during any 12 month period to attend or participate in a school-related event for his or her child.
Nomad may deny the use of leave if such leave would disrupt the business of the Client Facility.

Nurses seeking to use leave shall provide notice to Nomad and the Client Facility at least 10 calendar days in advance, if foreseeable.

### 49.4    Jury Duty Leave

Nurses who are summoned for jury duty will be entitled to take leave to serve on a jury. A nurse serving on a jury for 5 or fewer days will be paid their usual compensation, less the amount paid for jury duty service. Leave will be determined based on the duration of jury service.

### 49.5    District of Columbia Emancipation Day Leave

Nurses working in the District of Columbia will be entitled to a day of leave on April 16, the District of Columbia Emancipation Day. Nurses shall notify Nomad and the Client Facility of their desire for leave to celebrate the District of Columbia Emancipation Day at least 10 calendar days in advance.

50.     **West Virginia**

The following policies shall apply to nurses on assignments in West Virginia:

### 50.1    Meal Break

In West Virginia, nurses who work for more than 6 hours during a calendar day are entitled to an unpaid meal break of at least 30 minutes.

### 50.2    Jury Duty Leave

Nurses summoned for jury duty will be granted unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

### 50.3    Voting Leave

Nurses who are registered to vote, may take leave from work to vote. If your shift does not allow you at least three consecutive hours off work during polling hours, you will be granted up to three hours of paid leave to vote. If, on the day of voting, your shift provides at least three consecutive hours off work during polling hours, you will be granted up to three hours of unpaid leave to vote. Nurses must notify Nomad and the Client Facility at least three days before the Election Day, that the nurse wishes to take leave to vote pursuant to this policy.

51.     **Wisconsin**

The following policies shall apply to nurses on assignments in Wisconsin:

### 51.1    Wisconsin Family and Medical Leave

In Wisconsin, eligible nurses may be entitled to Family and Medical Leave. Nurses that have worked for Nomad for 52 consecutive weeks and at least 1000 hours in the 12 months prior to leave, may take the following unpaid leave: (a) up to six weeks of leave for the birth or adoption of a child; (b) two weeks to care for a parent, child, or spouse with a serious health condition; and two weeks for the serious health condition of the nurse.

Serious health condition is defined as a disabling physical or mental illness, injury, impairment, or condition involving inpatient care in a hospital, nursing home, hospice, or outpatient care that requires continuing treatment or supervision by a health care provider.

Nurses seeking to take leave under the Wisconsin Family and Medical Leave must notify Nomad and the Client Facility in advance in a reasonable and practicable manner.

### 51.2    Jury Duty Leave

Nurses summoned for jury duty will be granted unpaid leave to serve on a jury. The length of the leave will be determined by the length of the jury service.

### 51.3    Witness Leave

Nurses who are subpoenaed to attend a judicial proceeding as a witness will be granted unpaid leave to serve as a witness. Nurses must notify Nomad and the Client Facility for their need for leave to serve as a witness as soon as possible.

### 51.4    Voting Leave

Nurses registered to vote may take unpaid leave to vote if you are unable to vote during non-working hours. Nurses will be granted up to three hours of leave to vote. Nomad and the Client Facility reserve the right to designate which hours may be used for leave to vote. Nurses must notify Nomad and the Client Facility before Election Day that the nurse wishes to take leave to vote pursuant to this policy.

### 51.5    Emergency Response Leave

Nurses who volunteer as a fire fighter, emergency medical services practitioner, emergency medical responder, or ambulance driver for a volunteer fire department, a public agency, or a nonprofit corporation, may be entitled to unpaid leave due to an emergency that begins before the nurse is required to report to work. Nurses must notify Nomad and the Client Facility of taking leave under this policy.

52.    **Wyoming**

The following policies shall apply to nurses on assignment in Wyoming:

### 52.1    Jury Duty Leave

Nurses who have been summoned for jury duty may take unpaid leave to serve on a jury. The leave time will be determined by the length of the jury service. Please notify Nomad and the Client Facility as soon as possible after receiving a jury summons.

### 52.2    Voting Leave

If there are less than 3 consecutive hours between the opening of the polls and the beginning of the regular work shift or between the end of the regular work shift and the closing of the polls, a nurse entitled to vote in Wyoming may seek up to 1 hour of paid leave from work to vote. Nomad and the Client Facility will decide when such leave is taken.

### 52.3    Victim and Witness Leave

Nurses who are subpoenaed to attend a judicial proceeding as a witness or a crime victim will be granted unpaid leave to attend such proceedings, in accordance with the subpoena. Nurses must notify Nomad and the Client Facility of their need for such leave as soon as possible.

# II.    RECEIPT, ACKNOWLEDGEMENT, AND CONSENT

I have received Nomad Nurses, Inc.'s Nurse Employee Handbook and State-Specific Supplements and have read all items carefully. I understand all of the rules, policies, terms and conditions set forth therein, and agree to abide by them, realizing that failure to do so may result in disciplinary action up to and including termination of employment and/or placement.

**I understand and agree that this Handbook is <u>not</u> a contract and does not in any way create an express or implied contract of employment between me and Nomad**, but rather is intended to foster a better working atmosphere while the employment relationship exists. I understand that, except for employment-at-will status, any and all policies and practices may be changed at any time by Nomad.

I understand that this Handbook supersedes all previous written and unwritten policies and handbooks. I also understand that if there is a conflict between the Nurse Employee Handbook and the terms of my Nurse Employment Agreement and/or any Placement Agreement, my Nurse Employment Agreement and/or Placement Agreement shall control, with the Placement Agreement taking ultimate precedence on the terms of a particular placement.

I acknowledge that my employment relationship with Nomad is at will. **Accordingly, either I or Nomad can terminate the relationship at will, with or without cause, at any time, for any lawful reason or no reason at all.** I also understand that no supervisor, manager, or other representative of Nomad may enter into any agreement contrary to this Nurse Employee Handbook or for employment for any specified time, and any such agreement or terms are unenforceable unless they are in a writing signed by me and Nomad's CEO.

As of today's date, I have no knowledge of any transactions, events, or relationships that appear to violate Nomad's Code of Business Ethics.

*Jenna Gayler*
_____
Signature


Jenna Gayler
_____        09 / 16 / 2022
Printed Name                                    Date


4832-7025-1355, v. 21

# Appendix D:
# National Patient Safety Goals (AXD)

Although there are no National Patient Safety Goals directly applicable to the Health Care Staffing Services program, contracted staff members who are placed in the various health care settings or locations (for example, in a behavioral health care setting or at a critical access hospital) do need to be oriented about the goals, according to Joint Commission HCSS Standard HSHR.3, in regard to working with clinical staff.

**Note:** Gaps in the numbering indicate that a goal or requirement was "retired," usually because the requirements were integrated into the standards.

---

**Abbreviations Key:** Ambulatory Care (AHC), Behavioral Health Care (BHC), Critical Access Hospital (CAH), Hospital (HAP), Laboratory (LAB), Nursing Care Centers (NCC), Office-Based Surgery (OBS), and Home Care (OME). "All programs" refers to these eight accreditation programs.

---

*Health Care Staffing Services Certification Manual*

| National Patient Safety Goal and Requirements | Who Needs to Know |
|---|---|
| **GOAL 1** Improve the accuracy of patient identification. | All programs |
| **NPSG.01.01.01** Use at least two patient identifiers when providing care, treatment, or services. | All programs |
| **NPSG.01.03.01** Eliminate transfusion errors related to patient misidentification. | AHC, CAH, HAP, OBS |
| **GOAL 2** Improve the effectiveness of communication among caregivers. | CAH, HAP, LAB |
| **NPSG.02.03.01** Report critical results of tests and diagnostic procedures on a timely basis. | CAH, HAP, LAB |
| **GOAL 3** Improve the safety of using medications. | AHC, BHC, CAH, HAP, NCC, OBS |
| **NPSG.03.04.01** Label all medications, medication containers, and other solutions on and off the sterile field in perioperative and other procedural settings. | AHC, CAH, HAP, OBS |
| **NPSG.03.05.01** Reduce the likelihood of patient harm associated with the use of anticoagulant therapy.[*] | AHC, CAH, HAP, NCC |
| **NPSG.03.06.01** Maintain and communicate accurate patient medication information. | AHC, BHC, CAH, HAP, NCC, OBS, OME |
| **GOAL 6** Reduce harm associated with clinical alarm systems. | CAH, HAP |
| **NPSG.06.01.01** Improve the safety of clinical alarm systems. | CAH, HAP |

---

[*]This requirement applies only to organizations that provide anticoagulant therapy and/or long-term anticoagulation prophylaxis (for example, atrial fibrillation) where the clinical expectation is that the patient's laboratory values for coagulation will remain outside normal values. This requirement does not apply to routine situations in which short-term prophylactic anticoagulation is used for venous thromboembolism prevention (for example, related to procedures or hospitalization) and the clinical expectation is that the patient's laboratory values for coagulation will remain within, or close to, normal values.

**E-dition January 1, 2019, Release** Case ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

*Appendix D: National Patient Safety Goals* ◥

| National Patient Safety Goal and Requirements | Who Needs to Know |
|---|---|
| **GOAL 7** Reduce the risk of health care–associated infections. | All programs |
| **NPSG.07.01.01** Comply with either the current Centers for Disease Control and Prevention (CDC) hand hygiene guidelines or the current World Health Organization (WHO) hand hygiene guidelines.[†] | All programs |
| **NPSG.07.03.01** Implement evidence-based practices to prevent health care–associated infections due to multidrug-resistant organisms in acute care and critical access hospitals. | CAH, HAP |
| **NPSG.07.04.01** Implement evidence-based practices to prevent central line–associated bloodstream infections. | CAH, HAP, NCC |
| **NPSG.07.05.01** Implement evidence-based practices for preventing surgical site infections. | AHC, CAH, HAP, OBS |
| **NPSG.07.06.01** Implement evidence-based practices to prevent indwelling catheter-associated urinary tract infections. (CAUTI)[‡] | CAH, HAP |
| **GOAL 9** Reduce the risk of patient harm resulting from falls. | NCC, OME |
| **NPSG.09.02.01** Reduce the risk of falls. | NCC, OME |
| **GOAL 14** Prevent health care–associated pressure ulcers (decubitus ulcers). | NCC |
| **NPSG.14.01.01** Assess and periodically reassess each resident's risk for developing a pressure ulcer (decubitus ulcer) and take action to address any identified risks. | NCC |

[†]For behavioral health care, this requirement applies only to organizations that provide physical care.
[‡]This NPSG is not applicable to pediatric patient populations. Research resulting in evidence-based practices was conducted with adults, and there is no consensus that these practices apply to children.

**E-dition January 1, 2019, Release** e5da00e1008d4b8a8278bd774ccee18c0a2f8652

*Health Care Staffing Services Certification Manual*

| National Patient Safety Goal and Requirements | Who Needs to Know |
|---|---|
| **GOAL 15** The organization identifies safety risks inherent in its patient population. | BHC, HAP, OME |
| **NPSG.15.01.01** Identify patients at risk for suicide.[§] | BHC, HAP |
| **NPSG.15.02.01** Identify risks associated with home oxygen therapy such as home fires. | OME |

| Universal Protocol | Who Needs to Know |
|---|---|
| **Universal Protocol** for Preventing Wrong Site, Wrong Procedure, Wrong Person Surgery | AHC, CAH, HAP, OBS |
| **UP.01.01.01** Conduct a preprocedure verification process. | AHC, CAH, HAP, OBS |
| **UP.01.02.01** Mark the procedure site. | AHC, CAH, HAP, OBS |
| **UP.01.03.01** A time-out is performed before the procedure. | AHC, CAH, HAP, OBS |

---

[§]This requirement applies only to psychiatric hospitals and patients being treated for emotional or behavioral disorders in general hospitals.

**E-dition January 1, 2019, Release** Case: e5da00e1008d4b8a8278bd774ccee18c0a2f8652





**Morbidity and Mortality Weekly Report**

Recommendations and Reports                    October 25, 2002 / Vol. 51 / No. RR-16

# Guideline for Hand Hygiene in Health-Care Settings

## Recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force

**INSIDE: Continuing Education Examination**

**CENTERS FOR DISEASE CONTROL AND PREVENTION**
**SAFER • HEALTHIER • PEOPLE™**

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**MMWR**

The *MMWR* series of publications is published by the Epidemiology Program Office, Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, Atlanta, GA 30333.

**SUGGESTED CITATION**

Centers for Disease Control and Prevention. Guideline for Hand Hygiene in Health-Care Settings: Recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force. MMWR 2002;51(No. RR-16):[inclusive page numbers].

**Centers for Disease Control and Prevention**

Julie L. Gerberding, M.D., M.P.H.
*Director*

David W. Fleming, M.D.
*Deputy Director for Science and Public Health*

Dixie E. Snider, Jr., M.D., M.P.H.
*Associate Director for Science*

**Epidemiology Program Office**

Stephen B. Thacker, M.D., M.Sc.
*Director*

**Office of Scientific and Health Communications**

John W. Ward, M.D.
*Director*
*Editor, MMWR Series*

Suzanne M. Hewitt, M.P.A.
*Managing Editor*

Rachel J. Wilson
Douglas W. Weatherwax
*Project Editors*

Malbea A. Heilman
Beverly J. Holland
*Visual Information Specialists*

Quang M. Doan
Erica R. Shaver
*Information Technology Specialists*

## CONTENTS

Part I. Review of the Scientific Data Regarding
Hand Hygiene ............................................................. 1
Historical Perspective ............................................... 1
Normal Bacterial Skin Flora ...................................... 2
Physiology of Normal Skin ........................................ 2
Definition of Terms ................................................... 3
Evidence of Transmission of Pathogens on Hands ............. 4
Models of Hand Transmission .................................... 5
Relation of Hand Hygiene and Acquisition
of Health-Care–Associated Pathogens .......................... 5
Methods Used To Evaluate the Efficacy
of Hand-Hygiene Products ......................................... 6
Review of Preparations Used for Hand Hygiene ................. 8
Activity of Antiseptic Agents Against
Spore-Forming Bacteria .......................................... 16
Reduced Susceptibility of Bacteria to Antiseptics ........... 17
Surgical Hand Antisepsis ......................................... 17
Relative Efficacy of Plain Soap, Antiseptic
Soap/Detergent, and Alcohols .................................. 18
Irritant Contact Dermatitis Resulting from
Hand-Hygiene Measures ......................................... 18
Proposed Methods for Reducing Adverse
Effects of Agents ................................................. 19
Factors To Consider When Selecting
Hand-Hygiene Products .......................................... 20
Hand-Hygiene Practices Among HCWs ......................... 21
Lessons Learned from Behavioral Theories ................... 25
Methods Used To Promote Improved Hand Hygiene ........ 26
Efficacy of Promotion and Impact of Improved
Hand Hygiene .................................................... 27
Other Policies Related to Hand Hygiene ....................... 29
Hand-Hygiene Research Agenda ................................ 30
Web-Based Hand-Hygiene Resources ........................... 30
Part II. Recommendations ........................................ 31
Categories ........................................................ 31
Recommendations ................................................ 32
Part III. Performance Indicators .................................. 34
References .......................................................... 34
Appendix ............................................................ 45
Continuing Education Activity ................................. CE-1

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Vol. 51 / RR-16                    Recommendations and Reports                                    1

# Guideline for Hand Hygiene in Health-Care Settings

## Recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force

Prepared by
John M. Boyce, M.D.[1]
Didier Pittet, M.D.[2]
[1]Hospital of Saint Raphael
New Haven, Connecticut
[2]University of Geneva
Geneva, Switzerland

### Summary

*The Guideline for Hand Hygiene in Health-Care Settings provides health-care workers (HCWs) with a review of data regarding handwashing and hand antisepsis in health-care settings. In addition, it provides specific recommendations to promote improved hand-hygiene practices and reduce transmission of pathogenic microorganisms to patients and personnel in health-care settings. This report reviews studies published since the 1985 CDC guideline (Garner JS, Favero MS. CDC guideline for handwashing and hospital environmental control, 1985. Infect Control 1986;7:231–43) and the 1995 APIC guideline (Larson EL, APIC Guidelines Committee. APIC guideline for handwashing and hand antisepsis in health care settings. Am J Infect Control 1995;23:251–69) were issued and provides an in-depth review of hand-hygiene practices of HCWs, levels of adherence of personnel to recommended handwashing practices, and factors adversely affecting adherence. New studies of the in vivo efficacy of alcohol-based hand rubs and the low incidence of dermatitis associated with their use are reviewed. Recent studies demonstrating the value of multidisciplinary hand-hygiene promotion programs and the potential role of alcohol-based hand rubs in improving hand-hygiene practices are summarized. Recommendations concerning related issues (e.g., the use of surgical hand antiseptics, hand lotions or creams, and wearing of artificial fingernails) are also included.*

## Part I. Review of the Scientific Data Regarding Hand Hygiene

### Historical Perspective

For generations, handwashing with soap and water has been considered a measure of personal hygiene (*1*). The concept of cleansing hands with an antiseptic agent probably emerged in the early 19th century. As early as 1822, a French pharmacist demonstrated that solutions containing chlorides of lime or soda could eradicate the foul odors associated with human corpses and that such solutions could be used as disinfectants and antiseptics (*2*). In a paper published in 1825, this pharmacist stated that physicians and other persons attending patients with contagious diseases would benefit from moistening their hands with a liquid chloride solution (*2*).

In 1846, Ignaz Semmelweis observed that women whose babies were delivered by students and physicians in the First Clinic at the General Hospital of Vienna consistently had a higher mortality rate than those whose babies were delivered by midwives in the Second Clinic (*3*). He noted that physicians who went directly from the autopsy suite to the obstetrics ward had a disagreeable odor on their hands despite washing their hands with soap and water upon entering the obstetrics clinic. He postulated that the puerperal fever that affected so many parturient women was caused by "cadaverous particles" transmitted from the autopsy suite to the obstetrics ward via the hands of students and physicians. Perhaps because of the known deodorizing effect of chlorine compounds, as of May 1847, he insisted that students and physicians clean their hands with a chlorine solution between each patient in the clinic. The maternal mortality rate in the First Clinic subsequently dropped dramatically and remained low for years. This intervention by Semmelweis represents the first evidence indicating that cleansing heavily contaminated hands with an antiseptic agent between patient contacts may reduce health-care–associated transmission of contagious diseases more effectively than handwashing with plain soap and water.

In 1843, Oliver Wendell Holmes concluded independently that puerperal fever was spread by the hands of health personnel (*1*). Although he described measures that could be taken to limit its spread, his recommendations had little impact on

The material in this report originated in the National Center for Infectious Diseases, James M. Hughes, M.D., Director; and the Division of Healthcare Quality Promotion, Steve Solomon, M.D., Acting Director.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

obstetric practices at the time. However, as a result of the seminal studies by Semmelweis and Holmes, handwashing gradually became accepted as one of the most important measures for preventing transmission of pathogens in health-care facilities.

In 1961, the U. S. Public Health Service produced a training film that demonstrated handwashing techniques recommended for use by health-care workers (HCWs) (4). At the time, recommendations directed that personnel wash their hands with soap and water for 1–2 minutes before and after patient contact. Rinsing hands with an antiseptic agent was believed to be less effective than handwashing and was recommended only in emergencies or in areas where sinks were unavailable.

In 1975 and 1985, formal written guidelines on handwashing practices in hospitals were published by CDC (5,6). These guidelines recommended handwashing with non-antimicrobial soap between the majority of patient contacts and washing with antimicrobial soap before and after performing invasive procedures or caring for patients at high risk. Use of waterless antiseptic agents (e.g., alcohol-based solutions) was recommended only in situations where sinks were not available.

In 1988 and 1995, guidelines for handwashing and hand antisepsis were published by the Association for Professionals in Infection Control (APIC) (7,8). Recommended indications for handwashing were similar to those listed in the CDC guidelines. The 1995 APIC guideline included more detailed discussion of alcohol-based hand rubs and supported their use in more clinical settings than had been recommended in earlier guidelines. In 1995 and 1996, the Healthcare Infection Control Practices Advisory Committee (HICPAC) recommended that either antimicrobial soap or a waterless antiseptic agent be used for cleaning hands upon leaving the rooms of patients with multidrug-resistant pathogens (e.g., vancomycin-resistant enterococci [VRE] and methicillin-resistant *Staphylococcus aureus* [MRSA]) (9,10). These guidelines also provided recommendations for handwashing and hand antisepsis in other clinical settings, including routine patient care. Although the APIC and HICPAC guidelines have been adopted by the majority of hospitals, adherence of HCWs to recommended handwashing practices has remained low (11,12).

Recent developments in the field have stimulated a review of the scientific data regarding hand hygiene and the development of new guidelines designed to improve hand-hygiene practices in health-care facilities. This literature review and accompanying recommendations have been prepared by a Hand Hygiene Task Force, comprising representatives from HICPAC, the Society for Healthcare Epidemiology of America (SHEA), APIC, and the Infectious Diseases Society of America (IDSA).

## Normal Bacterial Skin Flora

To understand the objectives of different approaches to hand cleansing, a knowledge of normal bacterial skin flora is essential. Normal human skin is colonized with bacteria; different areas of the body have varied total aerobic bacterial counts (e.g., 1 x $10^6$ colony forming units (CFUs)/$cm^2$ on the scalp, 5 x $10^5$ CFUs/$cm^2$ in the axilla, 4 x $10^4$ CFUs/$cm^2$ on the abdomen, and 1 x $10^4$ CFUs/$cm^2$ on the forearm) (13). Total bacterial counts on the hands of medical personnel have ranged from 3.9 x $10^4$ to 4.6 x $10^6$ (14–17). In 1938, bacteria recovered from the hands were divided into two categories: transient and resident (14). Transient flora, which colonize the superficial layers of the skin, are more amenable to removal by routine handwashing. They are often acquired by HCWs during direct contact with patients or contact with contaminated environmental surfaces within close proximity of the patient. Transient flora are the organisms most frequently associated with health-care–associated infections. Resident flora, which are attached to deeper layers of the skin, are more resistant to removal. In addition, resident flora (e.g., coagulase-negative staphylococci and diphtheroids) are less likely to be associated with such infections. The hands of HCWs may become persistently colonized with pathogenic flora (e.g., *S. aureus*), gram-negative bacilli, or yeast. Investigators have documented that, although the number of transient and resident flora varies considerably from person to person, it is often relatively constant for any specific person (14,18).

## Physiology of Normal Skin

The primary function of the skin is to reduce water loss, provide protection against abrasive action and microorganisms, and act as a permeability barrier to the environment. The basic structure of skin includes, from outer- to innermost layer, the superficial region (i.e., the stratum corneum or horny layer, which is 10- to 20-µm thick), the viable epidermis (50- to 100-µm thick), the dermis (1- to 2-mm thick), and the hypodermis (1- to 2-mm thick). The barrier to percutaneous absorption lies within the stratum corneum, the thinnest and smallest compartment of the skin. The stratum corneum contains the corneocytes (or horny cells), which are flat, polyhedral-shaped nonnucleated cells, remnants of the terminally differentiated keratinocytes located in the viable epidermis. Corneocytes are composed primarily of insoluble bundled keratins surrounded by a cell envelope stabilized by cross-linked proteins and covalently bound lipid. Interconnecting the corneocytes of the stratum corneum are polar structures (e.g., corneodesmosomes), which contribute to stratum corneum cohesion.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

The intercellular region of the stratum corneum is composed of lipid primarily generated from the exocytosis of lamellar bodies during the terminal differentiation of the keratinocytes. The intercellular lipid is required for a competent skin barrier and forms the only continuous domain. Directly under the stratum corneum is a stratified epidermis, which is composed primarily of 10–20 layers of keratinizing epithelial cells that are responsible for the synthesis of the stratum corneum. This layer also contains melanocytes involved in skin pigmentation; Langerhans cells, which are important for antigen presentation and immune responses; and Merkel cells, whose precise role in sensory reception has yet to be fully delineated. As keratinocytes undergo terminal differentiation, they begin to flatten out and assume the dimensions characteristic of the corneocytes (i.e., their diameter changes from 10–12 μm to 20–30 μm, and their volume increases by 10- to 20-fold). The viable epidermis does not contain a vascular network, and the keratinocytes obtain their nutrients from below by passive diffusion through the interstitial fluid.

The skin is a dynamic structure. Barrier function does not simply arise from the dying, degeneration, and compaction of the underlying epidermis. Rather, the processes of cornification and desquamation are intimately linked; synthesis of the stratum corneum occurs at the same rate as loss. Substantial evidence now confirms that the formation of the skin barrier is under homeostatic control, which is illustrated by the epidermal response to barrier perturbation by skin stripping or solvent extraction. Circumstantial evidence indicates that the rate of keratinocyte proliferation directly influences the integrity of the skin barrier. A general increase in the rate of proliferation results in a decrease in the time available for 1) uptake of nutrients (e.g., essential fatty acids), 2) protein and lipid synthesis, and 3) processing of the precursor molecules required for skin-barrier function. Whether chronic but quantitatively smaller increases in rate of epidermal proliferation also lead to changes in skin-barrier function remains unclear. Thus, the extent to which the decreased barrier function caused by irritants is caused by an increased epidermal proliferation also is unknown.

The current understanding of the formation of the stratum corneum has come from studies of the epidermal responses to perturbation of the skin barrier. Experimental manipulations that disrupt the skin barrier include 1) extraction of skin lipids with apolar solvents, 2) physical stripping of the stratum corneum using adhesive tape, and 3) chemically induced irritation. All of these experimental manipulations lead to a decreased skin barrier as determined by transepidermal water loss (TEWL). The most studied experimental system is the treatment of mouse skin with acetone. This experiment results in a marked and immediate increase in TEWL, and therefore a decrease in skin-barrier function. Acetone treatment selectively removes glycerolipids and sterols from the skin, which indicates that these lipids are necessary, though perhaps not sufficient in themselves, for barrier function. Detergents act like acetone on the intercellular lipid domain. The return to normal barrier function is biphasic: 50%–60% of barrier recovery typically occurs within 6 hours, but complete normalization of barrier function requires 5–6 days.

## Definition of Terms

*Alcohol-based hand rub.* An alcohol-containing preparation designed for application to the hands for reducing the number of viable microorganisms on the hands. In the United States, such preparations usually contain 60%–95% ethanol or isopropanol.

*Antimicrobial soap.* Soap (i.e., detergent) containing an antiseptic agent.

*Antiseptic agent.* Antimicrobial substances that are applied to the skin to reduce the number of microbial flora. Examples include alcohols, chlorhexidine, chlorine, hexachlorophene, iodine, chloroxylenol (PCMX), quaternary ammonium compounds, and triclosan.

*Antiseptic handwash.* Washing hands with water and soap or other detergents containing an antiseptic agent.

*Antiseptic hand rub.* Applying an antiseptic hand-rub product to all surfaces of the hands to reduce the number of microorganisms present.

*Cumulative effect.* A progressive decrease in the numbers of microorganisms recovered after repeated applications of a test material.

*Decontaminate hands.* To Reduce bacterial counts on hands by performing antiseptic hand rub or antiseptic handwash.

*Detergent.* Detergents (i.e., surfactants) are compounds that possess a cleaning action. They are composed of both hydrophilic and lipophilic parts and can be divided into four groups: anionic, cationic, amphoteric, and nonionic detergents. Although products used for handwashing or antiseptic handwash in health-care settings represent various types of detergents, the term "soap" is used to refer to such detergents in this guideline.

*Hand antisepsis.* Refers to either antiseptic handwash or antiseptic hand rub.

*Hand hygiene.* A general term that applies to either handwashing, antiseptic handwash, antiseptic hand rub, or surgical hand antisepsis.

*Handwashing.* Washing hands with plain (i.e., non-antimicrobial) soap and water.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

*Persistent activity.* Persistent activity is defined as the prolonged or extended antimicrobial activity that prevents or inhibits the proliferation or survival of microorganisms after application of the product. This activity may be demonstrated by sampling a site several minutes or hours after application and demonstrating bacterial antimicrobial effectiveness when compared with a baseline level. This property also has been referred to as "residual activity." Both substantive and nonsubstantive active ingredients can show a persistent effect if they substantially lower the number of bacteria during the wash period.

*Plain soap.* Plain soap refers to detergents that do not contain antimicrobial agents or contain low concentrations of antimicrobial agents that are effective solely as preservatives.

*Substantivity.* Substantivity is an attribute of certain active ingredients that adhere to the stratum corneum (i.e., remain on the skin after rinsing or drying) to provide an inhibitory effect on the growth of bacteria remaining on the skin.

*Surgical hand antisepsis.* Antiseptic handwash or antiseptic hand rub performed preoperatively by surgical personnel to eliminate transient and reduce resident hand flora. Antiseptic detergent preparations often have persistent antimicrobial activity.

*Visibly soiled hands.* Hands showing visible dirt or visibly contaminated with proteinaceous material, blood, or other body fluids (e.g., fecal material or urine).

*Waterless antiseptic agent.* An antiseptic agent that does not require use of exogenous water. After applying such an agent, the hands are rubbed together until the agent has dried.

*Food and Drug Administration (FDA) product categories.* The 1994 FDA Tentative Final Monograph for Health-Care Antiseptic Drug Products divided products into three categories and defined them as follows (19):

- *Patient preoperative skin preparation.* A fast-acting, broadspectrum, and persistent antiseptic-containing preparation that substantially reduces the number of microorganisms on intact skin.
- *Antiseptic handwash or HCW handwash.* An antisepticcontaining preparation designed for frequent use; it reduces the number of microorganisms on intact skin to an initial baseline level after adequate washing, rinsing, and drying; it is broad-spectrum, fast-acting, and if possible, persistent.
- *Surgical hand scrub.* An antiseptic-containing preparation that substantially reduces the number of microorganisms on intact skin; it is broad-spectrum, fast-acting, and persistent.

## Evidence of Transmission of Pathogens on Hands

Transmission of health-care–associated pathogens from one patient to another via the hands of HCWs requires the following sequence of events:

- Organisms present on the patient's skin, or that have been shed onto inanimate objects in close proximity to the patient, must be transferred to the hands of HCWs.
- These organisms must then be capable of surviving for at least several minutes on the hands of personnel.
- Next, handwashing or hand antisepsis by the worker must be inadequate or omitted entirely, or the agent used for hand hygiene must be inappropriate.
- Finally, the contaminated hands of the caregiver must come in direct contact with another patient, or with an inanimate object that will come into direct contact with the patient.

Health-care–associated pathogens can be recovered not only from infected or draining wounds, but also from frequently colonized areas of normal, intact patient skin (20– 31). The perineal or inguinal areas are usually most heavily colonized, but the axillae, trunk, and upper extremities (including the hands) also are frequently colonized (23,25,26,28,30–32). The number of organisms (e.g., *S. aureus*, *Proteus mirabilis*, *Klebsiella* spp., and *Acinetobacter* spp.) present on intact areas of the skin of certain patients can vary from 100 to $10^6/cm^2$ (25,29,31,33). Persons with diabetes, patients undergoing dialysis for chronic renal failure, and those with chronic dermatitis are likely to have areas of intact skin that are colonized with *S. aureus* (34–41). Because approximately $10^6$ skin squames containing viable microorganisms are shed daily from normal skin (42), patient gowns, bed linen, bedside furniture, and other objects in the patient's immediate environment can easily become contaminated with patient flora (30,43–46). Such contamination is particularly likely to be caused by staphylococci or enterococci, which are resistant to dessication.

Data are limited regarding the types of patient-care activities that result in transmission of patient flora to the hands of personnel (26,45–51). In the past, attempts have been made to stratify patient-care activities into those most likely to cause hand contamination (52), but such stratification schemes were never validated by quantifying the level of bacterial contamination that occurred. Nurses can contaminate their hands with 100–1,000 CFUs of *Klebsiella* spp. during "clean" activities (e.g., lifting a patient; taking a patient's pulse, blood pressure, or oral temperature; or touching a patient's hand, shoulder, or groin) (48). Similarly, in another study, hands were cultured of nurses who touched the groins of patients heavily colonized with *P. mirabilis* (25); 10–600 CFUs/mL of this

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

organism were recovered from glove juice samples from the nurses' hands. Recently, other researchers studied contamination of HCWs' hands during activities that involved direct patient-contact wound care, intravascular catheter care, respiratory-tract care, and the handling of patient secretions (51). Agar fingertip impression plates were used to culture bacteria; the number of bacteria recovered from fingertips ranged from 0 to 300 CFUs. Data from this study indicated that direct patient contact and respiratory-tract care were most likely to contaminate the fingers of caregivers. Gram-negative bacilli accounted for 15% of isolates and *S. aureus* for 11%. Duration of patient-care activity was strongly associated with the intensity of bacterial contamination of HCWs' hands.

HCWs can contaminate their hands with gram-negative bacilli, *S. aureus*, enterococci, or *Clostridium difficile* by performing "clean procedures" or touching intact areas of the skin of hospitalized patients (26,45,46,53). Furthermore, personnel caring for infants with respiratory syncytial virus (RSV) infections have acquired RSV by performing certain activities (e.g., feeding infants, changing diapers, and playing with infants) (49). Personnel who had contact only with surfaces contaminated with the infants' secretions also acquired RSV by contaminating their hands with RSV and inoculating their oral or conjunctival mucosa. Other studies also have documented that HCWs may contaminate their hands (or gloves) merely by touching inanimate objects in patient rooms (46,53–56). None of the studies concerning hand contamination of hospital personnel were designed to determine if the contamination resulted in transmission of pathogens to susceptible patients.

Other studies have documented contamination of HCWs' hands with potential health-care–associated pathogens, but did not relate their findings to the specific type of preceding patient contact (15,17,57–62). For example, before glove use was common among HCWs, 15% of nurses working in an isolation unit carried a median of 1 x $10^4$ CFUs of *S. aureus* on their hands (61). Of nurses working in a general hospital, 29% had *S. aureus* on their hands (median count: 3,800 CFUs), whereas 78% of those working in a hospital for dermatology patients had the organism on their hands (median count: 14.3 x $10^6$ CFUs). Similarly, 17%–30% of nurses carried gram-negative bacilli on their hands (median counts: 3,400–38,000 CFUs). One study found that *S. aureus* could be recovered from the hands of 21% of intensive-care–unit personnel and that 21% of physician and 5% of nurse carriers had >1,000 CFUs of the organism on their hands (59). Another study found lower levels of colonization on the hands of personnel working in a neurosurgery unit, with an average of 3 CFUs of *S. aureus* and 11 CFUs of gram-negative bacilli (16). Serial

cultures revealed that 100% of HCWs carried gram-negative bacilli at least once, and 64% carried *S. aureus* at least once.

## Models of Hand Transmission

Several investigators have studied transmission of infectious agents by using different experimental models. In one study, nurses were asked to touch the groins of patients heavily colonized with gram-negative bacilli for 15 seconds — as though they were taking a femoral pulse (25). Nurses then cleaned their hands by washing with plain soap and water or by using an alcohol hand rinse. After cleaning their hands, they touched a piece of urinary catheter material with their fingers, and the catheter segment was cultured. The study revealed that touching intact areas of moist skin of the patient transferred enough organisms to the nurses' hands to result in subsequent transmission to catheter material, despite handwashing with plain soap and water.

The transmission of organisms from artificially contaminated "donor" fabrics to clean "recipient" fabrics via hand contact also has been studied. Results indicated that the number of organisms transmitted was greater if the donor fabric or the hands were wet upon contact (63). Overall, only 0.06% of the organisms obtained from the contaminated donor fabric were transferred to recipient fabric via hand contact. *Staphylococcus saprophyticus, Pseudomonas aeruginosa,* and *Serratia* spp. were also transferred in greater numbers than was *Escherichia coli* from contaminated fabric to clean fabric after hand contact (64). Organisms are transferred to various types of surfaces in much larger numbers (i.e., >$10^4$) from wet hands than from hands that are thoroughly dried (65).

## Relation of Hand Hygiene and Acquisition of Health-Care–Associated Pathogens

Hand antisepsis reduces the incidence of health-care–associated infections (66,67). An intervention trial using historical controls demonstrated in 1847 that the mortality rate among mothers who delivered in the First Obstetrics Clinic at the General Hospital of Vienna was substantially lower when hospital staff cleaned their hands with an antiseptic agent than when they washed their hands with plain soap and water (3).

In the 1960s, a prospective, controlled trial sponsored by the National Institutes of Health and the Office of the Surgeon General demonstrated that infants cared for by nurses who did not wash their hands after handling an index infant colonized with *S. aureus* acquired the organism more often and more rapidly than did infants cared for by nurses who used hexachlorophene to clean their hands between infant

contacts (68). This trial provided evidence that, when compared with no handwashing, washing hands with an antiseptic agent between patient contacts reduces transmission of health-care–associated pathogens.

Trials have studied the effects of handwashing with plain soap and water versus some form of hand antisepsis on health-care–associated infection rates (69,70). Health-care–associated infection rates were lower when antiseptic handwashing was performed by personnel (69). In another study, antiseptic handwashing was associated with lower health-care–associated infection rates in certain intensive-care units, but not in others (70).

Health-care–associated infection rates were lower after antiseptic handwashing using a chlorhexidine-containing detergent compared with handwashing with plain soap or use of an alcohol-based hand rinse (71). However, because only a minimal amount of the alcohol rinse was used during periods when the combination regimen also was in use and because adherence to policies was higher when chlorhexidine was available, determining which factor (i.e., the hand-hygiene regimen or differences in adherence) accounted for the lower infection rates was difficult. Investigators have determined also that health-care–associated acquisition of MRSA was reduced when the antimicrobial soap used for hygienic handwashing was changed (72,73).

Increased handwashing frequency among hospital staff has been associated with decreased transmission of *Klebsiella* spp. among patients (48); these studies, however, did not quantitate the level of handwashing among personnel. In a recent study, the acquisition of various health-care–associated pathogens was reduced when hand antisepsis was performed more frequently by hospital personnel (74); both this study and another (75) documented that the prevalence of health-care–associated infections decreased as adherence to recommended hand-hygiene measures improved.

Outbreak investigations have indicated an association between infections and understaffing or overcrowding; the association was consistently linked with poor adherence to hand hygiene. During an outbreak investigation of risk factors for central venous catheter-associated bloodstream infections (76), after adjustment for confounding factors, the patient-to-nurse ratio remained an independent risk factor for bloodstream infection, indicating that nursing staff reduction below a critical threshold may have contributed to this outbreak by jeopardizing adequate catheter care. The understaffing of nurses can facilitate the spread of MRSA in intensive-care settings (77) through relaxed attention to basic control measures (e.g., hand hygiene). In an outbreak of *Enterobacter cloacae* in a neonatal intensive-care unit (78), the daily number of hospitalized children was above the maximum capacity of the unit, resulting in an available space per child below current recommendations. In parallel, the number of staff members on duty was substantially less than the number necessitated by the workload, which also resulted in relaxed attention to basic infection-control measures. Adherence to hand-hygiene practices before device contact was only 25% during the workload peak, but increased to 70% after the end of the understaffing and overcrowding period. Surveillance documented that being hospitalized during this period was associated with a fourfold increased risk of acquiring a health-care–associated infection. This study not only demonstrates the association between workload and infections, but it also highlights the intermediate cause of antimicrobial spread: poor adherence to hand-hygiene policies.

## Methods Used To Evaluate the Efficacy of Hand-Hygiene Products

### Current Methods

Investigators use different methods to study the in vivo efficacy of handwashing, antiseptic handwash, and surgical hand antisepsis protocols. Differences among the various studies include 1) whether hands are purposely contaminated with bacteria before use of test agents, 2) the method used to contaminate fingers or hands, 3) the volume of hand-hygiene product applied to the hands, 4) the time the product is in contact with the skin, 5) the method used to recover bacteria from the skin after the test solution has been used, and 6) the method of expressing the efficacy of the product (i.e., either percent reduction in bacteria recovered from the skin or log reduction of bacteria released from the skin). Despite these differences, the majority of studies can be placed into one of two major categories: studies focusing on products to remove transient flora and studies involving products that are used to remove resident flora from the hands. The majority of studies of products for removing transient flora from the hands of HCWs involve artificial contamination of the volunteer's skin with a defined inoculum of a test organism before the volunteer uses a plain soap, an antimicrobial soap, or a waterless antiseptic agent. In contrast, products tested for the preoperative cleansing of surgeons' hands (which must comply with surgical hand-antisepsis protocols) are tested for their ability to remove resident flora from without artificially contaminating the volunteers' hands.

In the United States, antiseptic handwash products intended for use by HCWs are regulated by FDA's Division of Over-the-Counter Drug Products (OTC). Requirements for in vitro and in vivo testing of HCW handwash products and surgical

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

hand scrubs are outlined in the FDA Tentative Final Monograph for Healthcare Antiseptic Drug Products (TFM) (*19*). Products intended for use as HCW handwashes are evaluated by using a standardized method (*19*). Tests are performed in accordance with use directions for the test material. Before baseline bacterial sampling and before each wash with the test material, 5 mL of a standardized suspension of *Serratia marcescens* are applied to the hands and then rubbed over the surfaces of the hands. A specified volume of the test material is dispensed into the hands and is spread over the hands and lower one third of the forearms. A small amount of tap water is added to the hands, and hands are completely lathered for a specified time, covering all surfaces of the hands and the lower third of the forearms. Volunteers then rinse hands and forearms under $40^{\circ}$C tap water for 30 seconds. Ten washes with the test formulation are required. After the first, third, seventh, and tenth washes, rubber gloves or polyethylene bags used for sampling are placed on the right and left hands, and 75 mL of sampling solution is added to each glove; gloves are secured above the wrist. All surfaces of the hand are massaged for 1 minute, and samples are obtained aseptically for quantitative culture. No neutralizer of the antimicrobial is routinely added to the sampling solution, but if dilution of the antimicrobial in the sampling fluid does not result in demonstrable neutralization, a neutralizer specific for the test formulation is added to the sampling solution. For waterless formulations, a similar procedure is used. TFM criteria for efficacy are as follows: a 2-$\log_{10}$ reduction of the indicator organism on each hand within 5 minutes after the first use, and a 3-$\log_{10}$ reduction of the indicator organism on each hand within 5 minutes after the tenth use (*19*).

Products intended for use as surgical hand scrubs have been evaluated also by using a standardized method (*19*). Volunteers clean under fingernails with a nail stick and clip their fingernails. All jewelry is removed from hands and arms. Hands and two thirds of forearms are rinsed with tap water ($38^{\circ}$C–$42^{\circ}$C) for 30 seconds, and then they are washed with a non-antimicrobial soap for 30 seconds and are rinsed for 30 seconds under tap water. Baseline microbial hand counts can then be determined. Next, a surgical scrub is performed with the test formulation using directions provided by the manufacturer. If no instructions are provided with the formulation, two 5-minute scrubs of hands and forearms followed by rinsing are performed. Reduction from baseline microbial hand counts is determined in a series of 11 scrubs conducted during 5 days. Hands are sampled at 1 minute, 3 hours, and 6 hours after the first scrubs on day 1, day 2, and day 5. After washing, volunteers wear rubber gloves; 75 mL of sampling solution are then added to one glove, and all surfaces of the hands are massaged for 1 minute. Samples are then taken aseptically and cultured quantitatively. The other glove remains on the other hand for 6 hours and is sampled in the same manner. TFM requires that formulations reduce the number of bacteria 1 $\log_{10}$ on each hand within 1 minute of product application and that the bacterial cell count on each hand does not subsequently exceed baseline within 6 hours on day 1; the formulation must produce a 2-$\log_{10}$ reduction in microbial flora on each hand within 1 minute of product application by the end of the second day of enumeration and a 3-$\log_{10}$ reduction of microbial flora on each hand within 1 minute of product use by the end of the fifth day when compared with the established baseline (*19*).

The method most widely used in Europe to evaluate the efficacy of hand-hygiene agents is European Standard 1500–1997 (EN 1500—Chemical disinfectants and antiseptics. Hygienic hand-rub test method and requirements) (*79*). This method requires 12–15 test volunteers and an 18- to 24-hour growth of broth culture of *E. coli* K12. Hands are washed with a soft soap, dried, and then immersed halfway to the metacarpals in the broth culture for 5 seconds. Hands are removed from the broth culture, excess fluid is drained off, and hands are dried in the air for 3 minutes. Bacterial recovery for the initial value is obtained by kneading the fingertips of each hand separately for 60 seconds in 10 mL of tryptic soy broth (TSB) without neutralizers. The hands are removed from the broth and disinfected with 3 mL of the hand-rub agent for 30 seconds in a set design. The same operation is repeated with total disinfection time not exceeding 60 seconds. Both hands are rinsed in running water for 5 seconds and water is drained off. Fingertips of each hand are kneaded separately in 10 mL of TSB with added neutralizers. These broths are used to obtain the final value. $\log_{10}$ dilutions of recovery medium are prepared and plated out. Within 3 hours, the same volunteers are tested with the reference disinfectant (60% 2-propanol [isopropanol]) and the test product. Colony counts are performed after 24 and 48 hours of incubation at $36^{\circ}$C. The average colony count of both left and right hand is used for evaluation. The log-reduction factor is calculated and compared with the initial and final values. The reduction factor of the test product should be superior or the same as the reference alcohol-based rub for acceptance. If a difference exists, then the results are analyzed statistically using the Wilcoxon test. Products that have log reductions substantially less than that observed with the reference alcohol-based hand rub (i.e., approximately 4 $\log_{10}$ reduction) are classified as not meeting the standard.

Because of different standards for efficacy, criteria cited in FDA TFM and the European EN 1500 document for establishing alcohol-based hand rubs vary (*1,19,79*). Alcohol-based

hand rubs that meet TFM criteria for efficacy may not necessarily meet the EN 1500 criteria for efficacy (*80*). In addition, scientific studies have not established the extent to which counts of bacteria or other microorganisms on the hands need to be reduced to minimize transmission of pathogens in healthcare facilities (*1,8*); whether bacterial counts on the hands must be reduced by 1 $\log_{10}$ (90% reduction), 2 $\log_{10}$ (99%), 3 $\log_{10}$ (99.9%), or 4 $\log_{10}$ (99.99%) is unknown. Several other methods also have been used to measure the efficacy of antiseptic agents against various viral pathogens (*81–83*).

## Shortcomings of Traditional Methodologies

Accepted methods of evaluating hand-hygiene products intended for use by HCWs require that test volunteers wash their hands with a plain or antimicrobial soap for 30 seconds or 1 minute, despite the observation in the majority of studies that the average duration of handwashing by hospital personnel is <15 seconds (*52,84–89*). A limited number of investigators have used 15-second handwashing or hygienic hand-wash protocols (*90–94*). Therefore, almost no data exist regarding the efficacy of plain or antimicrobial soaps under conditions in which they are actually used by HCWs. Similarly, certain accepted methods for evaluating waterless antiseptic agents for use as antiseptic hand rubs require that 3 mL of alcohol be rubbed into the hands for 30 seconds, followed by a repeat application for the same duration. This type of protocol also does not reflect actual usage patterns among HCWs. Furthermore, volunteers used in evaluations of products are usually surrogates for HCWs, and their hand flora may not reflect flora found on the hands of personnel working in health-care settings. Further studies should be conducted among practicing HCWs using standardized protocols to obtain more realistic views of microbial colonization and risk of bacterial transfer and cross-transmission (*51*).

## Review of Preparations Used for Hand Hygiene

### Plain (Non-Antimicrobial) Soap

Soaps are detergent-based products that contain esterified fatty acids and sodium or potassium hydroxide. They are available in various forms including bar soap, tissue, leaflet, and liquid preparations. Their cleaning activity can be attributed to their detergent properties, which result in removal of dirt, soil, and various organic substances from the hands. Plain soaps have minimal, if any, antimicrobial activity. However, handwashing with plain soap can remove loosely adherent transient flora. For example, handwashing with plain soap and water for 15 seconds reduces bacterial counts on the skin by 0.6–1.1 $\log_{10}$, whereas washing for 30 seconds reduces counts

by 1.8–2.8 $\log_{10}$ (*1*). However, in several studies, handwashing with plain soap failed to remove pathogens from the hands of hospital personnel (*25,45*). Handwashing with plain soap can result in paradoxical increases in bacterial counts on the skin (*92,95–97*). Non-antimicrobial soaps may be associated with considerable skin irritation and dryness (*92,96,98*), although adding emollients to soap preparations may reduce their propensity to cause irritation. Occasionally, plain soaps have become contaminated, which may lead to colonization of hands of personnel with gram-negative bacilli (*99*).

### Alcohols

The majority of alcohol-based hand antiseptics contain either isopropanol, ethanol, n-propanol, or a combination of two of these products. Although n-propanol has been used in alcohol-based hand rubs in parts of Europe for many years, it is not listed in TFM as an approved active agent for HCW handwashes or surgical hand-scrub preparations in the United States. The majority of studies of alcohols have evaluated individual alcohols in varying concentrations. Other studies have focused on combinations of two alcohols or alcohol solutions containing limited amounts of hexachlorophene, quaternary ammonium compounds, povidone-iodine, triclosan, or chlorhexidine gluconate (*61,93,100–119*).

The antimicrobial activity of alcohols can be attributed to their ability to denature proteins (*120*). Alcohol solutions containing 60%–95% alcohol are most effective, and higher concentrations are less potent (*120–122*) because proteins are not denatured easily in the absence of water (*120*). The alcohol content of solutions may be expressed as percent by weight (w/w), which is not affected by temperature or other variables, or as percent by volume (vol/vol), which can be affected by temperature, specific gravity, and reaction concentration (*123*). For example, 70% alcohol by weight is equivalent to 76.8% by volume if prepared at 15°C, or 80.5% if prepared at 25°C (*123*). Alcohol concentrations in antiseptic hand rubs are often expressed as percent by volume (*19*).

Alcohols have excellent in vitro germicidal activity against gram-positive and gram-negative vegetative bacteria, including multidrug-resistant pathogens (e.g., MRSA and VRE), *Mycobacterium tuberculosis*, and various fungi (*120–122,124–129*). Certain enveloped (lipophilic) viruses (e.g., herpes simplex virus, human immunodeficiency virus [HIV], influenza virus, respiratory syncytial virus, and vaccinia virus) are susceptible to alcohols when tested in vitro (*120,130,131*) (Table 1). Hepatitis B virus is an enveloped virus that is somewhat less susceptible but is killed by 60%–70% alcohol; hepatitis C virus also is likely killed by this percentage of alcohol (*132*). In a porcine tissue carrier model used to study antiseptic activity, 70% ethanol and 70% isopropanol were found to

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**TABLE 1. Virucidal activity of antiseptic agents against enveloped viruses**

| Ref. no. | Test method | Viruses | Agent | Results |
|---|---|---|---|---|
| (379) | Suspension | HIV | 19% EA | LR = 2.0 in 5 minutes |
| (380) | Suspension | HIV | 50% EA<br>35% IPA | LR > 3.5<br>LR > 3.7 |
| (381) | Suspension | HIV | 70% EA | LR = 7.0 in 1 minute |
| (382) | Suspension | HIV | 70% EA | LR = 3.2B 5.5 in 30 seconds |
| (383) | Suspension | HIV | 70% IPA/0.5% CHG<br>4% CHG | LR = 6.0 in 15 seconds<br>LR = 6.0 in 15 seconds |
| (384) | Suspension | HIV | Chloroxylenol<br>Benzalkonium chloride | Inactivated in 1 minute<br>Inactivated in 1 minute |
| (385) | Suspension | HIV | Povidone-iodine<br>Chlorhexidine | Inactivated<br>Inactivated |
| (386) | Suspension | HIV | Detergent/0.5% PCMX | Inactivated in 30 seconds |
| (387) | Suspension/dried plasma chimpanzee challenge | HBV | 70% IPA | LR = 6.0 in 10 minutes |
| (388) | Suspension/plasma chimpanzee challenge | HBV | 80% EA | LR = 7.0 in 2 minutes |
| (389) | Suspension | HSV | 95% EA<br>75% EA<br>95% IPA<br>70% EA + 0.5% CHG | LR > 5.0 in 1 minute<br>LR > 5.0<br>LR > 5.0<br>LR > 5.0 |
| (130) | Suspension | RSV | 35% IPA<br>4% CHG | LR > 4.3 in 1 minute<br>LR > 3.3 |
| (141) | Suspension | Influenza<br>Vaccinia | 95% EA<br>95% EA | Undetectable in 30 seconds<br>Undetectable in 30 seconds |
| (141) | Hand test | Influenza<br>Vaccinia | 95% EA<br>95% EA | LR > 2.5<br>LR > 2.5 |

**Note:** HIV = human immunodeficiency virus, EA = ethanol, LR = Log$_{10}$ reduction, IPA = isopropanol, CHG = chlorhexidine gluconate, HBV = hepatitis B virus, RSV = respiratory syncitial virus, HSV = herpes simplex virus, HAV = hepatitis A virus, and PCMX = chloroxylenol.

reduce titers of an enveloped bacteriophage more effectively than an antimicrobial soap containing 4% chlorhexidine gluconate (133). Despite its effectiveness against these organisms, alcohols have very poor activity against bacterial spores, protozoan oocysts, and certain nonenveloped (nonlipophilic) viruses.

Numerous studies have documented the *in vivo* antimicrobial activity of alcohols. Alcohols effectively reduce bacterial counts on the hands (14,121,125,134). Typically, log reductions of the release of test bacteria from artificially contaminated hands average 3.5 log$_{10}$ after a 30-second application and 4.0–5.0 log$_{10}$ after a 1-minute application (1). In 1994, the FDA TFM classified ethanol 60%–95% as a Category I agent (i.e., generally safe and effective for use in antiseptic handwash or HCW hand-wash products) (19). Although TFM placed isopropanol 70%–91.3% in category IIIE (i.e., insufficient data to classify as effective), 60% isopropanol has subse-

quently been adopted in Europe as the reference standard against which alcohol-based hand-rub products are compared (79). Alcohols are rapidly germicidal when applied to the skin, but they have no appreciable persistent (i.e., residual) activity. However, regrowth of bacteria on the skin occurs slowly after use of alcohol-based hand antiseptics, presumably because of the sublethal effect alcohols have on some of the skin bacteria (135,136). Addition of chlorhexidine, quaternary ammonium compounds, octenidine, or triclosan to alcohol-based solutions can result in persistent activity (1).

Alcohols, when used in concentrations present in alcohol-based hand rubs, also have in vivo activity against several nonenveloped viruses (Table 2). For example, 70% isopropanol and 70% ethanol are more effective than medicated soap or nonmedicated soap in reducing rotavirus titers on fingerpads (137,138). A more recent study using the same test methods evaluated a commercially available product containing 60%

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

10 MMWR October 25, 2002

**TABLE 2. Virucidal activity of antiseptic agents against nonenveloped viruses**

| Ref. no. | Test method | Viruses | Antiseptic | Result |
|---|---|---|---|---|
| (390) | Suspension | Rotavirus | 4% CHG | LR < 3.0 in 1 minute |
| | | | 10% Povidone-Iodine | LR > 3.0 |
| | | | 70% IPA/0.1% HCP | LR > 3.0 |
| (141) | Hand test | Adenovirus | 95% EA | LR > 1.4 |
| | | Poliovirus | 95% EA | LR = 0.2–1.0 |
| | | Coxsackie | 95% EA | LR = 1.1–1.3 |
| | Finger test | Adenovirus | 95% EA | LR > 2.3 |
| | | Poliovirus | 95% EA | LR = 0.7–2.5 |
| | | Coxsackie | 95% EA | LR = 2.9 |
| (389) | Suspension | ECHO virus | 95% EA | LR > 3.0 in 1 minute |
| | | | 75% EA | LR ≤ 1.0 |
| | | | 95% IPA | LR = 0 |
| | | | 70% IPA + 0.5% CHG | LR = 0 |
| (140) | Finger pad | HAV | 70% EA | 87.4% reduction |
| | | | 62% EA foam | 89.3% reduction |
| | | | plain soap | 78.0% reduction |
| | | | 4% CHG | 89.6% reduction |
| | | | 0.3% Triclosan | 92.0% reduction |
| (105) | Finger tips | Bovine | n-propanol + IPA | LR = 3.8 in 30 seconds |
| | | Rotavirus | 70% IPA | LR = 3.1 |
| | | | 70% EA | LR = 2.9 |
| | | | 2% triclosan | LR = 2.1 |
| | | | water (control) | LR = 1.3 |
| | | | 7.5% povidone-iodine | LR = 1.3 |
| | | | plain soap | LR = 1.2 |
| | | | 4% CHG | LR = 0.5 |
| (137) | Finger pad | Human | 70% IPA | 98.9% decrease in 10 seconds |
| | | Rotavirus | plain soap | 77.1% |
| (138) | Finger pad | Human | 70% IPA | 99.6% decrease in 10 seconds |
| | | Rotavirus | 2% CHG | 80.3% |
| | | | plain soap | 72.5% |
| (81) | Finger pad | Rotavirus | 60% EA gel | LR > 3.0 in 10 seconds |
| | | Rhinovirus | 60% EA gel | LR > 3.0 |
| | | Adenovirus | 60% EA gel | LR > 3.0 |
| (139) | Finger pad | Poliovirus | 70% EA | LR = 1.6 in 10 seconds |
| | | | 70% IPA | LR = 0.8 |
| (200) | Finger tips | Poliovirus | Plain soap | LR = 2.1 |
| | | | 80% EA | LR = 0.4 |

**Note:** HIV = human immunodeficiency virus, EA = ethanol, LR = $Log_{10}$ reduction, IPA = isopropanol, CHG = chlorhexidine gluconate, HBV = hepatitis B virus, RSV = respiratory syncitial virus, HSV = herpes simplex virus, and HAV = hepatitis A virus.

ethanol and found that the product reduced the infectivity titers of three nonenveloped viruses (i.e., rotavirus, adenovirus, and rhinovirus) by >3 logs (81). Other nonenveloped viruses such as hepatitis A and enteroviruses (e.g., poliovirus) may require 70%–80% alcohol to be reliably inactivated (82,139). However, both 70% ethanol and a 62% ethanol foam product with emollients reduced hepatitis A virus titers on whole hands or fingertips more than nonmedicated soap; both were equally as effective as antimicrobial soap containing 4% chlorhexidine gluconate in reducing reduced viral counts on hands (140). In the same study, both 70% ethanol and the 62% ethanol foam product demonstrated greater virucidal activity against poliovirus than either non-antimicrobial soap or a 4% chlorhexidine gluconate-containing soap (140). However, depending on the alcohol concentration, the amount of time that hands are exposed to the alcohol, and viral variant, alcohol may not be effective against hepatitis A and other nonlipophilic viruses. The inactivation of nonenveloped viruses is influenced by temperature, disinfectant-virus volume ratio, and protein load (141). Ethanol has greater activity against viruses than isopropanol. Further in vitro and in vivo studies of both alcohol-based formulations and antimicrobial soaps are warranted to establish the minimal level of virucidal activity that is required to interrupt direct contact transmission of viruses in health-care settings.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Alcohols are not appropriate for use when hands are visibly dirty or contaminated with proteinaceous materials. However, when relatively small amounts of proteinaceous material (e.g., blood) are present, ethanol and isopropanol may reduce viable bacterial counts on hands more than plain soap or antimicrobial soap (*142*).

Alcohol can prevent the transfer of health-care–associated pathogens (*25,63,64*). In one study, gram-negative bacilli were transferred from a colonized patient's skin to a piece of catheter material via the hands of nurses in only 17% of experiments after antiseptic hand rub with an alcohol-based hand rinse (*25*). In contrast, transfer of the organisms occurred in 92% of experiments after handwashing with plain soap and water. This experimental model indicates that when the hands of HCWs are heavily contaminated, an antiseptic hand rub using an alcohol-based rinse can prevent pathogen transmission more effectively than can handwashing with plain soap and water.

Alcohol-based products are more effective for standard handwashing or hand antisepsis by HCWs than soap or antimicrobial soaps (Table 3) (*25,53,61,93,106–112,119,143–152*). In all but two of the trials that compared alcohol-based solutions with antimicrobial soaps or detergents, alcohol reduced bacterial counts on hands more than washing hands with soaps or detergents containing hexachlorophene, povidone-iodine, 4% chlorhexidine, or triclosan. In studies examining antimicrobial-resistant organisms, alcohol-based products reduced the number of multidrug-resistant pathogens recovered from the hands of HCWs more effectively than did handwashing with soap and water (*153–155*).

Alcohols are effective for preoperative cleaning of the hands of surgical personnel (*1,101,104,113–119,135,143,147,156–159*) (Tables 4 and 5). In multiple studies, bacterial counts on the hands were determined immediately after using the product and again 1–3 hours later; the delayed testing was performed to determine if regrowth of bacteria on the hands is inhibited during operative procedures. Alcohol-based solutions were more effective than washing hands with plain soap in all studies, and they reduced bacterial counts on the hands more than antimicrobial soaps or detergents in the majority of experiments (*101,104,113–119,135,143,147,157–159*). In addition, the majority of alcohol-based preparations were more effective than povidone-iodine or chlorhexidine.

The efficacy of alcohol-based hand-hygiene products is affected by several factors, including the type of alcohol used, concentration of alcohol, contact time, volume of alcohol used, and whether the hands are wet when the alcohol is applied. Applying small volumes (i.e., 0.2–0.5 mL) of alcohol to the hands is not more effective than washing hands with plain soap and water (*63,64*). One study documented that 1 mL of alcohol was substantially less effective than 3 mL (*91*). The ideal volume of product to apply to the hands is not known

**TABLE 3. Studies comparing the relative efficacy (based on $\log_{10}$ reductions achieved) of plain soap or antimicrobial soaps versus alcohol-based antiseptics in reducing counts of viable bacteria on hands**

| Ref. no. | Year | Skin contamination | Assay method | Time (sec) | Relative efficacy |
|---|---|---|---|---|---|
| (*143*) | 1965 | Existing hand flora | Finger-tip agar culture | 60 | Plain soap < HCP < 50% EA foam |
| (*119*) | 1975 | Existing hand flora | Hand-rub broth culture | — | Plain soap < 95% EA |
| (*106*) | 1978 | Artificial contamination | Finger-tip broth culture | 30 | Plain soap < 4% CHG < P-I < 70% EA = alc. CHG |
| (*144*) | 1978 | Artificial contamination | Finger-tip broth culture | 30 | Plain soap < 4% CHG < 70% EA |
| (*107*) | 1979 | Existing hand flora | Hand-rub broth culture | 120 | Plain soap < 0.5% aq. CHG < 70% EA < 4% CHG < alc.CHG |
| (*145*) | 1980 | Artificial contamination | Finger-tip broth culture | 60–120 | 4% CHG < P-I < 60% IPA |
| (*53*) | 1980 | Artificial contamination | Finger-tip broth culture | 15 | Plain soap < 3% HCP < P-I < 4% CHG < 70% EA |
| (*108*) | 1982 | Artificial contamination | Glove juice test | 15 | P-I < alc. CHG |
| (*109*) | 1983 | Artificial contamination | Finger-tip broth culture | 120 | 0.3–2% triclosan = 60% IPA = alc. CHG < alc. triclosan |
| (*146*) | 1984 | Artificial contamination | Finger-tip agar culture | 60 | Phenolic < 4% CHG < P-I < EA < IPA < n-P |
| (*147*) | 1985 | Existing hand flora | Finger-tip agar culture | 60 | Plain soap < 70% EA < 95% EA |
| (*110*) | 1986 | Artificial contamination | Finger-tip broth culture | 60 | Phenolic = P-I < alc. CHG < n-P |
| (*93*) | 1986 | Existing hand flora | Sterile-broth bag technique | 15 | Plain soap < IPA < 4% CHG < IPA-E < alc. CHG |
| (*61*) | 1988 | Artificial contamination | Finger-tip broth culture | 30 | Plain soap < triclosan < P-I < IPA < alc. CHG < n-P |
| (*25*) | 1991 | Patient contact | Glove-juice test | 15 | Plain soap < IPA-E |
| (*148*) | 1991 | Existing hand flora | Agar-plate/image analysis | 30 | Plain soap < 1% triclosan < P-I < 4% CHG < IPA |
| (*111*) | 1992 | Artificial contamination | Finger-tip agar culture | 60 | Plain soap < IPA < EA < alc. CHG |
| (*149*) | 1992 | Artificial contamination | Finger-tip broth culture | 60 | Plain soap < 60% n-P |
| (*112*) | 1994 | Artificial contamination | Agar-plate/image analysis | 30 | Plain soap < alc. CHG |
| (*150*) | 1999 | Existing hand flora | Agar-plate culture | N.S. | Plain soap < commercial alcohol mixture |
| (*151*) | 1999 | Artificial contamination | Glove-juice test | 20 | Plain soap < 0.6% PCMX < 65% EA |
| (*152*) | 1999 | Artificial contamination | Finger-tip broth culture | 30 | 4% CHG < plain soap < P-I < 70% EA |

**Note:** Existing hand flora = without artificially contaminiating hands with bacteria, alc. CHG = alcoholic chlorhexidine gluconate, aq. CHG = aqueous chlorhexidine gluconate, 4% CHG = chlorhexidine gluconate detergent, EA = ethanol, HCP = hexachlorophene soap/detergent, IPA = isopropanol, IPA-E = isopropanol + emollients, n-P = n-propanol, PCMX = chloroxylenol detergent, P-I = povidone-iodine detergent, and N.S. = not stated.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**TABLE 4. Studies comparing the relative efficacy of plain soap or antimicrobial soap versus alcohol-containing products in reducing counts of bacteria recovered from hands immediately after use of products for pre-operative cleansing of hands**

| Ref. no. | Year | Assay method | Relative efficacy |
|---|---|---|---|
| (143) | 1965 | Finger-tip agar culture | HCP < 50% EA foam + QAC |
| (157) | 1969 | Finger-tip agar culture | HCP < P-I < 50% EA foam + QAC |
| (101) | 1973 | Finger-tip agar culture | HCP soap < EA foam + 0.23% HCP |
| (135) | 1974 | Broth culture | Plain soap < 0.5% CHG < 4% CHG < alc. CHG |
| (119) | 1975 | Hand-broth test | Plain soap < 0.5% CHG < 4% CHG < alc. CHG |
| (118) | 1976 | Glove-juice test | 0.5% CHG < 4% CHG < alc. CHG |
| (114) | 1977 | Glove-juice test | P-I < CHG < alc. CHG |
| (117) | 1978 | Finger-tip agar culture | P-I = 46% EA + 0.23% HCP |
| (113) | 1979 | Broth culture of hands | Plain soap < P-I < alc. CHG < alc. P-I |
| (116) | 1979 | Glove-juice test | 70% IPA = alc. CHG |
| (147) | 1985 | Finger-tip agar culture | Plain soap < 70% - 90% EA |
| (115) | 1990 | Glove-juice test, modified | Plain soap < triclosan < CHG < P-I < alc. CHG |
| (104) | 1991 | Glove-juice test | Plain soap < 2% triclosan < P-I < 70% IPA |
| (158) | 1998 | Finger-tip broth culture | 70% IPA < 90% IPA = 60% n-P |
| (159) | 1998 | Glove-juice test | P-I < CHG < 70% EA |

**Note:** QAC = quaternary ammonium compound, alc. CHG = alcoholic chlorhexidine gluconate, CHG = chlorhexidine gluconate detergent, EA = ethanol, HCP = hexachlorophene detergent, IPA = isopropanol, and P-I = povidone-iodine detergent.

**TABLE 5. Efficacy of surgical hand-rub solutions in reducing the release of resident skin flora from clean hands**

| Study | Rub | Concentration* (%) | Time (min) | Mean log reducation | |
|---|---|---|---|---|---|
| | | | | Immediate | Sustained (3 hr) |
| 1 | n-Propanol | 60 | 5 | 2.9[†] | 1.6[†] |
| 2 | | | 5 | 2.7[†] | NA |
| 3 | | | 5 | 2.5[†] | 1.8[†] |
| 4 | | | 5 | 2.3[†] | 1.6[†] |
| 5 | | | 3 | 2.9[§] | NA |
| 4 | | | 3 | 2.0[†] | 1.0[†] |
| 4 | | | 1 | 1.1[†] | 0.5[†] |
| 6 | Isopropanol | 90 | 3 | 2.4[§] | 1.4[§] |
| 6 | | 80 | 3 | 2.3[§] | 1.2[§] |
| 7 | | 70 | 5 | 2.4[†] | 2.1[†] |
| 4 | | | 5 | 2.1[†] | 1.0[†] |
| 6 | | | 3 | 2.0[§] | 0.7[§] |
| 5 | | | 3 | 1.7[c] | NA |
| 4 | | | 3 | 1.5[†] | 0.8[†] |
| 8 | | | 2 | 1.2 | 0.8 |
| 4 | | | 1 | 0.7[†] | 0.2 |
| 9 | | | 1 | 0.8 | NA |
| 10 | | 60 | 5 | 1.7 | 1.0 |
| 7 | Isopropanol + chlorhexidine gluc. (w/v) | 70 + 0.5 | 5 | 2.5[†] | 2.7[†] |
| 8 | | | 2 | 1.0 | 1.5 |
| 11 | Ethanol | 95 | 2 | 2.1 | NA |
| 5 | | 85 | 3 | 2.4[§] | NA |
| 12 | | 80 | 2 | 1.5 | NA |
| 8 | | 70 | 2 | 1.0 | 0.6 |
| 13 | Ethanol + chlorhexidine gluc. (w/v) | 95 + 0.5 | 2 | 1.7 | NA |
| 14 | | 77 + 0.5 | 5 | 2.0 | 1.5[¶] |
| 8 | | 70 + 0.5 | 2 | 0.7 | 1.4 |
| 8 | Chlorhexidine gluc. (aq. Sol., w/v) | 0.5 | 2 | 0.4 | 1.2 |
| 15 | Povidone-iodine (aq. Sol., w/v) | 1.0 | 5 | 1.9[†] | 0.8[†] |
| 16 | Peracetic acid (w/v) | 0.5 | 5 | 1.9 | NA |

**Note:** NA = not available.

**Source:** Rotter M. Hand washing and hand disinfection [Chapter 87]. In: Mayhall CG, ed. Hospital epidemiology and infection control. 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999. Table 5 is copyrighted by Lippincott Williams & Wilkins; it is reprinted here with their permission and permission from Manfred Rotler, M.D., Professor of Hygiene and Microbiology, Klinisches Institute für Hygiene der Universitat Wien, Germany.

* Volume/volume unless otherwise stated.

[†] Tested according to Deutsche Gesellschaft fur Hygiene, and Mikrobiologic (DGHM)-German Society of Hygiene and Microbiology method.

[§] Tested according to European Standard prEN.

[¶] After 4 hours.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

and may vary for different formulations. However, if hands feel dry after rubbing hands together for 10–15 seconds, an insufficient volume of product likely was applied. Because alcohol-impregnated towelettes contain a limited amount of alcohol, their effectiveness is comparable to that of soap and water (*63,160,161*).

Alcohol-based hand rubs intended for use in hospitals are available as low viscosity rinses, gels, and foams. Limited data are available regarding the relative efficacy of various formulations. One field trial demonstrated that an ethanol gel was slightly more effective than a comparable ethanol solution at reducing bacterial counts on the hands of HCWs (*162*). However, a more recent study indicated that rinses reduced bacterial counts on the hands more than the gels tested (*80*). Further studies are warranted to determine the relative efficacy of alcohol-based rinses and gels in reducing transmission of health-care–associated pathogens.

Frequent use of alcohol-based formulations for hand antisepsis can cause drying of the skin unless emollients, humectants, or other skin-conditioning agents are added to the formulations. The drying effect of alcohol can be reduced or eliminated by adding 1%–3% glycerol or other skin-conditioning agents (*90,93,100,101,106,135,143,163,164*). Moreover, in several recent prospective trials, alcohol-based rinses or gels containing emollients caused substantially less skin irritation and dryness than the soaps or antimicrobial detergents tested (*96,98,165,166*). These studies, which were conducted in clinical settings, used various subjective and objective methods for assessing skin irritation and dryness. Further studies are warranted to establish whether products with different formulations yield similar results.

Even well-tolerated alcohol hand rubs containing emollients may cause a transient stinging sensation at the site of any broken skin (e.g., cuts and abrasions). Alcohol-based hand-rub preparations with strong fragrances may be poorly tolerated by HCWs with respiratory allergies. Allergic contact dermatitis or contact urticaria syndrome caused by hypersensitivity to alcohol or to various additives present in certain alcohol hand rubs occurs only rarely (*167,168*).

Alcohols are flammable. Flash points of alcohol-based hand rubs range from 21°C to 24°C, depending on the type and concentration of alcohol present (*169*). As a result, alcohol-based hand rubs should be stored away from high temperatures or flames in accordance with National Fire Protection Agency recommendations. In Europe, where alcohol-based hand rubs have been used extensively for years, the incidence of fires associated with such products has been low (*169*). One recent U.S. report described a flash fire that occurred as a result of an unusual series of events, which included an HCW applying an alcohol gel to her hands, immediately removing a

polyester isolation gown, and then touching a metal door before the alcohol had evaporated (*170*). Removing the polyester gown created a substantial amount of static electricity that generated an audible static spark when the HCW touched the metal door, igniting the unevaporated alcohol on her hands (*170*). This incident emphasizes the need to rub hands together after application of alcohol-based products until all the alcohol has evaporated.

Because alcohols are volatile, containers should be designed to minimize evaporation. Contamination of alcohol-based solutions has seldom been reported. One report documented a cluster of pseudoinfections caused by contamination of ethyl alcohol by *Bacillus cereus* spores (*171*).

## Chlorhexidine

Chlorhexidine gluconate, a cationic bisbiguanide, was developed in England in the early 1950s and was introduced into the United States in the 1970s (*8,172*). Chlorhexidine base is only minimally soluble in water, but the digluconate form is water-soluble. The antimicrobial activity of chlorhexidine is likely attributable to attachment to, and subsequent disruption of, cytoplasmic membranes, resulting in precipitation of cellular contents (*1,8*). Chlorhexidine's immediate antimicrobial activity occurs more slowly than that of alcohols. Chlorhexidine has good activity against gram-positive bacteria, somewhat less activity against gram-negative bacteria and fungi, and only minimal activity against tubercle bacilli (*1,8,172*). Chlorhexidine is not sporicidal (*1,172*). It has in vitro activity against enveloped viruses (e.g., herpes simplex virus, HIV, cytomegalovirus, influenza, and RSV) but substantially less activity against nonenveloped viruses (e.g., rotavirus, adenovirus, and enteroviruses) (*130,131,173*). The antimicrobial activity of chlorhexidine is only minimally affected by the presence of organic material, including blood. Because chlorhexidine is a cationic molecule, its activity can be reduced by natural soaps, various inorganic anions, nonionic surfactants, and hand creams containing anionic emulsifying agents (*8,172,174*). Chlorhexidine gluconate has been incorporated into a number of hand-hygiene preparations. Aqueous or detergent formulations containing 0.5% or 0.75% chlorhexidine are more effective than plain soap, but they are less effective than antiseptic detergent preparations containing 4% chlorhexidine gluconate (*135,175*). Preparations with 2% chlorhexidine gluconate are slightly less effective than those containing 4% chlorhexidine (*176*).

Chlorhexidine has substantial residual activity (*106,114–116,118,135,146,175*). Addition of low concentrations (0.5%–1.0%) of chlorhexidine to alcohol-based preparations results in greater residual activity than alcohol alone (*116,135*). When used as recommended, chlorhexidine has a good safety

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

record (*172*). Minimal, if any, absorption of the compound occurs through the skin. Care must be taken to avoid contact with the eyes when using preparations with ≥1% chlorhexidine, because the agent can cause conjunctivitis and severe corneal damage. Ototoxicity precludes its use in surgery involving the inner or middle ear. Direct contact with brain tissue and the meninges should be avoided. The frequency of skin irritation is concentration-dependent, with products containing 4% most likely to cause dermatitis when used frequently for antiseptic handwashing (*177*); allergic reactions to chlorhexidine gluconate are uncommon (*118,172*). Occasional outbreaks of nosocomial infections have been traced to contaminated solutions of chlorhexidine (*178–181*).

## Chloroxylenol

Chloroxylenol, also known as parachlorometaxylenol (PCMX), is a halogen-substituted phenolic compound that has been used as a preservative in cosmetics and other products and as an active agent in antimicrobial soaps. It was developed in Europe in the late 1920s and has been used in the United States since the 1950s (*182*).

The antimicrobial activity of PCMX likely is attributable to inactivation of bacterial enzymes and alteration of cell walls (*1*). It has good in vitro activity against gram-positive organisms and fair activity against gram-negative bacteria, mycobacteria, and certain viruses (*1,7,182*). PCMX is less active against *P. aeruginosa*, but addition of ethylenediaminetetraacetic acid (EDTA) increases its activity against *Pseudomonas* spp. and other pathogens.

A limited number of articles focusing on the efficacy of PCMX-containing preparations intended for use by HCWs have been published in the last 25 years, and the results of studies have sometimes been contradictory. For example, in studies in which antiseptics were applied to abdominal skin, PCMX had the weakest immediate and residual activity of any of the agents studied (*183*). However, when 30-second handwashes were performed using 0.6% PCMX, 2% chlorhexidine gluconate, or 0.3% triclosan, the immediate effect of PCMX was similar to that of the other agents. When used 18 times per day for 5 consecutive days, PCMX had less cumulative activity than did chlorhexidine gluconate (*184*). When PCMX was used as a surgical scrub, one report indicated that 3% PCMX had immediate and residual activity comparable to 4% chlorhexidine gluconate (*185*), whereas two other studies demonstrated that the immediate and residual activity of PCMX was inferior to both chlorhexidine gluconate and povidone-iodine (*176,186*). The disparity between published studies may be associated with the various concentrations of PCMX included in the preparations evaluated and with other aspects of the formulations tested, including the

presence or absence of EDTA (*7,182*). PCMX is not as rapidly active as chlorhexidine gluconate or iodophors, and its residual activity is less pronounced than that observed with chlorhexidine gluconate (*7,182*). In 1994, FDA TFM tentatively classified PCMX as a Category IIISE active agent (i.e., insufficient data are available to classify this agent as safe and effective) (*19*). Further evaluation of this agent by the FDA is ongoing.

The antimicrobial activity of PCMX is minimally affected by the presence of organic matter, but it is neutralized by nonionic surfactants. PCMX, which is absorbed through the skin (*7,182*), is usually well-tolerated, and allergic reactions associated with its use are uncommon. PCMX is available in concentrations of 0.3%–3.75%. In-use contamination of a PCMX-containing preparation has been reported (*187*).

## Hexachlorophene

Hexachlorophene is a bisphenol composed of two phenolic groups and three chlorine moieties. In the 1950s and early 1960s, emulsions containing 3% hexachlorophene were widely used for hygienic handwashing, as surgical scrubs, and for routine bathing of infants in hospital nurseries. The antimicrobial activity of hexachlorophene results from its ability to inactivate essential enzyme systems in microorganisms. Hexachlorophene is bacteriostatic, with good activity against *S. aureus* and relatively weak activity against gram-negative bacteria, fungi, and mycobacteria (*7*).

Studies of hexachlorophene as a hygienic handwash and surgical scrub demonstrated only modest efficacy after a single handwash (*53,143,188*). Hexachlorophene has residual activity for several hours after use and gradually reduces bacterial counts on hands after multiple uses (i.e., it has a cumulative effect) (*1,101,188,189*). With repeated use of 3% hexachlorophene preparations, the drug is absorbed through the skin. Infants bathed with hexachlorophene and personnel regularly using a 3% hexachlorophene preparation for handwashing have blood levels of 0.1–0.6 ppm hexachlorophene (*190*). In the early 1970s, certain infants bathed with hexachlorophene developed neurotoxicity (vacuolar degeneration) (*191*). As a result, in 1972, the FDA warned that hexachlorophene should no longer be used routinely for bathing infants. However, after routine use of hexachlorophene for bathing infants in nurseries was discontinued, investigators noted that the incidence of health-care–associated *S. aureus* infections in hospital nurseries increased substantially (*192,193*). In several instances, the frequency of infections decreased when hexachlorophene bathing of infants was reinstituted. However, current guidelines still recommend against the routine bathing of neonates with hexachlorophene because of its potential neurotoxic effects (*194*). The agent is classified by FDA TFM as not

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

generally recognized as safe and effective for use as an antiseptic handwash (*19*). Hexachlorophene should not be used to bathe patients with burns or extensive areas of susceptible, sensitive skin. Soaps containing 3% hexachlorophene are available by prescription only (*7*).

## Iodine and Iodophors

Iodine has been recognized as an effective antiseptic since the 1800s. However, because iodine often causes irritation and discoloring of skin, iodophors have largely replaced iodine as the active ingredient in antiseptics.

Iodine molecules rapidly penetrate the cell wall of microorganisms and inactivate cells by forming complexes with amino acids and unsaturated fatty acids, resulting in impaired protein synthesis and alteration of cell membranes (*195*). Iodophors are composed of elemental iodine, iodide or triiodide, and a polymer carrier (i.e., the complexing agent) of high molecular weight. The amount of molecular iodine present (so-called "free" iodine) determines the level of antimicrobial activity of iodophors. "Available" iodine refers to the total amount of iodine that can be titrated with sodium thiosulfate (*196*). Typical 10% povidone-iodine formulations contain 1% available iodine and yield free iodine concentrations of 1 ppm (*196*). Combining iodine with various polymers increases the solubility of iodine, promotes sustained release of iodine, and reduces skin irritation. The most common polymers incorporated into iodophors are polyvinyl pyrrolidone (i.e., povidone) and ethoxylated nonionic detergents (i.e., poloxamers) (*195,196*). The antimicrobial activity of iodophors also can be affected by pH, temperature, exposure time, concentration of total available iodine, and the amount and type of organic and inorganic compounds present (e.g., alcohols and detergents).

Iodine and iodophors have bactericidal activity against gram-positive, gram-negative, and certain spore-forming bacteria (e.g., clostridia and *Bacillus* spp.) and are active against mycobacteria, viruses, and fungi (*8,195,197–200*). However, in concentrations used in antiseptics, iodophors are not usually sporicidal (*201*). In vivo studies have demonstrated that iodophors reduce the number of viable organisms that are recovered from the hands of personnel (*113,145,148,152,155*). Povidone-iodine 5%–10% has been tentatively classified by FDA TFM as a Category I agent (i.e., a safe and effective agent for use as an antiseptic handwash and an HCW handwash) (*19*). The extent to which iodophors exhibit persistent antimicrobial activity after they have been washed off the skin is unclear. In one study, persistent activity was noted for 6 hours (*176*); however, several other studies demonstrated persistent activity for only 30–60 minutes after washing hands with an iodophor (*61,117,202*). In studies in which bacterial counts

were obtained after gloves were worn for 1–4 hours after washing, iodophors have demonstrated poor persistent activity (*1,104,115,189,203–208*). The in vivo antimicrobial activity of iodophors is substantially reduced in the presence of organic substances (e.g., blood or sputum) (*8*).

The majority of iodophor preparations used for hand hygiene contain 7.5%–10% povidone-iodine. Formulations with lower concentrations also have good antimicrobial activity because dilution can increase free iodine concentrations (*209*). However, as the amount of free iodine increases, the degree of skin irritation also may increase (*209*). Iodophors cause less skin irritation and fewer allergic reactions than iodine, but more irritant contact dermatitis than other antiseptics commonly used for hand hygiene (*92*). Occasionally, iodophor antiseptics have become contaminated with gram-negative bacilli as a result of poor manufacturing processes and have caused outbreaks or pseudo-outbreaks of infection (*196*).

## Quaternary Ammonium Compounds

Quaternary ammonium compounds are composed of a nitrogen atom linked directly to four alkyl groups, which may vary in their structure and complexity (*210*). Of this large group of compounds, alkyl benzalkonium chlorides are the most widely used as antiseptics. Other compounds that have been used as antiseptics include benzethonium chloride, cetrimide, and cetylpyridium chloride (*1*). The antimicrobial activity of these compounds was first studied in the early 1900s, and a quaternary ammonium compound for preoperative cleaning of surgeons' hands was used as early as 1935 (*210*). The antimicrobial activity of this group of compounds likely is attributable to adsorption to the cytoplasmic membrane, with subsequent leakage of low molecular weight cytoplasmic constituents (*210*).

Quaternary ammonium compounds are primarily bacteriostatic and fungistatic, although they are microbicidal against certain organisms at high concentrations (*1*); they are more active against gram-positive bacteria than against gram-negative bacilli. Quaternary ammonium compounds have relatively weak activity against mycobacteria and fungi and have greater activity against lipophilic viruses. Their antimicrobial activity is adversely affected by the presence of organic material, and they are not compatible with anionic detergents (*1,210*). In 1994, FDA TFM tentatively classified benzalkonium chloride and benzethonium chloride as Category IIISE active agents (i.e., insufficient data exists to classify them as safe and effective for use as an antiseptic handwash) (*19*). Further evaluation of these agents by FDA is in progress.

Quaternary ammonium compounds are usually well tolerated. However, because of weak activity against

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

gram-negative bacteria, benzalkonium chloride is prone to contamination by these organisms. Several outbreaks of infection or pseudoinfection have been traced to quaternary ammonium compounds contaminated with gram-negative bacilli (*211–213*). For this reason, in the United States, these compounds have been seldom used for hand antisepsis during the last 15–20 years. However, newer handwashing products containing benzalkonium chloride or benzethonium chloride have recently been introduced for use by HCWs. A recent study of surgical intensive-care unit personnel found that cleaning hands with antimicrobial wipes containing a quaternary ammonium compound was about as effective as using plain soap and water for handwashing; both were less effective than decontaminating hands with an alcohol-based hand rub (*214*). One laboratory-based study reported that an alcohol-free hand-rub product containing a quaternary ammonium compound was efficacious in reducing microbial counts on the hands of volunteers (*215*). Further studies of such products are needed to determine if newer formulations are effective in health-care settings.

### Triclosan

Triclosan (chemical name: 2,4,4' –trichloro-2'-hydroxydiphenyl ether) is a nonionic, colorless substance that was developed in the 1960s. It has been incorporated into soaps for use by HCWs and the public and into other consumer products. Concentrations of 0.2%–2% have antimicrobial activity. Triclosan enters bacterial cells and affects the cytoplasmic membrane and synthesis of RNA, fatty acids, and proteins (*216*). Recent studies indicate this agent's antibacterial activity is attributable to binding to the active site of enoyl-acyl carrier protein reductase (*217,218*).

Triclosan has a broad range of antimicrobial activity, but it is often bacteriostatic (*1*). Minimum inhibitory concentrations (MICs) range from 0.1 to 10 ug/mL, whereas minimum bactericidal concentrations are 25–500 ug/mL. Triclosan's activity against gram-positive organisms (including MRSA) is greater than against gram-negative bacilli, particularly *P. aeruginosa* (*1,216*). The agent possesses reasonable activity against mycobacterial and *Candida* spp., but it has limited activity against filamentous fungi. Triclosan (0.1%) reduces bacterial counts on hands by 2.8 $\log_{10}$ after a 1-minute hygienic handwash (*1*). In several studies, log reductions have been lower after triclosan is used than when chlorhexidine, iodophors, or alcohol-based products are applied (*1,61,149,184,219*). In 1994, FDA TFM tentatively classified triclosan $\leq$1.0% as a Category IIISE active agent (i.e., insufficient data exist to classify this agent as safe and effective for use as an antiseptic handwash) (*19*). Further evaluation of this agent by the FDA is underway. Like chlorhexidine, triclosan has persistent activity on the skin. Its activity in

hand-care products is affected by pH, the presence of surfactants, emollients, or humectants and by the ionic nature of the particular formulation (*1,216*). Triclosan's activity is not substantially affected by organic matter, but it can be inhibited by sequestration of the agent in micelle structures formed by surfactants present in certain formulations. The majority of formulations containing <2% triclosan are well-tolerated and seldom cause allergic reactions. Certain reports indicate that providing hospital personnel with a triclosan-containing preparation for hand antisepsis has led to decreased MRSA infections (*72,73*). Triclosan's lack of potent activity against gram-negative bacilli has resulted in occasional reports of contamination (*220*).

### Other Agents

Approximately 150 years after puerperal-fever–related maternal mortality rates were demonstrated by Semmelweis to be reduced by use of a hypochlorite hand rinse, the efficacy of rubbing hands for 30 seconds with an aqueous hypochlorite solution was studied once again (*221*). The solution was demonstrated to be no more effective than distilled water. The regimen used by Semmelweis, which called for rubbing hands with a 4% [w/w] hypochlorite solution until the hands were slippery (approximately 5 minutes), has been revisited by other researchers (*222*). This more current study indicated that the regimen was 30 times more effective than a 1-minute rub using 60% isopropanol. However, because hypochlorite solutions are often irritating to the skin when used repeatedly and have a strong odor, they are seldom used for hand hygiene.

Certain other agents are being evaluated by FDA for use in health-care-related antiseptics (*19*). However, the efficacy of these agents has not been evaluated adequately for use in handwashing preparations intended for use by HCWs. Further evaluation of these agents is warranted. Products that use different concentrations of traditional antiseptics (e.g., low concentrations of iodophor) or contain novel compounds with antiseptic properties are likely to be introduced for use by HCWs. For example, preliminary studies have demonstrated that adding silver-containing polymers to an ethanol carrier (i.e., Surfacine®) results in a preparation that has persistent antimicrobial activity on animal and human skin (*223*). New compounds with good in vitro activity must be tested in vivo to determine their abilities to reduce transient and resident skin flora on the hands of HCWs.

## Activity of Antiseptic Agents Against Spore-Forming Bacteria

The widespread prevalence of health-care–associated diarrhea caused by *Clostridium difficile* and the recent occurrence

in the United States of human *Bacillus anthracis* infections associated with contaminated items sent through the postal system has raised concern regarding the activity of antiseptic agents against spore-forming bacteria. None of the agents (including alcohols, chlorhexidine, hexachlorophene, iodophors, PCMX, and triclosan) used in antiseptic handwash or antiseptic hand-rub preparations are reliably sporicidal against *Clostridium* spp. or *Bacillus* spp. (*120,172,224,225*). Washing hands with non-antimicrobial or antimicrobial soap and water may help to physically remove spores from the surface of contaminated hands. HCWs should be encouraged to wear gloves when caring for patients with *C. difficile*–associated diarrhea (*226*). After gloves are removed, hands should be washed with a non-antimicrobial or an antimicrobial soap and water or disinfected with an alcohol-based hand rub. During outbreaks of *C. difficile*–related infections, washing hands with a non-antimicrobial or antimicrobial soap and water after removing gloves is prudent. HCWs with suspected or documented exposure to *B. anthracis*-contaminated items also should be encouraged to wash their hands with a non-antimicrobial or antimicrobial soap and water.

## Reduced Susceptibility of Bacteria to Antiseptics

Reduced susceptibility of bacteria to antiseptic agents can either be an intrinsic characteristic of a species or can be an acquired trait (*227*). Several reports have described strains of bacteria that appear to have acquired reduced susceptibility (when defined by MICs established in vitro) to certain antiseptics (e.g., chlorhexidine, quaternary ammonium compounds, and triclosan) (*227–230*). However, because the antiseptic concentrations that are actually used by HCWs are often substantially higher than the MICs of strains with reduced antiseptic susceptibility, the clinical relevance of the in vitro findings is questionable. For example, certain strains of MRSA have chlorhexidine and quaternary ammonium compound MICs that are several-fold higher than methicillin-susceptible strains, and certain strains of *S. aureus* have elevated MICs to triclosan (*227,228*). However, such strains were readily inhibited by the concentrations of these antiseptics that are actually used by practicing HCWs (*227,228*). The description of a triclosan-resistant bacterial enzyme has raised the question of whether resistance to this agent may develop more readily than to other antiseptic agents (*218*). In addition, exposing *Pseudomonas* strains containing the MexAB-OprM efflux system to triclosan may select for mutants that are resistant to multiple antibiotics, including fluoroquinolones (*230*). Further studies are needed to determine whether reduced susceptibility to antiseptic agents is of epidemiologic significance and whether resistance to antiseptics has any influence on the prevalence of antibiotic-resistant strains (*227*).

## Surgical Hand Antisepsis

Since the late 1800s, when Lister promoted the application of carbolic acid to the hands of surgeons before procedures, preoperative cleansing of hands and forearms with an antiseptic agent has been an accepted practice (*231*). Although no randomized, controlled trials have been conducted to indicate that surgical-site infection rates are substantially lower when preoperative scrubbing is performed with an antiseptic agent rather than a non-antimicrobial soap, certain other factors provide a strong rationale for this practice. Bacteria on the hands of surgeons can cause wound infections if introduced into the operative field during surgery (*232*); rapid multiplication of bacteria occurs under surgical gloves if hands are washed with a non-antimicrobial soap. However, bacterial growth is slowed after preoperative scrubbing with an antiseptic agent (*14,233*). Reducing resident skin flora on the hands of the surgical team for the duration of a procedure reduces the risk of bacteria being released into the surgical field if gloves become punctured or torn during surgery (*1,156,169*). Finally, at least one outbreak of surgical-site infections occurred when surgeons who normally used an antiseptic surgical scrub preparation began using a non-antimicrobial product (*234*).

Antiseptic preparations intended for use as surgical hand scrubs are evaluated for their ability to reduce the number of bacteria released from hands at different times, including 1) immediately after scrubbing, 2) after wearing surgical gloves for 6 hours (i.e., persistent activity), and 3) after multiple applications over 5 days (i.e., cumulative activity). Immediate and persistent activity are considered the most important in determining the efficacy of the product. U.S. guidelines recommend that agents used for surgical hand scrubs should substantially reduce microorganisms on intact skin, contain a nonirritating antimicrobial preparation, have broad-spectrum activity, and be fast-acting and persistent (*19,235*).

Studies have demonstrated that formulations containing 60%–95% alcohol alone or 50%–95% when combined with limited amounts of a quaternary ammonium compound, hexachlorophene, or chlorhexidine gluconate, lower bacterial counts on the skin immediately postscrub more effectively than do other agents (Table 4). The next most active agents (in order of decreasing activity) are chlorhexidine gluconate, iodophors, triclosan, and plain soap (*104,119,186,188, 203,204,206,208,236*). Because studies of PCMX as a surgical scrub have yielded contradictory results, further studies are needed to establish how the efficacy of this compound compares with the other agents (*176,185,186*).

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

MMWR October 25, 2002

Although alcohols are not considered to have persistent antimicrobial activity, bacteria appear to reproduce slowly on the hands after a surgical scrub with alcohol, and bacterial counts on hands after wearing gloves for 1–3 hours seldom exceed baseline (i.e., prescrub) values (1). However, a recent study demonstrated that a formulation containing 61% ethanol alone did not achieve adequate persistent activity at 6 hours postscrub (237). Alcohol-based preparations containing 0.5% or 1% chlorhexidine gluconate have persistent activity that, in certain studies, has equaled or exceeded that of chlorhexidine gluconate-containing detergents (1,118,135,237).*

Persistent antimicrobial activity of detergent-based surgical scrub formulations is greatest for those containing 2% or 4% chlorhexidine gluconate, followed by hexachlorophene, triclosan, and iodophors (1,102,113–115,159,189,203, 204,206–208,236). Because hexachlorophene is absorbed into the blood after repeated use, it is seldom used as a surgical scrub.

Surgical staff have been traditionally required to scrub their hands for 10 minutes preoperatively, which frequently leads to skin damage. Several studies have demonstrated that scrubbing for 5 minutes reduces bacterial counts as effectively as a 10-minute scrub (117,238,239). In other studies, scrubbing for 2 or 3 minutes reduced bacterial counts to acceptable levels (156,205,207,240,241).

Studies have indicated that a two-stage surgical scrub using an antiseptic detergent, followed by application of an alcohol-containing preparation, is effective. For example, an initial 1- or 2-minute scrub with 4% chlorhexidine gluconate or povidone-iodine followed by application of an alcohol-based product has been as effective as a 5-minute scrub with an antiseptic detergent (114,242).

Surgical hand-antisepsis protocols have required personnel to scrub with a brush. But this practice can damage the skin of personnel and result in increased shedding of bacteria from the hands (95,243). Scrubbing with a disposable sponge or combination sponge-brush has reduced bacterial counts on the hands as effectively as scrubbing with a brush (244–246). However, several studies indicate that neither a brush nor a

sponge is necessary to reduce bacterial counts on the hands of surgical personnel to acceptable levels, especially when alcohol-based products are used (102,117,159,165,233,237, 247,248). Several of these studies performed cultures immediately or at 45–60 minutes postscrub (102,117, 233,247,248), whereas in other studies, cultures were obtained 3 and 6 hours postscrub (159,237). For example, a recent laboratory-based study using volunteers demonstrated that brushless application of a preparation containing 1% chlorhexidine gluconate plus 61% ethanol yielded lower bacterial counts on the hands of participants than using a sponge/brush to apply a 4% chlorhexidine-containing detergent preparation (237).

## Relative Efficacy of Plain Soap, Antiseptic Soap/Detergent, and Alcohols

Comparing studies related to the in vivo efficacy of plain soap, antimicrobial soaps, and alcohol-based hand rubs is problematic, because certain studies express efficacy as the percentage reduction in bacterial counts achieved, whereas others give $\log_{10}$ reductions in counts achieved. However, summarizing the relative efficacy of agents tested in each study can provide an overview of the in vivo activity of various formulations intended for handwashing, hygienic handwash, antiseptic hand rub, or surgical hand antisepsis (Tables 2–4).

## Irritant Contact Dermatitis Resulting from Hand-Hygiene Measures

### Frequency and Pathophysiology of Irritant Contact Dermatitis

In certain surveys, approximately 25% of nurses report symptoms or signs of dermatitis involving their hands, and as many as 85% give a history of having skin problems (249). Frequent and repeated use of hand-hygiene products, particularly soaps and other detergents, is a primary cause of chronic irritant contact dermatitis among HCWs (250). The potential of detergents to cause skin irritation can vary considerably and can be ameliorated by the addition of emollients and humectants. Irritation associated with antimicrobial soaps may be caused by the antimicrobial agent or by other ingredients of the formulation. Affected persons often complain of a feeling of dryness or burning; skin that feels "rough;" and erythema, scaling, or fissures. Detergents damage the skin by causing denaturation of stratum corneum proteins, changes in intercellular lipids (either depletion or reorganization of lipid moieties), decreased corneocyte cohesion, and decreased stratum corneum water-binding capacity (250,251). Damage

---

* In a recent randomized clinical trial, surgical site infection rates were monitored among patients who were operated on by surgical personnel who cleaned their hands preoperatively either by performing a traditional 5-minute surgical hand scrub using 4% povidone-iodine or 4% antisepsis antimicrobial soap, or by washing their hands for 1 minute with a non-antimicrobial soap followed by a 5-minute hand-rubbing technique using an alcohol-based hand rinse containing 0.2% mecetronium etilsulfate. The incidence of surgical site infections was virtually identical in the two groups of patients. (**Source:** Parienti JJ, Thibon P, Heller R, et al. for Members of the Antisepsie Chirurgicale des Mains Study Group. Hand-rubbing with an aqueous alcoholic solution vs traditional surgical hand-scrubbing and 30-day surgical site infection rates: a randomized equivalence study. JAMA 2002;288:722–7).

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

to the skin also changes skin flora, resulting in more frequent colonization by staphylococci and gram-negative bacilli (*17,90*). Although alcohols are among the safest antiseptics available, they can cause dryness and irritation of the skin (*1,252*). Ethanol is usually less irritating than n-propanol or isopropanol (*252*).

Irritant contact dermatitis is more commonly reported with iodophors (*92*). Other antiseptic agents that can cause irritant contact dermatitis (in order of decreasing frequency) include chlorhexidine, PCMX, triclosan, and alcohol-based products. Skin that is damaged by repeated exposure to detergents may be more susceptible to irritation by alcohol-based preparations (*253*). The irritancy potential of commercially prepared hand-hygiene products, which is often determined by measuring transepidermal water loss, may be available from the manufacturer. Other factors that can contribute to dermatitis associated with frequent handwashing include using hot water for handwashing, low relative humidity (most common in winter months), failure to use supplementary hand lotion or cream, and the quality of paper towels (*254,255*). Shear forces associated with wearing or removing gloves and allergy to latex proteins may also contribute to dermatitis of the hands of HCWs.

### Allergic Contact Dermatitis Associated with Hand-Hygiene Products

Allergic reactions to products applied to the skin (i.e., contact allergies) may present as delayed type reactions (i.e., allergic contact dermatitis) or less commonly as immediate reactions (i.e., contact urticaria). The most common causes of contact allergies are fragrances and preservatives; emulsifiers are less common causes (*256–259*). Liquid soaps, hand lotions or creams, and "udder ointments" may contain ingredients that cause contact allergies among HCWs (*257,258*).

Allergic reactions to antiseptic agents, including quaternary ammonium compounds, iodine or iodophors, chlorhexidine, triclosan, PCMX, and alcohols have been reported (*118,167,172,256,260–265*). Allergic contact dermatitis associated with alcohol-based hand rubs is uncommon. Surveillance at a large hospital in Switzerland, where a commercial alcohol hand rub has been used for >10 years, failed to identify a single case of documented allergy to the product (*169*). In late 2001, a Freedom of Information Request for data in the FDA's Adverse Event Reporting System regarding adverse reactions to popular alcohol hand rubs in the United States yielded only one reported case of an erythematous rash reaction attributed to such a product (John M. Boyce, M.D., Hospital of St. Raphael, New Haven, Connecticut, personal communication, 2001). However, with increasing use of such products by HCWs, true allergic reactions to such products likely will be encountered.

Allergic reactions to alcohol-based products may represent true allergy to alcohol, allergy to an impurity or aldehyde metabolite, or allergy to another constituent of the product (*167*). Allergic contact dermatitis or immediate contact urticarial reactions may be caused by ethanol or isopropanol (*167*). Allergic reactions can be caused by compounds that may be present as inactive ingredients in alcohol-based hand rubs, including fragrances, benzyl alcohol, stearyl or isostearyl alcohol, phenoxyethanol, myristyl alcohol, propylene glycol, parabens, and benzalkonium chloride (*167,256,266–270*).

## Proposed Methods for Reducing Adverse Effects of Agents

Potential strategies for minimizing hand-hygiene–related irritant contact dermatitis among HCWs include reducing the frequency of exposure to irritating agents (particularly anionic detergents), replacing products with high irritation potential with preparations that cause less damage to the skin, educating personnel regarding the risks of irritant contact dermatitis, and providing caregivers with moisturizing skin-care products or barrier creams (*96,98,251,271–273*). Reducing the frequency of exposure of HCWs to hand-hygiene products would prove difficult and is not desirable because of the low levels of adherence to hand-hygiene policies in the majority of institutions. Although hospitals have provided personnel with non-antimicrobial soaps in hopes of minimizing dermatitis, frequent use of such products may cause greater skin damage, dryness, and irritation than antiseptic preparations (*92,96,98*). One strategy for reducing the exposure of personnel to irritating soaps and detergents is to promote the use of alcohol-based hand rubs containing various emollients. Several recent prospective, randomized trials have demonstrated that alcohol-based hand rubs containing emollients were better tolerated by HCWs than washing hands with non-antimicrobial soaps or antimicrobial soaps (*96,98,166*). Routinely washing hands with soap and water immediately after using an alcohol hand rub may lead to dermatitis. Therefore, personnel should be reminded that it is neither necessary nor recommended to routinely wash hands after each application of an alcohol hand rub.

Hand lotions and creams often contain humectants and various fats and oils that can increase skin hydration and replace altered or depleted skin lipids that contribute to the barrier function of normal skin (*251,271*). Several controlled trials have demonstrated that regular use (e.g., twice a day) of such products can help prevent and treat irritant contact dermatitis caused by hand-hygiene products (*272,273*). In one study, frequent and scheduled use of an oil-containing lotion improved skin condition, and thus led to a 50% increase in

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

handwashing frequency among HCWs (273). Reports from these studies emphasize the need to educate personnel regarding the value of regular, frequent use of hand-care products.

Recently, barrier creams have been marketed for the prevention of hand-hygiene–related irritant contact dermatitis. Such products are absorbed to the superficial layers of the epidermis and are designed to form a protective layer that is not removed by standard handwashing. Two recent randomized, controlled trials that evaluated the skin condition of caregivers demonstrated that barrier creams did not yield better results than did the control lotion or vehicle used (272,273). As a result, whether barrier creams are effective in preventing irritant contact dermatitis among HCWs remains unknown.

In addition to evaluating the efficacy and acceptability of hand-care products, product-selection committees should inquire about the potential deleterious effects that oil-containing products may have on the integrity of rubber gloves and on the efficacy of antiseptic agents used in the facility (8,236).

## Factors To Consider When Selecting Hand-Hygiene Products

When evaluating hand-hygiene products for potential use in health-care facilities, administrators or product-selection committees must consider factors that can affect the overall efficacy of such products, including the relative efficacy of antiseptic agents against various pathogens (Appendix) and acceptance of hand-hygiene products by personnel (274,275). Soap products that are not well-accepted by HCWs can be a deterrent to frequent handwashing (276). Characteristics of a product (either soap or alcohol-based hand rub) that can affect acceptance by personnel include its smell, consistency (i.e., "feel"), and color (92,277,278). For soaps, ease of lathering also may affect user preference.

Because HCWs may wash their hands from a limited number of times per shift to as many as 30 times per shift, the tendency of products to cause skin irritation and dryness is a substantial factor that influences acceptance, and ultimate usage (61,98,274,275,277,279). For example, concern regarding the drying effects of alcohol was a primary cause of poor acceptance of alcohol-based hand-hygiene products in hospitals in the United States (5,143). However, several studies have demonstrated that alcohol-based hand rubs containing emollients are acceptable to HCWs (90,93,98,100,101,106,143,163,164,166). With alcohol-based products, the time required for drying may also affect user acceptance.

Studies indicate that the frequency of handwashing or antiseptic handwashing by personnel is affected by the accessibility of hand-hygiene facilities (280–283). In certain health-care facilities, only one sink is available in rooms housing several patients, or sinks are located far away from the door of the room, which may discourage handwashing by personnel leaving the room. In intensive-care units, access to sinks may be blocked by bedside equipment (e.g., ventilators or intravenous infusion pumps). In contrast to sinks used for handwashing or antiseptic handwash, dispensers for alcohol-based hand rubs do not require plumbing and can be made available adjacent to each patient's bed and at many other locations in patient-care areas. Pocket carriage of alcohol-based hand-rub solutions, combined with availability of bedside dispensers, has been associated with substantial improvement in adherence to hand-hygiene protocols (74,284). To avoid any confusion between soap and alcohol hand rubs, alcohol hand-rub dispensers should not be placed adjacent to sinks. HCWs should be informed that washing hands with soap and water after each use of an alcohol hand rub is not necessary and is not recommended, because it may lead to dermatitis. However, because personnel feel a "build-up" of emollients on their hands after repeated use of alcohol hand gels, washing hands with soap and water after 5–10 applications of a gel has been recommended by certain manufacturers.

Automated handwashing machines have not been demonstrated to improve the quality or frequency of handwashing (88,285). Although technologically advanced automated handwashing devices and monitoring systems have been developed recently, only a minimal number of studies have been published that demonstrate that use of such devices results in enduring improvements in hand-hygiene adherence among HCWs. Further evaluation of automated handwashing facilities and monitoring systems is warranted.

Dispenser systems provided by manufacturers or vendors also must be considered when evaluating hand-hygiene products. Dispensers may discourage use by HCWs when they 1) become blocked or partially blocked and do not deliver the product when accessed by personnel, and 2) do not deliver the product appropriately onto the hands. In one hospital where a viscous alcohol-based hand rinse was available, only 65% of functioning dispensers delivered product onto the caregivers' hands with one press of the dispenser lever, and 9% of dispensers were totally occluded (286). In addition, the volume delivered was often suboptimal, and the product was sometimes squirted onto the wall instead of the caregiver's hand.

Only limited information is available regarding the cost of hand-hygiene products used in health-care facilities (165,287). These costs were evaluated in patient-care areas at a 450-bed community teaching hospital (287); the hospital spent $22,000 ($0.72 per patient-day) on 2% chlorhexidine-containing preparations, plain soap, and an alcohol hand rinse. (287) When

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

hand-hygiene supplies for clinics and nonpatient care areas were included, the total annual budget for soaps and hand antiseptic agents was $30,000 (approximately $1 per patient-day). Annual hand-hygiene product budgets at other institutions vary considerably because of differences in usage patterns and varying product prices. One researcher (*287*) determined that if non-antimicrobial liquid soap were assigned an arbitrary relative cost of 1.0, the cost per liter would be 1.7 times as much for 2% chlorhexidine gluconate detergent, 1.6–2.0 times higher for alcohol-based hand-rub products, and 4.5 times higher for an alcohol-based foam product. A recent cost comparison of surgical scrubbing with an antimicrobial soap versus brushless scrubbing with an alcohol-based hand rub revealed that costs and time required for preoperative scrubbing were less with the alcohol-based product (*165*). In a trial conducted in two critical-care units, the cost of using an alcohol hand rub was half as much as using an antimicrobial soap for handwashing ($0.025 versus $0.05 per application, respectively) (*166*).

To put expenditures for hand-hygiene products into perspective, health-care facilities should consider comparing their budget for hand-hygiene products to estimated excess hospital costs resulting from health-care–associated infections. The excess hospital costs associated with only four or five health-care–associated infections of average severity may equal the entire annual budget for hand-hygiene products used in inpatient-care areas. Just one severe surgical site infection, lower respiratory tract infection, or bloodstream infection may cost the hospital more than the entire annual budget for antiseptic agents used for hand hygiene (*287*). Two studies provided certain quantitative estimates of the benefit of hand-hygiene–promotion programs (*72,74*). One study demonstrated a cost saving of approximately $17,000 resulting from reduced use of vancomycin after the observed decrease in MRSA incidence in a 7-month period (*72*). In another study that examined both direct costs associated with the hand-hygiene promotion program (increased use of hand-rub solution and poster production) and indirect costs associated with health-care–personnel time (*74*), costs of the program were an estimated $57,000 or less per year (an average of $1.42 per patient admitted). Supplementary costs associated with the increased use of alcohol-based hand-rub solution averaged $6.07 per 100 patient-days. Based on conservative estimates of $2,100 saved per infection averted and on the assumption that only 25% of the observed reduction in the infection rate was associated with improved hand-hygiene practice, the program was substantially cost-effective. Thus, hospital administrators must consider that by purchasing more effective or more acceptable hand-hygiene products to improve hand-hygiene practices, they will avoid the occurrence of nosocomial infections; preventing only a limited number of additional health-care–associated infections per year will lead to savings that will exceed any incremental costs of improved hand-hygiene products.

## Hand-Hygiene Practices Among HCWs

In observational studies conducted in hospitals, HCWs washed their hands an average of five times per shift to as many as 30 times per shift (Table 6) (*17,61,90,98,274,288*); certain HCWs washed their hands ≤100 times per shift (*90*). Hospitalwide surveillance of hand hygiene reveals that the average number of handwashing opportunities varies markedly between hospital wards. For example, nurses in pediatric wards had an average of eight opportunities for hand hygiene per hour of patient care compared with an average of 20 for nurses in intensive-care units (*11*). The duration of handwashing or hygienic handwash episodes by HCWs has averaged 6.6–24.0 seconds in observational studies (Table 7) (*17,52,59,84–87,89,249,279*). In addition to washing their

**TABLE 6. Handwashing frequency among health-care workers**

| Ref. no. | Year | Avg. no./ time period | Range | Avg. no./hr |
|---|---|---|---|---|
| (*61*) | 1988 | 5/8 hour | N.S. | |
| (*89*) | 1984 | 5–10/shift | N.S. | |
| (*96*) | 2000 | 10/shift | N.S. | |
| (*273*) | 2000 | 12–18/day | 2–60 | |
| (*98*) | 2000 | 13–15/8 hours | 5–27 | 1.6–1.8/hr |
| (*90*) | 1977 | 20–42/8 hours | 10–100 | |
| (*391*) | 2000 | 21/12 hours | N.S. | |
| (*272*) | 2000 | 22/day | 0–70 | |
| (*88*) | 1991 | | | 1.7–2.1/hr |
| (*17*) | 1998 | | | 2.1/hr |
| (*279*) | 1978 | | | 3/hr |
| (*303*) | 1994 | | | 3.3/hr |

**Note:** N.S. = Not Stated.

**TABLE 7. Average duration of handwashing by health-care workers**

| Ref. no. | Year | Mean/median time |
|---|---|---|
| (*392*) | 1997 | 4.7–5.3 seconds |
| (*303*) | 1994 | 6.6 seconds |
| (*52*) | 1974 | 8–9.3 seconds |
| (*85*) | 1984 | 8.6 seconds |
| (*86*) | 1994 | <9 seconds |
| (*87*) | 1994 | 9.5 seconds |
| (*88*) | 1991 | <10 seconds |
| (*294*) | 1990 | 10 seconds |
| (*89*) | 1984 | 11.6 seconds |
| (*300*) | 1992 | 12.5 seconds |
| (*59*) | 1988 | 15.6–24.4 seconds |
| (*17*) | 1998 | 20.6 seconds |
| (*279*) | 1978 | 21 seconds |
| (*293*) | 1989 | 24 seconds |

hands for limited time periods, personnel often fail to cover all surfaces of their hands and fingers (*288*).

## Adherence of HCWs to Recommended Hand-Hygiene Practices

Observational Studies of Hand-Hygiene Adherence. Adherence of HCWs to recommended hand-hygiene procedures has been poor, with mean baseline rates of 5%–81% (overall average: 40%) (Table 8) (*71,74,86,87,276,280,281,283,285, 289–313*). The methods used for defining adherence (or nonadherence) and those used for conducting observations vary considerably among studies, and reports do not provide detailed information concerning the methods and criteria used. The majority of studies were conducted with hand-hygiene adherence as the major outcome measure, whereas a limited number measured adherence as part of a broader investigation. Several investigators reported improved adherence after implementing various interventions, but the majority of studies had short follow-up periods and did not confirm whether behavioral improvements were long-lasting. Other studies established that sustained improvements in handwashing behavior occurred during a long-term program to improve adherence to hand-hygiene policies (*74,75*).

**TABLE 8. Hand-hygiene adherence by health-care workers (1981–2000)**

| Ref. no. | Year | Setting | Before/ after | Adherence baseline | Adherence after intervention | Invervention |
|---|---|---|---|---|---|---|
| (*280*) | 1981 | ICU | A | 16% | 30% | More convenient sink locations |
| (*289*) | 1981 | ICU | A | 41% | — | |
| | | ICU | A | 28% | — | |
| (*290*) | 1983 | All wards | A | 45% | — | |
| (*281*) | 1986 | SICU | A | 51% | — | |
| | | MICU | A | 76% | — | |
| (*276*) | 1986 | ICU | A | 63% | 92% | Performance feedback |
| (*291*) | 1987 | PICU | A | 31% | 30% | Wearing overgown |
| (*292*) | 1989 | MICU | B/A | 14%/28%* | 73%/81% | Feedback, policy reviews, memo, and posters |
| | | MICU | B/A | 26%/23% | 38%/60% | |
| (*293*) | 1989 | NICU | A/B | 75%/50% | — | |
| (*294*) | 1990 | ICU | A | 32% | 45% | Alcohol rub introduced |
| (*295*) | 1990 | ICU | A | 81% | 92% | Inservices first, then group feedback |
| (*296*) | 1990 | ICU | B/A | 22% | 30% | |
| (*297*) | 1991 | SICU | A | 51% | — | |
| (*298*) | 1991 | Pedi OPDs | B | 49% | 49% | Signs, feedback, and verbal reminders to physicians |
| (*299*) | 1991 | Nursery and NICU | B/A[†] | 28% | 63% | Feedback, dissemination of literature, and results of environmental cultures |
| (*300*) | 1992 | NICU/others | A | 29% | — | |
| (*71*) | 1992 | ICU | N.S. | 40% | — | |
| (*301*) | 1993 | ICUs | A | 40% | — | |
| (*87*) | 1994 | Emergency Room | A | 32% | — | |
| (*86*) | 1994 | All wards | A | 32% | — | |
| (*285*) | 1994 | SICU | A | 22% | 38% | Automated handwashing machines available |
| (*302*) | 1994 | NICU | A | 62% | 60% | No gowning required |
| (*303*) | 1994 | ICU Wards | AA | 30%29% | — | |
| (*304*) | 1995 | ICU Oncol Ward | A | 56% | — | |
| (*305*) | 1995 | ICU | N.S. | 5% | 63% | Lectures, feedback, and demonstrations |
| (*306*) | 1996 | PICU | B/A | 12%/11% | 68%/65% | Overt observation, followed by feedback |
| (*307*) | 1996 | MICU | A | 41% | 58% | Routine wearing of gowns and gloves |
| (*308*) | 1996 | Emergency Dept | A | 54% | 64% | Signs/distributed review paper |
| (*309*) | 1998 | All wards | A | 30% | — | |
| (*310*) | 1998 | Pediatric wards | B/A | 52%/49% | 74%/69% | Feedback, movies, posters, and brochures |
| (*311*) | 1999 | MICU | B/A | 12%/55% | — | |
| (*74*) | 2000 | All wards | B/A | 48% | 67% | Posters, feedback, administrative support, and alcohol rub |
| (*312*) | 2000 | MICU | A | 42% | 61% | Alcohol hand rub made available |
| (*283*) | 2000 | MICU | B/A | 10%/22% | 23%/48% | Education, feedback, and alcohol gel made available |
| | | CTICU | B/A | 4%/13% | 7%/14% | |
| (*313*) | 2000 | Medical wards | A | 60% | 52% | Education, reminders, and alcohol gel made available |

**Note:** ICU = intensive care unit, SICU = surgical ICU, MICU = medical ICU, PICU = pediatric ICU, NICU = neonatal ICU, Emerg = emergency, Oncol = oncology, CTICU = cardiothoracic ICU, and N.S. = not stated.
* Percentage compliance before/after patient contact.
[†] After contact with inanimate objects.

**Factors Affecting Adherence.** Factors that may influence hand hygiene include those identified in epidemiologic studies and factors reported by HCWs as being reasons for lack of adherence to hand-hygiene recommendations. Risk factors for poor adherence to hand hygiene have been determined objectively in several observational studies or interventions to improve adherence (*11,12,274,292,295,314–317*). Among these, being a physician or a nursing assistant, rather than a nurse, was consistently associated with reduced adherence (Box 1).

In the largest hospitalwide survey of hand-hygiene practices among HCWs (*11*), predictors of poor adherence to recommended hand-hygiene measures were identified. Predictor variables included professional category, hospital ward, time of day/week, and type and intensity of patient care, defined as the number of opportunities for hand hygiene per hour of patient care. In 2,834 observed opportunities for hand hygiene, average adherence was 48%. In multivariate analysis, nonadherence was lowest among nurses and during weekends

**BOX 1. Factors influencing adherence to hand-hygiene practices\***

**Observed risk factors for poor adherence to recommended hand-hygiene practices**
- Physician status (rather than a nurse)
- Nursing assistant status (rather than a nurse)
- Male sex
- Working in an intensive-care unit
- Working during the week (versus the weekend*)*
- Wearing gowns/gloves
- Automated sink
- Activities with high risk of cross-transmission
- High number of opportunities for hand hygiene per hour of patient care

**Self-reported factors for poor adherence with hand hygiene**
- Handwashing agents cause irritation and dryness
- Sinks are inconveniently located/shortage of sinks
- Lack of soap and paper towels
- Often too busy/insufficient time
- Understaffing/overcrowding
- Patient needs take priority
- Hand hygiene interferes with health-care worker relationships with patients
- Low risk of acquiring infection from patients
- Wearing of gloves/beliefs that glove use obviates the need for hand hygiene
- Lack of knowledge of guidelines/protocols
- Not thinking about it/forgetfulness
- No role model from colleagues or superiors
- Skepticism regarding the value of hand hygiene
- Disagreement with the recommendations
- Lack of scientific information of definitive impact of improved hand hygiene on health-care–associated infection rates

**Additional perceived barriers to appropriate hand hygiene**
- Lack of active participation in hand-hygiene promotion at individual or institutional level
- Lack of role model for hand hygiene
- Lack of institutional priority for hand hygiene
- Lack of administrative sanction of noncompliers/rewarding compliers
- Lack of institutional safety climate

\* **Source:** Adapted from Pittet D. Improving compliance with hand hygiene in hospitals. Infect Control Hosp Epidemiol 2000;21:381–6.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

(Odds Ratio [OR]: 0.6; 95% confidence interval [CI] = 0.4–0.8). Nonadherence was higher in intensive-care units compared with internal medicine wards (OR: 2.0; 95% CI = 1.3–3.1), during procedures that carried a high risk of bacterial contamination (OR: 1.8; 95% CI = 1.4–2.4), and when intensity of patient care was high (21–40 handwashing opportunities — OR: 1.3; 95% CI = 1.0-1.7; 41–60 opportunities — OR: 2.1; 95% CI = 1.5-2.9; >60 opportunities — OR: 2.1; 95% CI = 1.3–3.5). The higher the demand for hand hygiene, the lower the adherence; on average, adherence decreased by 5% (± 2%) for each increase of 10 opportunities per hour when the intensity of patient care exceeded 10 opportunities per hour. Similarly, the lowest adherence rate (36%) was found in intensive-care units, where indications for hand hygiene were typically more frequent (on average, 20 opportunities per patient-hour). The highest adherence rate (59%) was observed in pediatrics wards, where the average intensity of patient care was lower than in other hospital areas (an average of eight opportunities per patient-hour). The results of this study indicate that full adherence to previous guidelines may be unrealistic, and that facilitated access to hand hygiene could help improve adherence (11,12,318).

Perceived barriers to adherence with hand-hygiene practice recommendations include skin irritation caused by hand-hygiene agents, inaccessible hand-hygiene supplies, interference with HCW-patient relationships, priority of care (i.e., the patients' needs are given priority over hand hygiene), wearing of gloves, forgetfulness, lack of knowledge of the guidelines, insufficient time for hand hygiene, high workload and understaffing, and the lack of scientific information indicating a definitive impact of improved hand hygiene on healthcare–associated infection rates (11,274,292,295,315–317). Certain perceived barriers to adherence with hand-hygiene guidelines have been assessed or quantified in observational studies (12,274,292,295,314–317) (Box 1).

Skin irritation by hand-hygiene agents constitutes a substantial barrier to appropriate adherence (319). Because soaps and detergents can damage skin when applied on a regular basis, HCWs must be better informed regarding the possible adverse effects associated with hand-hygiene agents. Lack of knowledge and education regarding this subject is a barrier to motivation. In several studies, alcohol-based hand rubs containing emollients (either isopropanol, ethanol, or n-propanol in 60%–90% vol/vol) were less irritating to the skin than the soaps or detergents tested. In addition, the alcohol-based products containing emollients that were tested were at least as tolerable and efficacious as the detergents tested. Also, studies demonstrate that several hand lotions have reduced skin scaling and cracking, which may reduce microbial shedding from the hands (67,272,273).

Easy access to hand-hygiene supplies, whether sink, soap, medicated detergent, or alcohol-based hand-rub solution, is essential for optimal adherence to hand-hygiene recommendations. The time required for nurses to leave a patient's bedside, go to a sink, and wash and dry their hands before attending the next patient is a deterrent to frequent handwashing or hand antisepsis (11,318). Engineering controls could facilitate adherence, but careful monitoring of hand-hygiene behavior should be conducted to exclude the possible negative effect of newly introduced handwashing devices (88).

The impact of wearing gloves on adherence to hand-hygiene policies has not been definitively established, because published studies have yielded contradictory results (87,290,301,320). Hand hygiene is required regardless of whether gloves are used or changed. Failure to remove gloves after patient contact or between "dirty" and "clean" body-site care on the same patient must be regarded as nonadherence to hand-hygiene recommendations (11). In a study in which experimental conditions approximated those occurring in clinical practice (321), washing and reusing gloves between patient contacts resulted in observed bacterial counts of 0–4.7 log on the hands after glove removal. Therefore, this practice should be discouraged; handwashing or disinfection should be performed after glove removal.

Lack of 1) knowledge of guidelines for hand hygiene, 2) recognition of hand-hygiene opportunities during patient care, and 3) awareness of the risk of cross-transmission of pathogens are barriers to good hand-hygiene practices. Furthermore, certain HCWs believe they have washed their hands when necessary, even when observations indicate they have not (89,92,295,296,322).

Perceived barriers to hand-hygiene behavior are linked not only to the institution, but also to HCWs' colleagues. Therefore, both institutional and small-group dynamics need to be considered when implementing a system change to secure an improvement in HCWs' hand-hygiene practice.

## Possible Targets for Hand-Hygiene Promotion

Targets for the promotion of hand hygiene are derived from studies assessing risk factors for nonadherence, reported reasons for the lack of adherence to recommendations, and additional factors perceived as being important to facilitate appropriate HCW behavior. Although certain factors cannot be modified (Box 1), others can be changed.

One factor that must be addressed is the time required for HCWs to clean their hands. The time required for traditional handwashing may render full adherence to previous guidelines unrealistic (11,12,318) and more rapid access to hand-hygiene materials could help improve adherence. One study conducted in an intensive-care unit demonstrated that it took

nurses an average of 62 seconds to leave a patient's bedside, walk to a sink, wash their hands, and return to patient care (*318*). In contrast, an estimated one fourth as much time is required when using alcohol-based hand rub placed at each patient's bedside. Providing easy access to hand-hygiene materials is mandatory for appropriate hand-hygiene behavior and is achievable in the majority of health-care facilities (*323*). In particular, in high-demand situations (e.g., the majority of critical-care units), under hectic working conditions, and at times of overcrowding or understaffing, HCWs may be more likely to use an alcohol-based hand rub than to wash their hands (*323*). Further, using alcohol-based hand rubs may be a better option than traditional handwashing with plain soap and water or antiseptic handwash, because they not only require less time (*166,318*) but act faster (*1*) and irritate hands less often (*1,67,96,98,166*). They also were used in the only program that reported a sustained improvement in hand-hygiene adherence associated with decreased infection rates (*74*). However, making an alcohol-based hand rub available to personnel without providing ongoing educational and motivational activities may not result in long-lasting improvement in hand-hygiene practices (*313*). Because increased use of hand-hygiene agents might be associated with skin dryness, the availability of free skin-care lotion is recommended.

Education is a cornerstone for improvement with hand-hygiene practices. Topics that must be addressed by educational programs include the lack of 1) scientific information for the definitive impact of improved hand hygiene on health-care–associated infection and resistant organism transmission rates; 2) awareness of guidelines for hand hygiene and insufficient knowledge concerning indications for hand hygiene during daily patient care; 3) knowledge concerning the low average adherence rate to hand hygiene by the majority of HCWs; and 4) knowledge concerning the appropriateness, efficacy, and understanding of the use of hand-hygiene and skin-care–protection agents.

HCWs necessarily evolve within a group that functions within an institution. Possible targets for improvement in hand-hygiene behavior not only include factors linked to individual HCWs, but also those related to the group(s) and the institution as a whole (*317,323*). Examples of possible targets for hand-hygiene promotion at the group level include education and performance feedback on hand-hygiene adherence; efforts to prevent high workload, downsizing, and understaffing; and encouragement and provision of role models from key members in the work unit. At the institutional level, targets for improvement include 1) written guidelines, hand-hygiene agents, skin-care promotions and agents, or hand-hygiene facilities; 2) culture or tradition of adherence; and 3) administrative leadership, sanction, support, and rewards. Several studies, conducted in various types of institutions, reported modest and even low levels of adherence to recommended hand-hygiene practices, indicating that such adherence varied by hospital ward and by type of HCW. These results indicate educational sessions may need to be designed specifically for certain types of personnel (*11,289,290,294,317,323*).

## Lessons Learned from Behavioral Theories

In 1998, the prevailing behavioral theories and their applications with regard to the health professions were reviewed by researchers in an attempt to better understand how to target more successful interventions (*317*). The researchers proposed a hypothetical framework to enhance hand-hygiene practices and stressed the importance of considering the complexity of individual and institutional factors when designing behavioral interventions.

Although behavioral theories and secondary interventions have primarily targeted individual workers, this practice might be insufficient to produce sustained change (*317,324,325*). Interventions aimed at improving hand-hygiene practices must account for different levels of behavior interaction (*12,317,326*). Thus, the interdependence of individual factors, environmental constraints, and the institutional climate must be taken into account in the strategic planning and development of hand-hygiene campaigns. Interventions to promote hand hygiene in hospitals should consider variables at all these levels. Various factors involved in hand-hygiene behavior include intention, attitude towards the behavior, perceived social norm, perceived behavioral control, perceived risk for infection, hand-hygiene practices, perceived role model, perceived knowledge, and motivation (*317*). The factors necessary for change include 1) dissatisfaction with the current situation, 2) perception of alternatives, and 3) recognition, both at the individual and institutional level, of the ability and potential to change. Although the latter implies education and motivation, the former two necessitate a system change.

Among the reported reasons for poor adherence with hand-hygiene recommendations (Box 1), certain ones are clearly associated with the institution or system (e.g., lack of institutional priority for hand hygiene, administrative sanctions, and a safety climate). Although all of these reasons would require a system change in the majority of institutions, the third requires management commitment, visible safety programs, an acceptable level of work stress, a tolerant and supportive attitude toward reported problems, and belief in the efficacy

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

of preventive strategies (*12,317,325,327*). Most importantly, an improvement in infection-control practices requires 1) questioning basic beliefs, 2) continuous assessment of the group (or individual) stage of behavioral change, 3) intervention(s) with an appropriate process of change, and 4) supporting individual and group creativity (*317*). Because of the complexity of the process of change, single interventions often fail. Thus, a multimodal, multidisciplinary strategy is likely necessary (*74,75,317,323,326*).

## Methods Used To Promote Improved Hand Hygiene

Hand-hygiene promotion has been challenging for >150 years. In-service education, information leaflets, workshops and lectures, automated dispensers, and performance feedback on hand-hygiene adherence rates have been associated with transient improvement (*291,294–296,306,314*).

Several strategies for promotion of hand hygiene in hospitals have been published (Table 9). These strategies require education, motivation, or system change. Certain strategies are based on epidemiologic evidence, others on the authors' and other investigators' experience and review of current knowledge. Some strategies may be unnecessary in certain circumstances, but may be helpful in others. In particular, changing the hand-hygiene agent could be beneficial in institutions or hospital wards with a high workload and a high demand for hand hygiene when alcohol-based hand rubs are not available (*11,73,78,328*). However, a change in the recommended hand-hygiene agent could be deleterious if introduced during winter, at a time of higher hand-skin irritability, and if not accompanied by the provision of skin-care products (e.g., protective creams and lotions). Additional specific elements should be considered for inclusion in educational and motivational programs (Box 2).

Several strategies that could potentially be associated with successful promotion of hand hygiene require a system change (Box 1). Hand-hygiene adherence and promotion involve factors at both the individual and system level. Enhancing individual and institutional attitudes regarding the feasibility of making changes (self-efficacy), obtaining active participation of personnel at both levels, and promoting an institutional safety climate represent challenges that exceed the current perception of the role of infection-control professionals.

Whether increased education, individual reinforcement technique, appropriate rewarding, administrative sanction, enhanced self-participation, active involvement of a larger number of organizational leaders, enhanced perception of health threat, self-efficacy, and perceived social pressure (*12,317,329,330*), or combinations of these factors can improve HCWs' adherence with hand hygiene needs further investigation. Ultimately, adherence to recommended hand-hygiene practices should become part of a culture of patient safety where a set of interdependent quality elements interact to achieve a shared objective (*331*).

On the basis of both these hypothetical considerations and successful, actual experiences in certain institutions, strategies to improve adherence to hand-hygiene practices should be both multimodal and multidisciplinary. However, strategies must be further researched before they are implemented.

**TABLE 9. Stategies for successful promotion of hand hygiene in hospitals**

| Strategy | Tool for change* | Selected references† |
|---|---|---|
| Education | E (M, S) | (*74,295,306,326,393*) |
| Routine observation and feedback | S (E, M) | (*74,294,306,326,393*) |
| Engineering control | | |
|    Make hand hygiene possible, easy, and convenient | S | (*74,281,326,393*) |
|    Make alcohol-based hand rub available | S | (*74*) |
|    (at least in high-demand situations) | S | (*74,283,312*) |
| Patient education | S (M) | (*283,394*) |
| Reminders in the workplace | S | (*74,395*) |
| Administrative sanction/rewarding | S | (*12,317*) |
| Change in hand-hygiene agent | S (E) | (*11,67,71,283,312*) |
| Promote/facilitate skin care for health-care–workers' hands | S (E) | (*67,74,274,275*) |
| Obtain active participation at individual and institutional level | E, M, S | (*74,75,317*) |
| Improve institutional safety climate | S (M) | (*74,75,317*) |
| Enhance individual and instititional self-efficacy | S (E, M) | (*74,75,317*) |
| Avoid overcrowding, understaffing, and excessive workload | S | (*11,74,78,297,396*) |
| Combine several of above strategies | E, M, S | (*74,75,295,306,317,326*) |

\* The dynamic of behavioral change is complex and involves a combination of education (E), motivation (M), and system change (S).
† Only selected references have been listed; readers should refer to more extensive reviews for exhaustive reference lists (*1,8,317,323,397*).

**BOX 2. Elements of health-care worker educational and motivational programs**

**Rationale for hand hygiene**
- Potential risks of transmission of microorganisms to patients
- Potential risks of health-care worker colonization or infection caused by organisms acquired from the patient
- Morbidity, mortality, and costs associated with health-care–associated infections

**Indications for hand hygiene**
- Contact with a patient's intact skin (e.g., taking a pulse or blood pressure, performing physical examinations, lifting the patient in bed) (*25,26,45,48,51,53*)
- Contact with environmental surfaces in the immediate vicinity of patients (*46,51,53,54*)
- After glove removal (*50,58,71*)

**Techniques for hand hygiene**
- Amount of hand-hygiene solution
- Duration of hand-hygiene procedure
- Selection of hand-hygiene agents
  — Alcohol-based hand rubs are the most efficacious agents for reducing the number of bacteria on the hands of personnel. Antiseptic soaps and detergents are the next most effective, and non-antimicrobial soaps are the least effective (*1,398*).
  — Soap and water are recommended for visibly soil hands.
  — Alcohol-based hand rubs are recommended for routine decontamination of hands for all clinical indications (except when hands are visibly soiled) and as one of the options for surgical hand hygiene.

**Methods to maintain hand skin health**
- Lotions and creams can prevent or minimize skin dryness and irritation caused by irritant contact dermatitis
- Acceptable lotions or creams to use
- Recommended schedule for applying lotions or creams

**Expectations of patient care managers/administrators**
- Written statements regarding the value of, and support for, adherence to recommended hand-hygiene practices
- Role models demonstrating adherence to recommended hand hygiene practices (*399*)

**Indications for, and limitations of, glove use**
- Hand contamination may occur as a result of small, undetected holes in examination gloves (*321,361*)
- Contamination may occur during glove removal (50)
- Wearing gloves does not replace the need for hand hygiene (58)
- Failure to remove gloves after caring for a patient may lead to transmission of microorganizations from one patient to another (*373*).

## Efficacy of Promotion and Impact of Improved Hand Hygiene

The lack of scientific information of the definitive impact of improved hand hygiene on health-care–associated infection rates is a possible barrier to appropriate adherence with hand-hygiene recommendations (Box 1). However, evidence supports the belief that improved hand hygiene can reduce health-care–associated infection rates. Failure to perform appropriate hand hygiene is considered the leading cause of health-care–associated infections and spread of multiresistant organisms and has been recognized as a substantial contributor to outbreaks.

Of nine hospital-based studies of the impact of hand hygiene on the risk of health-care–associated infections (Table 10) (*48,69–75,296*), the majority demonstrated a temporal relationship between improved hand-hygiene practices and reduced infection rates.

In one of these studies, endemic MRSA in a neonatal intensive-care unit was eliminated 7 months after introduction of a new

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**TABLE 10. Association between improved adherence with hand-hygiene practice and health-care–associated infection rates**

| Year | Ref. no. | Hospital setting | Results | Duration of follow-up |
|------|----------|------------------|---------|-----------------------|
| 1977 | (48) | Adult ICU | Reduction in health-care–associated infections caused by endemic *Klebsiella* spp. | 2 years |
| 1982 | (69) | Adult ICU | Reduction in health-care-associated infection rates | N.S. |
| 1984 | (70) | Adult ICU | Reduction in health-care–associated infection rates | N.S. |
| 1990 | (296) | Adult ICU | No effect (average hand hygiene adherence improvement did not reach statistical significance) | 11 months |
| 1992 | (71) | Adult ICU | Substantial difference between rates of health-care–associated infection between two different hand-hygiene agents | 8 months |
| 1994 | (72) | NICU | Elimination of MRSA, when combined with multiple other infection-control measures. Reduction of vancomycin use | 9 months |
| 1995 | (73) | Newborn nursery | Elimination of MRSA, when combined with multiple other infection-control measures | 3.5 years |
| 2000 | (75) | MICU/NICU | 85% relative reduction of VRE rate in the intervention hospital; 44% relative reduction in control hospital; no change in MRSA | 8 months |
| 2000 | (74) | Hospitalwide | Substantial reduction in the annual overall prevalence of health-care–associated infections and MRSA cross-transmission rates. Active surveillance cultures and contact precautions were implemented during same period | 5 years |

**Note**: ICU = intensive care unit, NICU = neonatal ICU, MRSA = methicillin-resistant *Staphylococcus aureus*, MICU = medical ICU, and N.S. = not stated.

hand antiseptic (1% triclosan); all other infection-control measures remained in place, including the practice of conducting weekly active surveillance by obtaining cultures (72). Another study reported an MRSA outbreak involving 22 infants in a neonatal unit (73). Despite intensive efforts, the outbreak could not be controlled until a new antiseptic was added (i.e., 0.3% triclosan); all previously used control measures remained in place, including gloves and gowns, cohorting, and obtaining cultures for active surveillance.

The effectiveness of a longstanding, hospitalwide program to promote hand hygiene at the University of Geneva hospitals was recently reported (74). Overall adherence to hand-hygiene guidelines during routine patient care was monitored during hospitalwide observational surveys. These surveys were conducted biannually during December 1994–December 1997, before and during implementation of a hand-hygiene campaign that specifically emphasized the practice of bedside, alcohol-based hand disinfection. Individual-sized bottles of hand-rub solution were distributed to all wards, and custom-made holders were mounted on all beds to facilitate access to hand disinfection. HCWs were also encouraged to carry bottles in their pockets, and in 1996, a newly designed flat (instead of round) bottle was made available to further facilitate pocket carriage. The promotional strategy was multimodal and involved a multidisciplinary team of HCWs, the use of wall posters, the promotion of antiseptic hand rubs located at bedsides throughout the institution, and regular performance feedback to all HCWs (see http://www.hopisafe.ch for further

details on methodology). Health-care–associated infection rates, attack rates of MRSA cross-transmission, and consumption of hand-rub disinfectant were measured. Adherence to recommended hand-hygiene practices improved progressively from 48% in 1994 to 66% in 1997 (p < 0.001). Whereas recourse to handwashing with soap and water remained stable, frequency of hand disinfection markedly increased during the study period (p < 0.001), and the consumption of alcohol-based hand-rub solution increased from 3.5 to 15.4 liters per 1,000 patient-days during 1993–1998 (p < 0.001). The increased frequency of hand disinfection was unchanged after adjustment for known risk factors of poor adherence. During the same period, both overall health-care–associated infection and MRSA transmission rates decreased (both p < 0.05). The observed reduction in MRSA transmission may have been affected by both improved hand-hygiene adherence and the simultaneous implementation of active surveillance cultures for detecting and isolating patients colonized with MRSA (332). The experience from the University of Geneva hospitals constitutes the first report of a hand-hygiene campaign with a sustained improvement over several years. An additional multimodal program also yielded sustained improvements in hand-hygiene practices over an extended period (75); the majority of studies have been limited to a 6- to 9-month observation period.

Although these studies were not designed to assess the independent contribution of hand hygiene on the prevention of health-care–associated infections, the results indicate that

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

improved hand-hygiene practices reduce the risk of transmission of pathogenic microorganisms. The beneficial effects of hand-hygiene promotion on the risk of cross-transmission also have been reported in surveys conducted in schools and day care centers (333–338), as well as in a community setting (339–341).

## Other Policies Related to Hand Hygiene

### Fingernails and Artificial Nails

Studies have documented that subungual areas of the hand harbor high concentrations of bacteria, most frequently coagulase-negative staphylococci, gram-negative rods (including *Pseudomonas* spp.), Corynebacteria, and yeasts (14,342,343). Freshly applied nail polish does not increase the number of bacteria recovered from periungual skin, but chipped nail polish may support the growth of larger numbers of organisms on fingernails (344,345). Even after careful handwashing or the use of surgical scrubs, personnel often harbor substantial numbers of potential pathogens in the subungual spaces (346–348).

Whether artificial nails contribute to transmission of healthcare–associated infections is unknown. However, HCWs who wear artificial nails are more likely to harbor gram-negative pathogens on their fingertips than are those who have natural nails, both before and after handwashing (347–349). Whether the length of natural or artificial nails is a substantial risk factor is unknown, because the majority of bacterial growth occurs along the proximal 1 mm of the nail adjacent to subungual skin (345,347,348). Recently, an outbreak of *P. aeruginosa* in a neonatal intensive care unit was attributed to two nurses (one with long natural nails and one with long artificial nails) who carried the implicated strains of *Pseudomonas* spp. on their hands (350). Patients were substantially more likely than controls to have been cared for by the two nurses during the exposure period, indicating that colonization of long or artificial nails with *Pseudomonas* spp. may have contributed to causing the outbreak. Personnel wearing artificial nails also have been epidemiologically implicated in several other outbreaks of infection caused by gram-negative bacilli and yeast (351–353). Although these studies provide evidence that wearing artificial nails poses an infection hazard, additional studies are warranted.

### Gloving Policies

CDC has recommended that HCWs wear gloves to 1) reduce the risk of personnel acquiring infections from patients, 2) prevent health-care worker flora from being transmitted to patients, and 3) reduce transient contamination of the hands

of personnel by flora that can be transmitted from one patient to another (354). Before the emergence of the acquired immunodeficiency syndrome (AIDS) epidemic, gloves were worn primarily by personnel caring for patients colonized or infected with certain pathogens or by personnel exposed to patients with a high risk of hepatitis B. Since 1987, a dramatic increase in glove use has occurred in an effort to prevent transmission of HIV and other bloodborne pathogens from patients to HCWs (355). The Occupational Safety and Health Administration (OSHA) mandates that gloves be worn during all patient-care activities that may involve exposure to blood or body fluids that may be contaminated with blood (356).

The effectiveness of gloves in preventing contamination of HCWs' hands has been confirmed in several clinical studies (45,51,58). One study found that HCWs who wore gloves during patient contact contaminated their hands with an average of only 3 CFUs per minute of patient care, compared with 16 CFUs per minute for those not wearing gloves (51). Two other studies, involving personnel caring for patients with *C. difficile* or VRE, revealed that wearing gloves prevented hand contamination among the majority of personnel having direct contact with patients (45,58). Wearing gloves also prevented personnel from acquiring VRE on their hands when touching contaminated environmental surfaces (58). Preventing heavy contamination of the hands is considered important, because handwashing or hand antisepsis may not remove all potential pathogens when hands are heavily contaminated (25,111).

Several studies provide evidence that wearing gloves can help reduce transmission of pathogens in health-care settings. In a prospective controlled trial that required personnel to routinely wear vinyl gloves when handling any body substances, the incidence of *C. difficile* diarrhea among patients decreased from 7.7 cases/1,000 patient discharges before the intervention to 1.5 cases/1,000 discharges during the intervention (226). The prevalence of asymptomatic *C. difficile* carriage also decreased substantially on "glove" wards, but not on control wards. In intensive-care units where VRE or MRSA have been epidemic, requiring all HCWs to wear gloves to care for all patients in the unit (i.e., universal glove use) likely has helped control outbreaks (357,358).

The influence of glove use on the hand-hygiene habits of personnel is not clear. Several studies found that personnel who wore gloves were less likely to wash their hands upon leaving a patient's room (290,320). In contrast, two other studies found that personnel who wore gloves were substantially more likely to wash their hands after patient care (87,301).

The following caveats regarding use of gloves by HCWs must be considered. Personnel should be informed that gloves

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

do not provide complete protection against hand contamination. Bacterial flora colonizing patients may be recovered from the hands of $\leq$30% of HCWs who wear gloves during patient contact (50,58). Further, wearing gloves does not provide complete protection against acquisition of infections caused by hepatitis B virus and herpes simplex virus (359,360). In such instances, pathogens presumably gain access to the caregiver's hands via small defects in gloves or by contamination of the hands during glove removal (50,321,359,361).

Gloves used by HCWs are usually made of natural rubber latex and synthetic nonlatex materials (e.g., vinyl, nitrile, and neoprene [polymers and copolymers of chloroprene]). Because of the increasing prevalence of latex sensitivity among HCWs and patients, FDA has approved several powdered and powder-free latex gloves with reduced protein contents, as well as synthetic gloves that can be made available by health-care institutions for use by latex-sensitive employees. In published studies, the barrier integrity of gloves varies on the basis of type and quality of glove material, intensity of use, length of time used, manufacturer, whether gloves were tested before or after use, and method used to detect glove leaks (359,361–366). In published studies, vinyl gloves have had defects more frequently than latex gloves, the difference in defect frequency being greatest after use (359,361,364,367). However, intact vinyl gloves provide protection comparable to that of latex gloves (359). Limited studies indicate that nitrile gloves have leakage rates that approximate those of latex gloves (368–371). Having more than one type of glove available is desirable, because it allows personnel to select the type that best suits their patient-care activities. Although recent studies indicate that improvements have been made in the quality of gloves (366), hands should be decontaminated or washed after removing gloves (8,50,58,321,361). Gloves should not be washed or reused (321,361). Use of petroleum-based hand lotions or creams may adversely affect the integrity of latex gloves (372). After use of powdered gloves, certain alcohol hand rubs may interact with residual powder on the hands of personnel, resulting in a gritty feeling on the hands. In facilities where powdered gloves are commonly used, various alcohol-based hand rubs should be tested after removal of powdered gloves to avoid selecting a product that causes this undesirable reaction. Personnel should be reminded that failure to remove gloves between patients may contribute to transmission of organisms (358,373).

## Jewelry

Several studies have demonstrated that skin underneath rings is more heavily colonized than comparable areas of skin on fingers without rings (374–376). One study found that 40% of nurses harbored gram-negative bacilli (e.g., *E. cloacae*, *Klebsiella*, and *Acinetobacter*) on skin under rings and that certain nurses carried the same organism under their rings for several months (375). In a more recent study involving >60 intensive care unit nurses, multivariable analysis revealed that rings were the only substantial risk factor for carriage of gram-negative bacilli and *S. aureus* and that the concentration of organisms recovered correlated with the number of rings worn (377). Whether the wearing of rings results in greater transmission of pathogens is unknown. Two studies determined that mean bacterial colony counts on hands after handwashing were similar among persons wearing rings and those not wearing rings (376,378). Further studies are needed to establish if wearing rings results in greater transmission of pathogens in health-care settings.

## Hand-Hygiene Research Agenda

Although the number of published studies concerning hand hygiene has increased considerably in recent years, many questions regarding hand-hygiene products and strategies for improving adherence of personnel to recommended policies remain unanswered. Several concerns must still be addressed by researchers in industry and by clinical investigators (Box 3).

## Web-Based Hand-Hygiene Resources

Additional information regarding improving hand hygiene is available at http://www.hopisafe.ch
University of Geneva Hospitals, Geneva, Switzerland
http://www.cdc.gov/ncidod/hip
CDC, Atlanta, Georgia
http://www.jr2.ox.ac.uk/bandolier/band88/b88-8.html
Bandolier journal, United Kingdom
http://www.med.upenn.edu
University of Pennsylvania, Philadelphia, Pennsylvania

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

BOX 3. Hand-hygiene research agenda

**Education and promotion**
- Provide health-care workers (HCWs) with better education regarding the types of patient care activities that can result in hand contamination and cross-transmission of microorganisms.
- Develop and implement promotion hand-hygiene programs in pregraduate courses.
- Study the impact of population-based education on hand-hygiene behavior.
- Design and conduct studies to determine if frequent glove use should be encouraged or discouraged.
- Determine evidence-based indications for hand cleansing (considering that it might be unrealistic to expect HCWs to clean their hands after every contact with the patient).
- Assess the key determinants of hand-hygiene behavior and promotion among the different populations of HCWs.
- Develop methods to obtain management support.
- Implement and evaluate the impact of the different components of multimodal programs to promote hand hygiene.

**Hand-hygiene agents and hand care**
- Determine the most suitable formulations for hand-hygiene products.
- Determine if preparations with persistent antimicrobial activity reduce infection rates more effectively than do preparations whose activity is limited to an immediate effect.
- Study the systematic replacement of conventional handwashing by the use of hand disinfection.
- Develop devices to facilitate the use and optimal application of hand-hygiene agents.
- Develop hand-hygiene agents with low irritancy potential.
- Study the possible advantages and eventual interaction of hand-care lotions, creams, and other barriers to help minimize the potential irritation associated with hand-hygiene agents.

**Laboratory-based and epidemiologic research and development**
- Develop experimental models for the study of cross-contamination from patient to patient and from environment to patient.
- Develop new protocols for evaluating the in vivo efficacy of agents, considering in particular short application times and volumes that reflect actual use in health-care facilities.
- Monitor hand-hygiene adherence by using new devices or adequate surrogate markers, allowing frequent individual feedback on performance.
- Determine the percentage increase in hand-hygiene adherence required to achieve a predictable risk reduction in infection rates.
- Generate more definitive evidence for the impact on infection rates of improved adherence to recommended hand-hygiene practices.
- Provide cost-effectiveness evaluation of successful and unsuccessful promotion campaigns.

# Part II. Recommendations

## Categories

These recommendations are designed to improve hand-hygiene practices of HCWs and to reduce transmission of pathogenic microorganisms to patients and personnel in health-care settings. This guideline and its recommendations are not intended for use in food processing or food-service establishments, and are not meant to replace guidance provided by FDA's Model Food Code.

As in previous CDC/HICPAC guidelines, each recommendation is categorized on the basis of existing scientific data, theoretical rationale, applicability, and economic impact. The CDC/HICPAC system for categorizing recommendations is as follows:

*Category IA.* Strongly recommended for implementation and strongly supported by well-designed experimental, clinical, or epidemiologic studies.

*Category IB.* Strongly recommended for implementation and supported by certain experimental, clinical, or epidemiologic studies and a strong theoretical rationale.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

*Category IC.* Required for implementation, as mandated by federal or state regulation or standard.

*Category II.* Suggested for implementation and supported by suggestive clinical or epidemiologic studies or a theoretical rationale.

*No recommendation.* Unresolved issue. Practices for which insufficient evidence or no consensus regarding efficacy exist.

## Recommendations

1. Indications for handwashing and hand antisepsis
   A. When hands are visibly dirty or contaminated with proteinaceous material or are visibly soiled with blood or other body fluids, wash hands with either a non-antimicrobial soap and water or an antimicrobial soap and water (IA) (*66*).
   B. If hands are not visibly soiled, use an alcohol-based hand rub for routinely decontaminating hands in all other clinical situations described in items 1C–J (IA) (*74,93,166,169,283,294,312,398*). Alternatively, wash hands with an antimicrobial soap and water in all clinical situations described in items 1C–J (IB) (*69-71,74*).
   C. Decontaminate hands before having direct contact with patients (IB) (*68,400*).
   D. Decontaminate hands before donning sterile gloves when inserting a central intravascular catheter (IB) (*401,402*).
   E. Decontaminate hands before inserting indwelling urinary catheters, peripheral vascular catheters, or other invasive devices that do not require a surgical procedure (IB) (*25,403*).
   F. Decontaminate hands after contact with a patient's intact skin (e.g., when taking a pulse or blood pressure, and lifting a patient) (IB) (*25,45,48,68*).
   G. Decontaminate hands after contact with body fluids or excretions, mucous membranes, nonintact skin, and wound dressings if hands are not visibly soiled (IA) (*400*).
   H. Decontaminate hands if moving from a contaminated-body site to a clean-body site during patient care (II) (*25,53*).
   I. Decontaminate hands after contact with inanimate objects (including medical equipment) in the immediate vicinity of the patient (II) (*46,53,54*).
   J. Decontaminate hands after removing gloves (IB) (*50,58,321*).
   K. Before eating and after using a restroom, wash hands with a non-antimicrobial soap and water or with an antimicrobial soap and water (IB) (*404-409*).
   L. Antimicrobial-impregnated wipes (i.e., towelettes) may be considered as an alternative to washing hands with non-antimicrobial soap and water. Because they are not as effective as alcohol-based hand rubs or washing hands with an antimicrobial soap and water for reducing bacterial counts on the hands of HCWs, they are not a substitute for using an alcohol-based hand rub or antimicrobial soap (IB) (*160,161*).
   M. Wash hands with non-antimicrobial soap and water or with antimicrobial soap and water if exposure to *Bacillus anthracis* is suspected or proven. The physical action of washing and rinsing hands under such circumstances is recommended because alcohols, chlorhexidine, iodophors, and other antiseptic agents have poor activity against spores (II) (*120,172, 224,225*).
   N. No recommendation can be made regarding the routine use of nonalcohol-based hand rubs for hand hygiene in health-care settings. Unresolved issue.
2. Hand-hygiene technique
   A. When decontaminating hands with an alcohol-based hand rub, apply product to palm of one hand and rub hands together, covering all surfaces of hands and fingers, until hands are dry (IB) (*288,410*). Follow the manufacturer's recommendations regarding the volume of product to use.
   B. When washing hands with soap and water, wet hands first with water, apply an amount of product recommended by the manufacturer to hands, and rub hands together vigorously for at least 15 seconds, covering all surfaces of the hands and fingers. Rinse hands with water and dry thoroughly with a disposable towel. Use towel to turn off the faucet (IB) (*90-92,94,411*). Avoid using hot water, because repeated exposure to hot water may increase the risk of dermatitis (IB) (*254,255*).
   C. Liquid, bar, leaflet or powdered forms of plain soap are acceptable when washing hands with a non-antimicrobial soap and water. When bar soap is used, soap racks that facilitate drainage and small bars of soap should be used (II) (*412-415*).
   D. Multiple-use cloth towels of the hanging or roll type are not recommended for use in health-care settings (II) (*137,300*).
3. Surgical hand antisepsis
   A. Remove rings, watches, and bracelets before beginning the surgical hand scrub (II) (*375,378,416*).
   B. Remove debris from underneath fingernails using a nail cleaner under running water (II) (*14,417*).

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

C. Surgical hand antisepsis using either an antimicrobial soap or an alcohol-based hand rub with persistent activity is recommended before donning sterile gloves when performing surgical procedures (IB) (*115,159,232,234,237,418*).

D. When performing surgical hand antisepsis using an antimicrobial soap, scrub hands and forearms for the length of time recommended by the manufacturer, usually 2–6 minutes. Long scrub times (e.g., 10 minutes) are not necessary (IB) (*117,156,205, 207,238-241*).

E. When using an alcohol-based surgical hand-scrub product with persistent activity, follow the manufacturer's instructions. Before applying the alcohol solution, prewash hands and forearms with a non-antimicrobial soap and dry hands and forearms completely. After application of the alcohol-based product as recommended, allow hands and forearms to dry thoroughly before donning sterile gloves (IB) (*159,237*).

4. Selection of hand-hygiene agents

A. Provide personnel with efficacious hand-hygiene products that have low irritancy potential, particularly when these products are used multiple times per shift (IB) (*90,92,98,166,249*). This recommendation applies to products used for hand antisepsis before and after patient care in clinical areas and to products used for surgical hand antisepsis by surgical personnel.

B. To maximize acceptance of hand-hygiene products by HCWs, solicit input from these employees regarding the feel, fragrance, and skin tolerance of any products under consideration. The cost of hand-hygiene products should not be the primary factor influencing product selection (IB) (*92,93,166, 274,276-278*).

C. When selecting non-antimicrobial soaps, antimicrobial soaps, or alcohol-based hand rubs, solicit information from manufacturers regarding any known interactions between products used to clean hands, skin care products, and the types of gloves used in the institution (II) (*174,372*).

D. Before making purchasing decisions, evaluate the dispenser systems of various product manufacturers or distributors to ensure that dispensers function adequately and deliver an appropriate volume of product (II) (*286*).

E. Do not add soap to a partially empty soap dispenser. This practice of "topping off" dispensers can lead to bacterial contamination of soap (IA) (*187,419*).

5. Skin care

A. Provide HCWs with hand lotions or creams to minimize the occurrence of irritant contact dermatitis associated with hand antisepsis or handwashing (IA) (*272,273*).

B. Solicit information from manufacturers regarding any effects that hand lotions, creams, or alcohol-based hand antiseptics may have on the persistent effects of antimicrobial soaps being used in the institution (IB) (*174,420,421*).

6. Other Aspects of Hand Hygiene

A. Do not wear artificial fingernails or extenders when having direct contact with patients at high risk (e.g., those in intensive-care units or operating rooms) (IA) (*350–353*).

B. Keep natural nails tips less than 1/4-inch long (II) (*350*).

C. Wear gloves when contact with blood or other potentially infectious materials, mucous membranes, and nonintact skin could occur (IC) (*356*).

D. Remove gloves after caring for a patient. Do not wear the same pair of gloves for the care of more than one patient, and do not wash gloves between uses with different patients (IB) (*50,58,321,373*).

E. Change gloves during patient care if moving from a contaminated body site to a clean body site (II) (*50,51,58*).

F. No recommendation can be made regarding wearing rings in health-care settings. Unresolved issue.

7. Health-care worker educational and motivational programs

A. As part of an overall program to improve hand-hygiene practices of HCWs, educate personnel regarding the types of patient-care activities that can result in hand contamination and the advantages and disadvantages of various methods used to clean their hands (II) (*74,292,295,299*).

B. Monitor HCWs' adherence with recommended hand-hygiene practices and provide personnel with information regarding their performance (IA) (*74,276,292,295,299,306,310*).

C. Encourage patients and their families to remind HCWs to decontaminate their hands (II) (*394,422*).

8. Administrative measures

A. Make improved hand-hygiene adherence an institutional priority and provide appropriate

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

administrative support and financial resources (IB) (*74,75*).

B. Implement a multidisciplinary program designed to improve adherence of health personnel to recommended hand-hygiene practices (IB) (*74,75*).

C. As part of a multidisciplinary program to improve hand-hygiene adherence, provide HCWs with a readily accessible alcohol-based hand-rub product (IA) (*74,166,283,294,312*).

D. To improve hand-hygiene adherence among personnel who work in areas in which high workloads and high intensity of patient care are anticipated, make an alcohol-based hand rub available at the entrance to the patient's room or at the bedside, in other convenient locations, and in individual pocket-sized containers to be carried by HCWs (IA) (*11,74,166,283,284,312,318,423*).

E. Store supplies of alcohol-based hand rubs in cabinets or areas approved for flammable materials (IC).

## Part III. Performance Indicators

1. The following performance indicators are recommended for measuring improvements in HCWs' hand-hygiene adherence:

A. Periodically monitor and record adherence as the number of hand-hygiene episodes performed by personnel/number of hand-hygiene opportunities, by ward or by service. Provide feedback to personnel regarding their performance.

B. Monitor the volume of alcohol-based hand rub (or detergent used for handwashing or hand antisepsis) used per 1,000 patient-days.

C. Monitor adherence to policies dealing with wearing of artificial nails.

D. When outbreaks of infection occur, assess the adequacy of health-care worker hand hygiene.

### References

1. Rotter M. Hand washing and hand disinfection [Chapter 87]. In: Mayhall CG, ed. Hospital epidemiology and infection control. 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins, 1999.
2. Labarraque AG. Instructions and observations regarding the use of the chlorides of soda and lime. Porter J, ed. [French] New Haven, CT: Baldwin and Treadway, 1829.
3. Semmelweis I. Etiology, concept, and prophylaxis of childbed fever. Carter KC, ed. 1st ed. Madison, WI: The University of Wisconsin Press, 1983.
4. Coppage CM. Hand washing in patient care [Motion picture]. Washington, DC: US Public Health Service, 1961.
5. Steere AC, Mallison GF. Handwashing practices for the prevention of nosocomial infections. Ann Intern Med 1975;83:683–90.
6. Garner JS, Favero MS. CDC guideline for handwashing and hospital environmental control, 1985. Infect Control 1986;7:231–43.
7. Larson E. Guideline for use of topical antimicrobial agents. Am J Infect Control 1988;16:253–66.
8. Larson EL, APIC Guidelines Committee. APIC guideline for handwashing and hand antisepsis in health care settings. Am J Infect Control 1995;23:251–69.
9. Hospital Infection Control Practices Advisory Committee (HICPAC). Recommendations for preventing the spread of vancomycin resistance. Infect Control Hosp Epidemiol 1995;16:105–13.
10. Garner JS, Hospital Infection Control Practices Advisory Committee. Guideline for isolation precautions in hospitals. Infect Control Hosp Epidemiol 1996;17:53–80.
11. Pittet D, Mourouga P, Perneger TV, Members of the Infection Control Program. Compliance with handwashing in a teaching hospital. Ann Intern Med 1999;130:126–30.
12. Boyce JM. It is time for action: improving hand hygiene in hospitals. Ann Intern Med 1999;130:153–5.
13. Selwyn S. Microbiology and ecology of human skin. Practitioner 1980;224:1059–62.
14. Price PB. Bacteriology of normal skin: a new quantitative test applied to a study of the bacterial flora and the disinfectant action of mechanical cleansing. J Infect Dis 1938;63:301–18.
15. Larson E. Effects of handwashing agent, handwashing frequency, and clinical area on hand flora. Am J Infect Control 1984;11:76–82.
16. Maki D. Control of colonization and transmission of pathogenic bacteria in the hospital. Ann Intern Med 1978;89(Pt 2):777–80.
17. Larson EL, Norton Hughes CA, Pyrak JD, Sparks SM, Cagatay EU, Bartkus JM. Changes in bacterial flora associated with skin damage on hands of health care personnel. Am J Infect Control 1998;26:513–21.
18. Sprunt K, Redman W, Leidy G. Antibacterial effectiveness of routine hand washing. Pediatrics 1973;52:264–71.
19. Food and Drug Administration. Tentative final monograph for healthcare antiseptic drug products; proposed rule. Federal Register 1994;59:31441–52.
20. Lowbury EJL. Gram-negative bacilli on the skin. Br J Dermatol 1969;81(suppl 1):55–61.
21. Noble WC. Distribution of the Micrococcaceae. Br J Dermatol 1969;81(suppl 1):27–31.
22. McBride ME, Duncan WC, Bodey GP, McBride CM. Microbial skin flora of selected cancer patients and hospital personnel. J Clin Microbiol 1976;3:14–20.
23. Casewell MW. Role of hands in nosocomial gram-negative infection. In: Maibach HI, Aly R, eds. Skin microbiology: relevance to clinical infection. New York, NY: Springer-Verlag, 1981.
24. Larson EL, McGinley KJ, Foglia AR, Talbot GH, Leyden JJ. Composition and antimicrobic resistance of skin flora in hospitalized and healthy adults. J Clin Microbiol 1986;23:604–8.
25. Ehrenkranz NJ, Alfonso BC. Failure of bland soap handwash to prevent hand transfer of patient bacteria to urethral catheters. Infect Control Hosp Epidemiol 1991;12:654–62.
26. Sanderson PJ, Weissler S. Recovery of coliforms from the hands of nurses and patients: activities leading to contamination. J Hosp Infect 1992;21:85–93.
27. Coello R, Jiménez J, García M, et al. Prospective study of infection, colonization and carriage of methicillin-resistant *Staphylococcus aureus* in an outbreak affecting 990 patients. Eur J Clin Microbiol Infect Dis 1994;13:74–81.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

28. Sanford MD, Widmer AF, Bale MJ, Jones RN, Wenzel RP. Efficient detection and long-term persistence of the carriage of methicillin-resistant *Staphylococcus aureus*. Clin Infect Dis 1994;19:1123–8.

29. Bertone SA, Fisher MC, Mortensen JE. Quantitative skin cultures at potential catheter sites in neonates. Infect Control Hosp Epidemiol 1994;15:315–8.

30. Bonten MJM, Hayden MK, Nathan C, VanVoorhis J, et al. Epidemiology of colonisation of patients and environment with vancomycin-resistant enterococci. Lancet 1996;348:1615–9.

31. Larson EL, Cronquist AB, Whittier S, Lai L, Lyle CT, Della Latta P. Differences in skin flora between inpatients and chronically ill patients. Heart Lung 2000;29:298–305.

32. Polakoff S, Richards IDG, Parker MT, Lidwell OM. Nasal and skin carriage of *Staphylococcus aureus* by patients undergoing surgical operation. J Hyg (Lond) 1967;65:559–66.

33. Leyden JJ, McGinley KJ, Nordstrom KM, Webster GF. Skin microflora. J Invest Dermatol 1987;88:65s–72s.

34. Tuazon CU, Perez A, Kishaba T, Sheagren JN. *Staphylococcus aureus* among insulin-injecting diabetic patients. JAMA 1975;231:1272.

35. Kaplowitz LG, Comstock JA, Landwehr DM, Dalton HP, Mayhall CG. Prospective study of microbial colonization of the nose and skin and infection of the vascular access site in hemodialysis patients. J Clin Microbiol 1988;26:1257–62.

36. Aly R, Maibach HI, Shinefield HR. Microbial flora of atopic dermatitis. Arch Dermatol 1977;113:780–2.

37. Kirmani N, Tuazon CU, Murray HW, Parrish AE, Sheagren JN. *Staphylococcus aureus* carriage rate of patients receiving long-term hemodialysis. Arch Intern Med 1978;138:1657–9.

38. Goldblum SE, Ulrich JA, Goldman RS, Reed W. Nasal and cutaneous flora among hemodialysis patients and personnel: quantitative and qualitative characterization and patterns of staphylococcal carriage. Am J Kidney Dis 1982;11:281–6.

39. Boelaert JR, Van Landuyt HW, Gordts BZ, De Baere YA, Messer SA, Herwaldt LA. Nasal and cutaneous carriage of *Staphylococcus aureus* in hemodialysis patients: the effect of nasal mupirocin. Infect Control Hosp Epidemiol 1996;17:809–11.

40. Zimakoff J, Pedersen FB, Bergen L, et al. *Staphylococcus aureus* carriage and infections among patients in four haemo- and peritoneal-dialysis centres in Denmark. J Hosp Infect 1996;33:289–300.

41. Bibel DJ, Greenbert JH, Cook JL. *Staphylococcus aureus* and the microbial ecology of atopic dermatitis. Can J Microbiol 1997;23:1062–8.

42. Noble WC. Dispersal of skin microorganisms. Br J Dermatol 1975;93:477–85.

43. Walter CW, Kundsin RB, Shilkret MA, Day MM. Spread of staphylococci to the environment. Antibiotics Annual 1959:952–7.

44. Boyce JM, Opal SM, Chow JW, et al. Outbreak of multidrug-resistant *Enterococcus faecium* with transferable *vanB* class vancomycin resistance. J Clin Microbiol 1994;32:1148–53.

45. McFarland LV, Mulligan ME, Kwok RYY, Stamm WE. Nosocomial acquisition of *Clostridium difficile* infection. N Engl J Med 1989;320:204–10.

46. Samore MH, Venkataraman L, DeGirolami PC, Levin E, Arbeit RD, Karchmer AW. Clinical and molecular epidemiology of sporadic and clustered cases of nosocomial *Clostridium difficile* diarrhea. Am J Med 1996;100:32–40.

47. Lidwell OM, Towers AG, Ballard J, Gladstone B. Transfer of microorganisms between nurses and patients in a clean air environment. J Appl Bacteriol 1974;37:649–56.

48. Casewell M, Phillips I. Hands as route of transmission for *Klebsiella* species. Br Med J 1977;2:1315–7.

49. Hall CB, Douglas RG. Modes of transmission of respiratory syncytial virus. J Pediatr 1981;99:100–2.

50. Olsen RJ, Lynch P, Coyle MB, Cummings J, Bokete T, Stamm WE. Examination gloves as barriers to hand contamination in clinical practice. JAMA 1993;270:350–3.

51. Pittet D, Dharan S, Touveneau S, Sauvan V, Perneger TV. Bacterial contamination of the hands of hospital staff during routine patient care. Arch Intern Med 1999;159:821–6.

52. Fox MK, Langner SB, Wells RW. How good are hand washing practices? Am J Nursing 1974;74:1676–8.

53. Ojajärvi J. Effectiveness of hand washing and disinfection methods in removing transient bacteria after patient nursing. J Hyg (Lond) 1980;85:193–203.

54. Boyce JM, Potter-Bynoe G, Chenevert C, King T. Environmental contamination due to methicillin-resistant *Staphylococcus aureus*: possible infection control implications. Infect Control Hosp Epidemiol 1997;18:622–7.

55. Hayden, MK, Blom, DW, Lyle, EA, et al. The risk of hand and glove contamination by healthcare workers (HCWs) after contact with a VRE (+) patient (pt) or the pts environment (env) [Abstract K-1334]. Presented at the 41st Interscience Conference on Antimicrobial Agents and Chemotherapy Chicago: American Society for Microbiology, 2001.

56. Scott E, Bloomfield SF. The survival and transfer of microbial contamination via cloths, hands and utensils. J Appl Bacteriol 1990;68:271–8.

57. Bauer TM, Ofner E, Just HM, Just H, Daschner FD. An epidemiological study assessing the relative importance of airborne and direct contact transmission of microorganisms in a medical intensive care unit. J Hosp Infect 1990;15:301–9.

58. Tenorio AR, Badri SM, Sahgal NB, et al. Effectiveness of gloves in the prevention of hand carriage of vancomycin-resistant *Enterococcus* species by health care workers after patient care. Clin Infect Dis 2001;32:826–9.

59. Daschner FD. How cost-effective is the present use of antiseptics? J Hosp Infect 1988;11(suppl A):227–35.

60. Knittle MA, Eitzman DV, Baer H. Role of hand contamination of personnel in the epidemiology of gram-negative nosocomial infections. J Pediatr 1975;86:433–7.

61. Ayliffe GAJ, Babb JR, Davies JG, Lilly HA. Hand disinfection: a comparison of various agents in laboratory and ward studies. J Hosp Infect 1988;11:226–43.

62. Strausbaugh LJ, Sewell DL, Ward TT, Pfaller MA, Heitzman T, Tjoelker R. High frequency of yeast carriage on hands of hospital personnel. J Clin Microbiol 1994;32:2299–300.

63. Marples RR, Towers AG. A laboratory model for the investigation of contact transfer of micro-organisms. J Hyg (Lond) 1979;82:237–48.

64. Mackintosh CA, Hoffman PN. An extended model for transfer of micro-organisms via the hands: differences between organisms and the effect of alcohol disinfection. J Hyg (Lond) 1984;92:345–55.

65. Patrick DR, Findon G, Miller TE. Residual moisture determines the level of touch-contact-associated bacterial transfer following hand washing. Epidemiol Infect 1997;119:319–25.

66. Larson E. A causal link between handwashing and risk of infection? Examination of the evidence. Infect Control Hosp Epidemiol 1988;9:28–36.

67. Larson E. Skin hygiene and infection prevention: more of the same or different approaches? Clin Infect Dis 1999;29:1287–94.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

68. Mortimer EA Jr, Lipsitz PJ, Wolinsky E, Gonzaga AJ, Rammelkamp CH Jr. Transmission of staphylococci between newborns. Am J Dis Child 1962;104:289–95.

69. Maki DG. The use of antiseptics for handwashing by medical personnel. J Chemother 1989;1(suppl 1):3–11.

70. Massanari RM, Hierholzer WJ Jr. A crossover comparison of antiseptic soaps on nosocomial infection rates in intensive care units. Am J Infect Control 1984;12:247–8.

71. Doebbeling BN, Stanley GL, Sheetz CT, et al. Comparative efficacy of alternative hand-washing agents in reducing nosocomial infections in intensive care units. N Engl J Med 1992;327:88–93.

72. Webster J, Faoagali JL, Cartwright D. Elimination of methicillin-resistant *Staphylococcus aureus* from a neonatal intensive care unit after hand washing with triclosan. J Paediatr Child Health 1994;30:59–64.

73. Zafar AB, Butler RC, Reese DJ, Gaydos LA, Mennonna PA. Use of 0.3% triclosan (Bacti-Stat*) to eradicate an outbreak of methicillin-resistant *Staphylococcus aureus* in a neonatal nursery. Am J Infect Control 1995;23:200–8.

74. Pitter D, Hugonnet S, Harbarth S, Mourouga P, Sauvan V, Touveneau S. Effectiveness of a hospital-wide programme to improve compliance with hand hygiene. Lancet 2000;356:1307–12.

75. Larson EL, Early E, Cloonan P, Sugrue S, Parides M. An organizational climate intervention associated with increased handwashing and decreased nosocomial infections. Behav Med 2000;26:14–22.

76. Fridkin SK, Pear SM, Williamson TH, Galgiani JN, Jarvis WR. The role of understaffing in central venous catheter-associated bloodstream infections. Infect Control Hosp Epidemiol 1996;17:150–8.

77. Vicca AF. Nursing staff workload as a determinant of methicillin-resistant *Staphylococcus aureus* spread in an adult intensive therapy unit. J Hosp Infect 1999;43:109–13.

78. Harbarth S, Sudre P, Dharan S, Cadenas M, Pitter D. Outbreak of *Enterobacter cloacae* related to understaffing, overcrowding, and poor hygiene practices. Infect Control Hosp Epidemiol 1999;20:598–603.

79. European Committee for Standardization. Chemical disinfectants and antiseptics—hygienic handrub—test method and requirements (phase2/step2) [European standard EN 1500]. Brussels, Belgium: Central Secretariat: 1997.

80. Kramer A, Rudolph P, Kampf G, Pitter D. Limited efficacy of alcohol-based hand gels. Lancet 2002;359:1489–90.

81. Sattar SA, Abebe M, Bueti AJ, Jampani H, Newman J, Hua S. Activity of an alcohol-based hand gel against human adeno-, rhino-, and rotaviruses using the fingerpad method. Infect Control Hosp Epidemiol 2000;21:516–9.

82. Wolff MH, Schmitt J, Rahaus M, König A. Hepatitis A virus: a test method for virucidal activity. J Hosp Infect 2001;48(suppl A):S18–S22.

83. Steinmann J. Some principles of virucidal testing. J Hosp Infect 2001;48(suppl A):S15–S17.

84. Gould D, Ream E. Assessing nurses' hand decontamination performance. Nursing Times 1993;89:47–50.

85. Quraishi ZA, McGuckin M, Blais FX. Duration of handwashing in intensive care units: a descriptive study. Am J Infect Control 1984;11:83–7.

86. Lund S, Jackson J, Leggett J, Hales L, Dworkin R, Gilbert D. Reality of glove use and handwashing in a community hospital. Am J Infect Control 1994;22:352–7.

87. Meengs MR, Giles BK, Chisholm CD, Cordell WH, Nelson DR. Hand washing frequency in an emergency department. Ann Emerg Med 1994;23:1307–12.

88. Larson E, McGeer A, Quraishi ZA, et al. Effect of an automated sink on handwashing practices and attitudes in high-risk units. Infect Control Hosp Epidemiol 1991;12:422–8.

89. Broughall JM, Marshman C, Jackson B, Bird P. An automatic monitoring system for measuring handwashing frequency. J Hosp Infect 1984;5:447–53.

90. Ojajärvi J, Mäkelä P, Rantasalo I. Failure of hand disinfection with frequent hand washing: a need for prolonged field studies. J Hyg (Lond) 1977;79:107–19.

91. Larson EL, Eke PI, Wilder MP, Laughon BE. Quantity of soap as a variable in handwashing. Infect Control 1987;8:371–5.

92. Larson E, Leyden JJ, McGinley KJ, Grove GL, Talbot GH. Physiologic and microbiologic changes in skin related to frequent handwashing. Infect Control 1986;7:59–63.

93. Larson EL, Eke PI, Laughon BE. Efficacy of alcohol-based hand rinses under frequent-use conditions. Antimicrob Agents Chemother 1986;30:542–4.

94. Larson EL, Laughon BE. Comparison of four antiseptic products containing chlorhexidine gluconate. Antimicrob Agents Chemother 1987;31:1572–4.

95. Meers PD, Yeo GA. Shedding of bacteria and skin squames after handwashing. J Hyg (Lond) 1978;81:99–105.

96. Winnefeld M, Richard MA, Drancourt M, Grobb JJ. Skin tolerance and effectiveness of two hand decontamination procedures in everyday hospital use. Br J Dermatol 2000;143:546–50.

97. Maki DG, Zilz MA, Alvarado CJ. Evaluation of the antibacterial efficacy of four agents for handwashing. In: Nelson JC, Grassi C, eds. Current chemotherapy and infectious disease proceedings of the 11th International Congress on Chemotherapy and the 19th ICACC. Washington, DC: American Society for Microbiology, 1979.

98. Boyce JM, Kelliher S, Vallande N. Skin irritation and dryness associated with two hand-hygiene regimens: soap-and-water handwashing versus hand antisepsis with an alcoholic hand gel. Infect Control Hosp Epidemiol 2000;21:442–8.

99. Sartor C, Jacomo V, Duvivier C, Tissot-Dupont H, Sambuc R, Drancourt M. Nosocomial *Serratia marcescens* infections associated with extrinsic contamination of a liquid nonmedicated soap. Infect Control Hosp Epidemiol 2000;21:196–9.

100. Walter CW. Editorial: disinfection of hands. Am J Surg 1965;109:691–3.

101. Gravens DL, Butcher HR Jr, Ballinger WF, Dewar NE. Septisol antiseptic foam for hands of operating room personnel: an effective antibacterial agent. Surgery 1973;73:360–7.

102. Eitzen HE, Ritter MA, French MLV, Gioe TJ. A microbiological in-use comparison of surgical hand-washing agents. J Bone Joint Surg Am 1979;61–A:403–6.

103. Minakuchi K, Yamamoto Y, Matsunaga K, et al. The antiseptic effect of a quick drying rubbing type povidone-iodine alcoholic disinfectant solution. Postgrad Med J 1993;69(suppl 3):S23–S26.

104. Babb JR, Davies JG, Ayliffe GAJ. A test procedure for evaluating surgical hand disinfection. J Hosp Infect 1991;18(suppl B):41–9.

105. Bellamy K, Alcock R, Babb JR, Davies JG, Ayliffe GA. A test for the assessment of 'hygienic' hand disinfection using rotavirus. J Hosp Infect 1993;24:201–10.

106. Ayliffe GAJ, Babb JR, Quoraishi AH. A test for 'hygienic' hand disinfection. J Clin Pathol 1978;31:923–8.

107. Lilly HA, Lowbury EJL, Wilkins MD. Detergents compared with each other and with antiseptics as skin 'degerming' agents. J Hyg (Lond) 1979;82:89–93.

108. Ulrich JA. Clinical study comparing hibistat (0.5% chlorhexidine gluconate in 70% isopropyl alcohol) and betadine surgical scrub (7.5% povidone-iodine) for efficacy against experimental contamination of human skin. Curr Ther Res 1982;31:27–30.

109. Bartzokas CA, Gibson MF, Graham R, Pinder DC. A comparison of triclosan and chlorhexidine preparations with 60 per cent isopropyl alcohol for hygienic hand disinfection. J Hosp Infect 1983;4:245–55.

110. Rotter ML, Koller W, Wewalka G, Werner HP, Ayliffe GAJ, Babb JR. Evaluation of procedures for hygienic hand-disinfection: controlled parallel experiments on the Vienna test model. J Hyg (Lond) 1986;96:27–37.

111. Kjrlen H, Andersen BM. Handwashing and disinfection of heavily contaminated hands—effective or ineffective? J Hosp Infect 1992;21:61–71.

112. Namura S, Nishijima S, Asada Y. An evaluation of the residual activity of antiseptic handrub lotions: an 'in use' setting study. J Dermatol 1994;21:481–5.

113. Jarvis JD, Wynne CD, Enwright L, Williams JD. Handwashing and antiseptic-containing soaps in hospital. J Clin Path 1979;32:732–7.

114. Pereira LJ, Lee GM, Wade KJ. An evaluation of five protocols for surgical handwashing in relation to skin condition and microbial counts. J Hosp Infect 1997;36:49–65.

115. Larson EL, Butz AM, Gullette DL, Laughon BA. Alcohol for surgical scrubbing? Infect Control Hosp Epidemiol 1990;11:139–43.

116. Aly R, Maibach HI. Comparative study on the antimicrobial effect of 0.5% chlorhexidine gluconate and 70% isopropyl alcohol on the normal flora of hands. Appl Environ Microbiol 1979;37:610–3.

117. Galle PC, Homesley HD, Rhyne AL. Reassessment of the surgical scrub. Surg Gynecol Obstet 1978;147:215–8.

118. Rosenberg A, Alatary SD, Peterson AF. Safety and efficacy of the antiseptic chlorhexidine gluconate. Surg Gynecol Obstet 1976;143:789–92.

119. Ayliffe GAJ, Babb JR, Bridges K, et al. Comparison of two methods for assessing the removal of total organisms and pathogens from the skin. J Hyg (Lond) 1975;75:259–74.

120. Larson EL, Morton HE. Alcohols [Chapter 11]. In: Block SS, ed. Disinfection, sterilization and preservation. 4th ed. Philadelphia, PA: Lea and Febiger, 1991:642-54.

121. Price PB. Ethyl alcohol as a germicide. Arch Surg 1939;38:528–42.

122. Harrington C, Walker H. The germicidal action of alcohol. Boston Medical and Surgical Journal 1903;148:548–52.

123. Price PB. New studies in surgical bacteriology and surgical technic. JAMA 1938;111:1993–6.

124. Coulthard CE, Sykes G. The germicidal effect of alcohol with special reference to its action on bacterial spores. Pharmaceutical Journal 1936;137:79–81.

125. Pohle WD, Stuart LS. The germicidal action of cleaning agents—a study of a modification of Price's procedure. J Infect Dis 1940;67:275–81.

126. Gardner AD. Rapid disinfection of clean unwashed skin: further experiments. Lancet 1948:760–3.

127. Sakuragi T, Yanagisawa K, Dan K. Bactericidal activity of skin disinfectants on methicillin-resistant *Staphylococcus aureus*. Anesth Analg 1995;81:555–8.

128. Kampf G, Jarosch R, Rüden H. Limited effectiveness of chlorhexidine based hand disinfectants against methicillin-resistant *Staphylococcus aureus* (MRSA). J Hosp Infect 1998;38:297–303.

129. Kampf G, Höfer M, Wendt C. Efficacy of hand disinfectants against vancomycin-resistant enterococci in vitro. J Hosp Infect 1999;42:143–50.

130. Platt J, Bucknall RA. The disinfection of respiratory syncytial virus by isopropanol and a chlorhexidine-detergent handwash. J Hosp Infect 1985;6:89–94.

131. Krilov LR, Harkness SH. Inactivation of respiratory syncytial virus by detergents and disinfectants. Pediatr Infect Dis 1993;12:582–4.

132. Sattar SA, Tetro J, Springthorpe VS, Giulivi A. Preventing the spread of hepatitis B and C viruses: where are germicides relevant? Am J Infect Control 2001;29:187–97.

133. Woolwine JD, Gerberding JL. Effect of testing method on apparent activities of antiviral disinfectants and antiseptics. Antimicrob Agents Chemother 1995;39:921–3.

134. Pillsbury DM, Livingood CS, Nichols AC. Bacterial flora of the normal skin: report on the effect of various ointment and solutions, with comments on the clinical significance of this study. Arch Dermatol 1942;45:61–80.

135. Lowbury EJL, Lilly HA, Ayliffe GAJ. Preoperative disinfection of surgeons' hands: use of alcoholic solutions and effects of gloves on skin flora. Br Med J 1974;4:369–72.

136. Lilly HA, Lowbury EJL, Wilkins MD, Zaggy A. Delayed antimicrobial effects of skin disinfection by alcohol. J Hyg (Lond) 1979;82:497–500.

137. Ansari SA, Springthorpe VS, Sattar SA, Tostowaryk W, Wells GA. Comparison of cloth, paper, and warm air drying in eliminating viruses and bacteria from washed hands. Am J Infect Control 1991;19:243–9.

138. Ansari SA, Sattar SA, Springthorpe VS, Wells GA, Tostowaryk W. In vivo protocol for testing efficacy of hand-washing agents against viruses and bacteria: experiments with rotavirus and *Escherichia coli*. Appl Environ Microbiol 1989;55:3113–8.

139. Steinmann J, Nehrkorn R, Meyer A, Becker K. Two in-vivo protocols for testing virucidal efficacy of handwashing and hand disinfection. Zentralbl Hyg Umweltmed. 1995;196:425–36.

140. Mbithi JN, Springthorpe VS, Sattar SA. Comparative in vivo efficiencies of hand-washing agents against hepatitis A virus (HM-175) and poliovirus type 1 (Sabin). Appl Environ Microbiol 1993;59:3463–9.

141. Schurmann W, Eggers HJ. Antiviral activity of an alcoholic hand disinfectant: comparison of the in vitro suspension test with in vivo experiments on hands, and on individual fingertips. Antiviral Res 1983;3:25–41.

142. Larson E, Bobo L. Effective hand degerming in the presence of blood. J Emerg Med 1992;10:7–11.

143. Dineen P, Hildick-Smith G. Antiseptic care of the hands [Chapter 21]. In: Maibach HI, Hildick-Smith G, eds. Skin bacteria and their role in infection. New York: McGraw-Hill, 1965.

144. Lilly HA, Lowbury EJL. Transient skin flora: their removal by cleansing or disinfection in relation to their mode of deposition. J Clin Path 1978;31:919–22.

145. Rotter M, Koller W, Wewalka G. Povidone-iodine and chlorhexidine gluconate-containing detergents for disinfection of hands. J Hosp Infect 1980;1:149–58.

146. Rotter ML. Hygienic hand disinfection. Infect Control 1984;1:18–22.

147. Blech MF, Hartemann P, Paquin JL. Activity of non antiseptic soaps and ethanol for hand disinfection. Zentralbl Bakteriol Hyg [B] 1985;181:496–512.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

148. Leyden JJ, McGinley KJ, Kaminer MS, et al. Computerized image analysis of full-hand touch plates: a method for quantification of surface bacteria on hands and the effect of antimicrobial agents. J Hosp Infect 1991;18(suppl B):13–22.

149. Rotter ML, Koller W. Test models for hygienic handrub and hygienic handwash: the effects of two different contamination and sampling techniques. J Hosp Infect 1992;20:163–71.

150. Zaragoza M, Sallés M, Gomez J, Bayas JM, Trilla A. Handwashing with soap or alcoholic solutions? A randomized clinical trial of its effectiveness. Am J Infect Control 1999;27:258–61.

151. Paulson DS, Fendler EJ, Dolan MJ, Williams RA. A close look at alcohol gel as an antimicrobial sanitizing agent. Am J Infect Control 1999;27:332–8.

152. Cardoso CL, Pereira HH, Zequim JC, Guilhermetti M. Effectiveness of hand-cleansing agents for removing *Acinetobacter baumannii* strain from contaminated hands. Am J Infect Control 1999;27:327–31.

153. Casewell MW, Law MM, Desai N. A laboratory model for testing agents for hygienic hand disinfection: handwashing and chlorhexidine for the removal of klebsiella. J Hosp Infect 1988;12:163–75.

154. Wade JJ, Desai N, Casewell MW. Hygienic hand disinfection for the removal of epidemic vancomycin-resistant *Enterococcus faecium* and gentamicin-resistant *Enterobacter cloacae*. J Hosp Infect 1991;18:211–8.

155. Huang Y, Oie S, Kamiya A. Comparative effectiveness of hand-cleansing agents for removing methicillin-resistant *Staphylococcus aureus* from experimentally contaminated fingertips. Am J Infect Control 1994;22:224–7.

156. Lowbury EJL, Lilly HA. Disinfection of the hands of surgeons and nurses. Br Med J 1960;1:5184.

157. Berman RE, Knight RA. Evaluation of hand antisepsis. Arch Environ Health 1969;18:781–3.

158. Rotter ML, Simpson RA, Koller W. Surgical hand disinfection with alcohols at various concentrations: parallel experiments using the new proposed European standards method. Infect Control Hosp Epidemiol 1998;19:778–81.

159. Hobson DW, Woller W, Anderson L, Guthery E. Development and evaluation of a new alcohol-based surgical hand scrub formulation with persistent antimicrobial characteristics and brushless application. Am J Infect Control 1998;26:507–12.

160. Jones MV, Rowe GB, Jackson B, Pritchard NJ. The use of alcoholic paper wipes for routine hand cleasing: results of trials in two hospitals. J Hosp Infect 1986;8:268–74.

161. Butz AM, Laughon BE, Gullette DL, Larson EL. Alcohol-impregnated wipes as an alternative in hand hygiene. Am J Infect Control 1990;18:70–6.

162. Ojajärvi J. Handwashing in Finland. J Hosp Infect 1991;18(suppl B):35–40.

163. Newman JL, Seitz JC. Intermittent use of an antimicrobial hand gel for reducing soap-induced irritation of health care personnel. Am J Infect Control 1990;18:194–200.

164. Rotter ML, Koller W, Neumann R. The influence of cosmetic additives on the acceptability of alcohol-based hand disinfectants. J Hosp Infect 1991;18 (suppl B):57–63.

165. Larson EL, Aiello AE, Heilman JM, et al. Comparison of different regimens for surgical hand preparation. AORN J 2001;73:412–20.

166. Larson EL, Aiello AE, Bastyr J, et al. Assessment of two hand hygiene regimens for intensive care unit personnel. Crit Care Med 2001;29;944–51.

167. Ophaswongse S, Maibach HI. Alcohol dermatitis: allergic contact dermatitis and contact urticaria syndrome: a review. Contact Dermatitis 1994;30:1–6.

168. Rilliet A, Hunziker N, Brun R. Alcohol contact urticaria syndrome (immediate-type hypersensitivity): case report. Dermatologica 1980;161:361–4.

169. Widmer AF. Replace hand washing with use of a waterless alcohol hand rub? Clin Infect Dis 2000;31:136–43.

170. Bryant KA, Pearce J, Stover B. Flash fire associated with the use of alcohol-based antiseptic agent [Letter]. Am J Infect Control 2002;30:256–7.

171. Hsueh PR, Teng LJ, Yang PC, Pan HL, Ho SW, Luh KT. Nosocomial pseudoepidemic caused by *Bacillus cereus* traced to contaminated ethyl alcohol from a liquor factory. J Clin Microbiol 1999;37:2280–4.

172. Denton GW. Chlorhexidine [Chapter 16]. In: Block SS, ed. Disinfection, sterilization and reservation. 4th ed. Philadelphia, PA: Lea and Febiger, 1991.

173. Narang HK, Codd AA. Action of commonly used disinfectants against enteroviruses. J Hosp Infect 1983;4:209–12.

174. Walsh B, Blakemore PH, Drabu YJ. The effect of handcream on the antibacterial activity of chlorhexidine gluconate. J Hosp Infect 1987;9:30–3.

175. Lowbury EJL, Lilly HA. Use of 4% chlorhexidine detergent solution (Hibiscrub) and other methods of skin disinfection. Br Med J 1973;1:510–5.

176. Paulson DS. Comparative evaluation of five surgical hand scrub preparations. AORN J 1994;60:246–56.

177. Stingeni L, Lapomarda V, Lisi P. Occupational hand dermatitis in hospital environments. Contact Dermatitis 1995;33:172–6.

178. Marrie TJ, Costerton JW. Prolonged survival of *Serratia marcescens* in chlorhexidine. Appl Environ Microbiol 1981;42:1093–102.

179. McAllister TA, Lucas CE, Mocan H, et al. *Serratia marcescens* outbreak in a paediatric oncology unit traced to contaminated chlorhexidine. Scott Med J 1989;34:525–8.

180. Vigeant P, Loo VG, Bertrand C, et al. An outbreak of *Serratia marcescens* infections related to contaminated chlorhexidine. Infect Control Hosp Epidemiol 1998;19:791–4.

181. Vu-Thien H, Darbord JC, Moissenet D, et al. Investigation of an outbreak of wound infections due to *Alcaligenes xylosoxidans* transmitted by chlorhexidine in a burns unit. Eur J Clin Microbiol 1998;17:724–6.

182. Larson E, Talbot GH. An approach for selection of health care personnel handwashing agents. Infect Control 1986;7:419–24.

183. Davies J, Babb JR, Ayliffe GAJ, Wilkins MD. Disinfection of the skin of the abdomen. Br J Surg 1978;65:855–8.

184. Larson E, Mayur K, Laughon BA. Influence of two handwashing frequencies on reduction in colonizing flora with three handwashing products used by health care personnel. Am J Infect Control 1988;17:83–8.

185. Soulsby ME, Barnett JB, Maddox S. Brief report: the antiseptic efficacy of chlorxylenol-containing vs. chlorhexidine gluconate-containing surgical scrub preparations. Infect Control 1986;7:223–6.

186. Aly R, Maibach HI. Comparative antibacterial efficacy of a 2-minute surgical scrub with chlorhexidine gluconate, povidone-iodine, and chloroxylenol sponge-brushes. Am J Infect Control 1988;16:173–7.

187. Archibald LK, Corl A, Shah B, et al. *Serratia marcescens* outbreak associated with extrinsic contamination of 1% chlorxylenol soap. Infect Control Hosp Epidemiol 1997;18:704–9.

188. Lowbury EJL, Lilly HA, Bull JP. Disinfection of hands: removal of resident bacteria. Br Med J 1963;1:1251–6.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

189. Kundsin RB, Walter CW. The surgical scrub—practical consideration. Arch Surg 1973;107:75–7.

190. Lockhart J. How toxic is hexachlorophene? Pediatrics 1972;50:229–35.

191. Shuman RM, Leech RW, Alvord EC Jr. Neurotoxicity of hexachlorophene in humans: II. a clinicopathological study of 46 premature infants. Arch Neurol 1975;32:320–5.

192. Dixon RE, Kaslow RA, Mallison GF, Bennett JV. Staphylococcal disease outbreaks in hospital nurseries in the United States—December 1971 through March 1972. Pediatrics 1973;51:413–6.

193. Kaslow RA, Dixon RE, Martin SM, et al. Staphylococcal disease related to hospital nursery bathing practices—a nationwide epidemiologic investigation. Pediatrics 1973;51:418–29.

194. American Academy of Pediatrics, American College of Obstetricians and Gynecologists. Guidelines for perinatal care. 4th ed. Elk Grove Village, IL: American Academy of Pediatrics; Washington, DC: American Academy of Obstetricians and Gynecologists, 1997.

195. Gottardi W. Iodine and iodine compounds [Chapter 8]. In: Block SS, ed. Disinfection, sterilization and preservation. 4th ed. Philadelphia, PA: Lea & Febiger; 1991.

196. Anderson RL. Iodophor antiseptics: intrinsic microbial contamination with resistant bacteria. Infect Control Hosp Epidemiol 1989;10:443–6.

197. Goldenheim PD. In vitro efficacy of povidone-iodine solution and cream against methicillin-resistant *Staphylococcus aureus*. Postgrad Med J 1993;69(suppl 3):S62–S65.

198. Traoré O, Fayard SF, Laveran H. An in-vitro evaluation of the activity of povidone-iodine against nosocomial bacterial strains. J Hosp Infect 1996;34:217–22.

199. McLure AR, Gordon J. In-vitro evaluation of povidone-iodine and chlorhexidine against methicillin-resistant *Staphylococcus aureus*. J Hosp Infect 1992;21:291–9.

200. Davies JG, Babb JR, Bradley CR, Ayliffe GAJ. Preliminary study of test methods to assess the virucidal activity of skin disinfectants using poliovirus and bacteriophages. J Hosp Infect 1993;25:125–31.

201. Rotter ML. Chapter 79/Hand washing and hand disinfection. In: Mayhall CG, ed. Hospital Epidemiology and Infection Control. Baltimore, MD: Williams & Wilkins, 1996.

202. Wade JJ, Casewell MW. The evaluation of residual antimicrobial activity on hands and its clinical relevance. J Hosp Infect 1991;18 (suppl B):23–8.

203. Aly R, Maibach HI. Comparative evaluation of chlorhexidine gluconate (Hibiclens®) and povidone-iodine (E-Z Scrub®) sponge/brushes for presurgical hand scrubbing. Curr Ther Res 1983;34:740–5.

204. Herruzo-Cabrera R, Vizcaino-Alcaide MJ, Fdez-AciZero MJ. Usefulness of an alcohol solution of N-duopropenide for the surgical antisepsis of the hands compared with handwashing with iodine-povidone and chlorhexidine: clinical essay. J Surgical Research 2000;94:6–12.

205. Hingst V, Juditzki I, Heeg P, Sonntag HG. Evaluation of the efficacy of surgical hand disinfection following a reduced application time of 3 instead of 5 min. J Hosp Infect 1992;20:79–86.

206. Faoagali J, Fong J, George N, Mahoney P, O'Rourke V. Comparison of the immediate, residual, and cumulative antibacterial effects of Novaderm R, Novascrub R, Betadine Surgical Scrub, Hibiclens, and liquid soap. Am J Infect Control 1995;23:337–43.

207. Pereira LJ, Lee GM, Wade KJ. The effect of surgical handwashing routines on the microbial counts of operating room nurses. Am J Infect Control 1990;18:354–64.

208. Peterson AF, Rosenberg A. Comparative evaluation of surgical scrub preparations. Surg Gynecol Obstet 1978;146:63–5.

209. Berkelman RL, Holland BW, Anderson RL. Increased bactericidal activity of dilute preparations of povidone-iodine solutions. J Clin Microbiol 1982;15:635–9.

210. Merianos JJ. Quaternary ammonium antimicrobial compounds [Chapter 13]. In: Block SS, ed. Disinfection, Sterilization, and Preservation. 4th ed. Philadelphia, PA: Lea and Febiger; 1991.

211. Dixon RE, Kaslow RA, Mackel DC, Fulkerson CC, Mallison GF. Aqueous quaternary ammonium antiseptics and disinfectants: use and misuse. JAMA 1976;236:2415–7.

212. Sautter RL, Mattman LH, Legaspi RC. *Serratia marcescens* meningitis associated with a contaminated benzalkonium chloride solution. Infect Control 1984;5:223–5.

213. Oie S, Kamiya A. Microbial contamination of antiseptics and disinfectants. Am J Infect Control 1996;24:389–95.

214. Hayes RA, Trick WE, Vernon MO, et al. Comparison of three hand hygiene (HH) methods in a surgical intensive care unit (SICU) [Abstract K-1337]. Presented at the 41st Interscience Conference on Antimicrobial Agents and Chemotherapy Chicago, IL: American Society for Microbiology, 2001.

215. Dyer DL, Gerenraich KB, Wadhams PS. Testing a new alcohol-free hand sanitizer to combat infection. AORN J 1998;68:239–51.

216. Jones RD, Jampani HB, Newman JL, Lee AS. Triclosan: a review of effectiveness and safety in health care settings. Am J Infect Control 2000;28:184–96.

217. Ward WH, Holdgate GA, Rowsell S, et al. Kinetic and structural characteristics of the inhibition of enoyl (acyl carrier protein) reductase by triclosan. Biochemistry 1999;38:12514–25.

218. Heath RJ, Li J, Roland GE. Inhibition of the *Staphylococcus aureus* NADPH-dependent enoyl-acyl carrier protein reductase by triclosan and hexachlorophene. J Biol Chem 2000;275:4654–9.

219. Faoagali JL, George N, Fong J, Davy J, Dowser M. Comparison of the antibacterial efficacy of 4% chlorhexidine gluconate and 1% triclosan handwash products in an acute clinical ward. Am J Infect Control 1999;27:320–6.

220. Barry MA, Craven DE, Goularte TA, Lichtenberg DA. *Serratia marcescens* contamination of antiseptic soap containing triclosan: implications for nosocomial infection. Infect Control 1984;5:427–30.

221. Lowbury EJL, Lilly HA, Bull JP. Disinfection of hands: removal of transient organisms. Br Med J 1964;2:230–3.

222. Rotter ML. Semmelweis' sesquicentennial: a little-noted anniversary of handwashing. Current Opinion in Infectious Diseases 1998;11:457–60.

223. Manivannan G, Brady MJ, Cahalan PT, et al. Immediate, persistent and residual antimicrobial efficiency of Surfacine™ hand sanitizer [Abstract]. Infection Control Hosp Epidemiol 2000;21:105.

224. Gershenfeld L. Povidone-iodine as a sporicide. Am J Pharm 1962;134:79–81.

225. Russell AD. Chemical sporicidal and sporostatic agents [Chapter 22]. In: Block SS, ed. Disinfection, sterilization and preservation. 4th ed. Philadelphia, PA: Lea and Febiger, 1991.

226. Johnson S, Gerding DN, Olson MM, et al. Prospective, controlled study of vinyl glove use to interrupt *Clostridium difficile* nosocomial transmission. Am J Med 1990;88:137–40.

227. Russell AD. Mechanisms of bacterial insusceptibility to biocides. Am J Infect Control 2001;29:259–61.

228. Cookson BD, Bolton MC, Platt JH. Chlorhexidine resistance in methicillin-resistant *Staphylococcus aureus* or just an elevated MIC? An in vitro and in vivo assessment. Antimicrob Agents Chemother 1991;35:1997–2002.

229. McMurry LM, Oethinger M, Levy SB. Overexpression of *marA*, *soxS*, or *acrAB* produces resistance to triclosan in laboratory and clinical strains of *Escherichia coli*. FEMS Microbiol Lett 1998;166:305–9.

230. Chuanchuen R, Beinlich K, Hoang TT, et al. Cross-resistance between triclosan and antibiotics in *Pseudomonas aeruginosa* is mediated by multidrug efflux pumps: exposure of a susceptible mutant strain to triclosan selects *nfxB* mutants overexpressing MexCD-OprJ. Antimicrob Agents Chemother 2001;45:428–32.

231. Gröschel DHM, Pruett TL. Surgical antisepsis [Chapter 36]. In: Block SS, ed. Disinfection, sterilization and preservation. 4th ed. Philadelphia, PA: Lea and Febiger, 1991.

232. Boyce JM, Potter-Bynoe G, Opal SM, Dziobek L, Medeiros AA. A common-source outbreak of *Staphylococcus epidermidis* infections among patients undergoing cardiac surgery. J Infect Dis 1990;161:493–9.

233. Dewar NE, Gravens DL. Effectiveness of septisol antiseptic foam as a surgical scrub agent. Appl Microbiol 1973;26:544–9.

234. Grinbaum RS, de Mendonça JS, Cardo DM. An outbreak of handscrubbing-related surgical site infections in vascular surgical procedures. Infect Control Hosp Epidemiol 1995;16:198–202.

235. AORN Recommended Practices Committee. Recommended practices for surgical hand scrubs. In: Fogg D, Parker N, Shevlin D, eds. Standards, Recommended Practices, and Guidelines. Denver, CO: AORN, 2001.

236. Larson E, Anderson JK, Baxendale L, Bobo L. Effects of a protective foam on scrubbing and gloving. Am J Infect Control 1993;21:297–301.

237. Mulberry G, Snyder AT, Heilman J, Pyrek J, Stahl J. Evaluation of a waterless, scrubless chlorhexidine gluconate/ethanol surgical scrub for antimicrobial efficacy. Am J Infect Control 2001;29:377–82.

238. Dineen P. An evaluation of the duration of the surgical scrub. Surg Gynecol Obstet 1969;129:1181–4.

239. O'Farrell DA, Kenny G, O'Sullivan M, Nicholson P, Stephens M, Hone R. Evaluation of the optimal hand-scrub duration prior to total hip arthroplasty. J Hosp Infect 1994;26:93–8.

240. O'Shaughnessy M, O'Malley VP, Corbett G, Given HF. Optimum duration of surgical scrub-time [Short note]. Br J Surg 1991;78:685–6.

241. Wheelock SM, Lookinland S. Effect of surgical hand scrub time on subsequent bacterial growth. AORN J 1997;65:1087–98.

242. Deshmukh N, Kjellberg SI, Kramer JW. A comparison of 5-minute povidone-iodine scrub and 1-minute povidone-iodine scrub followed by alcohol foam. Military Medicine 1998;163:145–7.

243. Kikuchi-Numagami K, Saishu T, Fukaya M, Kanazawa E, Tagami H. Irritancy of scrubbing up for surgery with or without a brush. Acta Derm Venereol 1999;79:230–2.

244. Dineen P. The use of a polyurethane sponge in surgical scrubbing. Surg Gynecol Obstet 1966;123:595–8.

245. Bornside GH, Crowder VH Jr, Cohn I Jr. A bacteriological evaluation of surgical scrubbing with disposable iodophor-soap impregnated polyurethane scrub sponges. Surgery 1968;64:743–51.

246. McBride ME, Duncan WC, Knox JM. An evaluation of surgical scrub brushes. Surg Gynecol Obstet 1973;137:934–6.

247. Berman RE, Knight RA. Evaluation of hand antisepsis. Arch Environ Health 1969;18:781–3.

248. Loeb MB, Wilcox L, Smaill F, Walter S, Duff Z. A randomized trial of surgical scrubbing with a brush compared to antiseptic soap alone. Am J Infect Control 1997;25:11–5.

249. Larson E, Friedman C, Cohran J, Treston-Aurand J, Green S. Prevalence and correlates of skin damage on the hands of nurses. Heart Lung 1997;26:404–12.

250. Tupker RA. Detergents and cleansers [Chapter 7]. In: van der Valk PGM, Maibach HI, eds. The Irritant Contact Dermatitis Syndrome. New York, NY: CRC Press, 1996.

251. Wilhelm KP. Prevention of surfactant-induced irritant contact dermatitis. Curr Probl Dermatol 1996;25:78–85

252. de Haan P, Meester HHM, Bruynzeel DP. Irritancy of alcohols [Chapter 6]. In: van der Valk PGM, Maibach HI, eds. The Irritant Contact Dermatitis Syndrome. New York, NY: CRC Press, 1996.

253. Lübbe J, Ruffieux C, van Melle G, Perrenoud D. Irritancy of the skin disinfectant n-propanol. Contact Dermatitis 2001;45:226–31.

254. qhlenschlaeger J, Friberg J, Ramsing D, Agner T. Temperature dependency of skin susceptibility to water and detergents. Acta Derm Venereol 1996;76:274–6.

255. Emilson A, Lindberg M, Forslind B. The temperature effect of in vitro penetration of sodium lauryl sulfate and nickel chloride through human skin. Acta Derm Venereol 1993;73:203–7.

256. de Groot AC. Contact allergy to cosmetics: causative ingredients. Contact Dermatitis 1987;17:26–34.

257. Schnuch A, Uter W, Geier J, Frosch PJ, Rustemeyer T. Contact allergies in healthcare workers—results from the IVDK. Acta Derm Venereol 1998;78:358–63.

258. Rastogi SC, Heydorn S, Johansen JD, Basketter DA. Fragrance chemicals in domestic and occupational products. Contact Dermatitis 2001;45:221–5.

259. Uter W, Schnuch A, Geier J, Pfahlberg A, Gefeller O. Association between occupation and contact allergy to the fragrance mix: a multifactorial analysis of national surveillance data. Occup Environ Med 2001;58:392–8.

260. Perrenoud D, Bircher A, Hunziker T, et al. Frequency of sensitization to 13 common preservatives in Switzerland. Contact Dermatitis 1994;30:276–9.

261. Kiec-Swierczynska M, Krecisz B. Occupational skin diseases among the nurses in the region of Lodz. Int J Occup Med Environ Health 2000;13:179–84

262. Garvey LH, Roed-Petersen J, and Husum B. Anaphylactic reactions in anaesthetised patients—four cases of chlorhexidine allergy. Acta Anaesthesiol Scand 2001;45:1290–4.

263. Pham, NH, Weiner JM, Reisner GS, and Baldo BA. Anaphylaxis to chlorhexidine. Case report. Implication of immunoglobulin E antibodies and identification of an allergenic determinant. Clin Exp Allergy 2000;30:1001–7.

264. Nishioka K, Seguchi T, Yasuno H, Yamamoto T, Tominaga K. The results of ingredient patch testing in contact dermatitis elicited by povidone-iodine preparations. Contact Dermatitis 2000;42:90–4.

265. Wong CSM, Beck MH. Allergic contact dermatitis from triclosan in antibacterial handwashes. Contact Dermatitis 2001;45:307.

266. Guin JD, Goodman J. Contact urticaria from benzyl alcohol presenting as intolerance to saline soaks. Contact Dermatitis 2001;45:182–3.

267. Podda M, Zollner T, Grundmann-Kollmann M, Kaufmann R, Boehncke WF. Allergic contact dermatitis from benzyl alcohol during topical antimycotic treatment. Contact Dermatitis 1999;41:302–3.

268. Yesudian PD, King CM. Allergic contact dermatitis from stearyl alcohol in Efudix® cream. Contact Dermatitis 2001;45:313–4.

269. Aust LB, Maibach HI. Incidence of human skin sensitization to isostearyl alcohol in two separate groups of panelists. Contact Dermatitis 1980;6:269–71.

270. Funk JO, Maibach HI. Propylene glycol dermatitis: re-evaluation of an old problem. Contact Dermatitis 1994;31:236–41.

271. Hannuksela M. Moisturizers in the prevention of contact dermatitis. Curr Probl Dermatol 1996;25:214–20.

272. Berndt U, Wigger-Alberti W, Gabard B, Elsner P. Efficacy of a barrier cream and its vehicle as protective measures against occupational irritant contact dermatitis. Contact Dermatitis 2000;42:77–80.

273. McCormick RD, Buchman TL, Maki DG. Double-blind, randomized trial of scheduled use of a novel barrier cream and an oil-containing lotion for protecting the hands of health care workers. Am J Infect Control 2000;28:302–10.

274. Larson E, Killien M. Factors influencing handwashing behavior of patient care personnel. Am J Infect Control 1982;10:93–9.

275. Zimakoff J, Kjelsberg AB, Larsen SO, Holstein B. A multicenter questionnaire investigation of attitudes toward hand hygiene, assessed by the staff in fifteen hospitals in Denmark and Norway. Am J Infect Control 1992;20:58–64.

276. Mayer JA, Dubbert PM, Miller M, Burkett PA, Chapman SW. Increasing handwashing in an intensive care unit. Infect Control 1986;7:259–62.

277. Ojajärvi J. The importance of soap selection for routine hand hygiene in hospital. J Hyg (Lond) 1981;86:275–83.

278. Scott D, Barnes A, Lister M, Arkell P. An evaluation of the user acceptability of chlorhexidine handwash formulations. J Hosp Infect 1991;18(suppl B):51–5.

279. Taylor LJ. An evaluation of handwashing techniques—2. Nursing Times 1978;74:108–10.

280. Preston GA, Larson EL, Stamm WE. The effect of private isolation rooms on patient care practices, colonization and infection in an intensive care unit. Am J Med 1981;70:641–5.

281. Kaplan LM, McGuckin M. Increasing handwashing compliance with more accessible sinks. Infect Control 1986;7:408–10.

282. Freeman, J. Prevention of nosocomial infections by location of sinks for hand washing adjacent to the bedside [Abstract 60]. In: Program and abstracts of the 33rd Interscience Conference on Antimicrobial Agents and Chemotherapy. Washington, DC: American Society for Microbiology, 1993:130.

283. Bischoff WE, Reynolds TM, Sessler CN, Edmond MB, Wenzel RP. Handwashing compliance by health care workers. The impact of introducing an accessible, alcohol-based hand antiseptic. Arch Intern Med 2000;160:1017–21.

284. Pittet D. Compliance with hand disinfection and its impact on hospital-acquired infections. J Hosp Infect 2001;48(suppl A):S40–S46.

285. Wurtz R, Moye G, Jovanovic B. Handwashing machines, handwashing compliance, and potential for cross-contamination. Am J Infect Control 1994;22:228–30.

286. Kohan C, Ligi C, Dumigan DG, Boyce JM. The importance of evaluating product dispensers when selecting alcohol-based handrubs. Am J Infect Control 2002 (in press).

287. Boyce JM. Antiseptic techology: access, affordability, and acceptance. Emerg Infect Diseases 2001;7:231–3.

288. Taylor LJ. An evaluation of handwashing techniques—1. Nursing Times 1978;54–5.

289. Albert RK, Condie F. Hand-washing patterns in medical intensive-care units. N Engl J Med 1981;304:1465–6.

290. Larson E. Compliance with isolation technique. Am J Infect Control 1983;11:221–5.

291. Donowitz LG. Handwashing technique in a pediatric intensive care unit. Am J Dis Child 1987;141:683–5.

292. Conly JM, Hill S, Ross J, Lertzman J, Loule TJ. Handwashing practices in an intensive care unit: the effects of an educational program and its relationship to infection rates. Am J Infect Control 1989;17:330–9.

293. DeCarvalho M, Lopes JMA, Pellitteri M. Frequency and duration of handwashing in a neonatal intensive care unit. Pediatr Infect Dis J 1989;8:179–80.

294. Graham M. Frequency and duration of handwashing in an intensive care unit. Am J Infect Control 1990;18:77–80.

295. Dubbert PM, Dolce J, Richter W, Miller M, Chapman SW. Increasing ICU staff handwashing: effects of education and group feedback. Infect Control Hosp Epidemiol 1990;11:191–3.

296. Simmons B, Bryant J, Neiman K, Spencer L, Arheart K. The role of handwashing in prevention of endemic intensive care unit infections. Infect Control Hosp Epidemiol 1990;11:589–94.

297. Pettinger A, Nettleman MD. Epidemiology of isolation precautions. Infect Control Hosp Epidemiol 1991;12:303–7.

298. Lohr JA, Ingram DL, Dudley SM, Lawton EL, Donowitz LG. Hand washing in pediatric ambulatory settings: an inconsistent practice. Am J Dis Child 1991;145:1198–9.

299. Raju TNK, Kobler C. Improving handwashing habits in the newborn nurseries. Am J Med.Sci 1991;302:355–8.

300. Larson EL, McGinley KJ, Foglia A, et al. Handwashing practices and resistance and density of bacterial hand flora on two pediatric units in Lima, Peru. Am J Infect Control 1992;20:65–72.

301. Zimakoff J, Stormark M, Larsen SO. Use of gloves and handwashing behaviour among health care workers in intensive care units. A multicentre investigation in four hospitals in Denmark and Norway. J Hosp Infect 1993;24:63–7.

302. Pelke S, Ching D, Easa D, Melish ME. Gowning does not affect colonization or infection rates in a neonatal intensive care unit. Arch Pediatr Adolesc Med 1994;148:1016–20.

303. Gould D. Nurses' hand decontamination practice: results of a local study. J Hosp Infect 1994;28:15–30.

304. Shay DK, Maloney SA, Montecalvo M, et al. Epidemiology and mortality risk of vancomycin-resistant enterococcal bloodstream infections. J Infect Dis 1995;172:993–1000.

305. Berg DE, Hershow RC, Ramirez CA. Control of nosocomial infections in an intensive care unit in Guatemala City. Clin Infect Dis 1995;21:588–93.

306. Tibballs J. Teaching hospital medical staff to handwash. Med J Aust 1996;164:395–8.

307. Slaughter S, Hayden MK, Nathan C, et al. A comparison of the effect of universal use of gloves and gowns with that of glove use alone on acquisition of vancomycin-resistant enterococci in a medical intensive care unit. Ann Intern Med 1996;125:448–56.

308. Dorsey ST, Cydulka RK, Emerman CL. Is handwashing teachable?: failure to improve handwashing behavior in an urban emergency department. Acad Emerg Med 1996;3:360–5.

309. Watanakunakorn C, Wang C, Hazy J. An observational study of hand washing and infection control practices by healthcare workers. Infect Control Hosp Epidemiol 1998;19:858–60.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

310. Avila-Agüero ML, UmaZa MA, Jiménez AL, Faingezicht I, París MM. Handwashing practices in a tertiary-care, pediatric hospital and the effect on an educational program. Clin Perform Qual Health Care 1998;6:70–2.

311. Kirkland KB, Weinstein JM. Adverse effects of contact isolation. Lancet 1999;354:1177–8.

312. Maury E, Alzieu M, Baudel JL, et al. Availability of an alcohol solution can improve hand disinfection compliance in an intensive care unit. Am J Respir Crit Care Med 2000;162:324–7.

313. Muto CA, Sistrom MG, Farr BM. Hand hygiene rates unaffected by installation of dispensers of a rapidly acting hand antiseptic. Am J Infect Control 2000;28:273–6.

314. Jarvis WR. Handwashing—the Semmelweis lesson forgotten? Lancet 1994;344:1311–2.

315. Larson E, Kretzer EK. Compliance with handwashing and barrier precautions. J Hosp Infect 1995;30(suppl):88–106.

316. Sproat LJ, Inglis TJJ. A multicentre survey of hand hygiene practice in intensive care units. J Hosp Infect 1994;26:137–48.

317. Kretzer EK, Larson EL. Behavioral interventions to improve infection control practices. Am J Infect Control 1998;26:245–53.

318. Voss A, Widmer AF. No time for handwashing!? Handwashing versus alcoholic rub: can we afford 100% compliance? Infect Control Hosp Epidemiol 1997;18:205–8.

319. Larson E. Handwashing and skin physiologic and bacteriologic aspects. Infect Control 1985;6:14–23.

320. Thompson BL, Dwyer DM, Ussery XT, Denman S, Vacek P, Schwartz B. Handwashing and glove use in a long-term care facility. Infect Control Hosp Epidemiol 1997;18:97–103.

321. Doebbeling BN, Pfaller MA, Houston AK, Wenzel RP. Removal of nosocomial pathogens from the contaminated glove. Ann Intern Med 1988;109:394–8.

322. McLane C, Chenelly S, Sylwestrak ML, Kirchhoff KT. A nursing practice problem: failure to observe aseptic technique. Am J Infect Control 1983;11:178–82.

323. Pittet D. Improving compliance with hand hygiene in hospitals. Infect Control Hosp Epidemiol 2000;21:381–6.

324. Teare L, Handwashing Liasion Group. Hand washing: a modest measure—with big effects. Br Med J 1999;318:686.

325. Teare EL, Cookson B, French GL, et al. UK handwashing initiative. J Hosp Infect 1999;43:1–3.

326. Larson EL, Bryan JL, Adler LM, Blanc C. A multifaceted approach to changing handwashing behavior. Am J Infect Control 1997;25:3–10.

327. Weeks A. Why I don't wash my hands between each patient contact [Letter]. Br Med J 1999;319:518.

328. Webster J. Handwashing in a neonatal intensive care nursery: product acceptability and effectiveness of chlorhexidine gluconate 4% and triclosan 1%. J Hosp Infect 1992;21:137–41.

329. Kelen GD, Green GB, Hexter DA, et al. Substantial improvement in compliance with universal precautions in an emergency department following institution of policy. Arch Intern Med 1991;151:2051–6.

330. Lundberg GD. Changing physician behavior in ordering diagnostic tests [Editorial]. JAMA 1998;280:2036.

331. Phillips DF. "New look" reflects changing style of patient safety enhancement. JAMA 1999;281:217–9.

332. Harbarth S, Martin Y, Rohner P, Henry N, Auckenthaler R, Pittet D. Effect of delayed infection control measures on a hospital outbreak of methicillin-resistant *Staphylococcus aureus*. J Hosp Infect 2000;46:43–9.

333. Early E, Battle K, Cantwell E, English J, Lavin JE, Larson E. Effect of several interventions on the frequency of handwashing among elementary public school children. Am J Infect Control 1998;26:263–9.

334. Butz AM, Larson E, Fosarelli P, Yolken R. Occurrence of infectious symptoms in children in day care homes. Am J Infect Control 1990;18:347–53.

335. Kimel LS. Handwashing education can decrease illness absenteeism. J Sch Nurs 1996;12:14–6, 18.

336. Master D, Hess Longe S, Dickson H. Scheduled hand washing in an elementary school population. Fam Med 1997;29:336–9.

337. Roberts L, Smith W, Jorm L, Patel M, Douglas RM, McGilchrist C. Effect of infection control measures on the frequency of upper respiratory infection in child care: a randomized, controlled trial. Pediatrics 2000;105:738–42.

338. Roberts L, Jorm L, Patel M, Smith W, Douglas RM, McGilchrist C. Effect of infection control measures on the frequency of diarrheal episodes in child care: a randomized, controlled trial. Pediatrics 2000;105:743–6.

339. Khan MU. Interruption of shigellosis by handwashing. Trans R Soc Trop Med Hyg 1982;76:164–8.

340. Shahid NS, Greenough WB, Samadi AR, Huq MI, Rahman N. Hand washing with soap reduces diarrhoea and spread of bacterial pathogens in a Bangladesh village. J Diarrhoeal Dis Res 1996;14:85–9.

341. Stanton BF, Clemens JD. An educational intervention for altering water-sanitation behaviors to reduce childhood diarrhea in urban Bangladesh. Am J Epidemiol 1987;125:292–301.

342. McGinley KJ, Larson EL, Leyden JJ. Composition and density of microflora in the subungual space of the hand. J Clin Microbiol 1988;26:950–3.

343. Hedderwick SA, McNeil SA, Lyons MJ, Kauffman CA. Pathogenic organisms associated with artificial fingernails worn by healthcare workers. Infect Control Hosp Epidemiol 2000;21:505–9.

344. Baumgardner CA, Maragos CS, Larson EL. Effects of nail polish on microbial growth of fingernails: dispelling sacred cows. AORN J 1993;58:84–8.

345. Wynd CA, Samstag DE, Lapp AM. Bacterial carriage on the fingernails of OR nurses. AORN J 1994;60:796–805.

346. Gross A, Cutright DE, D'Alessandro SM. Effect of surgical scrub on microbial population under the fingernails. Am J Surg 1979;138:463–7.

347. Pottinger J, Burns S, Manske C. Bacterial carriage by artificial versus natural nails. Am J Infect Control 1989;17:340–4.

348. McNeil SA, Foster CL, Hedderwick SA, Kauffman CA. Effect of hand cleansing with antimicrobial soap or alcohol-based gel on microbial colonization of artificial fingernails worn by health care workers. Clin Infect Dis 2001;32:367–72.

349. Rubin DM. Prosthetic fingernails in the OR. AORN J 1988;47:944–5, 948.

350. Moolenaar RL, Crutcher M, San Joaquin VH, et al. A prolonged outbreak of *Pseudomonas aeruginosa* in a neonatal intensive care unit: did staff fingernails play a role in disease transmission? Infect Control Hosp Epidemiol 2000;21:80–5.

351. Passaro DJ, Waring L, Armstrong R, et al. Postoperative *Serratia marcescens* wound infections traced to an out-of-hospital source. J Infect Dis 1997;175:992–5.

352. Foca M, Jakob K, Whittier S, et al. Endemic *Pseudomonas aeruginosa* infection in a neonatal intensive care unit. N Engl J Med 2000;343:695–700.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

353. Parry MF, Grant B, Yukna M, et al. *Candida* osteomyelitis and diskitis after spinal surgery: an outbreak that implicates artificial nail use. Clin Infect Dis 2001;32:352–7.

354. Garner JS, Simmons BP. Guideline for isolation precautions in hospitals. Infect Control 1983;4(suppl 4):245–325.

355. CDC. Recommendations for prevention of HIV transmission in health-care settings. MMWR 1987;36(suppl 2S):3S–18S.

356. Occupational Safety and Health Admininstration. 29 CFR Part 1910.1030. Occupational exposure to bloodborne pathogens: final rule. Federal Register 1991;29CFR Part 1910:1030.

357. Hartstein AI, Denny MA, Morthland VH, LeMonte AM, Pfaller MA. Control of methicillin-resistant *Staphylococcus aureus* in a hospital and an intensive care unit. Infect Control Hosp Epidemiol 1995;16:405–11.

358. Maki DG, McCormick RD, Zilz MA, Stolz SM, Alvarado CJ. An MRSA outbreak in a SICU during universal precautions: new epidemiology for nosocomial MRSA: downside for universal precautions [Abstract 473]. In: Program and abstracts of the 30th Interscience Conference on Antimicrobial Agents and Chemotherapy. Washington, DC: American Society for Microbiology, 1990.

359. Kotilainen HR, Brinker JP, Avato JL, Gantz NM. Latex and vinyl examination gloves: quality control procedures and implications for health care workers. Arch Intern Med 1989;149:2749–53.

360. Reingold AL, Kane MA, Hightower AW. Failure of gloves and other protective devices to prevent transmission of hepatitis B virus to oral surgeons. JAMA 1988;259:2558–60.

361. Korniewicz DM, Laughon BE, Butz A, Larson E. Integrity of vinyl and latex procedures gloves. Nurs Res 1989;38:144–6.

362. DeGroot-Kosolcharoen J, Jones JM. Permeability of latex and vinyl gloves to water and blood. Am J Infect Control 1989;17:196–201.

363. Korniewicz DM, Kirwin M, Cresci K, Markut C, Larson E. In-use comparison of latex gloves in two high-risk units: surgical intensive care and acquired immunodeficiency syndrome. Heart Lung 1992;21:81–4.

364. Korniewicz DM, Kirwin M, Cresci K, et al. Barrier protection with examination gloves: double versus single. Am J Infect Control 1994;22:12–5.

365. Sistrom MG, Muto CA, Neal J, Strain BA, Farr BM. Glove leakage rates as a function of latex content and brand: caveat emptor [Abstract 24]. In: Program and abstracts of the 10th Annual Meeting of Society of Healthcare Epidemiology of America, Orlando, Florida, 1998.

366. Flanagan H, Farr B. Continued evaluation of glove leakage rates at the University of Virginia. Presented at the 11th Annual Meeting of the Society for Healthcare Epidemiology of America, Toronto, Canada, April 1, 2001.

367. Korniewicz DM, Laughon BE, Cyr WH, Lytle CD, Larson E. Leakage of virus through used vinyl and latex examination gloves. J Clin Microbiol 1990;28:787–8.

368. Rego A, Roley L. In-use barrier integrity of gloves: latex and nitrile superior to vinyl. Am J Infect Control 1999;27:405–10.

369. Fisher MD, Reddy VR, Williams FM, Lin KY, Thacker JG, Edlich RF. Biomechanical performance of powder-free examination gloves. J Emerg Med 1999;17:1011–8.

370. Edlich RF, Suber F, Neal JG, Jackson EM, Williams FM. Integrity of powder-free examination gloves to bacteriophage penetration. J Biomed Mater Res 1999;48:755–8.

371. Murray CA, Burke FJT, McHugh S. An assessment of the incidence of punctures in latex and non-latex dental examination gloves in routine clinical practice. Br Dental Journal 2001;190:377–80.

372. Jones RD, Jampani H, Mulberry G, Rizer RL. Moisturizing alcohol hand gels for surgical hand preparation. AORN J 2000;71:584–99.

373. Patterson JE, Vecchio J, Pantelick EL, et al. Association of contaminated gloves with transmission of *Acinetobacter calcoaceticus* var. *antitratus* in an intensive care unit. Am J Med 1991;91:479–83.

374. Lowbury EJL. Aseptic methods in the operating suite. Lancet 1968;1:705–9.

375. Hoffman PN, Cooke EM, McCarville MR, Emmerson AM. Microorganisms isolated from skin under wedding rings worn by hospital staff. Br Med J 1985;290:206–7.

376. Jacobson G, Thiele JE, McCune JH, Farrell LD. Handwashing: ring-wearing and number of microorganisms. Nurs Res 1985;34:186–8.

377. Hayes RA, Trick WE, Vernon MO, et al. Ring use as a risk factor (RF) for hand colonization in a surgical intensive care unit (SICU) [Abstract K-1333]. In: Program and abstracts of the 41st Interscience Conference on Antimicrobial Agents and Chemotherapy. Washington, DC: American Society for Microbiology, 2001.

378. Salisbury DM, Hutfilz P, Treen LM, Bollin GE, Gautam S. The effect of rings on microbial load of health care workers' hands. Am J Infect Control 1997;25:24–7.

379. Spire B, Barré-Sinoussi F, Montagnier L, Chermann JC. Inactivation of lymphadenopathy associated virus by chemical disinfectants. Lancet 1984;2:899–901.

380. Martin LS, McDougal JS, Loskoski SL. Disinfection and inactivation of the human T lymphotropic virus type III/lymphadenopathy-associated virus. J Infect Dis 1985;152:400–3.

381. Resnick L, Veren K, Salahuddin SZ, Tondreau S, Markham PD. Stability and inactivation of HTLV-III/LAV under clinical and laboratory environments. JAMA 1986;255:1887–91.

382. van Bueren J, Larkin DP, Simpson RA. Inactivation of human immunodeficiency virus type 1 by alcohols. J Hosp Infect 1994;28:137–48.

383. Montefiori DC, Robinson WE Jr, Modliszewski A, Mitchell WM. Effective inactivation of human immunodeficiency virus with chlorhexidine antiseptics containing detergents and alcohol. J Hosp Infect 1990;15:279–82.

384. Wood A, Payne D. The action of three antiseptics/disinfectants against enveloped and non-enveloped viruses. J Hosp Infect 1998;38:283–95.

385. Harbison MA, Hammer SM. Inactivation of human immunodeficiency virus by Betadine products and chlorhexidine. J Acquir Immune Defic Syndr 1989;2:16–20.

386. Lavelle GC, Gubbe SL, Neveaux JL, Bowden BJ. Evaluation of an antimicrobial soap formula for virucidal efficacy in vitro against human immunodeficiency virus in a blood-virus mixture. Antimicrob Agents Chemother 1989;33:2034–6.

387. Bond WW, Favero MS, Petersen NJ, Ebert JW. Inactivation of hepatitis B virus by intermediate-to-high level disinfectant chemicals. J Clin Microbiol 1983;18:535–8.

388. Kobayashi H, Tsuzuki M, Koshimizu K, et al. Susceptibility of hepatitis B virus to disinfectants or heat. J Clin Microbiol 1984;20:214–6.

389. Kurtz JB. Virucidal effect of alcohols against echovirus 11 [Letter]. Lancet 1979;1:496–7.

390. Sattar SA, Raphael RA, Lochnan H, Springthorpe VS. Rotavirus inactivation by chemical disinfectants and antiseptics used in hospitals. Can J Microbiol 1983;29:1464–9.

391. Larson E, Silberger M, Jakob K, et al. Assessment of alternative hand hygiene regimens to improve skin health among neonatal intensive care unit nurses. Heart Lung 2000;29:136–42.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

**44** **MMWR** **October 25, 2002**

392. Gould D, Chamberlain A. The use of a ward-based educational teaching package to enhance nurses' compliance with infection control procedures. J Clin Nursing 1997;6:55–67.

393. Aspöck C, Koller W. A simple hand hygiene exercise. Am J Infect Control 1999;27:370–2.

394. McGuckin M, Waterman R, Porten L, et al. Patient education model for increasing handwashing compliance [Practice forum]. Am J Infect Control 1999;27:309–14.

395. Khatib M, Jamaleddine G, Abdallah A, Ibrahim Y. Hand washing and use of gloves while managing patients receiving mechanical ventilation in the ICU. Chest 1999;116:172–5.

396. Haley RW, Bregman DA. The role of understaffing and overcrowding in recurrent outbreaks of staphylococcal infection in a neonatal special-care unit. J Infect Dis 1982;145:875–85.

397. Pittet D, Boyce JM. Hand hygiene and patient care: pursuing the Semmelweis legacy. Lancet Infectious Diseases 2001;April:9–20.

398. Boyce JM. Scientific basis for handwashing with alcohol and other waterless antiseptic agents. In: Rutala WA, ed. Disinfection, sterilization and antisepsis: principles and practices in healthcare facilities. Washington, DC: Association for Professionals in Infection Control and Epidemiology, Inc, 2001.

399. O'Boyle CA, Henly SJ, Duckett LJ. Nurses' motivation to wash their hands: a standardized measurement approach. Applied Nursing Research 2001;14:136–45.

400. Semmelweis IP. Die aetiologie, der begriff und die prophylaxis des kindbettfiebers. Pest, Wien und Leipzig: CA Hartleben's Verlags-Expedition 1861.

401. Eggimann P, Harbarth S, Constantin MN, Touveneau S, Chevrolet JC, Pittet D. Impact of a prevention strategy targeted at vascular-access care on incidence of infections acquired in intensive care. Lancet 2000;355:1864–8.

402. Bull DA, Neumayer LA, Hunter GC, et al. Improved sterile technique diminishes the incidence of positive line cultures in cardiovascular patients. J Surgical Research 1992;52:106–10.

403. Hirschmann H, Fux L, Podusel J, et al. The influence of hand hygiene prior to insertion of peripheral venous catheters on the frequency of complications. J Hosp Infect 2001;49:199–203.

404. Drusin LM, Sohmer M, Groshen SL, Spiritos MD, Senterfit LB, Christenson WN. Nosocomial hepatitis A infection in a paediatric intensive care unit. Arch Dis Child 1987;62:690–5.

405. Doebbeling BN, Li N, Wenzel RP. An outbreak of hepatitis A among health care workers: risk factors for transmission. Am J Public Health 1993;83:1679–84.

406. Standaert SM, Hutcheson RH, Schaffner W. Nosocomial transmission of *Salmonella gastroenteritis* to laundry workers in a nursing home. Infect Control Hosp Epidemiol 1994;15:22–6.

407. Rodriguez EM, Parrott C, Rolka H, Monroe SS, Dwyer DM. An outbreak of viral gastroenteritis in a nursing home: importance of excluding ill employees. Infect Control Hosp Epidemiol 1996;17:587–92.

408. Schaffner W, Lefkowitz LB Jr, Goodman JS, Koenig MG. Hospital outbreak of infections with group a streptococci traced to an asymptomatic anal carrier. N Engl J Med 1969;280:1224–5.

409. Viglionese A, Nottebart VF, Bodman HA, Platt R. Recurrent group A streptococcal carriage in a health care worker associated with widely separated nosocomial outbreaks. Am J Med 1991;91(suppl 3B): 329S–33S.

410. Ojajärvi J. An evaluation of antiseptics used for hand disinfection in wards. J Hyg (Lond) 1976;76:75–82.

411. Mermel LA, Josephson SL, Dempsey J, Parenteau S, Perry C, Magill N. Outbreak of *Shigella sonnei* in a clinical microbiology laboratory. J Clin Microbiol 1997;35:3163–5.

412. McBride ME. Microbial flora of in-use soap products. Appl Environ Microbiol 1984;48:338–41.

413. Kabara JJ, Brady MB. Contamination of bar soaps under "in use" condition. J Environ Pathol Toxicol Oncol 1984;5:1–14.

414. Heinze JE, Yackovich F. Washing with contaminated bar soap is unlikely to transfer bacteria. Epidem Inf 1988;101:135–42.

415. Bannan EA, Judge LF. Bacteriological studies relating to handwashing: 1. the inability of soap bars to transmit bacteria. Am J Public Health 1965;55:915–21.

416. Field EA, McGowan P, Pearce PK, Martin MV. Rings and watches: should they be removed prior to operative dental procedures? J Dent 1996;24:65–9.

417. Lowbury EJL, Lilly HA. Gloved hand as applicator of antiseptic to operation sites. Lancet 1975;2:153–6.

418. AORN Recommended Practices Committee. Recommended practices for surgical hand scrubs. AORN J 1999;69:842–50.

419. Grohskopf LA, Roth VR, Feikin DR, et al. *Serratia liquefaciens* bloodstream infections from contamination of epoetin alfa at a hemodialysis center. N Engl J Med 2001;344:1491–7.

420. Dharan S, Hugonnet S, Sax H, Pittet D. Evaluation of interference of a hand care cream with alcohol-based hand disinfection. Occup Environ Dermatol 2001;49:81–4.

421. Heeg P. Does hand care ruin hand disinfection? J Hosp Infect 2001;48(suppl A):S37–S39.

422. McGuckin M, Waterman R, Storr J, et al. Evaluation of a patient-empowering hand hygiene programme in the U.K. J Hosp Infect 2001;48:222–7.

423. Girou E, Oppein F. Handwashing compliance in a French university hospital: new perspective with the introduction of hand-rubbing with a waterless alcohol-based solution. J Hosp Infect 2001;48(suppl A): S55–S57.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

# Appendix

## Antimicrobial Spectrum and Characteristics of Hand-Hygiene Antiseptic Agents*

| Group | Gram-positive bacteria | Gram-negative bacteria | Mycobacteria | Fungi | Viruses | Speed of action | Comments |
|---|---|---|---|---|---|---|---|
| Alcohols | +++ | +++ | +++ | +++ | +++ | Fast | Optimum concentration 60%–95%; no persistent activity |
| Chlorhexidine (2% and 4% aqueous) | +++ | ++ | + | + | +++ | Intermediate | Persistent activity; rare allergic reactions |
| Iodine compounds | +++ | +++ | +++ | ++ | +++ | Intermediate | Causes skin burns; usually too irritating for hand hygiene |
| Iodophors | +++ | +++ | + | ++ | ++ | Intermediate | Less irritating than iodine; acceptance varies |
| Phenol derivatives | +++ | + | + | + | + | Intermediate | Activity neutralized by nonionic surfactants |
| Tricolsan | +++ | ++ | + | — | +++ | Intermediate | Acceptability on hands varies |
| Quaternary ammonium compounds | + | ++ | — | — | + | Slow | Used only in combination with alcohols; ecologic concerns |

**Note:** +++ = excellent; ++ = good, but does not include the entire bacterial spectrum; + = fair; — = no activity or not sufficient.
* Hexachlorophene is not included because it is no longer an accepted ingredient of hand disinfectants.

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

MMWR

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652





## Morbidity and Mortality Weekly Report

**Recommendations and Reports**                    **October 25, 2002 / Vol. 51 / No. RR-16**

## Continuing Education Activity Sponsored by CDC
### Guideline for Hand Hygiene in Health-Care Settings

### Recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force

### EXPIRATION — October 25, 2004

You must complete and return the response form electronically or by mail by **October 25, 2004**, to receive continuing education credit. If you answer all of the questions, you will receive an award letter for 1.75 hours Continuing Medical Education (CME) credit; 0.15 Continuing Education Units (CEUs); 1.5 hours Certified Health Education Specialist (CHES) credit; or 1.9 contact hours Continuing Nursing Education (CNE) credit. If you return the form electronically, you will receive educational credit immediately. If you mail the form, you will receive educational credit in approximately 30 days. No fees are charged for participating in this continuing education activity.

### INSTRUCTIONS

**By Internet**
1. Read this *MMWR* (Vol. 51, RR-16), which contains the correct answers to the questions beginning on the next page.
2. Go to the *MMWR* Continuing Education Internet site at <http://www.cdc.gov/mmwr/cme/conted.html>.
3. Select which exam you want to take and select whether you want to register for CME, CEU, CHES, or CNE credit.
4. Fill out and submit the registration form.
5. Select exam questions. To receive continuing education credit, you must answer all of the questions. Questions with more than one correct answer will instruct you to "Indicate all that apply."
6. Submit your answers no later than **October 25, 2004**.
7. Immediately print your Certificate of Completion for your records.

**By Mail or Fax**
1. Read this *MMWR* (Vol. 50, RR-16), which contains the correct answers to the questions beginning on the next page.
2. Complete all registration information on the response form, including your name, mailing address, phone number, and e-mail address, if available.
3. Indicate whether you are registering for CME, CEU, CHES, or CNE credit.
4. Select your answers to the questions, and mark the corresponding letters on the response form. To receive continuing education credit, you must answer all of the questions. Questions with more than one correct answer will instruct you to "Indicate all that apply."
5. Sign and date the response form or a photocopy of the form and send no later than **October 25, 2004**, to
   Fax: 404-639-4198  Mail: MMWR CE Credit
   Office of Scientific and Health Communications
   Epidemiology Program Office, MS C-08
   Centers for Disease Control and Prevention
   1600 Clifton Rd, N.E.
   Atlanta, GA 30333
6. Your Certificate of Completion will be mailed to you within 30 days.

### ACCREDITATION

**Continuing Medical Education (CME).** CDC is accredited by the Accreditation Council for Continuing Medical Education (ACCME) to provide continuing medical education for physicians. CDC designates this educational activity for a maximum of 1.75 hours in category 1 credit toward the AMA Physician's Recognition Award. Each physician should claim only those hours of credit that he/she actually spent in the educational activity.

**Continuing Education Unit (CEU).** CDC has been approved as an authorized provider of continuing education and training programs by the International Association for Continuing Education and Training and awards 0.15 Continuing Education Units (CEUs).

**Certified Health Education Specialist (CHES).** CDC is a designated provider of continuing education contact hours in health education by the National Commission for Health Education Credentialing, Inc. This program is a designated event for CHES to receive 1.5 hours in category 1 credit in health education, CDC provider number GA0082.

**Continuing Nursing Education (CNE).** This activity for 1.9 contact hours is provided by CDC, which is accredited as a provider of continuing education in nursing by the American Nurses Credentialing Center's Commission on Accreditation.

## CENTERS FOR DISEASE CONTROL AND PREVENTION
### SAFER • HEALTHIER • PEOPLE™

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

## Goal and Objectives

This *MMWR* provides evidence-based recommendations for hand hygiene in health-care settings. These recommendations were developed by the Healthcare Infection Control Practices Advisory Committee (HICPAC), the Society for Healthcare Epidemiology of America, the Association for Professionals in Infection Control and Epidemiology, and the Infectious Diseases Society of America Hand Hygiene Task Force. The goal of this report is to provide guidance for clinicians and other health-care practitioners regarding strategies to improve hand-hygiene practices and reduce transmission of microorganisms in health-care settings. Upon completion of this educational activity, the reader should be able to 1) describe the indications for hand hygiene in health-care settings; 2) list the advantages of alcohol-based hand rubs; and 3) describe the barriers to hand hygiene in health-care settings.

***To receive continuing education credit, please answer all of the following questions.***

1. **Hand hygiene refers to . . .**
   A. handwashing using plain soap and water.
   B. using an antiseptic hand rub (e.g alcohol, chlorhexidine, iodine).
   C. handwashing using antimicrobial soap and water.
   D. all of the above.

2. **Hand hygiene adherence in health-care facilities might be improved by . . .**
   A. providing personnel with individual containers of alcohol-based hand rubs.
   B. providing personnel with hand lotions or creams.
   C. providing personnel with feedback regarding hand-hygiene adherence/performance.
   D. all of the above.

3. **Alcohol-based hand rubs have good or excellent antimicrobial activity against all of the following except . . .**
   A. viruses.
   B. fungi.
   C. mycobacteria.
   D. bacterial spores.
   E. gram-positive and gram-negative bacteria.

4. **Alcohol-based hand rubs are indicated for all of the following clinical situations except . . .**
   A. when the hands are visibly soiled.
   B. preoperative cleaning of hands by surgical personnel.
   C. before inserting urinary catheters, intravascular catheters, or other invasive devices.
   D. after removing gloves.

5. **Each of the following statements regarding alcohol-based hand rubs is true except . . .**
   A. alcohol-based hand rubs reduce bacterial counts on the hands of health-care personnel more effectively than plain soaps.
   B. alcohol-based hand rubs can be made more accessible than sinks or other handwashing facilities.
   C. alcohol-based hand rubs require less time to use than traditional handwashing.
   D. alcohol-based hand rubs have been demonstrated to cause less skin irritation and dryness than handwashing using soap and water.
   E. alcohol-based hand rubs are only effective if they are applied for ≥60 seconds.

6. **Which of the following statements regarding preoperative surgical hand antisepsis is true?**
   A. Antimicrobial counts on hands are reduced as effectively with a 5-minute scrub as with a 10-minute scrub.
   B. A brush or sponge must be used when applying the antiseptic agent to adequately reduce bacterial counts on hands.
   C. Alcohol-based hand rubs for preoperative surgical scrub have been associated with increased surgical site infection rates.
   D. A and B are true.
   E. A and C are true.

7. **Antimicrobial-impregnated wipes (i.e., towelettes) . . .**
   A. might be considered as an alternative to handwashing with plain soap and water.
   B. are as effective as alcohol-based hand rubs.
   C. are as effective as washing hands with antimicrobial soap and water.
   D. A and C.

8. **The following statements regarding hand hygiene in health-care settings are true except . . .**
   A. Overall adherence among health-care personnel is approximately 40%.
   B. Poor adherence to hand-hygiene practice is a primary contributor to health-care–associated infection and transmission of antimicrobial-resistant pathogens.
   C. Personnel wearing artificial nails or extenders have been linked to nosocomial outbreaks.
   D. Hand hygiene is not necessary if gloves are worn.

9. **Indicate your work setting.**
   A. State/local health department.
   B. Other public health setting.
   C. Hospital clinic/private practice.
   D. Managed care organization.
   E. Academic institution.
   F. Other.

10. **Which best describes your professional activities?**
    A. Patient care — emergency/urgent care department.
    B. Patient care — inpatient.
    C. Patient care — primary-care clinic or office.
    D. Laboratory/pharmacy.
    E. Public health.
    F. Other.

11. **I plan to use these recommendations as the basis for . . . (*Indicate all that apply.*)**
    A. health education materials.
    B. insurance reimbursement policies.
    C. local practice guidelines.
    D. public policy.
    E. other.

12. **Each month, approximately how many patients do you examine?**
    A. None.
    B. 1–5.
    C. 6–20.
    D. 21–50.
    E. 51–100.
    F. >100.

13. **How much time did you spend reading this report and completing the exam?**
    A. 1–1.5 hours.
    B. More than 1.5 hours but fewer than 2 hours.
    C. 2–2.5 hours.
    D. More than 2.5 hours.

**14.** After reading this report, I am confident I can describe the guidance for clinicians and other health-care practitioners regarding strategies to improve hand-hygiene practices and reduce transmission of microorganisms in health-care settings.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

**15.** After reading this report, I am confident I can describe the indications for hand hygiene in health-care settings.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

**16.** After reading this report, I am confident I can list the advantages of alcohol-based hand rubs.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

**17.** After reading this report, I am confident I can describe the barriers to hand hygiene in health-care settings.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

**18.** The objectives are relevant to the goal of this report.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

**19.** The tables and text boxes are useful.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

**20.** Overall, the presentation of the report enhanced my ability to understand the material.

A. Strongly agree.
B. Agree.
C. Neither agree nor disagree.
D. Disagree.
E. Strongly disagree.

---

*Detach or photocopy.*

# MMWR Response Form for Continuing Education Credit
## October 25, 2002/Vol. 51/No. RR-16
### Recommendations of the Healthcare Infection Control Practices Advisory Committee and the HICPAC/SHEA/APIC/IDSA Hand Hygiene Task Force

*To receive continuing education credit, you must*
1. *provide your contact information;*
2. *indicate your choice of CME, CEU, CHES, or CNE credit;*
3. *answer all of the test questions;*
4. *sign and date this form or a photocopy;*
5. *submit your answer form by October 25, 2004.*
*Failure to complete these items can result in a delay or rejection of your application for continuing education credit.*

Check One
☐ CME Credit
☐ CEU Credit
☐ CHES Credit
☐ CNE Credit

Last Name _____  First Name _____

Street Address or P.O. Box _____

Apartment _____  or  Suite _____

City _____  State _____  ZIP Code _____

Phone Number _____  Fax Number _____

E-Mail Address _____

Fill in the appropriate blocks to indicate your answers. Remember, you must answer all of the questions to receive continuing education credit!

| | | | | |
|---|---|---|---|---|
| 1. [ ] A [ ] B [ ] C [ ] D | | | | |
| 2. [ ] A [ ] B [ ] C [ ] D | | | | |
| 3. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 4. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 5. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 6. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 7. [ ] A [ ] B [ ] C [ ] D | | | | |
| 8. [ ] A [ ] B [ ] C [ ] D [ ] E [ ] F | | | | |
| 9. [ ] A [ ] B [ ] C [ ] D [ ] E [ ] F | | | | |
| 10. [ ] A [ ] B [ ] C [ ] D [ ] E [ ] F | | | | |
| 11. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 12. [ ] A [ ] B [ ] C [ ] D | | | | |
| 13. [ ] A [ ] B [ ] C [ ] D | | | | |
| 14. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 15. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 16. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 17. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 18. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 19. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 20. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 21. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 22. [ ] A [ ] B [ ] C [ ] D [ ] E | | | | |
| 23. [ ] A [ ] B [ ] C [ ] D [ ] E [ ] F | | | | |

*Signature* _____  *Date I Completed Exam* _____

**21. These recommendations will affect my practice.**
- A. Strongly agree.
- B. Agree.
- C. Neither agree nor disagree.
- D. Disagree.
- E. Strongly disagree.

**22. The availability of continuing education credit influenced my decision to read this report.**
- A. Strongly agree.
- B. Agree.
- C. Neither agree nor disagree.
- D. Disagree.
- E. Strongly disagree.

**23. How did you learn about this continuing education activity?**
- A. Internet.
- B. Advertisement (e.g., fact sheet, *MMWR* cover, newsletter, or journal).
- C. Coworker/supervisor.
- D. Conference presentation.
- E. *MMWR* subscription.
- F. Other.

Correct answers for questions 1–8
1. D; 2. D; 3. D; 4. A; 5. E; 6. A; 7. A; 8. D.

## Hospital Infection Control Practices Advisory Committee Members

**Chair:** Robert A. Weinstein, M.D., Cook County Hospital, Chicago, Illinois.

**Co-Chair:** Jane D. Siegel, M.D., University of Texas Southwestern Medical Center, Dallas, Texas.

**Executive Secretary:** Michele L. Pearson, M.D. CDC, Atlanta, Georgia.

**Members:** Raymond Y.W. Chinn, M.D., Sharp Memorial Hospital, San Diego, California; Alfred DeMaria, Jr, M.D., Massachusetts Department of Public Health, Jamaica Plain, Massachusetts; Elaine L. Larson, Ph.D., Columbia University School of Nursing, New York, New York; James T. Lee, M.D., Ph.D., University of Minnesota, Minneapolis, Minnesota; Ramon E. Moncada, M.D., Coronado Physician's Medical Center, Coronado, California; William A. Rutala, Ph.D., University of North Carolina, Chapel Hill, North Carolina; William E. Scheckler, M.D., University of Wisconsin, Madison, Wisconsin; and Marjorie A. Underwood, Mt. Diablo Medical Center, Concord, California.

## Hand Hygiene Task Force Members

**Chair:** John M. Boyce, M.D., Hospital of Saint Raphael, New Haven, Connecticut.

**Members:** Barry M. Farr, M.D., University of Virginia, Charlottesville, Virginia; William R. Jarvis, M.D., CDC, Atlanta, Georgia; Elaine L. Larson, Ph.D., Columbia School of Nursing, New York, New York; Maryanne McGuckin, DrScEd, University of Pennsylvania, Philadelphia, Pennsylvania; Carol O'Boyle, Ph.D., Minnesota Department of Health, Minneapolis, Minnesota; Didier Pittet, M.D., University of Geneva, Geneva, Switzerland; Jane D. Siegel, M.D., University of Texas Southwestern Medical Center, Dallas, Texas; Marjorie A. Underwood, Mt. Diablo Medical Center, Concord, California; Andreas F. Widmer, M.D., University Hospitals, Basel, Switzerland; Jolynn Zeller, Avera St. Lukes Hospital, Aberdeen, South Dakota; and Beth H. Stover, Kosair Children's Hospital, Louisville, Kentucky.

## Disclosure of Financial Interests and Relationships

**John Boyce:** Research and educational grants from Gojo Industries; honorarium from Procter and Gamble; and consultant to Bode Chemical.

**Barry Farr:** Research support from Gojo Industries.

**Elaine Larson:** Received products for testing in research studies from Procter and Gamble, 3M Corporation, and Steris.

**Carol O'Boyle:** Honorarium from 3M Corporation.

All *MMWR* references are available on the Internet at http://www.cdc.gov/mmwr. Use the search function to find specific articles.

———————

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

———————

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of these sites. URL addresses listed in *MMWR* were current as of the date of publication.

**MMWR**

The *Morbidity and Mortality Weekly Report (MMWR)* series is prepared by the Centers for Disease Control and Prevention (CDC) and is available free of charge in electronic format and on a paid subscription basis for paper copy. To receive an electronic copy each week, send an e-mail message to *listserv@listserv.cdc.gov*. The body content should read *SUBscribe mmwr-toc*. Electronic copy also is available from CDC's Internet server at *http://www.cdc.gov/mmwr* or from CDC's file transfer protocol server at *ftp://ftp.cdc.gov/pub/publications/mmwr*. To subscribe for paper copy, contact Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402; telephone 202-512-1800.

Data in the weekly *MMWR* are provisional, based on weekly reports to CDC by state health departments. The reporting week concludes at close of business on Friday; compiled data on a national basis are officially released to the public on the following Friday. Address inquiries about the *MMWR* series, including material to be considered for publication, to Editor, *MMWR* Series, Mailstop C-08, CDC, 1600 Clifton Rd., N.E., Atlanta, GA 30333; telephone 888-232-3228.

All material in the *MMWR* series is in the public domain and may be used and reprinted without permission; however, citation of the source is appreciated.

☆U.S. Government Printing Office: 2003-533-155/69065 Region IV

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652



## Travel RN Job Description

### Job Summary

The Registered Nurse (RN) has the responsibility to deliver individualized patient care by promoting and restoring patients' health. RN must collaborate with physicians and other facility staff; provide physical and psychological support to patients, friends, and families; and supervise assigned team members.

### Minimum Qualifications

- Current RN licensure in state of assignment or meet requirements to hold RN licensure in a compact state
- Current BLS required for all specialties. Additional certifications required based on specialty
- Evidence of 1 year of RN experience in a specialty within the past three years
- Graduate of an accredited school of nursing
- 80% or greater score on all competency assessments

### Responsibilities

- Maintains current competency in specialty by reviewing professional publications, attending educational workshops, taking appropriate CEs
- Monitor patient's condition and assess needs to provide best possible quality of care
- Delivers age-specific direct patient care according to unit scope of service
- Conducts ongoing assessments as determined by patient's condition, facility policies, procedures and protocols
- Communicate and document all required details as per facility charting protocol
- Maintain accurate, detailed reports and records
- Provide individualized, non-judgmental, non-discriminatory care to all patients, families and staff
- Upholds confidentiality related to patient, family, and staff
- Coordinate with multidisciplinary facility team to assess, plan, implement and evaluate patient care plans

### Acknowledgement

I  Jenna Gayler          have received a copy of my position description and understand the expectations of the required qualifications and responsibilities.

*Jenna Gayler*                                    09 / 16 / 2022

_____
Employee Signature                                    Date

*The statements above describe the general nature and level of work performed by a registered nurse. This is not an exhaustive list of all duties, responsibilities, knowledge, skills, abilities, etc.*

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652



Nomad Nurses
New York, NY 10017
PH (866) 656-6623
www.nomadhealth.com

## MEDICAL RELEASE AUTHORIZATION STATEMENT

I, __Jenna Gayler_____, do hereby authorize Nomad Nurses to release my
protected health information, licenses, and certifications, as requested. I am aware that
Nomad Nurses cannot control my recipient's use of the information, and the laws
protecting its confidentiality at Nomad Nurses may or may not safeguard the information
once is has been disclosed. Information will *not* be released without a signature below.

*Jenna Gayler*                                          09 / 16 / 2022
_____        _____

Employee Signature                              Date

Doc ID: e5da00e1008d4b8a8278bd774ccee18c0a2f8652

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Jenna Gayler, OSF Sacred Heart Medical Center, 2022 - Nurse... |
| **FILE NAME** | LB Copy of ...nt (3).docx and 6 others |
| **DOCUMENT ID** | e5da00e1008d4b8a8278bd774ccee18c0a2f8652 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **09 / 16 / 2022**<br>20:50:41 UTC | Sent for signature to Jenna Gayler (jenna3303@live.com) and Trent Godard (trent@nomadhealth.com) from jonathan.fiel@nomadhealth.com<br>IP: 68.109.98.15 |
| **VIEWED** | **09 / 16 / 2022**<br>20:53:59 UTC | Viewed by Jenna Gayler (jenna3303@live.com)<br>IP: 107.121.104.7 |
| **SIGNED** | **09 / 16 / 2022**<br>21:13:41 UTC | Signed by Jenna Gayler (jenna3303@live.com)<br>IP: 107.121.104.7 |
| **VIEWED** | **09 / 20 / 2022**<br>01:35:32 UTC | Viewed by Trent Godard (trent@nomadhealth.com)<br>IP: 71.167.26.187 |
| **SIGNED** | **09 / 20 / 2022**<br>01:45:05 UTC | Signed by Trent Godard (trent@nomadhealth.com)<br>IP: 71.167.26.187 |
| **COMPLETED** | **09 / 20 / 2022**<br>01:45:05 UTC | The document has been completed. |